

Steven M. Wilker, OSB No. 911882
Email: steven.wilker@tonkon.com
**Tonkon Torp LLP**
888 S.W. Fifth Avenue, Suite 1600
Portland, OR 97204
Telephone: 503.802.2040; Fax: 503.972.3740
Cooperating Attorney for the ACLU Foundation of Oregon

Ben Wizner (to be admitted *pro hac vice*)
Email: bwizner@aclu.org
Nusrat Jahan Choudhury (to be admitted *pro hac vice*)
Email: nchoudhury@aclu.org
**American Civil Liberties Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: 212.519.7870; Fax: 212.549.2629

Kevin Díaz, OSB No. 970480
Email: kdiaz@aclu-or.org
**ACLU Foundation of Oregon**
PO Box 40585
Portland, OR 97240
Telephone: 503.227.6928; Fax: 503.227.6928

Ahilan T. Arulanantham (to be admitted *pro hac vice*)
Email: aarulanantham@aclu-sc.org
Jennifer Pasquarella (to be admitted *pro hac vice*)
Email: jpasquarella@aclu-sc.org
**ACLU Foundation of Southern California**
1313 West Eighth Street
Los Angeles, CA 90017
Telephone: 213.977.9500; Fax: 213.977.5297

Alan L. Schlosser (to be admitted *pro hac vice*)
Email: aschlosser@aclunc.org
Julia Harumi Mass (to be admitted *pro hac vice*)
Email: jmass@aclunc.org
**ACLU Foundation of Northern California**
39 Drumm Street
San Francisco, CA 94111
Telephone: 415.621.2493; Fax: 415.255.8437

FILED'10 JUN 30 11:39USDC-ORP

PAGE 1 - COMPLAINT

Laura Schauer Ives (to be admitted *pro hac vice*)
Email: lives@aclu-nm.org
**ACLU Foundation of New Mexico**
P.O. Box 566
Albuquerque, NM 87103
Telephone: 505.243.0046; Fax: 505.266.5916

Reem Salahi (to be admitted *pro hac vice*)
Email: rsalahi@salahilaw.com
**Salahi Law**
429 Santa Monica Blvd, Suite 550
Santa Monica, CA 90401
Telephone: 510.225.8880
Cooperating Attorney for the ACLU Foundation of Southern California

Attorneys for Plaintiffs

FILED'10 JUN 30 11:49USDC-ORP

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### PORTLAND DIVISION

CV '10 - 750 BR

| | |
|---|---|
| AYMAN LATIF, MOHAMED SHEIKH ABDIRAHMAN KARIYE, RAYMOND EARL KNAEBLE IV, STEVEN WASHBURN, NAGIB ALI GHALEB, SAMIR MOHAMED AHMED MOHAMED, ABDULLATIF MUTHANNA, SALEH A. OMAR, ADAMA BAH, HALIME SAT, | Civil No. 10-CV-_____ |

Plaintiffs,

v.

ERIC H. HOLDER, JR., in his official capacity as
Attorney General of the United States; ROBERT S.
MUELLER, III, in his official capacity as Director of
the Federal Bureau of Investigation; and TIMOTHY
J. HEALY, in his official capacity as Director of the
Terrorist Screening Center,

Defendants.

**COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF**

(Violation of Fifth and Fourteenth
Amendment Rights, the Immigration
and Nationality Act, and the
Administrative Procedure Act)

## INTRODUCTION

1.      The United States' system of screening commercial airline passengers against databases of suspected terrorists is broken.  Thousands of people have been barred altogether from commercial air travel without any opportunity to confront or rebut the basis for their inclusion, or apparent inclusion, on a government watch list known as the "No Fly List." The result is a vast and growing list of individuals whom, on the basis of error or innuendo, the government deems too dangerous to fly, but too harmless to arrest.  Many of these individuals, like the Plaintiffs in this action, are citizens and lawful permanent residents of the United States; some, including three Plaintiffs in this action, are veterans of the United States Armed Forces. Some U.S. citizens and lawful permanent residents have been placed on the list while traveling abroad and therefore have found themselves stranded in foreign countries, without explanation or appropriate visas, unable to return home to their families, jobs, and needed medical care in the United States.  The Constitution does not permit such a fundamental deprivation of rights to be carried out under a veil of secrecy and in the absence of even rudimentary process.

2.      Ayman Latif, Raymond Earl Knaeble IV, Nagib Ali Ghaleb, Steven Washburn, Samir Mohamed Ahmed Mohamed, and Abdullatif Muthanna are U.S. citizens who were recently denied boarding on international flights to the United States and/or over U.S. airspace when seeking to return home to the United States from abroad.  Mohamed Sheikh Abdirahman Kariye is a U.S. citizen who was recently denied boarding on a flight originating in the United States.  Saleh Omar is a lawful permanent resident of the United States who was recently denied boarding on an international flight bound for the United States while seeking to return home to the United States from abroad.  Adama Bah, a citizen of Guinea with refugee

status in the United States, and Halime Sat, a lawful permanent resident of the United States, were recently denied boarding on flights originating in the United States.

3.      Mr. Latif, Mr. Kariye, Mr. Knaeble, Mr. Ghaleb, Mr. Washburn, Mr. Mohamed, Mr. Muthanna, Mr. Omar, Ms. Bah, and Ms. Sat (collectively "Plaintiffs") believe that they are on the No Fly List. Agents of the Federal Bureau of Investigation or other U.S. officials have told Mr. Washburn, Mr. Knaeble, Mr. Latif, Mr. Ghaleb, Mr. Mohamed, Mr. Omar, Mr. Muthanna, and Ms. Sat that they are on the No Fly List. A police officer told Ms. Bah that she is on the No Fly List. The Plaintiffs do not know why they are on the No Fly List, nor how they can get off it. The Plaintiffs have flown numerous times to, from, and within the United States in recent years without incident.

4.      Plaintiffs have submitted applications for "redress" through the only available government mechanism, to no avail. Each Plaintiff has sought explanations from the Department of Homeland Security and the Transportation Security Administration, but no government official or agency has offered any explanation for Plaintiffs' apparent placement on the No Fly List or any other watch list. Nor has any government official or agency offered any of the Plaintiffs any meaningful opportunity to contest his or her placement on such a list.

5.      Through this action for declaratory and injunctive relief, Plaintiffs seek the removal of their names from any government watch list that has prevented them from flying. In the alternative, Plaintiffs seek a hearing in which they can confront any evidence against them and contest their unlawful designation.

## PARTIES

6.    Plaintiff Ayman Latif is a thirty-two year-old U.S. citizen and disabled
veteran of the U.S. Marine Corps. He was born and raised in Miami, Florida. Mr. Latif resides
in Egypt with his wife and two children. He cannot return to the United States to attend a
Disability Evaluation with the U.S. Department of Veterans Affairs or to visit family because
Defendants have barred him from boarding commercial flights to or from the United States or
over U.S. airspace.

7.    Plaintiff Mohamed Sheikh Abdirahman Kariye is a forty-nine year-old
naturalized U.S. citizen and resident of Portland, Oregon. He is the Imam at the Masjid As-
Saber in Portland. He cannot visit his daughter, who resides in Dubai, because Defendants have
barred him from boarding commercial flights to or from the United States or over U.S. airspace.

8.    Plaintiff Raymond Earl Knaeble IV is a twenty-nine year-old U.S. citizen
and U.S. Army veteran. He was born and raised in California. Mr. Knaeble is currently located
in Colombia, where he recently traveled for his wedding and to visit relatives. Mr. Knaeble lost
a job that was offered to him when he was unable to return home to the United States for a
required pre-employment medical examination, because Defendants barred him from boarding a
commercial flight to the United States. Mr. Knaeble thereafter sought to travel to the United
States by flying to Mexico and entering the United States over land, but he was stopped and
returned to Colombia by Mexican authorities. Upon information and belief, Mexican authorities
deported Mr. Knaeble because of his inclusion on the No Fly List, as there was no known legal
barrier to his being permitted to transit through Mexico. Mr. Knaeble cannot return to the United
States to visit relatives, including his daughter in Texas, or to secure a job, because Defendants

continue to bar him from boarding commercial flights to or from the United States or over U.S. airspace.

9.      Plaintiff Steven Washburn is a fifty-four year-old U.S. citizen and U.S. Air Force veteran. Mr. Washburn was born and raised in Las Cruces, New Mexico. He was denied boarding by the Defendants on a commercial flight from the United Kingdom to the United States. Mr. Washburn thereafter attempted to fly from London to Mexico in order to enter the United States by land, but his flight was diverted back to London several hours after take-off. Upon information and belief, the airline diverted Mr. Washburn's flight from London to Mexico because of his inclusion on the No Fly List, as there was no known legal barrier to his being permitted to fly to, or transit through, Mexico. Mr. Washburn thereafter undertook a journey that lasted over fifty hours and required him to travel by plane from Dublin to Frankfurt, Frankfurt to São Paulo, São Paulo to Lima, Lima to Mexico City, and Mexico City to Ciudad Juarez; to endure hours of detention and interrogation by Mexican authorities in Mexico City and Ciudad Juarez; and to travel over land from Ciudad Juarez to Las Cruces, where he currently resides. He cannot see his wife, a Spanish citizen who is located in Ireland and is currently unable to secure a visa for travel to the United States, because Defendants have barred him from boarding commercial flights to or from the United States or over U.S. airspace.

10.      Plaintiff Nagib Ali Ghaleb is a thirty-one year-old U.S. citizen and resident of San Francisco, California. Mr. Ghaleb is currently located in Sana'a, Yemen, where he recently traveled to visit members of his family. Mr. Ghaleb remains in Sana'a, cannot return home, and risks losing his job as a janitor in San Francisco because Defendants have barred him from boarding commercial flights to or from the United States or over U.S. airspace.

11.     Plaintiff Samir Mohamed Ahmed Mohamed is a twenty-three year-old U.S. citizen and resident of Lindsay, California. Mr. Mohamed is currently located in Sana'a, Yemen, where he traveled to visit his family in September 2009. He remains in Sana'a, cannot return home to California, and risks losing his job in a clothing store because Defendants have barred him from boarding commercial flights to or from the United States or over U.S. airspace.

12.     Plaintiff Abdullatif Muthanna is a twenty-seven year-old U.S. citizen who resides in Rochester, New York. He suffers from serious medical conditions that require treatment by his general physician and specialists, all of whom are located in New York. Mr. Muthanna is currently located in southern Yemen, where he recently traveled to visit relatives. He remains in Yemen, cannot return home, and cannot receive needed medical care in the United States because Defendants have barred him from boarding commercial flights to or from the United States or over U.S. airspace.

13.     Plaintiff Saleh A. Omar is a thirty-five year-old lawful permanent resident of the United States. He is currently located in Yemen, where he recently traveled to visit relatives. He cannot return to his home and job in the United States because Defendants have barred him from boarding commercial flights to or from the United States or over U.S. airspace. He fears that Defendants' actions will result in his involuntary exclusion from the United States for over 180 days, that the federal government may initiate removal proceedings against him as a result, and that Defendants' bar on his ability to return home by plane threatens to jeopardize his right to become a naturalized U.S. citizen.

14.     Plaintiff Adama Bah is a twenty-two year-old citizen of Guinea who was granted refugee status in the United States in 2007. She resides in the city of New York, where she works as a caregiver to a family with two children and a disabled parent. She is unable to

earn certain wages as a caregiver because Defendants have barred her from boarding commercial flights to or from the United States or over U.S. airspace.

15.    Plaintiff Halime Sat is a twenty-eight year-old German citizen and lawful permanent resident of the United States. She was born in Bursa, Turkey and was raised in Cologne, Germany. Ms. Sat lives with her husband in Corona, California. She was recently prevented from attending a conference in the Bay Area and was forced to withdraw from an educational program in New York and to cancel plans to attend a family reunion in Germany because Defendants have barred her from boarding commercial flights to or from the United States or over U.S. airspace.

16.    Defendant Eric H. Holder, Jr. is the Attorney General of the United States and heads the Department of Justice ("DOJ"), a department of the United States government that oversees the Federal Bureau of Investigation ("FBI"). The FBI in turn administers the Terrorist Screening Center ("TSC"), which was created to consolidate the government's approach to terrorism screening. The TSC develops and maintains the federal government's consolidated Terrorist Screening Database (the "watch list"), of which the No Fly List is a component. Defendant Holder is sued in his official capacity.

17.    Defendant Robert S. Mueller is Director of the Federal Bureau of Investigation, which administers the TSC. Defendant Mueller is sued in his official capacity.

18.    Defendant Timothy J. Healy is Director of the Terrorist Screening Center and is sued in his official capacity.

## JURISDICTION AND VENUE

19.    This is a complaint for injunctive and declaratory relief based upon civil rights violations committed by the Terrorist Screening Center, Federal Bureau of Investigation,

and U.S. Department of Justice in violation of the Fifth and Fourteenth Amendments to the U.S.

Constitution, the Immigration and Nationality Act, and the Administrative Procedure Act.

20.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331

and 5 U.S.C. § 702.

21.    The Court has the authority to grant declaratory relief pursuant to the

Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

22.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because

Defendants are officers of agencies of the United States sued in their official capacity and

because this judicial district is where Plaintiff Mohamed Sheikh Abdirahman Kariye resides and

where a substantial part of the events or omissions giving rise to the claim occurred.

## FACTUAL ALLEGATIONS

**A.    The Federal Government's Terrorist Watch List**

23.    In September 2003, Attorney General John Ashcroft established the

Terrorist Screening Center to consolidate the government's approach to terrorism screening.  The

TSC, which is administered by the FBI, develops and maintains the federal government's

consolidated Terrorist Screening Database (the "watch list").  TSC's consolidated watch list is the

federal government's master repository for suspected international and domestic terrorist records

used for watch list-related screening.

24.    TSC sends records from its terrorist watch list to other government

agencies that in turn use those records to identify suspected terrorists.  For example, applicable

TSC records are provided to the Transportation Security Administration ("TSA") for use by

airlines in pre-screening passengers and to U.S. Customs and Border Protection ("CBP") for use

in screening travelers entering the United States.  Thus, while the TSC maintains and controls the

database of suspected terrorists, it is the front-line agencies like the TSA that carry out the screening function. In the context of air travel, when individuals make airline reservations and check in at airports, the front-line screening agency, TSA, or the airline, conducts a name-based search of the individual to determine whether he or she is on a watch list.

25.     Two government entities are primarily responsible for "nominating" individuals for inclusion in the terrorist watch list—the National Counterterrorism Center ("NCTC") and the Federal Bureau of Investigation. The NCTC, which is managed by the Office of the Director of National Intelligence, relies on information from other federal departments and agencies when including known or suspected international terrorists in its Terrorist Identities Datamart Environment ("TIDE") database. The NCTC reviews TIDE entries and recommends specific entries to the Terrorist Screening Center for inclusion in the watch list. TIDE is the source of all international terrorist identifier information included in the watch list. The FBI, in turn, nominates to the watch list individuals with suspected ties to domestic terrorism. TSC makes the final decision on whether a nominated individual meets the minimum requirements for inclusion into the watch list as a known or suspected terrorist and which screening systems will receive the information about that individual.

26.     Defendant Healy, Director of the TSC, has testified that in evaluating whether an individual meets the criteria for inclusion on the consolidated watch list, the TSC determines whether the nominated individual is "reasonably suspected" of having possible links to terrorism. According to the TSC, "reasonable suspicion requires articulable facts which, taken together with rational inferences, reasonably warrant the determination that an individual is known or suspected to be or has been engaged in conduct constituting, in preparation for, in aid of or related to terrorism and terrorist activities." Defendants have not stated publicly what

standards or criteria are applied to determine whether an individual on the consolidated watch list will be placed on the No Fly List that is distributed to the TSA.

27.    Under these standards, the number of records in the consolidated watch list has swelled to an estimated one million names, representing the identities and aliases of approximately 400,000 individuals. Once an individual has been placed on the watch list, the individual remains on the list until the agency that supplied the initial information in support of the nomination determines that the individual should be removed.

28.    A 2007 GAO report found that the TSC rejects approximately one percent of nominations to the watch list.

29.    In response to intelligence failures that permitted Nigerian citizen Umar Farouk Abdulmutallab, a would-be bomber, to fly from Amsterdam to Detroit on December 25, 2009, the Defendants have dramatically expanded the watch list as a whole and the No Fly List in particular. At a recent Senate hearing, Russell E. Travers, Deputy Director of the National Counterterrorism Center, stated that "[t]he entire federal government is leaning very far forward on putting people on lists," and that the watch list is "getting bigger, and it will get even bigger."

**B.    Inadequacy of Redress Procedure**

30.    The government entities and individuals involved in the creation, maintenance, support, modification, and enforcement of the No Fly List, including Defendants, have not provided travelers with a fair and effective mechanism through which they can challenge their inclusion on the No Fly List.

31.    An individual who has been barred from boarding an aircraft on account of apparent inclusion on the No Fly List has no clear avenue for redress, because no single government entity is responsible for removing an individual from the list. The TSC, which is

administered by the FBI, does not accept redress inquiries directly from the public, nor does it directly provide final disposition letters to individuals who have submitted redress queries. Rather, individuals who seek redress after having been prevented from flying must complete a standard form and submit it to the Department of Homeland Security Traveler Redress Inquiry Program ("DHS TRIP"). The DHS TRIP Program provides each individual with a "Redress Control Number" associated with the individual's report. Yet it is the TSC that has responsibility for consulting with relevant agencies to determine whether an individual has been appropriately listed and should remain on the list.

32.    Once TSC makes a determination regarding a particular individual's status on the watch lists, including the No Fly List, the front-line screening agency responds to the individual with a letter that neither confirms nor denies the existence of any terrorist watch list records relating to the individual. The government does not provide the individual with any opportunity to confront, or to rebut, the grounds for his possible inclusion on the watch list. Thus, the only "process" available to individuals who are prevented from boarding commercial flights is to submit their names and other identifying information to the Department of Homeland Security and hope that an unknown government agency corrects an error or changes its mind.

C.    **Plaintiffs' Allegations**

**Ayman Latif**

33.    Plaintiff Ayman Latif is a U.S. citizen who was born and raised in Miami, Florida. He is also a veteran of the U.S. Marine Corps. In 1999, the U.S. Department of Veterans Affairs determined that Mr. Latif was disabled as a result of serious injuries to his neck, back, and hips sustained during an auto accident during his final year of service as a Marine.

34.    Mr. Latif has worked for the U.S. government for more than fourteen years, both as a Marine and as an employee of the U.S. Postal Service.

35.    In November 2008, Mr. Latif and his wife moved to Egypt.  The couple first settled in Cairo, where they lived for about one year.  Mr. Latif and his family then moved to Munifiyyah, a town located two hours outside of Cairo, where Mr. Latif studies Arabic.

36.    After the birth of their daughter in October 2009, Mr. Latif and his wife planned to travel to Miami to visit relatives.  Mr. Latif purchased tickets for himself and his family to travel from Cairo to Miami on Iberia Airlines with a change of aircraft in Madrid.

37.    On the evening of April 13, 2010, Mr. Latif and his family went to the outdoor baggage scanning area for Iberia Airlines at Cairo International Airport to procure boarding passes for Iberia Airlines Flight 3735 from Cairo to Madrid and Flight 7001 from Madrid to Miami.  Upon learning that the family was traveling to the United States, an airline employee took the family's passports and made a call on his cell phone. The airline employee returned the passports to Mr. Latif and escorted the family to a line for business class passengers. When Mr. Latif and his family reached the front of the line, a ticketing agent stated, "I'm sorry sir.  We have just received a message from headquarters in Spain that you cannot board the plane."

38.    Mr. Latif was surprised.  He asked to speak to an Iberia Airlines supervisor.  Mr. Latif explained that he and his family were U.S. citizens and that he knew of no reason why they would not be permitted to fly to the United States via Madrid.  The supervisor stated that the U.S. Embassy, not Iberia Airlines headquarters in Spain, had sent the message that Mr. Latif was not permitted to board the flight.  The supervisor stated that there was nothing he could do to assist Mr. Latif.

39.     Mr. Latif immediately called the U.S. Embassy in Cairo from his cell phone. He spoke to an official who instructed him to go to the U.S. Embassy the next morning for more information. The Iberia Airlines supervisor with whom Mr. Latif had spoken also called the U.S. Embassy and secured another embassy counselor on the phone. This counselor told Mr. Latif that he might be on a "TSA list" and also instructed him to go to the U.S. Embassy first thing the next morning.

40.     Mr. Latif and his family left the airport and spent the night in a hotel located close to the U.S. Embassy.

41.     The following morning, Mr. Latif went to the U.S. Embassy. After waiting for some time, he spoke to an embassy official and explained that he and his family had been denied boarding passes for Iberia Airlines Flights 3735 and 7001. The official stated that the U.S. Embassy had no information about why this had occurred and that he could not do anything about it. The counselor told Mr. Latif that embassy officials would look into the matter and asked him to be patient.

42.     Mr. Latif returned to Munafiyyah with his family because he could not afford to pay for Cairo hotels while waiting for embassy officials to look into his situation.

43.     Mr. Latif sought urgently to find out why he was denied the ability to board his Iberia Airlines flights. He called the offices of Congressman Kendrick Meek of the 17th Congressional District of Florida and of Bill Nelson and George Le Mieux, the United States Senators from the State of Florida.

44.     On or around April 15, 2010, Mr. Latif completed a DHS TRIP form online. He was assigned Redress Control Number 2095199.

45.     At or around the same time, Mr. Latif called the U.S. Customs and Border Protection ("CBP") information line in Washington, D.C. and asked why he had been denied boarding on his Iberia Airlines flight.   CBP supervisor Olga DeLeon told him that she could not assist him, but that he should call the U.S. Embassy in Cairo and ask to speak with the FBI Liaison.

46.     Mr. Latif called the U.S. Embassy in Cairo and asked to be connected to the FBI Liaison.   A government official listened to his complaint and said that she would forward it to the appropriate official.

47.     That evening, Legal Attaché Hashim El-Gamil called Mr. Latif and told him that the FBI was investigating his case and that two FBI agents from Miami were traveling to Cairo to meet with him.   Mr. El-Gamil explained that it could take several weeks to arrange a meeting between Mr. Latif and the FBI agents because the agents were facing difficulties in securing visas to travel to Egypt.

48.     About one month later, a U.S. Embassy official called Mr. Latif and asked him to come to the embassy to speak with two FBI agents.   At the meeting, one agent introduced herself to Mr. Latif as FBI Special Agent Janet Waldron.   Agent Waldron and another FBI agent questioned Mr. Latif for at least four hours.   Agent Waldron told Mr. Latif that he is on the No Fly List.

49.     The next day, Agent Waldron and the other FBI agent questioned Mr. Latif for at least four hours.   At the end of the interrogation, the agents told Mr. Latif that they would file a report with FBI Headquarters.

50.     In or around the middle of May 2010, Mr. Latif's mother-in-law called him from Florida to tell him that she had received a piece of mail from the U.S. Department of

Veterans Affairs ("VA") addressed to him. He asked her to open the letter. The letter was dated

May 12, 2010 and stated that the "combined evaluation for all of your service-connected

disabilities will drop from 50% to 20%" and that Mr. Latif's monthly benefit would accordingly

be reduced from $899.00 to $293.00. Mr. Latif did not understand why the VA had decided to

reduce its evaluation of his disability and the monthly rate of compensation that he would receive

for his service-connected disabilities.

51.     Mr. Latif called the VA. A VA officer indicated that Mr. Latif had been

scheduled to attend a Disability Evaluation on April 15, 2010, which Mr. Latif had missed.

Because he had been denied boarding on his April 13, 2010 Iberia Airlines flights to Madrid and

Miami, Mr. Latif was not in Florida on April 15, 2010 and could not have attended the

evaluation, which would have taken place in the Veterans Affairs hospital in his home town.

52.     Ordinarily, if an individual misses a VA Disability Evaluation, the

appointment is rescheduled for a later date. Mr. Latif has not been able to reschedule his

Disability Evaluation, however, because he is unable to travel from Egypt to the United States to

attend a rescheduled VA appointment due to his placement on the No Fly List.

53.     On or around June 4, 2010, Mr. Latif completed a second DHS TRIP form

online. He was assigned Redress Control Number 2100977.

54.     On June 1, 2010, Mr. Latif went to the U.S Embassy in Cairo to speak to

Mr. El-Gamil regarding the outcome of his interview with the two FBI Agents from Miami. Mr.

El-Gamil indicated that the agents had submitted a report to FBI headquarters with a

recommendation that Mr. Latif be granted a waiver to fly to the United States, but that FBI

headquarters was not satisfied with the report. He told Mr. Latif that the FBI was sending two

other FBI agents to Egypt to speak with Mr. Latif and to administer a polygraph test. Mr. Latif

emphasized to Mr. El-Gamil that he was experiencing great hardship in not being able to fly to the United States, particularly because he was unable to travel to Florida to attend a rescheduled Disability Evaluation with the VA and because the VA decided to reduce his benefits as a result.

55.    On June 29, 2010, Mr. Latif and his family moved from Munifiyyah to lower-cost housing in Alexandria, Egypt, due to the reduction in Mr. Lati's VA benefits.

56.    Mr. Latif presents no security threat to commercial aviation and knows of no reason why he would be placed on the No Fly List.

57.    To this day, Mr. Latif cannot return home to the United States. He has been denied the ability to travel by commercial airline from Cairo to the United States, via Madrid. He has been told by FBI agents that he will not be permitted to travel on any commercial flight to the United States. He knows of no way to travel from Egypt to the United States by boat. Because Defendants have barred Mr. Latif from boarding commercial flights to or from the United States or over U.S. airspace, he cannot visit family members in the United States or participate in a Disability Evaluation that would prevent his veterans' disability benefits from being drastically reduced.

**Raymond Earl Knaeble IV**

58.    Plaintiff Raymond Earl Knaeble IV is a U.S. citizen who was born and raised in Ventura and Santa Barbara, California. He is also a veteran of the U.S. Army.

59.    In 2006, Mr. Knaeble moved to Kuwait to work for ITT Systems Corporation ("ITT Systems"), a multinational company specializing in global defense and security.

60.    In late 2008, Mr. Knaeble converted to Islam. From August 2009 to December 2009, he studied at the Saba Institute, a language school in Sana'a, Yemen that

specializes in teaching Arabic to foreigners.  Mr. Knaeble returned to Kuwait and created a

website, www.islambrotherhood.com, to provide the public with information about Islamic

beliefs and practices.

        61.     On March 1, 2010, ITT Systems offered Mr. Knaeble a position as a heavy

mobile equipment mechanic/driver in Qatar.  The effective date of employment was contingent

upon Mr. Knaeble's passage of a pre-employment medical exam that was to be scheduled within

days of acceptance of the offer.  ITT Systems indicated that a medical exam administered in the

United States would be processed more quickly than one administered in a foreign country.

        62.     Mr. Knaeble accepted the ITT Systems position in Qatar and scheduled his

physical examination to take place in Killeen, Texas on March 16, 2010.  Prior to moving to

Qatar to start his new job, Mr. Knaeble planned to travel to Bogota, Colombia so that he could

marry his fiancé, a Colombian citizen, and spend some time with her family and his relatives,

including his grandfather and aunts.  He also planned to visit his daughter in Texas and his

mother and sisters in California while in the United States following his scheduled medical

examination and before moving to Qatar with his new wife.

        63.     Mr. Knaeble booked airline tickets to travel first on Turkish Airlines and

Iberia Airlines from Kuwait to Bogota, where he would spend several days for his wedding and

visiting relatives, and then from Bogota to the United States.  His itinerary for travel from

Kuwait to Bogota included changes of aircraft in Istanbul, Barcelona, and Madrid.  He chose this

itinerary in order to book the lowest fares he could find from Kuwait to Bogota.  His itinerary for

travel from Bogota to the United States scheduled him to fly from Bogota to Miami on LAN

Airlines and from Miami to Killeen on American Airlines with a change of aircraft in Dallas.

64.     On March 10 and 11, 2010, Mr. Knaeble flew from Kuwait to Bogota without incident.

65.     On March 14, 2010, Mr. Knaeble went to Aeropuerto Internacional El Dorado in Bogota.   An airline official denied Mr. Knaeble a boarding pass for LAN Airlines Flight 570 to Miami and told him that no airlines would permit him to board a flight bound for the United States.  He was instructed to contact the U.S. Embassy in Bogota.

66.     Mr. Knaeble went to the U.S. Embassy the following day.  He spoke with Scott Renner, American Citizen Services Chief.  Mr. Renner took Mr. Knaeble's passport and told him to return the next day to speak with FBI agents.  Mr. Renner did not return Mr. Knaeble's passport that day.  Mr. Knaeble returned to the U.S. Embassy on March 16, 2010. Embassy officials instructed him to return several days later.

67.     Approximately four days later, Mr. Knaeble met with two FBI agents at the U.S. Embassy.  The agents identified themselves only as "Charles" and "Loretta," despite Mr. Knaeble's repeated requests to see their identification and credentials.  Charles and Loretta questioned Mr. Knaeble for six hours about his life before and after converting to Islam.  Mr. Knaeble asked them when he would be permitted to return to the United States.  The agents stated that they needed to relay his responses to their questions to officials in Washington, D.C., and that they would then be instructed as to whether Mr. Knaeble would be permitted to fly to the United States.  Neither agent told Mr. Knaeble why he had been placed on the No Fly List or why they were questioning him.

68.     Over the course of the following four weeks, Mr. Knaeble lived in hotels in Bogota and spoke regularly with FBI agents and U.S. Embassy officials in an effort to learn

why he was not permitted to board a flight for the United States. He hoped that by cooperating with FBI and embassy officials, he would secure permission to fly.

69.     On March 21, 2010, Mr. Knaeble received a letter from ITT Systems indicating that because he had not taken the required physical exam in Killeen as planned, the firm had withdrawn the offer it made to Mr. Knaeble for a position in Qatar.

70.     On March 26, 2010, Mr. Knaeble completed a DHS TRIP form online. He was assigned Redress Control Number 2093292.

71.     Due to the exorbitant cost of living in Bogota, Mr. Knaeble moved to Santa Marta, which is located on the coast of Colombia, to live with relatives while trying to sort out a way to return to the United States.

72.     Sometime in April 2010, Mr. Knaeble received a call from Rodney Sanchez of the FBI. Agent Sanchez indicated that he was a member of the Dallas, Texas FBI office and that he wanted to question Mr. Knaeble.

73.     On or around April 21, 2010, Scott Renner returned Mr. Knaeble's passport to him. Mr. Knaeble had been without a passport since March 15, 2010, the date on which Mr. Renner seized his passport.

74.     On April 22, 2010, Mr. Knaeble told Agent Sanchez that he was being represented by an attorney at the Council on American-Islamic Relations. He asked the agent to call his attorney to discuss his situation and any further questions the FBI wanted to ask him. Agent Sanchez stated that he had been trying to help Mr. Knaeble return to the United States, but that since Mr. Knaeble had retained an attorney, he was no longer going to work on getting him a flight home. Agent Sanchez also stated that because Mr. Knaeble retained an attorney, Mr Knaeble was "closing all doors in the investigation."

75.     Mr. Knaeble remained desperate to return to the United States.  On May 11, 2010, he purchased a ticket to fly from Santa Marta to Nuevo Laredo, Mexico, with stops in Bogota and Mexico City.  He hoped to enter the United States over land by crossing the border between Nuevo Laredo and Laredo, Texas.

76.     On May 12, 2010, Mr. Knaeble flew from Santa Marta to Bogota without incident, and from Bogota to Mexico City.  When Mr. Knaeble landed in Mexico City, however, Mexican government agents were waiting for him at the gate of the plane.  The agents questioned him for more than three hours about Islam, his activities in Yemen, and various Islamic groups to which Mr. Knaeble does not belong.  One agent asked Mr. Knaeble what he was doing in Mexico.  Mr. Knaeble explained that he was traveling to Nuevo Laredo where he would meet his father and travel to the United States.  The agent responded that Mr. Knaeble would not be doing any more traveling in Mexico and that the only trip he would take would be back to Colombia.  The authorities refused to allow Mr. Knaeble to board a flight from Mexico City to Nuevo Laredo or to travel by bus or any other means to the U.S.-Mexico border.  The agents detained Mr. Knaeble for fifteen hours.

77.     At around 3:00 P.M. the following day, the agents placed Mr. Knaeble on a flight back to Bogota.  Mr. Knaeble was able to secure permission to stay in Colombia for two months.

78.     Due to the high cost of living in Bogota, Mr. Knaeble returned to live with family members in Santa Marta.

79.     Mr. Knaeble's authorization to stay in Colombia will expire on July 13, 2010.  Mr. Knaeble does not want to violate Colombian law by remaining in that country without authorization.  Although he may leave Colombia and apply for another two-month authorization

at the border, Mr. Knaeble fears that doing so will subject him to arrest, detention, interrogation, and search, as was the case when he flew from Colombia to Mexico on May 12, 2010.

80.    Mr. Knaeble presents no security threat to commercial aviation and knows of no reason why he would be placed on the No Fly List.

81.    To this day, Mr. Knaeble cannot return home to the United States. He has been denied the ability to board a commercial flight from Bogota to the United States. He has been told by FBI agents that he is not permitted to travel on any commercial flight to the United States. Mexican authorities have prohibited him from entering Mexico and traveling to the United States by land. Mr. Knaeble is seeking a means to travel to the United States by boat, but the earliest practical opportunity to do so is to travel by cargo ship from Bogota to Florida in October 2010. He fears that Defendants will prevent him from returning to the United States by the time his authorization to remain in Colombia expires on July 13. Because Defendants have barred him from boarding commercial flights to or from the United States or over U.S. airspace, Mr. Knaeble lost a job with ITT Systems and is currently prevented from returning to his home country to secure other employment and to visit his family.

**Steven Washburn**

82.    Plaintiff Steven Washburn is a U.S. citizen and veteran of the U.S Air Force. In August 2008, Mr. Washburn and his wife decided to move to Riyadh, Saudi Arabia so that he could work for a technology company. After one and a half years in Saudi Arabia, the couple decided that life in Saudi Arabia did not suit them and that they wanted to move back to the United States.

83.    In preparation for their move back to the United States, in January 2010, Mr. Washburn and his wife sold their home and all of their possessions and closed their bank

accounts. The proceeds from these sales and their savings constituted their entire life savings. Mr. Washburn and his wife decided to take these life savings with them to the United States in cash.

84.    Mr. Washburn and his wife purchased airline tickets to travel from Riyadh to Las Cruces, New Mexico, where his parents live. They planned to spend a one-week layover in Ireland during this trip so that they could visit Mr. Washburn's step-daughter, who was pregnant at the time.

85.    The Washburns traveled from Riyadh to Dublin without incident. The couple then sought to continue their journey to the United States on February 5, 2010. That day, Mr. Washburn attempted to board Aer Lingus Flight 133 at Shannon Airport Ireland bound for Boston. At the check-in counter, an airline employee denied him a boarding pass. When Mr. Washburn asked why the boarding pass was denied, the employee responded that Mr. Washburn was on the No Fly List.

86.    Mr. Washburn contacted the U.S. Embassy in Dublin to ask why he was denied boarding on Aer Lingus Airlines Flight 133. An embassy official replied that the U.S. Embassy did not know why someone would be on the No Fly List and did not have access to such information. Mr. Washburn explained that he and his wife were moving back to the United States from Saudi Arabia. He also explained that they could not return to Riyadh because they had sold their home there and because they no longer had valid visas to remain in Saudi Arabia. Embassy officials advised Mr. Washburn to fly to Canada or Mexico and to enter the United States by driving over land across the border.

87.    Mr. Washburn was eager to return to the United States to re-establish a life there with his wife. He also knew that his visa to stay in Ireland would run out soon.

88.     Mr. Washburn purchased a new set of airline tickets to travel from Dublin to Ciudad Juarez, Mexico, with changes of aircraft in London and Mexico City. He planned to enter the United States by walking over a bridge located at the border between Ciudad Juarez and El Paso, Texas, as officials at the U.S. Embassy in Dublin had advised.

89.     On February 12, 2010, Mr. Washburn flew from Dublin to London's Heathrow International Airport without incident on BMI Flight 120. He was permitted to board British Airways Flight 243 from London to Mexico City. The plane took off without incident. Approximately three and a half hours later, however, the aircraft turned around and flew back to Heathrow International Airport. Airline employees provided no explanation for the decision.

90.     Upon information and belief, British Airways Flight 243 returned to London because, after Mr. Washburn had boarded the flight, federal government officials instructed airline officials not to fly over U.S. airspace with Mr. Washburn on board due to his placement on the No Fly List.

91.     When British Airways Flight 243 landed at Heathrow, airport security and New Scotland Yard officials met Mr. Washburn at the gate. These officials escorted Mr. Washburn to a room where they detained and interrogated him for more than nine hours. Airport security and New Scotland Yard officials also photographed and fingerprinted Mr. Washburn and subjected him to a DNA test. They seized the life savings that Mr. Washburn carried with him. New Scotland Yard officials subsequently escorted Mr. Washburn to another aircraft, which took him back to Ireland.

92.     Several days later, Mr. Washburn's visa to stay in Ireland expired. Irish authorities renewed Mr. Washburn's visa for 30 days so that he could legally remain in that country while determining how to return to the United States.

93.     Desperate to get his name off the No Fly List, Mr. Washburn telephoned the FBI in New Mexico to ask for help.  FBI officials told him that they wanted to speak with him.  Mr. Washburn agreed to meet with FBI officials at the U.S. embassy in Dublin.  Mr. Washburn was subsequently interrogated three different times by FBI agents and voluntarily took a polygraph test.  FBI agents told him that he had passed the polygraph test.

94.     One FBI agent told Mr. Washburn that he had recommended that Mr. Washburn be given a one-time waiver to fly back to the United States, but that FBI Headquarters had not yet made a decision regarding the recommendation.

95.     On March 13, 2010, Irish immigration authorities renewed Mr. Washburn's visa for 30 days and indicated that no further renewals would be granted.

96.     On April 27, 2010, Mr. Washburn completed a DHS TRIP form online. He was assigned Redress Control Number 2096551.

97.     Mr. Washburn researched whether he could travel by boat from Ireland to the United States.  He could not locate a trans-Atlantic ship traveling from Europe to the United States until September.  Mr. Washburn booked a new series of flights from Dublin to Ciudad Juarez, Mexico, with stops in Frankfurt, Germany; São Paulo, Brazil; Lima, Peru; and Mexico City.  He hoped to enter the United States over land by crossing the border between Ciudad Juarez and El Paso, Texas.

98.     Mr. Washburn flew without incident from Dublin to Frankfurt, from Frankfurt to São Paulo, São Paulo to Lima, and from Lima to Mexico City.

99.     Mr. Washburn arrived in Mexico City International Airport at around 6:45 P.M. on May 21, 2010.  At customs, Mr. Washburn was escorted to a separate room where he was detained and questioned by Mexican Federal Protection officers until 11:30 P.M.  Mr.

PAGE 25 -COMPLAINT

Washburn missed his connecting flight to Ciudad Juarez, which was scheduled to depart at 8:25 P.M.

100.    At around 11:30 P.M., officers escorted Mr. Washburn to another room where he was detained overnight and not permitted to eat or drink anything except water.

101.    At around 8:00 A.M. the next morning, Mexican Federal Protection officers escorted Mr. Washburn to an aircraft that transported him to Ciudad Juarez.

102.    Mr. Washburn arrived at the Ciudad Juarez airport at around 11:00 A.M. and was met by three Mexican Federal Protection officers who took him to an office for questioning. The officers then took Mr. Washburn to a bridge on the U.S.-Mexico border and handed him off to U.S. Customs and Border Protection officers who were waiting for Mr. Washburn.

103.    CBP officers escorted Mr. Washburn through a check point and took him to a facility where he was detained, handcuffed to a chair for several hours, and questioned for at least one hour. Officers searched Mr. Washburn's belongings and photographed and fingerprinted him.

104.    At around 7:00 P.M., CBP officers released Mr. Washburn.

105.    Mr. Washburn presents no security threat to commercial aviation and knows of no reason why he would be placed on the No Fly List.

106.    Because Defendants have barred him from boarding commercial flights to or from the United States or over U.S. airspace, Mr. Washburn cannot visit is wife, who is a Spanish citizen and remains in Ireland because she currently lacks a visa for travel to the United States, or his step-daughter and her family who live in Dublin.

**Nagib Ali Ghaleb**

107.    Plaintiff Nagib Ali Ghaleb is a naturalized U.S. citizen and San Francisco resident. He moved to the United States from Yemen in 1996. Mr. Ghaleb works in San Francisco as a janitor.

108.    Mr. Ghaleb's wife and four children, one of whom is a U.S. citizen, live in Yemen. Several years ago, he submitted visa applications for his wife and three of his children so that they could immigrate to the United States. Their visa petitions were approved, but there has been a long delay in processing their immigrant visa paperwork.

109.    Mr. Ghaleb traveled to Yemen to visit his family and to meet with the U.S. consul there in hopes of finding out the reason for the delay in processing his wife's and children's visa applications. Mr. Ghaleb planned to travel to Yemen in August 2009 and to return to San Francisco in February 2010 so that he could resume his work.

110.    On August 17, 2009, Mr. Ghaleb flew from San Francisco to Sana'a without incident.

111.    On February 16, 2010, Mr. Ghaleb flew on Yemenia Airlines from Sana'a to Frankfurt without incident.

112.    At Frankfurt Airport, Mr. Ghaleb went to the check-in counter for United Airlines to secure a boarding pass for his United Airlines flight to San Francisco. An airline employee took his passport and asked him to sit down and wait. Some time later, several United Airlines supervisors arrived at the check-in counter.

113.    After some time, two U.S. officials wearing suits arrived at the United Airlines check-in counter. Upon information and belief, the officials were FBI agents. One FBI agent told Mr. Ghaleb that he would not be permitted to board his United Airlines flight to San

Francisco. Mr. Ghaleb was confused and asked if this was really true. The FBI agents

confirmed that it was. Mr. Ghaleb asked if he could fly to San Francisco on a different flight.

One FBI agent stated: "You cannot go to America at all." The U.S. officials left.

114.    After some time, a German police officer arrived and escorted Mr. Ghaleb

to a separate room for questioning. The police officer took Mr. Ghaleb's passport and searched

him and his luggage. Another German officer arrived and questioned Mr. Ghaleb again. After

Mr. Ghaleb had been searched and questioned for approximately three hours, a German police

officer told him that he was free to go. Mr. Ghaleb told the officers that he had nowhere to go

because he did not have any money to purchase a new ticket to fly back to Yemen. He explained

that he had spent all of his money to purchase his ticket to fly from Frankfurt to San Francisco.

The German officers told Mr. Ghaleb that Germany had no problem with him and that he was

free to take a cab to the U.S. Embassy and to seek assistance there.

115.    Mr. Ghaleb called a friend who worked at a travel agency in Yemen for

help. His friend helped him secure an electronic ticket to fly from Frankfurt to Sana'a. Mr.

Ghaleb flew back to Yemen the same day.

116.    After arriving in Sana'a, Mr. Ghaleb went directly to the U.S. Embassy.

He explained his situation to an embassy official and asked to speak with a consular official.

Two consular officials, one who spoke Arabic and one who did not, escorted Mr. Ghaleb to a

room where they questioned him for three hours. The consular official who did not speak Arabic

photocopied Mr. Ghaleb's passport. He then told Mr. Ghaleb that it would be impossible for him

to enter the United States. Mr. Ghaleb was shocked and confused. The Arabic-speaking

consular official told Mr. Ghaleb in Arabic that he would explain what the other official had said.

He stated that Mr. Ghaleb would not be permitted to board flights to the United States and asked

Mr. Ghaleb: "What did you do wrong? You must be a terrorist." The Arabic-speaking consular official said jokingly: "You can take a car to the United States."

117.    Approximately two weeks later, Mr. Ghaleb was contacted by an official from the U.S. Embassy in Sana'a and asked to come to the embassy for further questioning.

118.    Mr. Ghaleb went to the U.S. Embassy on or around March 1, 2010. He was questioned for around one and one half hours by two officials, one of whom was the Arabic-speaking consular official who had questioned Mr. Ghaleb previously. Upon information and belief, the other official was an FBI agent. The interrogators knew what mosques Mr. Ghaleb attended in San Francisco and Oakland and that he was a highly regarded soccer player. They were aware that Mr. Ghaleb knew many people and that many people in the Bay Area Yemeni community knew him. The interrogators said that they knew Mr. Ghaleb lived in San Francisco and had been trying for a long time to bring his family to the United States. The consular official said: "We know how much you love America and we can make it easy for you to go back."

119.    Mr. Ghaleb showed them a letter from his attorney, Kip Evan Steinberg, that introduced Mr. Steinberg as his attorney, and a letter from Mr. Steinberg to Senator Dianne Feinstein seeking assistance with Mr. Ghaleb's apparent placement on the No Fly List. The interrogators told Mr. Ghaleb that neither a lawyer nor Senator Feinstein could help him and that the only people who could help him were sitting in the room with him. They said it could take "years and years" for him to correct this problem "his way."

120.    The interrogators offered to help Mr. Ghaleb if he would work with them. They offered to arrange for him to fly back to the United States immediately if he would agree to tell them who the "bad guys" were in Yemen and in San Francisco. Mr. Ghaleb refused, stating that he was not political and did not know about such things. The interrogators insisted that Mr.

Ghaleb did know and could provide the names of people from his mosque and his community. One official emphasized that it would be impossible for no one in the Bay Area Muslim community to have spoken badly about the United States. He encouraged Mr. Ghaleb to report such instances to them, whether they took place in the United States or Yemen.

121.    Mr. Ghaleb told the interrogators that he was not interested in spying in the Yemeni community. He stated: "I could give you false information about innocent people and claim they are the bad guys and help myself out of this situation, but these people will be harmed. Is this what you want?" Mr. Ghaleb raised his American passport and said: "What does this mean? I have rights. I am an American."

122.    The interrogators told Mr. Ghaleb that if he did not cooperate, they would call the Yemeni government and have him arrested and sent to jail, where he would spend the rest of his life and never see his family or his home in America again. They advised him to "think about it" and indicated that he could call Vincent Lisi at the U.S. Embassy if he wanted to get in touch.

123.    On or around March 2, 2010, Mr. Ghaleb submitted a completed DHS TRIP form online. He was assigned Redress Control Number 2089829.

124.    Mr. Ghaleb received a letter dated April 6, 2010 from Jim Kennedy of the DHS Traveler Redress Inquiry Program stating that DHS had received his Traveler Inquiry Forms and supporting materials submitted through the TRIP system. The letter stated: "In response to your request, we have conducted a review of any applicable records in consultation with other Federal agencies, as appropriate. Where it was determined that a correction to records was warranted, these records were modified to address any delay or denial of boarding that you may have experienced as a result of the watch list screening process."

125.     On May 3, 2010, Mr. Ghaleb again attempted to fly home to San Francisco. He flew without incident on Emirates Airlines from Sana'a to Dubai. In Dubai International Airport, Mr. Ghaleb was not permitted to board his Emirates Airlines flight to San Francisco. Dubai police told Mr. Ghaleb that he was on the No Fly List and detained him for several days. They berated him for attempting to fly when he knew that he was on the No Fly List and asked him why he had come to the UAE. They then returned him to Yemen by plane.

126.     Mr. Ghaleb called the FBI. An FBI officer told Mr. Ghaleb that he would be taken off the No Fly List if he would agree to become an FBI informant in the California Yemeni community.

127.     Mr. Ghaleb's leave from his position as a janitor in San Francisco expired in February, and he fears that his job will be unavailable unless he returns home promptly.

128.     Mr. Ghaleb presents no security threat to commercial aviation and knows of no reason why he would be placed on the No Fly List.

129.     To this day, Mr. Ghaleb cannot return home to the United States. He has twice been denied the ability to travel by commercial airline from abroad to the United States. FBI agents have told Mr. Ghaleb that he will not be permitted to travel on any commercial flight to the United States or over U.S. airspace. He knows of no way to travel from Yemen to the United States by boat. Because Defendants have barred him from boarding commercial flights to or from the United States or over U.S. airspace, Mr. Ghaleb is unable to return home and risks losing his job in San Francisco.

### Samir Mohamed Ahmed Mohamed

130.     Plaintiff Samir Mohamed Ahmed Mohamed moved to the United States from Yemen as a child and became a naturalized U.S. citizen in 1999. He lives in Lindsay,

California, where he works in a clothing store.  Mr. Mohamed's parents are both U.S. citizens who live in Buffalo, New York.  Mr. Mohamed has eleven siblings, eight of whom are U.S. citizens who live in the United States.

131.    Since he moved to the United States as a child, Mr. Mohamed has traveled to Yemen three times to visit family.  Mr. Mohamed most recently traveled from Lindsay to Yemen in September 2009 to visit his wife and two children who live in Almasser, a city in southern Yemen.  In April 2010, after spending several months with them, Mr. Mohamed booked a ticket on Saudi Arabian Airlines to return to the United States.  He sought to fly on Saudi Arabian Airlines from Sana'a to New York with a change of planes at King Abdulaziz International Airport near Jeddah, Saudi Arabia so that he could visit his parents and other relatives in New York for two weeks before flying to Fresno, California.

132.    On May 3, 2010, Mr. Mohamed flew on Saudi Arabian Airlines to King Abdulaziz International Airport without incident.  At the airport, he went to board Saudi Arabian Airlines Flight 25 to John F. Kennedy International Airport.  Mr. Mohamed proceeded through immigration with other passengers seeking to transfer to international flights.  Saudi immigration officials took Mr. Mohamed's passport and asked him to wait.  After some time, immigration officials took Mr. Mohamed downstairs to a room.  An immigration official told him that the Saudi authorities received a message from U.S. authorities indicating that he was "not allowed on United States land."  The official told Mr. Mohamed that he would not be permitted to fly to the United States and that the Saudi government would send him back to Yemen on a plane in two days, unless he purchased a ticket to return on an earlier flight.

133.    It was clear to Mr. Mohamed that he could not stay in Saudi Arabia because he did not have a visa to remain in that country.  It was also clear to him that he would

not be permitted to fly as planned on Saudi Arabian Airlines Flight 25 from King Abdulaziz International Airport to New York. Mr. Mohamed purchased a ticket to fly from King Abdulaziz International Airport to Sana'a on May 4, the following day.

134.    Mr. Mohamed missed his flight to Sana'a the following day. He called the emergency number for the U.S. Embassy in Jeddah and was transferred to a consular official. Mr. Mohamed explained to the official that he was a U.S. citizen without a visa to stay in Saudi Arabia and that he had been stuck in Jeddah for twenty-three hours because he was denied boarding on a Saudi Arabian Airlines Flight from King Abdulaziz International Airport to New York the previous day. The consular official told Mr. Mohamed that the U.S. Embassy did not know why he was not permitted to fly and asked Mr. Mohamed if he knew why this was the case. Mr. Mohamed replied that he had no idea why he was denied boarding the previous day. He asked the official if he was on a government watch list that denied him the ability to fly. The official responded that he did not know and that because Mr. Mohamed did not have a valid visa for Saudi Arabia, he was unable to push Saudi authorities to permit Mr. Mohamed to fly to the United States.

135.    During the course of May 4, Mr. Mohamed called the U.S. Embassy several times and spoke to the same consular official. The official advised Mr. Mohamed to return to Yemen on the next available flight, which was scheduled to leave the following day. The official also told Mr. Mohamed that he would send a message to the U.S. Embassy in Yemen so that Mr. Mohamed would not have a problem entering Yemen.

136.    On Wednesday, May 5, 2010, Mr. Mohamed flew to Sana'a without incident using the ticket for the May 4 flight that he had missed.

137.    After his arrival, he immediately went to the U.S. Embassy in Sana'a. There, Mr. Mohamed spoke to an official who made several phone calls to inquire on his behalf. The official told him to return the following Saturday.

138.    On Saturday, May 8, 2010, Mr. Mohamed returned to the U.S. Embassy in Sana'a. There, he was interviewed by two government officials, one of whom introduced herself as "Michelle." Upon information and belief, the two government officials were FBI agents. At the end of the interview, the officials told Mr. Mohamed that they would call him in one week to let him know the outcome of the interview.

139.    Mr. Mohamed never heard from the FBI agents. Over the course of the next few weeks, he went to the U.S. Embassy in Sana'a several times to see if he would be permitted to fly.

140.    After about four weeks, Mr. Mohamed called the U.S. Embassy and reached one of the FBI agents who had interviewed him. The agent stated that he would call Mr. Mohamed back in one hour. One hour later, the agent called Mr. Mohamed and told him that he would not be permitted to fly on commercial airlines unless he provided the reason why he was placed on the government's No Fly List. Mr. Mohamed stated that he knew of no reason why he would be placed on the list and asked the official why his name appeared on the list. The agent stated that he could not tell Mr. Mohamed anything. Mr. Mohamed asked the agent what he should do to get home to the United States. The agent stated that he could not do anything else for him and could not advise him. He suggested that Mr. Mohamed go to the U.S. Embassy and speak with a counselor.

141.    On or around June 8, 2010, Mr. Mohamed went to the U.S. Embassy in Sana'a to speak to a counselor. A U.S. Embassy employee told him that he was on a U.S. watch

list and that he would not be permitted to board a commercial flight to the United States or over

U.S. airspace.

142.    On June 8, 2010, Mr. Mohamed submitted a completed DHS TRIP form.

He was assigned Redress Control Number 2101514.

143.    On or around June 17, 2010, Mr. Mohamed called one of the FBI agents

who had questioned him on May 8, 2010 to see if there were any developments regarding his

ability to fly.  The agent told Mr. Mohamed that he was still on the No Fly List and that he did

not know how long Mr. Mohamed would remain on the list.  The agent stated that Mr. Mohamed

could travel to the United States from Yemen by boat.  He advised Mr. Mohamed to call him

every week for any new information about his placement on the No Fly List.

144.    Mr. Mohamed presents no security threat to commercial aviation and

knows of no reason why he would be placed on the No Fly List.

145.    To this day, Mr. Mohamed cannot return home to the United States.  He

has been denied the ability to travel by commercial airline from abroad to the United States.  Mr.

Mohamed has been told by a government official that he will not be permitted to travel on any

commercial flight to the United States or over U.S. airspace.  He knows of no way to travel from

Yemen to the United States by boat.  Because Defendants have barred him from boarding

commercial flights to or from the United States or over U.S. airspace, Mr. Mohamed is unable to

return to his job in a clothing store in California.  He currently has no income and is borrowing

money from others in order to support himself, his wife, and their two children.

**Abdullatif Muthanna**

146.    Plaintiff Abdullatif Muthanna is a naturalized U.S. citizen and resident of Rochester, New York.  Mr. Muthanna was born in Yemen and moved to the United States in 1996 to join his mother and step-father.

147.    Mr. Muthanna works for a clothing store in Rochester to support his wife and four children, who live in southern Yemen several hours outside the city of Aden.  He travels to southern Yemen every few years to spend time with his family.

148.    Mr. Muthanna remains in the United States apart from his family in order to earn an income and to receive medical care for the serious medical conditions with which he has been diagnosed.  Mr. Muthanna suffers from and receives treatment for digestive diseases and mental health conditions.  His doctors, including his primary care physician, internist, and gastroenterologist, are all located in New York.

149.    On June 18, 2009, Mr. Muthanna traveled from Rochester to southern Yemen without incident in order to visit his wife and children.  He planned to return to the United States by plane by traveling on Saudi Arabian Airlines from Aden to New York with a change of aircraft in King Abdulaziz International Airport near Jeddah, Saudia Arabia.

150.    On May 31, 2010 Mr. Muthanna traveled from Aden to King Abdulaziz International Airport without incident.  He had a three-day transit visa to stay in Jeddah while waiting to board his flight from King Abdulaziz International Airport to New York, which was scheduled to depart on June 3, 2010.

151.    On June 3, Mr. Muthanna went to King Abdulaziz International Airport to check in for Saudi Arabian Airlines Flight 0021 to New York.  Mr. Muthanna presented his ticket receipt and identification to an airline employee at the check-in counter.  The employee

made a telephone call. Afterwards, he showed Mr. Muthanna his computer screen. The screen displayed Mr. Muthanna's name and flight number and indicated that there was no seat for Mr. Muthanna on the Saudi Arabian Airlines flight to New York. Mr. Muthanna was confused and asked for an explanation. The airline employee told him: "You are not allowed to fly to New York. You cannot fly."

152.     The employee called officials from Saudi Arabian Immigration, who arrived at the    check-in counter. An immigration official told Mr. Muthanna that he could not board his flight to New York and that he had to return to Yemen.

153.     The official explained to Mr. Muthanna that because there was no flight scheduled to depart from King Abdulaziz International Airport for Yemen that day, he would have to stay in Jeddah and return the next morning.

154.     Mr. Muthanna returned to King Abdulaziz International Airport on the morning of June 4, 2010. There was no airline flying from that airport to Yemen that day. Mr. Muthanna purchased a ticket to fly from a different airport in Jeddah to Sana'a on Yemenia Airways.

155.     At the airport, a Saudi immigration official asked Mr. Muthanna for his passport and saw that his three-day transit visa for Saudi Arabia had expired on June 3 and that his passport lacked a visa for Yemen. The official told Mr. Muthanna that he would not be permitted to go through immigration to board his flight to Yemen. Mr. Muthanna explained that he had overstayed his Saudi Arabian transit visa by only one day because he was unexpectedly prevented from boarding his Saudi Arabian Airlines flight from King Abdulaziz International Airport to New York. He also explained that he did not have a visa for Yemen because he was on his way home to New York.

156.    Mr. Muthanna returned to King Abdulaziz International Airport to attempt to board a Saudi Arabian Airlines flight bound for Yemen. Once again, a Saudi immigration official would not let him pass through immigration to board his flight to Yemen because his three-day transit visa had expired and his passport lacked a valid visa for Yemen.

157.    The immigration official told Mr. Muthanna that he was not validly in Saudi Arabia and that he could be arrested and detained on that ground. He said that Mr. Muthanna should return to the United States. Mr. Muthanna explained that he was trying to do precisely that, but that he had been denied boarding on his flight home to New York the day before.

158.    After some time, a supervisor arrived at Immigration. Mr. Muthanna explained his situation. The supervisor made a copy of Mr. Muthanna's passport. He instructed him to speak with the U.S. Embassy in Sana'a. The supervisor told Mr. Muthanna that there was a Yemenia Airlines flight to Aden leaving that day.

159.    Mr. Muthanna finally left Jeddah by flying on Yemenia Airlines to Sana'a.

160.    After his arrival in Sana'a, Mr. Muthanna went to the U.S. Embassy. He was instructed to speak with the Legal Attaché.

161.    The Legal Attaché introduced himself as Vincent Lisi. Mr. Lisi questioned Mr. Muthanna for about half an hour. Mr. Muthanna asked him if he was placed on a U.S. government list. Mr. Lisi stated that Mr. Muthanna was not on a "black list," but that he was on a government list reserved for people who were not permitted to fly. Mr. Lisi also stated that this list was reserved for people about whom the government needed information and that Mr. Muthanna would not be permitted to fly on commercial airplanes bound for the United States or over U.S. airspace. Mr. Muthanna asked if he could fly to Mexico or Canada and cross

over land into the United States.  The agent said that this would not be possible.  He advised Mr.

Muthanna to return to the United States by ship.  Mr. Lisi told Mr. Muthanna that he would

contact him in one week to let him know whether he could fly.

162.    Mr. Muthanna called Mr. Lisi two days later to see if there was any

information about his situation.  Mr. Lisi instructed him to call back one week later.

163.    Mr. Muthanna returned to the U.S. Embassy in Sana'a one week later.  The

Legal Attaché questioned him further about his time in Yemen.  He again instructed Mr.

Muthanna to call him back in one week for more information about his case.

164.    One week later, Mr.  Muthanna called Mr. Lisi.  Again, Mr. Lisi

questioned Mr. Muthanna.  At the end of the conversation, Mr. Lisi again instructed Mr.

Muthanna to call him back in one week.

165.    Mr. Muthanna presents no security threat to commercial aviation and

knows of no reason why he would be placed on the No Fly List.

166.    To this day, Mr. Muthanna cannot return home to the United States.  He

has been denied the ability to travel by commercial airline from abroad to the United States.  Mr.

Mohamed has been told by a U.S. official that he will not be permitted to travel on any

commercial flight to the United States or over U.S. airspace.  He has searched for a way to travel

from Yemen to the United States by boat and has not found any possibility of doing so.  Because

Defendants have barred him from boarding commercial flights to or from the United States or

over U.S. airspace, Mr. Muthanna is unable to return to his job or to seek the medical attention

he needs from his providers in Rochester.  He currently has no income and is borrowing money

from people in order to support himself, his wife, and their children.

**Saleh A. Omar**

167.    Plaintiff Saleh A. Omar is a thirty-five year-old citizen of Yemen who has been a lawful permanent resident of the United States since March 19, 1996. He has lived and worked in Detroit for fourteen years. His father, three brothers, and uncle are all U.S. citizens.

168.    Since becoming a lawful permanent resident of the United States, Mr. Omar has resided continuously in the United States with no extended absences. He meets the statutory definitions for a finding of "good moral character" and is eligible to apply for naturalization as a U.S. citizen.

169.    Mr. Omar lives in Detroit and works in a mechanic shop to support his wife and three children, who live in Yemen. On December 7, 2009, Mr. Omar traveled to Yemen to visit his wife and children for a little over three months. He planned to return to his home and job in Detroit by flying from Sana'a to Detroit on March 8, 2010, with stops in Jeddah and New York.

170.    On March 8, 2010, Mr. Omar traveled on Saudi Arabian Airlines Flight 681 from Sana'a to King Abdulaziz International Airport near Jeddah without incident. At the airport, Mr. Omar presented his passport in order to board Saudi Arabian Airlines Flight 25 to John F. Kennedy International Airport in New York. A Saudi immigration official stopped Mr. Omar and told him that he could not go to New York because his name was in their computer. Mr. Omar asked why this was the case, but he received no response. The official returned Mr. Omar's passport to him and his ticket to New York was canceled.

171.    Mr. Omar stayed in Jeddah for approximately thirty hours and took the first available flight back to Yemen, on Saudi Arabian Airlines.

172.    After arriving in Sana'a, he asked a Saudi Arabian Airlines agent why he was unable to fly to New York and was told that his name was in their computer. The agent told Mr. Omar to go to the U.S. Embassy in Sana'a for more information. Mr. Omar went directly to the U.S. Embassy.

173.    At the U.S. Embassy, Mr. Omar asked to speak with someone who could tell him why he was prevented from traveling to the United States on his Saudi Arabian Airlines flight. Mr. Omar spoke with an official who introduced himself as Dennis Brady. Upon information and belief, Mr. Brady is an agent of the FBI. Mr. Brady questioned Mr. Omar. During the questioning, another U.S. embassy official entered the room and told Mr. Omar: "You can never go to America." Mr. Omar was confused and concerned, and asked why. Mr. Brady and the U.S. Embassy official told Mr. Omar that his name is on the No Fly List, but did not provide any reason why. Mr. Omar explained that he had lost hundreds of dollars by not being able to use the ticket he had purchased to fly from Jeddah to New York. He asked the officials to show him the No Fly List. The embassy official again told him: "You cannot go to the United States of America. Never." Several days later, Mr. Omar called the U.S. Embassy in Sana'a to see if they had any more information about his situation. The embassy officials with whom he spoke provided no information.

174.    Over the course of the next few weeks, Mr. Omar went to the U.S. Embassy in Sana'a two more times to find out why was denied boarding on his U.S.-bound flight at King Abdulaziz International Airport and for information about why his name was on the No Fly List. On at least one of these occasions, Mr. Omar met with and was questioned by Legal Attaché Vincent Lisi. Mr. Omar asked Mr. Lisi for help in returning home to Detroit so that he could get back to his job. He also asked when he would be permitted to travel to the United

States. Mr. Lisi told Mr. Omar that he could not help him and that he would not be permitted to travel to the United States. Mr. Omar asked why. Mr. Lisi did not reply.

175. On June 16, 2010, Mr. Omar submitted a completed DHS TRIP form. He was assigned Redress Control Number 2102388.

176. Mr. Omar presents no security threat to commercial aviation and knows of no reason why he would be placed on the No Fly List.

177. To this day, Mr. Omar cannot return home to the United States. He has been denied the ability to travel by commercial airline from abroad to the United States. Mr. Omar has been told by U.S. officials that he will not be permitted to travel on any commercial flight to the United States or over U.S. airspace. He knows of no way to travel from Yemen to the United States by boat. Because Defendants have barred him from boarding commercial flights to and from the United States and over U.S. airspace, Mr. Omar is unable to return home and to resume working at his job in a mechanic shop, and fears that if he is absent from the United States in excess of 180 days since his departure to Yemen in December 2009, the government may seek to rescind his lawful permanent status, despite the fact that his absence is entirely involuntary. His extended absence may also jeopardize his right to naturalize as a U.S. citizen.

**Mohamed Sheikh Abdirahman Kariye**

178. Plaintiff Mohamed Sheikh Abdirahman Kariye is a U.S. citizen and resident of Portland, Oregon. He is also the imam, or religious leader, of Masjid As-Saber, which is also known as The Islamic Center of Portland.

179.    In early 2010, Mr. Kariye sought to visit his daughter, who is a high school student in Dubai. He booked tickets to travel by plane from Portland to Dubai, with a change of aircraft in Amsterdam.

180.    On March 8, 2010, Mr. Kariye went to Portland International Airport to check in for his Delta Airlines Flight to Amsterdam. He gave his passport and airline ticket receipts to the Delta employee at the check-in counter. Several minutes later, the airline employee asked Mr. Kariye to wait. After some time, Mr. Kariye asked the Delta Airlines employees at the check-in counter what was taking so long. They did not answer his question.

181.    After at least two hours had passed, a police officer, detective, and U.S. marshal approached Mr. Kariye at the counter. Two other government officials also approached Mr. Kariye, but stood a little farther away from him. Upon information and belief, those two officials were agents of the FBI.

182.    A Delta Airlines employee told Mr. Kariye: "You cannot fly. You cannot board the plane." Mr. Kariye expressed confusion and insisted to know why. The employee replied: "You are on a government list." Mr. Kariye asked why he had been put on the list. He explained that he had flown to Dubai from Portland as recently as July 2009 and from Portland to Chicago and back as recently as October 2009. The Delta Airlines employee said that she did not know and could not help him further.

183.    The police officer approached Mr. Kariye and stated that Delta Airlines did not want him near the check-in counter. Mr. Kariye asked the officer and agents why he was not permitted to fly and reiterated that he had flown as recently as July 2009 and October 2009. The officer and agents said that they could not explain to him why he could not fly and that he had to leave the area.

184.    On May 3, 2010, Mr. Kariye submitted a completed DHS TRIP form. He was assigned Redress Control Number 2097225.

185.    Several years earlier, on September 10, 2002, Mr. Kariye was arrested on a sealed indictment in Portland International Airport by an FBI-led Joint Terrorism Task Force while attempting to board a plane bound for Dubai with his brother and four children. At the time, Mr. Kariye was traveling to Dubai to assume a teaching position. A senior customs inspector alleged that there were trace amounts of TNT in two of the bags carried by Mr. Kariye's brother. Although no bombs were found in the luggage, Mr. Kariye was subsequently held without bail. After five weeks of detention, Mr. Kariye was released when lab tests showed there were no traces of any explosives. He was never charged with any explosives-related violations. Salim Jiwa and Mike Gudgell, *Muslim Cleric Released in Portland*, ABC News, Oct. 11, 2002, at http://abcnews.go.com/US/story?id=91141&page=1.

186.    Mr. Kariye presents no security threat to commercial aviation and knows of no reason why he would be placed on the No Fly List.

187.    To this day, Mr. Kariye cannot board commercial airlines to or from the United States or over U.S. airspace. Because Defendants have barred him from boarding commercial flights to or from the United States or over U.S. airspace, he cannot visit his daughter in Dubai or escort his elderly mother from Portland to Mecca, Saudi Arabia so that she can complete the Hajj pilgrimage, which is a requirement of the Muslim faith, in late 2010 as planned.

### Adama Bah

188.    Plaintiff Adama Bah is a citizen of Guinea who moved to the United States with her family when she was two years old. In 2007, Ms. Bah was granted political

asylum on the ground that she would be subject to persecution if deported to Guinea. She currently lives in New York.

189.    Since 2008, Ms. Bah has worked in New York as a caregiver for two children and their mother, who is paralyzed from the waist down. Her duties include accompanying the family on their vacations and other trips to care for the children and their mother.

190.    In March 2010, Ms. Bah's employers requested that she travel with them to Chicago on a trip to visit a relative suffering from cancer. They purchased tickets for her to travel to Chicago's O'Hare International Airport on American Airlines.

191.    On March 31, 2010, Ms. Bah went to LaGuardia Airport to board American Airlines Flight 327 bound for Chicago. She attempted to check in at the automatic ticket window but received the message "See an agent."

192.    Ms. Bah asked an airline employee to help. An American Airlines employee scanned her ticket receipt and pulled something up on a computer. An alert appeared on the screen. The employee stated: "I have to call my supervisor. We have to work this out."

193.    An American Airlines supervisor and a female Port Authority officer arrived. The Port Authority officer told Ms. Bah that she is on the No Fly List. Several other officers and government officials arrived.

194.    The Port Authority officer asked Ms. Bah: "Do you have any idea why this is happening?" Ms. Bah responded that she had been detained by immigration authorities as a teenager but had been released without ever being charged with a crime.

195.    At the American Airlines check-in counter, an airline employee informed Ms. Bah that she is on the No Fly List.

196.   FBI Special Agent Marc Fenichel and New York Police Department Detective Jon McCormack arrived at the airport, and Ms. Bah met with them in a private room, accompanied by counsel, who had also arrived. The agents did not explain why Ms. Bah was not permitted to fly.

197.   When Ms. Bah was sixteen years old, she was arrested and detained on immigration grounds, because her childhood visa was no longer valid. She was held for six weeks in a juvenile detention center and faced deportation proceedings, but was permitted to remain in the United States after being granted asylum. Ms. Bah has never been charged with any crime.

198.   On April 26, 2010, Ms. Bah submitted a completed DHS TRIP form. She was assigned Redress Control Number 2096479.

199.   Ms. Bah presents no security threat to commercial aviation and knows of no reason why she would be placed on the No Fly List.

200.   To this day, Ms. Bah cannot board a commercial airline in the United States. Ms. Bah has been told by an airline employee that she will not be permitted to travel on any commercial flight in the United States. Because Defendants have barred her from boarding commercial flights to or from the United States or over U.S. airspace, Ms. Bah has lost the opportunity to earn wages that she would otherwise earn by providing caregiver services to her employer's family during their business or personal trips outside of New York City that involve plane travel.

**Halime Sat**

201.   Plaintiff Halime Sat is a twenty-eight year-old German citizen and lawful permanent resident of the United States. She was born in Bursa, Turkey and raised in Cologne,

Germany.  She is a resident of Corona, California, and has lived in the United States for approximately two years.  She is married to a U.S.-born citizen.

202.    Ms. Sat traveled by plane without incident as recently as December 2009 on a flight to St. Louis, Missouri.

203.    On April 23, 2010, Ms. Sat and her husband were scheduled to fly from Long Beach, California to Oakland, California on JetBlue Airways Flight B6 250 to attend a conference.  When Ms. Sat attempted to check in at the electronic kiosk, she was unable to do so. She went to the check-in counter and realized that her ticket had been booked incorrectly as "Halime Sat Mustafa."  "Mustafa" is the first name of Ms. Sat's husband, Mustafa Umar.  JetBlue Manager Juan Gonzales told Ms. Sat that it would be no problem to change the name on her ticket to her correct name.  He changed the name on the ticket to "Halime Sat" and said that he had to "clear it with security."

204.    Upon information and belief, Mr. Gonzales called the JetBlue security desk and the security desk told him to speak to a federal agent in Washington, D.C.  Mr. Gonzales was on the phone for approximately one hour on hold with the agency waiting for information or clearance.

205.    Meanwhile, Mr. Gonzales recommended that Ms. Sat's husband proceed to the gate so that he would not miss the flight.  He did so and decided to wait for his wife by the gate until the final boarding call, hoping that she would receive clearance in time to join him and board the plane.  Her husband informed the gate agents that he was waiting for his wife and would board just before they were ready to close the gate.  The agents agreed to allow him to wait.  He waited by the gate for ten minutes until the gate agents received a message by radio. The agents then promptly shut the gate and would not allow him to board the plane.  When he

asked them why, the agents responded that they were ordered not to allow him to board the plane. Ms. Sat's husband then returned to the ticket counter where she continued to wait.

206.    At that point, Mr. Gonzales informed Ms. Sat and her husband that Ms. Sat was on the No Fly List and that because their tickets were booked together, he was not allowed to fly, either.

207.    Shortly thereafter, an airport police officer approached Ms. Sat and her husband. He asked Ms. Sat's husband for his identification. The officer read his name over his radio and at least five police or airport security officers came and surrounded Ms. Sat and her husband.

208.    The officers asked Ms. Sat and her husband to sit down in the check-in area lounge. The officers watched over Ms. Sat and her husband in the lounge. They did not inform Ms. Sat or her husband of any reason for Ms. Sat's placement on the No Fly List, for preventing them both from boarding their scheduled flight, or for their detention at the airport. Ms. Sat and her husband were embarrassed and humiliated by this experience.

209.    Approximately one half hour to an hour later, FBI Agents David Gates and Douglas M. Swain arrived. The agents told Ms. Sat and her husband that Ms. Sat was on the No Fly List. The agents asked Ms. Sat about the origin of her last name and about when the couple had last traveled by plane. The couple refused to answer any additional questions without the assistance of a lawyer.

210.    On April 28, 2010, Ms. Sat completed a DHS TRIP form online. She was assigned Redress Control Number 2096525.

211.    On May 10, 2010, Ms. Sat also submitted a Freedom of Information Act and Privacy Act request to the FBI, DHS, and Immigration and Customs Enforcement for information pertaining to her nomination to the No Fly List.

212.    On June 7, 2010, counsel for Ms. Sat spoke with FBI Agent David Gates who confirmed that Ms. Sat has a "real match" and is on the No Fly List.

213.    On June 14, 2010, counsel for Ms. Sat sent a complaint to the TSA Ombudsman's office regarding Ms. Sat's placement on the No Fly List, but has received no response.

214.    Ms. Sat presents no security threat to commercial aviation and knows of no reason why she would be placed on the No Fly List.

215.    To this day, Ms. Sat cannot board a commercial flight in the United States. Ms. Sat has been told by an FBI agent that she is on the No Fly List and will not be permitted to travel on any commercial flight to or from the United States or over U.S. airspace.  Because Defendants have barred her from boarding commercial flights to or from the United States or over U.S. airspace, Ms. Sat was unable to attend a conference in the Bay Area, was forced to withdraw from a competitive educational course in New York City that was to commence at the end of June and to which she was accepted, was forced to cancel her plans to attend her family reunion in Germany in July, and was forced to cancel her plans to travel to Mecca, Saudi Arabia to perform the Hajj pilgrimage in October.

* * * * *

* * * * *

* * * * *

# CLAIMS

## COUNT I

## FAILURE TO PROVIDE NOTICE AND HEARING

### Procedural Due Process (Fifth Amendment)

216.     Defendants' actions deprive Plaintiffs of constitutionally protected liberty interests, including but not limited to those identified below.

217.     Plaintiffs have a liberty interest in traveling free from unreasonable burdens within, to, or from the United States, or over U.S. air space.

218.     Plaintiffs have the right to be free from false governmental stigmatization as individuals associated with terrorist activity, when such harm arises in conjunction with the deprivation of their right to travel on the same terms as other travelers.

219.     Plaintiffs have the right to be free from false governmental stigmatization as individuals associated with terrorist activity, when such harm arises in conjunction with the deprivation of their liberty interest under the Fifth Amendment to travel free from unreasonable burdens.

220.     Plaintiffs have a liberty interest in nonattainder (i.e., the interest against being singled out for punishment without trial).  Defendants' actions have singled out Plaintiffs for punishments that include, but are not limited to, the inability to travel by air to the United States, from the United States, and over U.S. airspace, effective banishment from the United States, and effective expatriation from the United States.

221.     Plaintiff Omar, a lawful permanent resident (LPR) with continual residence in the United States, has a liberty interest in maintaining his LPR status and a right—both statutory and constitutional—not to have his LPR status revoked, modified, or altered

without due process of law. Defendants have deprived Mr. Omar of these rights by preventing him from returning to the United States and by preventing him from returning before the expiration of 180 days from the date of his departure from the United States.

222.    Plaintiff Omar also has a liberty interest in not having his eligibility for naturalization revoked, modified, or altered without due process of law. Defendants have deprived Mr. Omar of these rights by preventing him from returning to the United States and by preventing him from returning before the expiration of 180 days and the expiration of one year from the date of departure from the United States.

223.    Plaintiffs are entitled to a legal mechanism that affords them notice and an opportunity to contest their inclusion on terrorist watch lists.

224.    Plaintiffs are entitled to a legal mechanism that affords them notice and an opportunity to contest the deprivation of their liberty interests, including but not limited to their liberty interests in traveling, freedom from false stigmatization, and nonattainder due to their inclusion on terrorist watch lists that prevent them from flying on commercial airplanes.

225.    Defendants have violated Plaintiffs' rights without affording them due process of law and will continue to do so into the future if Plaintiffs are not afforded the relief demanded below.

* * * * *

* * * * *

* * * * *

* * * * *

* * * * *

## COUNT II

## VIOLATION OF U.S. CITIZENS' RIGHT TO RESIDE IN UNITED STATES AND

## TO REENTER THE UNITED STATES FROM ABROAD

### Right to Citizenship (Fourteenth Amendment)

### (Plaintiffs Latif, Knaeble, Ghaleb, Mohamed, and Muthanna against Defendants)

226.    Defendants' actions described herein deprive Plaintiffs Latif, Knaeble, Ghaleb, Mohamed, and Muthanna of rights guaranteed by the Fourteenth Amendment to the U.S. Constitution.

227.    Plaintiffs Latif, Knaeble, Ghaleb, Mohamed, and Muthanna are U.S. citizens and therefore have an absolute right to reside in the United States and to return to the United States from abroad.

228.    Defendants have violated and continue to violate Plaintiffs' Fourteenth Amendment right to U.S. citizenship by depriving them of their rights or the full effect of their rights to reside in the United States and to reenter the United States from abroad by preventing them from boarding commercial flights to the United States or over U.S. airspace, even though Plaintiffs have no other practicable means of returning to the United States.

229.    Upon information and belief, Defendants also violated Plaintiff Knaeble's Fourteenth Amendment right to U.S. citizenship by depriving him of his right or the full effect of his right to reside in the United States and to reenter the United States from abroad by causing Mexican authorities to deport him to Colombia after his arrival in Mexico City due to his placement on a U.S. government watch list that prevented him from boarding commercial flights to the United States or over U.S. airspace.

## COUNT III

## FAILURE TO PROVIDE NOTICE OF IMMIGRATION CHARGES AND REMOVAL HEARING; VIOLATION OF THE IMMIGRATION AND NATIONALITY ACT

### 8 U.S.C. § 1229a and 8 U.S.C. § 1101(a)(20)

### (Plaintiff Omar against Defendants)

230.    Defendants' actions described herein deprive Plaintiff Omar of rights guaranteed by the Immigration and Nationality Act (INA).

231.    As a lawful permanent resident, Plaintiff Omar has been "lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws." 8 U.S.C. § 1101(a)(20).

232.    Defendants cannot deprive Mr. Omar of the privilege of residing permanently in the United States without charging him and providing him a removal hearing before an immigration judge, in accordance with the procedures set forth in 8 U.S.C. § 1229a.

233.    Defendants have violated the INA by excluding Mr. Omar from and preventing his return to the United States without charge and without providing him a removal hearing.

## COUNT IV

## UNLAWFUL AGENCY ACTION

### 5 U.S.C. §§ 702, 706

234.    Defendants' actions described herein were and are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

235.   Defendants' violations of Plaintiffs' constitutional and statutory rights constitute agency actions that are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity in violation of 5 U.S.C. § 706.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

a.   A declaratory judgment that:

i.   Defendants' policies, practices, and customs violate the Fifth Amendment to the United States Constitution and the Administrative Procedure Act;

ii.   Defendants' policies, practices, and customs violate the Fourteenth Amendment to the United States Constitution as to Plaintiffs Latif, Knaeble, Ghaleb, Mohamed, and Muthanna; and

iii.   Defendants' policies, practices, and customs violate the Immigration and Nationality Act as to Plaintiff Omar.

b.   An injunction that:

i.   requires Defendants to remedy the constitutional violations identified above, including the removal of Plaintiffs from any watch list or database that prevents them from flying; or

ii.   requires Defendants to provide Plaintiffs with meaningful notice of the grounds for their inclusion on a government watch list, and an opportunity to rebut the government's charges and to clear their names; and,

      iii.   requires Defendants to permit Plaintiffs Latif, Knaeble, Ghaleb,

Mohamed, Muthanna, and Omar to return to the United States subject to

suitable screening procedures.

  c.  Awards attorneys' fees, costs, and expenses of all litigation.

  d.  Grants such other relief as the Court may deem just and proper.

DATED this June 30, 2010.

        **TONKON TORP** LLP

        By: _/S/ Steven M. Wilker by ____
        Steven M. Wilker, OSB No. 911882      OSB #975368
          Email: steven.wilker@tonkon.com
          Telephone: 503.802.2040; Fax: 503.972.3740
        Cooperating Attorney for the ACLU Foundation of Oregon

        **American Civil Liberties Union Foundation**
        Ben Wizner (to be admitted *pro hac vice*)
          Email: bwizner@aclu.org
        Nusrat Jahan Choudhury (to be admitted *pro hac vice*)
          Email: nchoudhury@aclu.org
        Telephone: 212.519.7870; Fax: 212.549.2629

        **ACLU Foundation of Oregon**
        Kevin Díaz, OSB No. 970480
          Email: kdiaz@aclu-or.org
          Telephone: 503.227.6928; Fax: 503.227.6928

        **ACLU Foundation of Southern California**
        Ahilan T. Arulanantham (to be admitted *pro hac vice*)
          Email: aarulanantham@aclu-sc.org
        Jennifer Pasquarella (to be admitted *pro hac vice*)
          Email: jpasquarella@aclu-sc.org
          Telephone: 213.977.9500; Fax: 213.977.5297

**ACLU Foundation of Northern California**
Alan L. Schlosser (to be admitted *pro hac vice*)
    Email: aschlosser@aclunc.org
Julia Harumi Mass (to be admitted *pro hac vice*)
    Email: jmass@aclunc.org
    Telephone: 415.621.2493; Fax: 415.255.8437

**ACLU Foundation of New Mexico**
Laura Schauer Ives (to be admitted *pro hac vice*)
Email: lives@aclu-nm.org
P.O. Box 566
Albuquerque, NM 87103
Telephone: 505.243.0046; Fax: 505.266.5916

**Salahi Law**
Reem Salahi (to be admitted *pro hac vice*)
Email: rsalahi@salahilaw.com
429 Santa Monica Blvd, Suite 550
Santa Monica, CA 90401
Telephone: 510.225.8880
Cooperating Attorney for the ACLU Foundation of
Southern California

        Attorneys for Plaintiffs:
        Ayman Latif, Mohamed Sheikh Abdirahman
        Kariye, Raymond Earl Knaeble IV, Steven
        Washburn, Nagib Ali Ghaleb, Samir Mohamed
        Ahmed Mohamed, Abdullatif Muthanna, Saleh A.
        Omar, Adama Bah, Halime Sat

097204/00001/2295965v1

PAGE 56 - COMPLAINT