Steven M. Wilker, OSB No. 911882
   Email: steven.wilker@tonkon.com
**Tonkon Torp LLP**
1600 Pioneer Tower
888 SW 5th Avenue
Portland, OR 97204
Tel: 503.802.2040; Fax: 503.972.3740
Cooperating Attorney for the ACLU Foundation of Oregon

Ben Wizner (Admitted *pro hac vice*)
   Email: bwizner@aclu.org
Nusrat Jahan Choudhury (Admitted *pro hac vice*)
   Email: nchoudhury@aclu.org
**American Civil Liberties Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
Tel: 212.519.2500; Fax: 212.549.2654

 Kevin Díaz, OSB No. 970480
   Email: kdiaz@aclu-or.org
**ACLU Foundation of Oregon**
P.O. Box 40585
Portland, Oregon  97240
Tel: 503.227.6928; Fax: 503.227.6948

Ahilan T. Arulanantham (Admitted *pro hac vice*)
   Email: aarulanantham@aclu-sc.org
Jennifer Pasquarella (Admitted *pro hac vice*)
   Email: jpasquarella@aclu-sc.org
**ACLU Foundation of Southern California**
1313 West Eighth Street
Los Angeles, CA 90017
Tel: 213.977.9500; Fax: 213.977.5297

Alan L. Schlosser  (Admitted *pro hac vice*)
   Email: aschlosser@aclunc.org
Julia Harumi Mass  (Admitted *pro hac vice*)
   Email: jmass@aclunc.org
**ACLU Foundation of Northern California**
39 Drumm Street
San Francisco, CA 94111
Tel: 415.621.2493; Fax: 415.255.8437

Laura Schauer Ives (Admitted *pro hac vice*)
   Email: lives@aclu-nm.org
**ACLU Foundation of New Mexico**
P.O. Box 566
Albuquerque, NM 87103
Tel: 505.243.0046; Fax: 505.266.5916

Reem Salahi (Admitted *pro hac vice*)
   Email: rsalahi@salahilaw.com
Salahi Law
429 Santa Monica Blvd, Suite 550
Santa Monica, CA 90401
Tel: 510.225.8880
Cooperating Attorney for the ACLU Foundation of Southern California

        Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| AYMAN LATIF, MOHAMED SHEIKH ABDIRAHMAN KARIYE, RAYMOND EARL KNAEBLE IV, FAISAL NABIN KASHEM, ELIAS MUSTAFA MOHAMED, STEVEN WILLIAM WASHBURN, SAMIR MOHAMED AHMED MOHAMED, ABDULLATIF MUTHANNA, NAGIB ALI GHALEB, SALEH A. OMAR, ABDUL HAKEIM THABET AHMED, IBRAHEIM Y. MASHAL, SALAH ALI AHMED, AMIR MESHAL, STEPHEN DURGA PERSAUD, ADAMA BAH, HALIME SAT, <br><br>                Plaintiffs, <br><br>        v. <br><br> ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States; ROBERT S. MUELLER, III, in his official capacity as Director of the Federal Bureau of Investigation; and TIMOTHY J. HEALY, in his official capacity as Director of the Terrorist Screening Center, <br><br>                Defendants. | No. 10-cv-750 (BR) <br><br> **FIRST AMENDED** <br> **COMPLAINT FOR** <br> **INJUNCTIVE AND** <br> **DECLARATORY RELIEF** <br><br> **(Violation of Fifth and Fourteenth Amendment Rights, the Immigration and Nationality Act, and the Administrative Procedure Act)** |

PAGE 2 – FIRST AMENDED COMPLAINT

## INTRODUCTION

1.      The United States' system of screening commercial airline passengers against databases of suspected terrorists is broken.  Thousands of people have been barred altogether from commercial air travel without any opportunity to confront or rebut the basis for their inclusion, or apparent inclusion, on a government watch list known as the "No Fly List." The result is a vast and growing list of individuals whom, on the basis of error or innuendo, the government deems too dangerous to fly, but too harmless to arrest.  Many of these individuals, like the Plaintiffs in this action, are citizens and lawful permanent residents of the United States; some, including four Plaintiffs in this action, are veterans of the United States Armed Forces. Some U.S. citizens and lawful permanent residents have been placed on the list while traveling abroad and therefore have found themselves stranded in foreign countries, without explanation or appropriate visas, unable to return home to their families, jobs, and needed medical care in the United States.  The Constitution does not permit such a fundamental deprivation of rights to be carried out under a veil of secrecy and in the absence of even rudimentary process.

2.      Ayman Latif, Raymond Earl Knaeble IV, Faisal Nabin Kashem, Elias Mustafa Mohamed, Steven William Washburn, Samir Mohamed Ahmed Mohamed, Abdullatif Muthanna, and Nagib Ali Ghaleb are U.S. citizens who were recently denied boarding on international flights to the United States and/or over U.S. airspace when seeking to return home to the United States from abroad.  Mohamed Sheikh Abdirahman Kariye, Ibraheim Y. Mashal, Salah Ali Ahmed, Amir Meshal, and Stephen Durga Persaud are U.S. citizens who were recently denied boarding on flights originating in the United States or in U.S. territory.  Saleh Omar and Abdul Hakeim Thabet Ahmed are lawful permanent residents of the United States who were recently denied boarding on international flights bound for the United States while seeking to

return home to the United States from abroad.  Adama Bah, a citizen of Guinea with refugee

status in the United States, and Halime Sat, a lawful permanent resident of the United States,

were recently denied boarding on flights originating in the United States.

      3.    Mr. Latif, Mr. Kariye, Mr. Knaeble, Mr. Kashem, Mr. Elias Mustafa

Mohamed, Mr. Washburn, Mr. Samir Mohamed Ahmed Mohamed, Mr. Muthanna, Mr. Ghaleb,

Mr. Omar, Mr. Abdul Hakeim Thabet Ahmed, Mr. Salah Ali Ahmed, Mr. Mashal, Mr. Meshal,

Mr. Persaud, Ms. Bah, and Ms. Sat,  (collectively "Plaintiffs") believe that they are on the No

Fly List.  Agents of the Federal Bureau of Investigation or other U.S. officials have told Mr.

Latif, Mr. Knaeble, Mr. Kashem, Mr. Elias Mustafa Mohamed, Mr. Washburn, Mr. Samir

Mohamed Ahmed Mohamed, Mr. Muthanna, Mr. Ghaleb, Mr. Omar, Mr. Abdul Hakeim Thabet

Ahmed, Mr. Mashal, Mr. Meshal, Mr. Persaud, and Ms. Sat that they are on the No Fly List.  A

police officer told Ms. Bah that she is on the No Fly List.  The Plaintiffs do not know why they

are on the No Fly List or how they can get off it.  The Plaintiffs have flown numerous times to,

from, and within the United States in recent years without incident.

      4.    Plaintiffs have submitted applications for "redress" through the only

available government mechanism, to no avail.  Each Plaintiff has sought explanations from the

Department of Homeland Security and the Transportation Security Administration, but no

government official or agency has offered any explanation for Plaintiffs' apparent placement on

the No Fly List or any other watch list.  Nor has any government official or agency offered any

of the Plaintiffs any meaningful opportunity to contest his or her placement on such a list.

      5.    Through this action for declaratory and injunctive relief, Plaintiffs seek the

removal of their names from any government watch list that has prevented them from flying.  In

PAGE 4 – FIRST AMENDED COMPLAINT

the alternative, Plaintiffs seek a hearing in which they can confront any evidence against them and contest their unlawful designation.

## PARTIES

6.    Plaintiff Ayman Latif is a thirty-two year-old U.S. citizen and disabled veteran of the U.S. Marine Corps.  He was born and raised in Miami, Florida.  Mr. Latif resides in Egypt with his wife and two children.  He has been unable to return to the United States to attend a Disability Evaluation with the U.S. Department of Veterans Affairs or to visit family because Defendants barred him from boarding commercial flights to or from the United States or over U.S. airspace.  Since the commencement of this litigation, Mr. Latif has been told by a U.S. official that he will be allowed to fly to the United States on certain commercial airlines as a "one-time thing."  If he is permitted to fly home to the United States, Mr. Latif believes that he will not be able to return to Egypt to continue his Arabic language studies, because Defendants continue to bar him from flying on commercial airlines to and from the United States or over U.S. airspace at any other time or for any other purpose than a one-time trip from Egypt to the United States.

7.    Plaintiff Mohamed Sheikh Abdirahman Kariye is a forty-nine year-old naturalized U.S. citizen and resident of Portland, Oregon.  He is the Imam at the Masjid As-Saber in Portland.  He cannot visit his daughter, who resides in Dubai, or relatives in Somalia because Defendants have barred him from boarding commercial flights to or from the United States or over U.S. airspace.

8.    Plaintiff Raymond Earl Knaeble IV is a twenty-nine year-old U.S. citizen and U.S. Army veteran.  He was born and raised in California.  Mr. Knaeble is currently located in Colombia, where he traveled for his wedding and to visit relatives.  Mr. Knaeble lost a job that

PAGE 5 – FIRST AMENDED COMPLAINT

was offered to him when he was unable to return home to the United States for a required pre-employment medical examination because Defendants barred him from boarding a commercial flight to the United States.  Mr. Knaeble thereafter sought to travel to the United States by flying to Mexico and entering the United States over land, but he was stopped and returned to Colombia by Mexican authorities.  Upon information and belief, Mexican authorities deported Mr. Knaeble because of his inclusion on the No Fly List, as there was no known legal barrier to his being permitted to transit through Mexico.  Mr. Knaeble cannot return home to the United States to visit relatives, including his daughter in Texas, or to secure a job, because Defendants continue to bar him from boarding commercial flights to or from the United States or over U.S. airspace.

9.      Plaintiff Faisal Nabin Kashem is a twenty-two year-old citizen of the United States and a resident of Connecticut.  Since January 2010, he has been enrolled in a two-year Arabic language certificate program at the Islamic University of Al-Madinah Al-Munawwarah in Medina, Saudi Arabia.  Mr. Kashem remains in Medina, cannot return home to Connecticut, and cannot visit his family in the United States because Defendants have barred him from boarding commercial flights to or from the United States or over U.S. airspace.

10.     Plaintiff Elias Mustafa Mohamed is a twenty year-old citizen of the United States and a resident of Seattle, Washington.  Since January 2010, he has been enrolled in a two-year Arabic language certificate program at the Islamic University of Al-Madinah Al-Munawwarah in Medina, Saudi Arabia.  Mr. Mohamed remains in Medina, cannot return home to Seattle, and cannot visit his family in the United States because Defendants have barred him from boarding commercial flights to or from the United States or over U.S. airspace.

11.    Plaintiff Steven William Washburn is a fifty-four year-old U.S. citizen and U.S. Air Force veteran.  Mr. Washburn was born and raised in Las Cruces, New Mexico.  He was denied boarding by the Defendants on a commercial flight from the United Kingdom to the United States.  Mr. Washburn thereafter attempted to fly from London to Mexico in order to enter the United States by land, but his flight was diverted back to London several hours after take-off.  Upon information and belief, the airline diverted Mr. Washburn's flight from London to Mexico because of his inclusion on the No Fly List, as there was no known legal barrier to his being permitted to fly to, or transit through, Mexico.  Mr. Washburn thereafter undertook a journey that lasted over fifty hours and required him to travel by plane from Dublin to Frankfurt, Frankfurt to São Paulo, São Paulo to Lima, Lima to Mexico City, and Mexico City to Ciudad Juarez; to endure hours of detention and interrogation by Mexican authorities in Mexico City and Ciudad Juarez; and to travel over land from Ciudad Juarez to Las Cruces, where he currently resides.  He cannot see his wife, a Spanish citizen who is located in Ireland and is currently unable to secure a visa for travel to the United States, because Defendants have barred him from boarding commercial flights to or from the United States or over U.S. airspace.

12.    Plaintiff Nagib Ali Ghaleb is a thirty-one year-old U.S. citizen and resident of San Francisco, California.  Mr. Ghaleb was denied boarding by the Defendants on commercial flights from Frankfurt, Germany and from Dubai, United Arab Emirates to the United States.  After the commencement of this litigation, an FBI agent visited Mr. Ghaleb's brother in Detroit and told him that Mr. Ghaleb would be permitted to fly to the United States.  Thereafter, an official of the U.S. Embassy in Sana'a, Yemen told Mr. Ghaleb that he would be permitted to fly to the United States and instructed him to make arrangements to fly home by commercial air.  Mr. Ghaleb subsequently flew on commercial flights from Sana'a to San

Francisco via Frankfurt.  Because Defendants have twice barred Mr. Ghaleb from boarding

commercial flights to or from the United States or over U.S. airspace, Mr. Ghaleb does not know

whether his recent permission to fly by from Sana'a to San Francisco signifies that Defendants

have granted him a one-time waiver to fly or whether they have removed him from a government

watch list.  Mr. Ghaleb believes that he cannot fly to Yemen to visit his wife and children

because Defendants continue to bar him from flying commercial airlines to and from the United

States or over U.S. airspace at any other time or for any other purpose than a one-time trip from

Yemen to the United States.

    13.  Plaintiff Samir Mohamed Ahmed Mohamed is a twenty-three year-old

U.S. citizen and resident of Lindsay, California.  Mr. Mohamed is currently located in Sana'a,

Yemen, where he traveled to visit his family in September 2009.  He remains in Sana'a, cannot

return home to California, and risks losing his job because Defendants have barred him from

boarding commercial flights to or from the United States or over U.S. airspace.

    14.  Plaintiff Abdullatif Muthanna is a twenty-seven year-old U.S. citizen who

resides in Rochester, New York.  He suffers from serious medical conditions that require

treatment by his general physician and specialists, all of whom are located in New York.  Mr.

Muthanna is currently located in southern Yemen, where he traveled to visit relatives.  He

remains in Yemen, cannot return home, and cannot receive needed medical care in the United

States because Defendants have barred him from boarding commercial flights to or from the

United States or over U.S. airspace.

    15.  Plaintiff Saleh A. Omar is a thirty-five year-old lawful permanent resident

of the United States.  He is currently located in Yemen, where he traveled to visit relatives.  Mr.

Omar has been unable return to his home and job in the United States because Defendants barred

him from boarding commercial flights to or from the United States or over U.S. airspace. Since the commencement of this litigation, Mr. Omar has been told by a U.S. official to make arrangements to travel home by commercial air. If he is permitted to fly home to the United States, Mr. Omar believes that he will not be able to return to Yemen to visit family because Defendants continue to bar him from flying commercial airlines to and from the United States or over U.S. airspace at any other time or for any other purpose than a one-time trip from Yemen to the United States. Although Mr. Omar is attempting to make arrangements to fly home, he fears that the Defendants' actions will result in his involuntary exclusion from the United States for over 180 days, that the federal government may initiate removal proceedings against him as a result, and that the Defendants actions will jeopardize his right to become a naturalized U.S. citizen.

   16. Plaintiff Abdul Hakeim Thabet Ahmed is a citizen of Yemen who has been a lawful permanent resident of the United States since 1990. He is a resident of Rochester, New York, where he works as a vendor. He cannot return to his home and job in the United States and has been involuntarily excluded from the United States for more than 180 days because Defendants have barred him from boarding commercial flights to or from the United States or over U.S. airspace. Mr. Ahmed fears that the federal government may initiate removal proceedings against him and that the Defendants' bar on his ability to return home by plane threatens to jeopardize his right to become a naturalized U.S. citizen.

   17. Plaintiff Ibraheim (Abe) Y. Mashal is a thirty year-old U.S. citizen and veteran of the U.S. Marine Corps. He resides with his wife and three children in St. Charles, Illinois and works as a traveling dog trainer. He was recently unable to travel from Chicago to Spokane, Washington, where he was scheduled to provide dog training services to a client,

because Defendants barred him from boarding commercial flights to or from the United States or over U.S. airspace.

18.     Plaintiff Salah Ali Ahmed is a fifty-eight year-old U.S. citizen and resident of Norcross, Georgia, where he works as an electrical technician.  Mr. Ahmed has lived in Georgia since he moved to the United States from Somalia in 1992.  His wife and five of his six children are also U.S. citizens.  Mr. Ahmed cannot travel to Yemen to visit relatives because Defendants have barred him from boarding commercial flights to or from the United States or over U.S. airspace.

19.     Plaintiff Amir Meshal is a twenty-seven year-old U.S. citizen and resident of New Jersey, where he currently works as a taxi driver.  Mr. Meshal is unable to fly for business or personal reasons because Defendants have barred him from boarding commercial flights to or from the United States or over U.S. airspace.

20.     Plaintiff Stephen Durga Persaud is a twenty-nine-year old U.S. citizen and resident of Irvine, California.  He was denied boarding by the Defendants on a commercial flight from St. Thomas, U.S. Virgin Islands to the United States.  Mr. Persaud thereafter undertook a journey that lasted more than nine days in an effort to reach Irvine, where his pregnant wife and son awaited him, before the birth of his second child. This journey required Mr. Persaud to travel for five days by ship from St. Thomas to Miami and for four days by train from Miami to Los Angeles.  Mr. Persaud remains unable to fly for business or personal reasons because Defendants have barred him from boarding commercial flights to or from the United States or over U.S. airspace.

21.     Plaintiff Adama Bah is a twenty-two year-old citizen of Guinea who was granted refugee status in the United States in 2007.  She resides in the city of New York, where

she works as a caregiver to a family with two children and a disabled parent.  She is unable to earn certain wages as a caregiver and to visit close friends who live in Ohio, Denver and Atlanta because Defendants have barred her from boarding commercial flights to or from the United States or over U.S. airspace.

22.    Plaintiff Halime Sat is a twenty-eight year-old German citizen and lawful permanent resident of the United States.  She was born in Bursa, Turkey and was raised in Cologne, Germany.  Ms. Sat lives with her husband in Corona, California.  She was recently prevented from attending a conference in the Bay Area and was forced to withdraw from an educational program in New York and to cancel plans to attend a family reunion in Germany because Defendants have barred her from boarding commercial flights to or from the United States or over U.S. airspace.

23.    Defendant Eric H. Holder, Jr. is the Attorney General of the United States and heads the Department of Justice ("DOJ"), a department of the United States government that oversees the Federal Bureau of Investigation ("FBI").  The FBI in turn administers the Terrorist Screening Center ("TSC"), which was created to consolidate the government's approach to terrorism screening.  The TSC develops and maintains the federal government's consolidated Terrorist Screening Database (the "watch list"), of which the No Fly List is a component. Defendant Holder is sued in his official capacity.

24.    Defendant Robert S. Mueller is Director of the Federal Bureau of Investigation, which administers the TSC.  Defendant Mueller is sued in his official capacity.

25.    Defendant Timothy J. Healy is Director of the Terrorist Screening Center and is sued in his official capacity.

## JURISDICTION AND VENUE

26.     This is a complaint for injunctive and declaratory relief based upon civil rights violations committed by the Terrorist Screening Center, Federal Bureau of Investigation, and U.S. Department of Justice in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution, the Immigration and Nationality Act, and the Administrative Procedure Act.

27.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702.

28.     The Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

29.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants are officers of agencies of the United States sued in their official capacity and because this judicial district is where Plaintiff Mohamed Sheikh Abdirahman Kariye resides and where a substantial part of the events or omissions giving rise to the claim occurred.

## FACTUAL ALLEGATIONS

### A.      The Federal Government's Terrorist Watch List

30.     In September 2003, Attorney General John Ashcroft established the Terrorist Screening Center to consolidate the government's approach to terrorism screening.  The TSC, which is administered by the FBI, develops and maintains the federal government's consolidated Terrorist Screening Database (the "watch list").  TSC's consolidated watch list is the federal government's master repository for suspected international and domestic terrorist records used for watch list-related screening.

31.     TSC sends records from its terrorist watch list to other government agencies that in turn use those records to identify suspected terrorists.  For example, applicable

TSC records are provided to the Transportation Security Administration ("TSA") for use by airlines in pre-screening passengers and to U.S. Customs and Border Protection ("CBP") for use in screening travelers entering the United States. Thus, while the TSC maintains and controls the database of suspected terrorists, it is the front-line agencies like the TSA that carry out the screening function. In the context of air travel, when individuals make airline reservations and check in at airports, the front-line screening agency, TSA, or the airline, conducts a name-based search of the individual to determine whether he or she is on a watch list.

32. Two government entities are primarily responsible for "nominating" individuals for inclusion in the terrorist watch list—the National Counterterrorism Center ("NCTC") and the Federal Bureau of Investigation. The NCTC, which is managed by the Office of the Director of National Intelligence, relies on information from other federal departments and agencies when including known or suspected international terrorists in its Terrorist Identities Datamart Environment ("TIDE") database. TIDE also contains records for spouses and children of known or reasonably suspected terrorists, as well as other individuals who have a close relationship with known or reasonably suspected terrorists. The NCTC reviews TIDE entries and recommends specific entries to the Terrorist Screening Center for inclusion in the watch list. TIDE is the source of all international terrorist identifier information included in the watch list. The FBI, in turn, nominates to the watch list individuals with suspected ties to domestic terrorism. TSC makes the final decision on whether a nominated individual meets the minimum requirements for inclusion into the watch list as a known or suspected terrorist and which screening systems will receive the information about that individual.

33. Defendant Healy, Director of the TSC, has testified that in evaluating whether an individual meets the criteria for inclusion on the consolidated watch list, the TSC

determines whether the nominated individual is "reasonably suspected" of having possible links

to terrorism.  According to the TSC, "reasonable suspicion requires articulable facts which, taken

together with rational inferences, reasonably warrant the determination that an individual is

known or suspected to be or has been engaged in conduct constituting, in preparation for, in aid

of or related to terrorism and terrorist activities."  Defendants have not stated publicly what

standards or criteria are applied to determine whether an individual on the consolidated watch list

will be placed on the No Fly List that is distributed to TSA.

34.     Under these standards, the number of records in the consolidated watch

list has swelled to an estimated one million records, representing the identities and aliases of

approximately 400,000 individuals.  Once an individual has been placed on the watch list, the

individual remains on the list until the agency that supplied the initial information in support of

the nomination determines that the individual should be removed.

35.     A 2007 GAO report found that the TSC rejects approximately one percent

of nominations to the watch list.

36.     In response to intelligence failures that permitted Nigerian citizen Umar

Farouk Abdulmutallab, a would-be bomber, to fly from Amsterdam to Detroit on December 25,

2009, the Defendants have dramatically expanded the watch list as a whole and the No Fly List

in particular.  At a recent Senate hearing, Russell E. Travers, Deputy Director of the National

Counterterrorism Center, stated that "[t]he entire federal government is leaning very far forward

on putting people on lists," and that the watch list is "getting bigger, and it will get even bigger."

**B.     Inadequacy of Redress Procedure**

37.     The government entities and individuals involved in the creation,

maintenance, support, modification, and enforcement of the No Fly List, including Defendants,

have not provided travelers with a fair and effective mechanism through which they can challenge their inclusion on the No Fly List.

38.    An individual who has been barred from boarding an aircraft on account of apparent inclusion on the No Fly List has no clear avenue for redress, because no single government entity is responsible for removing an individual from the list.  The TSC, which is administered by the FBI, does not accept redress inquiries directly from the public, nor does it directly provide final disposition letters to individuals who have submitted redress queries. Rather, individuals who seek redress after having been prevented from flying must complete a standard form and submit it to the Department of Homeland Security Traveler Redress Inquiry Program ("DHS TRIP").  The DHS TRIP Program provides each individual with a "Redress Control Number" associated with the individual's report.  Yet it is the TSC that has responsibility for consulting with relevant agencies to determine whether an individual has been appropriately listed and should remain on the list.

39.    Once the TSC makes a determination regarding a particular individual's status on the watch lists, including the No Fly List, the front-line screening agency responds to the individual with a letter that neither confirms nor denies the existence of any terrorist watch list records relating to the individual.  The government does not provide the individual with any opportunity to confront, or to rebut, the grounds for his possible inclusion on the watch list. Thus, the only "process" available to individuals who are prevented from boarding commercial flights is to submit their names and other identifying information to the Department of Homeland Security and hope that an unknown government agency corrects an error or changes its mind.

PAGE 15 – FIRST AMENDED COMPLAINT

C.    **Plaintiffs' Allegations**

**Ayman Latif**

40.    Plaintiff Ayman Latif is a U.S. citizen who was born and raised in Miami, Florida. He is a veteran of the U.S. Marine Corps. In 1999, the U.S. Department of Veterans Affairs determined that Mr. Latif was disabled as a result of serious injuries to his neck, back, and hips sustained during an auto accident during his final year of service as a Marine.

41.    Mr. Latif has worked for the U.S. government for more than fourteen years, both as a Marine and as an employee of the U.S. Postal Service.

42.    In November 2008, Mr. Latif moved with his wife and family to Egypt so that he could study Arabic. The family first settled in Cairo, where they lived for about one year. Mr. Latif and his family then moved to Munifiyyah, a town located two hours outside of Cairo.

43.    After the birth of their daughter in October 2009, Mr. Latif and his wife planned to travel with their children to Miami to visit relatives, including his mother, who was elderly and very ill. Mr. Latif purchased tickets for himself and his family to travel from Cairo to Miami on Iberia Airlines with a change of aircraft in Madrid.

44.    On the evening of April 13, 2010, Mr. Latif and his family went to the outdoor baggage scanning area for Iberia Airlines at Cairo International Airport to procure boarding passes for Iberia Airlines Flight 3735 from Cairo to Madrid and Flight 7001 from Madrid to Miami. Upon learning that the family was traveling to the United States, an airline employee took the family's passports and made a call on his cell phone. The airline employee returned the passports to Mr. Latif and escorted the family to a line for business class passengers. When Mr. Latif and his family reached the front of the line, a ticketing agent stated, "I'm sorry

sir.  We have just received a message from headquarters in Spain that you cannot board the plane."

45.    Mr. Latif was surprised.  He asked to speak to an Iberia Airlines supervisor.  Mr. Latif explained that he and his family were U.S. citizens and that he knew of no reason why they would not be permitted to fly to the United States via Madrid.  The supervisor stated that the U.S. Embassy, not Iberia Airlines headquarters in Spain, had sent the message that Mr. Latif was not permitted to board the flight.  The supervisor stated that there was nothing he could do to assist Mr. Latif.

46.    Mr. Latif immediately called the U.S. Embassy in Cairo from his cell phone.  He spoke to an official who instructed him to go to the U.S. Embassy the next morning for more information.  The Iberia Airlines supervisor with whom Mr. Latif had spoken also called the U.S. Embassy and secured another embassy counselor on the phone.  This counselor told Mr. Latif that he might be on a "TSA list" and also instructed him to go to the U.S. Embassy first thing the next morning.

47.    Mr. Latif and his family left the airport and spent the night in a hotel located close to the U.S. Embassy.

48.    The following morning, Mr. Latif went to the U.S. Embassy.  He spoke to an embassy official and explained that he and his family had been denied boarding passes for Iberia Airlines Flights 3735 and 7001.  The official stated that the U.S. Embassy had no information about why this had occurred and that he could not do anything about it.  The counselor told Mr. Latif that embassy officials would look into the matter and asked him to be patient.

PAGE 17 – FIRST AMENDED COMPLAINT

49.     Mr. Latif returned to Munifiyyah with his family because he could not afford to pay for Cairo hotels while waiting for embassy officials to look into his situation.

50.     Mr. Latif sought urgently to find out why he was denied the ability to board his Iberia Airlines flights.  He called the offices of Congressman Kendrick Meek of the 17th Congressional District of Florida and of Bill Nelson and George Le Mieux, the United States Senators from the State of Florida.

51.     On or around April 15, 2010, Mr. Latif completed a DHS TRIP form online.  He was assigned Redress Control Number 2095199.

52.     At or around the same time, Mr. Latif called the U.S. Customs and Border Protection information line in Washington, D.C. and asked why he had been denied boarding on his Iberia Airlines flight.  CBP supervisor Olga DeLeon told him that she could not assist him, but that he should call the U.S. Embassy in Cairo and ask to speak with the FBI Liaison.

53.     Mr. Latif called the U.S. Embassy in Cairo and asked to be connected to the FBI Liaison.  A government official listened to his complaint and said that she would forward it to the appropriate official.

54.     That evening, Legal Attaché Hashim El-Gamil called Mr. Latif and told him that the FBI was investigating his case and that two FBI agents from Miami were traveling to Cairo to meet with him.  Mr. El-Gamil explained that it could take several weeks to arrange a meeting between Mr. Latif and the FBI agents because the agents were facing difficulties in securing visas to travel to Egypt.

55.     About one month later, a U.S. Embassy official called Mr. Latif and asked him to come to the embassy to speak with two FBI agents.  At the meeting, one agent introduced herself to Mr. Latif as FBI Special Agent Janet Waldron.  Agent Waldron and another FBI agent

questioned Mr. Latif for at least four hours.  Agent Waldron told Mr. Latif that he was on the No Fly List.

56.    The next day, Agent Waldron and the other FBI agent questioned Mr. Latif for at least four hours.  At the end of the interrogation, the agents told Mr. Latif that they would file a report with FBI Headquarters.

57.    In or around the middle of May 2010, Mr. Latif's mother-in-law called him from Florida to tell him that she had received a correspondence from the U.S. Department of Veterans Affairs ("VA") addressed to him.  He asked her to open the letter.  The letter was dated May 12, 2010 and stated that the "combined evaluation for all of [Mr. Latif's] service-connected disabilities will drop from 50% to 20%" and that Mr. Latif's monthly benefit would accordingly be reduced from $899.00 to $293.00.  Mr. Latif did not understand why the VA had decided to reduce its evaluation of his disability and the monthly rate of compensation that he would receive for his service-connected disabilities.

58.    Mr. Latif called the VA.  A VA officer indicated that Mr. Latif had been scheduled to attend a Disability Evaluation on April 15, 2010, which Mr. Latif had missed. Because he had been denied boarding on his April 13, 2010 Iberia Airlines flights to Madrid and Miami, Mr. Latif was not in Florida on April 15, 2010 and could not have attended the evaluation, which would have taken place in the Veterans Affairs hospital in his home town.

59.    Ordinarily, if an individual misses a VA Disability Evaluation, the appointment is rescheduled for a later date.  Mr. Latif was unable to reschedule his Disability Evaluation, however, because he was unable to fly from Egypt to the United States to attend a rescheduled VA appointment due to his placement on the No Fly List.

60.    On June 1, 2010, Mr. Latif went to the U.S Embassy in Cairo to speak to Mr. El-Gamil regarding the outcome of his interview with the two FBI Agents from Miami.  Mr. El-Gamil stated that the agents had submitted a report to FBI headquarters with a recommendation that Mr. Latif be granted a waiver to fly to the United States, but that FBI headquarters was not satisfied with the report.  He told Mr. Latif that the FBI was sending two other FBI agents to Egypt to speak with Mr. Latif and to administer a polygraph test.  Mr. Latif emphasized to Mr. El-Gamil that he was experiencing great hardship in not being able to fly to the United States, particularly because he was unable to travel to Florida to attend a rescheduled Disability Evaluation with the VA and because the VA decided to reduce his benefits as a result.

61.    On or around June 4, 2010, Mr. Latif completed a second DHS TRIP form online.  He was assigned Redress Control Number 2100977.

62.    On June 29, 2010, Mr. Latif and his family moved from Munifiyyah to lower-cost housing in Alexandria, Egypt, due to the impending reduction in Mr. Latif's VA benefits.  Moving his family to a new home and carrying out associated and necessary renovations on the new, lower-cost housing aggravated Mr. Latif's service-connected disabilities.

63.    On June 30, 2010, Mr. Latif filed the instant action against the Defendants for violation of his constitutional rights, seeking removal of his name from any government watch list that has prevented him from flying or, in the alternative, a hearing in which he can confront any evidence against him and contest his unlawful designation.

64.    On July 7, 2010, Mr. El-Gamil called Mr. Latif.  He stated that Mr. Latif would be permitted to fly to the United States as a "one-time thing," but that he could not guarantee that Mr. Latif would be able to return to Egypt by commercial air after this trip.  Mr.

PAGE 20 – FIRST AMENDED COMPLAINT

El-Gamil explained that Mr. Latif would have to straighten out his placement on the No Fly List while in the United States.  Mr. Latif asked if he and his family would be permitted to fly home on the Iberia Airlines tickets that were not used when he was denied boarding.  He explained that he could not afford to purchase new tickets or to pay penalty fees to use the Iberia Airlines tickets.  Mr. El-Gamil stated that he would inquire as to whether there were any restrictions on the flights on which Mr. Latif would be permitted to fly home.

65.    Several days later, Mr. El-Gamil called Mr. Latif.  He stated that Mr. Latif would be permitted to travel to the United States on flights run by any American commercial airline or any foreign carrier that is a sister company of an American commercial airline.  Mr. El-Gamil instructed Mr. Latif to ask Iberia Airlines to book him and his family to travel to the United States on such flights.

66.    Mr. Latif contacted Iberia Airlines to book tickets to travel home under the parameters explained by Mr. El-Gamil.  An airline official told him his request would take some time to process.

67.    During the following week, Mr. El-Gamil called Mr. Latif several times to ask whether Mr. Latif had booked tickets to return to the United States by commercial air.

68.    During the week of July 26, 2010, Mr. Latif received a call from Mark Perry of Citizenship Services at the U.S. Embassy in Cairo.  Mr. Perry asked Mr. Latif if he had made arrangements to fly to the United States.  Mr. Latif described his efforts to book tickets through Iberia Airlines to fly to the United States under the parameters explained by Mr. El-Gamil and explained that Iberia Airlines was resisting rebooking him on such flights and had not yet made a final decision.

69.    Mr. Latif received a July 27, 2010 letter from the Disabled American Veterans ("DAV") National Service Office.  The letter stated that the DAV had "reviewed the most recent VA decision concerning [Mr. Latif's] claim for benefits."  It reported that the VA had reduced its evaluation of Mr. Latif's residual cervical sprain/strain and the degenerative disc disease of his lumbar spine from "20 percent disabling" to 0 percent, effective October 1, 2010.

70.    Mr. Latif presents no security threat to commercial aviation and knows of no reason why he would be placed on the No Fly List.

71.    Although Mr. Latif is currently attempting to arrange for commercial air travel to the United States, to this day, he does not know whether he can fly commercial airlines to and from the United States or over U.S. airspace.  The Defendants denied him boarding on commercial flights from Cairo to the United States via Madrid.  Mr. Latif was not told why this occurred and was subsequently told by FBI agents that he would not be permitted to travel on any commercial flight to the United States.  After the commencement of this litigation, Mr. Latif was told by a U.S. government official that he would be allowed to fly to the United States on certain commercial airlines as a "one-time thing."  Mr. Latif was not told, however, whether he has been granted a one-time waiver to fly home or whether his name has been removed from the No Fly list, permitting him to fly on commercial airlines to and from the United States or over U.S. airspace.

72.    Mr. Latif fears that his name remains on the No Fly List and knows of no way to travel from Egypt to the United States by boat.  If Mr. Latif is denied boarding on the flight to the United States that he is attempting to secure, he will be unable to return home, will not be able to visit family members in the United States, and will not be able to participate in a Disability Evaluation that would prevent his veterans' disability benefits from being drastically

reduced and/or entirely withdrawn.  If Mr. Latif is permitted to fly from Egypt to the United

States and Defendants subsequently deny him boarding on a commercial flight, Mr. Latif will be

unable to return to Egypt where he seeks to continue his Arabic language studies.

### Raymond Earl Knaeble IV

73.     Plaintiff Raymond Earl Knaeble IV is a U.S. citizen who was born and

raised in Ventura and Santa Barbara, California.  He is also a veteran of the U.S. Army.

74.     In 2006, Mr. Knaeble moved to Kuwait to work for ITT Systems

Corporation ("ITT Systems"), a multinational company specializing in global defense and

security.

75.     In late 2008, Mr. Knaeble converted to Islam.  From August 2009 to

December 2009, he studied at the Saba Institute, a language school in Sana'a, Yemen that

specializes in teaching Arabic to foreigners.  Mr. Knaeble returned to Kuwait and created a

website, www.islambrotherhood.com, to provide the public with information about Islamic

beliefs and practices.

76.     On March 1, 2010, ITT Systems offered Mr. Knaeble a position as a heavy

mobile equipment mechanic/driver in Qatar.  The effective date of employment was contingent

upon Mr. Knaeble's passage of a pre-employment medical exam that was to be scheduled within

days of acceptance of the offer.  ITT Systems indicated that a medical exam administered in the

United States would be processed more quickly than one administered in a foreign country.

77.     Mr. Knaeble accepted the ITT Systems position in Qatar and scheduled his

physical examination to take place in Killeen, Texas on March 16, 2010.  Prior to moving to

Qatar to start his new job, Mr. Knaeble planned to travel to Bogota, Colombia so that he could

marry his fiancé, a Colombian citizen, and spend some time with her family and his relatives,

PAGE 23 – FIRST AMENDED COMPLAINT

including his grandfather and aunts.  He also planned to visit his daughter in Texas and his

mother and sisters in California while in the United States following his scheduled medical

examination and before moving to Qatar with his new wife.

78.    Mr. Knaeble booked airline tickets to travel first on Turkish Airlines and

Iberia Airlines from Kuwait to Bogota, where he would spend several days for his wedding and

visiting relatives, and then from Bogota to the United States.  His itinerary for travel from

Kuwait to Bogota included changes of aircraft in Istanbul, Barcelona, and Madrid.  He chose this

itinerary in order to book the lowest fares he could find from Kuwait to Bogota.  His itinerary for

travel from Bogota to the United States scheduled him to fly from Bogota to Miami on LAN

Airlines and from Miami to Killeen on American Airlines with a change of aircraft in Dallas.

79.    On March 10 and 11, 2010, Mr. Knaeble flew from Kuwait to Bogota

without incident.

80.    On March 14, 2010, Mr. Knaeble went to Aeropuerto Internacional El

Dorado in Bogota.    An airline official denied Mr. Knaeble a boarding pass for LAN Airlines

Flight 570 to Miami and told him that no airlines would permit him to board a flight bound for

the United States.  He was instructed to contact the U.S. Embassy in Bogota.

81.    Mr. Knaeble went to the U.S. Embassy the following day, on March 15,

2010.  He spoke with Scott Renner, American Citizen Services Chief.  Mr. Renner took Mr.

Knaeble's passport and told him to call him the next day.  Mr. Renner did not return Mr.

Knaeble's passport that day.

82.    Mr. Knaeble called the U.S. Embassy on March 16, 2010.  Embassy

officials instructed him to return several days later.

83.    Approximately four days later, Mr. Knaeble met with two FBI agents at the U.S. Embassy.  The agents identified themselves only as "Charles" and "Loretta," despite Mr. Knaeble's repeated requests to see their identification and credentials.  Charles and Loretta questioned Mr. Knaeble for six hours about his life before and after converting to Islam.  Mr. Knaeble asked them when he would be permitted to return to the United States.  The agents told Mr. Knaeble to be patient and said that they were doing their job.  Despite his repeated questions, neither agent told Mr. Knaeble why he had been placed on the No Fly List or why they were questioning him.

84.    Over the course of the following four weeks, Mr. Knaeble lived in hotels in Bogota and spoke regularly with FBI agents and U.S. Embassy officials in an effort to learn why he was not permitted to board a flight for the United States.    Mr. Knaeble met with Charles and Loretta at least ten times.  He hoped that by cooperating with FBI and embassy officials, he would secure permission to fly.

85.    On March 26, 2010, Mr. Knaeble completed a DHS TRIP form online. He was assigned Redress Control Number 2093292.

86.    Due to the exorbitant cost of living in Bogota, Mr. Knaeble moved to Santa Marta, which is located on the coast of Colombia, to live with relatives while trying to sort out a way to return to the United States.

87.    Sometime in April 2010, Mr. Knaeble received a call from Rodney Sanchez of the FBI.  Agent Sanchez indicated that he was a member of the Dallas, Texas FBI office and that he wanted to question Mr. Knaeble.  Mr. Knaeble met with Agent Sanchez approximately five times.

PAGE 25 – FIRST AMENDED COMPLAINT

88.    On April 13, 2010, Mr. Knaeble received a letter from ITT Systems indicating that because he had not taken the required physical exam in Killeen as planned, the firm had withdrawn the offer it made to Mr. Knaeble for a position in Qatar.

89.    On or around April 21, 2010, Scott Renner returned Mr. Knaeble's passport to him.  Mr. Knaeble had been without a passport since March 15, 2010, the date on which Mr. Renner seized his passport.

90.    On April 22, 2010, Mr. Knaeble told Agent Sanchez that he was being represented by an attorney at the Council on American-Islamic Relations.  He asked the agent to call his attorney to discuss his situation and any further questions the FBI wanted to ask him. Agent Sanchez stated that he had been trying to help Mr. Knaeble return to the United States, but that since Mr. Knaeble had retained an attorney, he was no longer going to work on getting him a flight home.  Agent Sanchez also stated that because Mr. Knaeble retained an attorney, Mr Knaeble was "closing all doors in the investigation."

91.    Mr. Knaeble remained desperate to return to the United States.  On May 11, 2010, he purchased a ticket to fly from Santa Marta to Nuevo Laredo, Mexico, with stops in Bogota and Mexico City.  He hoped to enter the United States over land by crossing the border between Nuevo Laredo and Laredo, Texas.

92.    On May 12, 2010, Mr. Knaeble flew from Santa Marta to Bogota without incident, and from Bogota to Mexico City.  When Mr. Knaeble landed in Mexico City, however, Mexican government agents were waiting for him at the gate of the plane.  The agents questioned him for more than three hours about Islam, his activities in Yemen, and various Islamic groups to which Mr. Knaeble does not belong.  One agent asked Mr. Knaeble what he was doing in Mexico.  Mr. Knaeble explained that he was traveling to Nuevo Laredo where he

would meet his father and travel to the United States.  The agent responded that Mr. Knaeble would not be doing any more traveling in Mexico and that the only trip he would take would be back to Colombia.  The authorities refused to allow Mr. Knaeble to board a flight from Mexico City to Nuevo Laredo or to travel by bus or any other means to the U.S.-Mexico border.  The agents detained Mr. Knaeble for fifteen hours.

93.    At around 3:00 P.M. the following day, the agents placed Mr. Knaeble on a flight back to Bogota.  Mr. Knaeble was able to secure permission to stay in Colombia for two months, until July 13, 2010.

94.    Due to the high cost of living in Bogota, Mr. Knaeble returned to live with family members in Santa Marta.

95.    On June 26, 2010, Mr. Knaeble left Santa Marta for Venezuela to apply for an extension of his authorization to stay in Colombia with a Colombian consulate in that country because his authorization was to expire in several weeks.  On June 29, 2010, the Colombian consulate in Maracaibo, Venezuela granted Mr. Knaeble authorization to remain in Colombia until June 29, 2012.  Mr. Knaeble returned to Santa Marta to live with family members.

96.    Mr. Knaeble fears that his departure to a foreign country to attempt to travel to the United States will subject him to arrest, detention, interrogation, and search, as was the case when he flew from Colombia to Mexico on May 12, 2010.

97.    Since he was denied boarding on March 14, 2010, Mr. Knaeble has been unauthorized to work in Colombia and unable to secure paid employment.

98.    Mr. Knaeble presents no security threat to commercial aviation and knows of no reason why he would be placed on the No Fly List.

PAGE 27 – FIRST AMENDED COMPLAINT

99.     To this day, Mr. Knaeble cannot return home to the United States.  He has been denied the ability to board a commercial flight from Bogota to the United States.  He has been told by FBI agents that he is not permitted to travel on any commercial flight to the United States.  Mexican authorities have prohibited him from entering Mexico and traveling to the United States by land.  Mr. Knaeble is seeking a means to travel to the United States by boat, but the earliest practical opportunity to do so is to travel by cargo ship from Bogota to Florida in October 2010.   He fears that the Defendants will prevent him from returning to the United States before his authorization to remain in Colombia expires on June 29, 2012.  Because Defendants have barred him from boarding commercial flights to or from the United States or over U.S. airspace, Mr. Knaeble lost a job with ITT Systems and is currently prevented from returning to his home country to secure other employment and to visit his family.

**Faisal Nabin Kashem**

100.     Plaintiff Faisal Nabin Kashem is a twenty-two year-old citizen of the United States and a resident of Connecticut.  Mr. Kashem and his family moved to Connecticut when he was in middle school.  He graduated from the University of Connecticut in 2005 with an undergraduate degree in accounting and worked for one year for Accenture, a consulting firm based in Hartford, Connecticut.

101.     In January 2010, Mr. Kashem enrolled in a fully-funded two-year Arabic language certificate program at the Islamic University of Al-Madinah Al-Munawwarah in Medina, Saudi Arabia.  He planned to complete the program and subsequently to enroll in a four-year Islamic Studies degree program at the university.

102.     On or around January 7, 2010, Mr. Kashem flew from New York's John F. Kennedy International Airport to Medina, with a change of planes at King Abdulaziz

International Airport near Jeddah.  He flew without incident, arrived in Medina, and commenced his studies.

103.    Mr. Kashem planned to return home to Connecticut for his two-month summer vacation, which was to take place from June to August 2010.

104.    On June 23, 2010, Mr. Kashem flew without incident from Medina to King Abdulaziz International Airport.  At around 11:00 P.M., Mr. Kashem attempted to check in for Saudi Arabian Airlines Flight 21 to John F. Kennedy International Airport, which was scheduled to depart at 1:55 AM the following morning.  A Saudi Arabian Airlines employee scanned his passport.  The employee told Mr. Kashem that he was on the "No Fly List" and that the United States had barred him from flying.

105.    Mr. Kashem asked the Saudi Arabian Airlines employee if he could talk to anyone at the airport for help.  The employee stated that Mr. Kashem would have to be cleared by the United States in order to board any flights to the United States.  He told Mr. Kashem to speak to an agent at the ticketing counter to recover the value of his ticket.  Mr. Kashem canceled his ticket to fly on Saudi Arabian Airlines before it departed so as not to lose the value of the ticket.

106.    Mr. Kashem called the emergency number for the U.S. Consulate in Jeddah.  The duty officer told him that she could not assist him.  She provided Mr. Kashem with the phone number for the U.S. Embassy in Riyadh.  Mr. Kashem was not able to reach a duty officer in Riyadh.

107.    Mr. Kashem secured accommodation at a friend's home in Jeddah for several nights so that he could stay in the city while seeking to determine why he could not fly. Mr. Kashem knew that he would need to spend several days in Jeddah because he was denied

boarding in the early morning hours on a Thursday and offices in Jeddah are closed on Thursday and Friday for the weekend in Saudi Arabia.

108.    On Friday morning, June 25, 2010, Mr. Kashem received a telephone call from Elias Mustafa Mohamed, a fellow student in the Arabic language certificate program at the Islamic University of Al-Madinah Al-Munawwarah.  Mr. Mohamed informed Mr. Kashem that he, too, had been denied boarding on a flight and was told that he was on the No Fly List.

109.    Mr. Kashem and Mr. Mohamed went to a store.  There, Mr. Kashem photocopied and scanned his identification papers and completed a DHS Trip application online. Mr. Kashem was assigned Redress Control Number 2103133.

110.    The following morning, on June 26, 2010, Mr. Kashem and Mr. Mohamed went to the U.S. Consulate in Jeddah, where they met with two U.S. government officials.  One official introduced himself as Chris O'Brien and stated that he was a "point of contact" for the "U.S. Consulate Department of State."  Another individual introduced himself as Stephen Sekellick and stated that he worked in security at the consulate.  The officials asked Mr. Kashem about his living situation in Saudi Arabia, his studies, and the amount of the stipend he received from the Islamic University.  The officials told him that they were collecting information about him to give to a "case manager."  Mr. Mohamed was also questioned by Mr. O'Brien and Mr. Sekellick.  Afterwards, Mr. Kashem and Mr. Mohamed returned by cab to their dormitories in Medina.

111.    On July 1, 2010, Mr. Kashem received a call from Chris O'Brien, who asked him and Mr. Mohamed to come to the U.S. consulate in Jeddah on July 6, 2010 for an interview with a "case manager" from Riyadh.

PAGE 30 – FIRST AMENDED COMPLAINT

112.    On July 6, 2010, Mr. Kashem and Mr. Mohamed made the four-hour trip from Medina to Jeddah and met Mr. O'Brien at the U.S. Consulate.  While Mr. Mohamed waited in the lobby, Mr. O'Brien escorted Mr. Kashem to separate room and told him: "FBI agents from Connecticut are here to see you."  Mr. Kashem was surprised, because he had been told that he would be meeting with a "case manager."

113.    The FBI agents from Connecticut introduced themselves as Tim Bonarski and Andy Klopfer.  Mr. Kashem requested to call his lawyer from the Council on American-Islamic Relations, so that she could represent him during the interview.  The agents called Mr. Kashem's attorney and permitted her to stay on speaker phone while they questioned Mr. Kashem for approximately three hours.

114.    The agents asked Mr. Kashem, among other things, why he wore traditional Saudi clothing, whether he socialized with Saudis while studying in the country, how he felt as an American in Saudi Arabia, whether he had heard of a Bangladeshi student at the Islamic University of Al-Madinah Al-Munawwarah who had been arrested on terrorism charges, whether he knew any Iraqi or Afghani students at the school, the amount of his university stipend, whether he had brought money with him to Saudi Arabia, and how much money he had in his bank account at the time.  Mr. Kashem answered their questions to the best of his ability. He told them that he had not heard of the Bangladeshi student they mentioned.  The agents asked Mr. Kashem if he had ever provided financial support to Al-Qaeda, Hezbollah, Hamas, or other such organizations.  Mr. Kashem responded that he had never made any such contributions and understood that doing so was against the law.

115.    The agents told Mr. Kashem that he was not banned from entering the United States, but would not be permitted to fly.  One agent suggested that Mr. Kashem fly to

Canada and drive across the border to the United States.  Mr. Kashem asked whether he would be barred at the border.  The agents stated that they could not guarantee that he would not be barred.

116.    Mr. Kashem presents no security threat to commercial aviation and knows of no reason why he would be placed on the No Fly List.

117.    To this day, Mr. Kashem cannot return home to the United States.  He has been denied the ability to board a commercial flight from Saudi Arabia to the United States.  He has been told by FBI agents that he is not permitted to travel on any commercial flight to the United States.  Mr. Kashem is seeking a means to travel to the United States by boat, but he cannot find a way to do so that is affordable and will permit him to return to Medina in time to begin the fall 2010 semester at his school.  Because Defendants have barred Mr. Kashem from boarding commercial flights to or from the United States or over U.S. airspace, Mr. Kashem is unable to return home or to visit his family in the United States during his school vacations and has missed the weddings of two close friends.

**Elias Mustafa Mohamed**

118.    Plaintiff Elias Mustafa Mohamed is a twenty year-old citizen of the United States and a resident of Seattle, Washington, where he has lived with his family since the age of six.  Mr. Mohamed's parents, step-father, and seven siblings are all U.S. citizens and live in the United States.

119.    In September 2008, Mr. Mohamed applied for admission to the two-year Arabic language certificate program at the Islamic University of Al-Madinah Al-Munawwarah in Medina, Saudi Arabia.  He was admitted and planned to begin his studies in January 2010.

120.    During the first week of January 2010, Mr. Mohamed flew on commercial flights without incident from Washington, D.C. to Medina, with a change of aircraft in King Abdulaziz Airport near Jeddah, to begin his studies at the Islamic University of Al-Madinah Al-Munawwarah.  He planned to return home to Seattle for his summer vacation on June 25, 2010.

121.    On June 25, 2010, Mr. Mohamed and five of his classmates flew from Medina to King Abdulaziz International Airport without incident.  At the Saudi Arabian Airlines check-in area, a classmate with the same first name as Mr. Mohamed stood in line ahead of him. When he presented his passport to the airline employee, he was told that he could not fly.  When Mr. Mohamed presented his passport to the airline employee, he was also told that he could not fly.  Mr. Mohamed's passport and the passport of his classmate with the same name were given to a Saudi Arabian Airlines supervisor.  The supervisor indicated that only Mr. Mohamed was not permitted to fly.

122.    Mr. Mohamed canceled his flight so that he would not lose the value of the ticket.

123.    A classmate told Mr. Mohamed that another classmate, Faisal Kashem, had also been denied boarding on a Saudi Arabian Airlines flight.  Mr. Mohamed called Mr. Kashem and explained his situation.

124.    Mr. Kashem and Mr. Mohamed went to a store.  There, Mr. Mohamed photocopied and scanned his identification papers and completed a DHS Trip application online. Mr. Mohamed was assigned Redress Control Number 2103288.

125.    The following morning, on June 26, 2010, Mr. Kashem and Mr. Mohamed went to the U.S. Consulate in Jeddah, where they met with Chris O'Brien and Stephen Sekellick. The officials first separately questioned Mr. Kashem for approximately half an hour, while Mr.

Mohamed waited in the lobby. The officials then separately questioned Mr. Mohamed. They

asked him where he had traveled prior to his arrival in Saudi Arabia. When Mr. Mohamed

explained that he had traveled to Cairo and Saudi Arabia during the summer of 2008, the

officials asked him why he had made this trip and how and why he came to study in Saudi

Arabia. Mr. Mohamed explained that he had traveled to Egypt in 2008 for tourism, that he had

then traveled to Saudi Arabia to complete *umrah* (Islamic pilgrimage), and that he applied to the

Islamic University of Al-Madinah Al-Munawwarah at that time because he hoped to work as a

professor. The officials also asked Mr. Mohamed, "Why do you think you're on the No Fly

List?" Mr. Mohamed responded that he had no idea. Mr. O'Brien took Mr. Kashem's telephone

number and said that he would follow-up in a week. Mr. Mohamed and Mr. Kashem returned to

their dormitories in Medina in a cab.

    126. On July 6, 2010, Mr. Mohamed made the four-hour trip with Mr. Kashem

from Medina to the U.S. Consulate in Jeddah. They were met by Mr. O'Brien, who first escorted

Mr. Kashem to a separate room while Mr. Mohamed waited in the lobby. Mr. O'Brien returned

to the lobby several minutes later and told Mr. Mohamed that two FBI agents had come from

Seattle to speak with him. Mr. O'Brien escorted Mr. Mohamed to a room, where two agents

were waiting for him. They introduced themselves as Agent Frederick Gutt and Agent Albert

Kelly of the Seattle FBI.

    127. Mr. Mohamed asked for permission to call an advocate at the Council on

American-Islamic Relations. The agents permitted him to make the call. Mr. Mohamed's

advocate listened on speakerphone as the agents questioned Mr. Mohamed.

    128. Agent Gutt led the questioning of Mr. Mohamed. He asked Mr. Mohamed

about a variety of subjects, including the purpose of and details about his 2008 trip to Egypt, why

he was studying at the Islamic University of Al-Madinah Al-Munawwarah, and whether he had

ever traveled to Somalia and Yemen.  The agents also showed Mr. Mohamed photos of two

young adult men in Seattle and asked him whether he knew them, had given them money to

travel, or had provided them any other support for their travel to Somalia.  Mr. Mohamed

responded that he did not know either of the two individuals, although he had seen one of them

at a mosque in Seattle and had worked at Taco Bell with the brother of the other individual.  Mr.

Mohamed told the agents he had never given either of them money or any other type of support.

The agents confirmed that Mr. Mohamed was on the No Fly List.

129.    Mr. Mohamed presents no security threat to commercial aviation and

knows of no reason why he would be placed on the No Fly List.

130.    To this day, Mr. Mohamed cannot return home to the United States.  He

has been denied the ability to board a commercial flight from Saudi Arabia to the United States.

He has been told by FBI agents that he is not permitted to travel on any commercial flight to the

United States.  Mr. Mohamed is seeking a means to travel to the United States by boat, but he

cannot find a way to do so that is affordable and will permit him to return to Medina in time to

begin the fall 2010 semester at his school.  Because Defendants have barred Mr. Mohamed from

boarding commercial flights to or from the United States or over U.S. airspace, Mr. Mohamed is

unable to return home or to visit his family in the United States during his school vacations.

**Steven William Washburn**

131.    Plaintiff Steven William Washburn is a U.S. citizen and veteran of the U.S

Air Force.  In August 2008, Mr. Washburn and his wife decided to move to Riyadh, Saudi

Arabia so that he could work for a technology company.  After one and a half years in Saudi

Arabia, the couple decided that life in Saudi Arabia did not suit them and that they wanted to move back to the United States.

132.    In preparation for their move back to the United States, in January 2010, Mr. Washburn and his wife sold their home and all of their possessions and closed their bank accounts.  The proceeds from these sales and their savings constituted their entire life savings.  Mr. Washburn and his wife decided to take these life savings with them to the United States in cash.

133.    Mr. Washburn and his wife purchased airline tickets to travel from Riyadh to Las Cruces, New Mexico, where his parents live.  They planned to spend a one-week layover in Ireland during this trip so that they could visit Mr. Washburn's step-daughter, who was pregnant at the time.

134.    The Washburns traveled from Riyadh to Dublin without incident.  The couple then sought to continue their journey to the United States on February 5, 2010.  That day, Mr. Washburn attempted to board Aer Lingus Flight 133 at Shannon Airport Ireland bound for Boston.  At the check-in counter, an airline employee denied him a boarding pass.  When Mr. Washburn asked why the boarding pass was denied, the employee responded that Mr. Washburn was on the No Fly List.

135.    Mr. Washburn contacted the U.S. Embassy in Dublin to ask why he was denied boarding on Aer Lingus Airlines Flight 133.  An embassy official replied that the U.S. Embassy did not know why someone would be on the No Fly List and did not have access to such information.  Mr. Washburn explained that he and his wife were moving back to the United States from Saudi Arabia.  He also explained that they could not return to Riyadh because they had sold their home there and because they no longer had valid visas to remain in Saudi Arabia.

PAGE 36 – FIRST AMENDED COMPLAINT

Embassy officials advised Mr. Washburn to fly to Canada or Mexico and to enter the United States by driving over land across the border.

136.    Mr. Washburn was eager to return to the United States to re-establish a life there with his wife.  He also knew that his visa to stay in Ireland would run out soon.

137.    Mr. Washburn purchased a new set of airline tickets to travel from Dublin to Ciudad Juarez, Mexico, with changes of aircraft in London and Mexico City.  He planned to enter the United States by walking over a bridge located at the border between Ciudad Juarez and El Paso, Texas, as officials at the U.S. Embassy in Dublin had advised.

138.    On February 12, 2010, Mr. Washburn flew from Dublin to London's Heathrow International Airport without incident on BMI Flight 120.  He was permitted to board British Airways Flight 243 from London to Mexico City.  The plane took off without incident.  Approximately three and a half hours later, however, the aircraft turned around and flew back to Heathrow International Airport.  Airline employees provided no explanation for the decision.

139.    Upon information and belief, British Airways Flight 243 returned to London because, after Mr. Washburn had boarded the flight, federal government officials instructed airline officials not to fly over U.S. airspace with Mr. Washburn on board due to his placement on the No Fly List.

140.    When British Airways Flight 243 landed at Heathrow, airport security and New Scotland Yard officials met Mr. Washburn at the gate.  These officials escorted Mr. Washburn to a room where they detained and interrogated him for more than nine hours.  Airport security and New Scotland Yard officials also photographed and fingerprinted Mr. Washburn and subjected him to a DNA test.  They seized the life savings that Mr. Washburn carried with

PAGE 37 – FIRST AMENDED COMPLAINT

him.  New Scotland Yard officials subsequently escorted Mr. Washburn to another aircraft, which took him back to Ireland.

141.    Several days later, Mr. Washburn's visa to stay in Ireland expired.  Irish authorities renewed Mr. Washburn's visa for 30 days so that he could legally remain in that country while determining how to return to the United States.

142.    Desperate to get his name off the No Fly List, Mr. Washburn telephoned the FBI in New Mexico to ask for help.  FBI officials told him that they wanted to speak with him.  Mr. Washburn agreed to meet with FBI officials at the U.S. embassy in Dublin.  Mr. Washburn was subsequently interrogated three different times by FBI agents and voluntarily took a polygraph test.  FBI agents told him that he had passed the polygraph test.

143.    One FBI agent told Mr. Washburn that he had recommended that Mr. Washburn be given a one-time waiver to fly back to the United States, but that FBI Headquarters had not yet made a decision regarding the recommendation.

144.    On March 13, 2010, Irish immigration authorities renewed Mr. Washburn's visa for 30 days and indicated that no further renewals would be granted.

145.    On April 27, 2010, Mr. Washburn completed a DHS TRIP form online. He was assigned Redress Control Number 2096551.

146.    Mr. Washburn researched whether he could travel by boat from Ireland to the United States.  He could not locate a trans-Atlantic ship traveling from Europe to the United States until September.  Mr. Washburn booked a new series of flights from Dublin to Ciudad Juarez, Mexico, with stops in Frankfurt, Germany; São Paulo, Brazil; Lima, Peru; and Mexico City.  He hoped to enter the United States over land by crossing the border between Ciudad Juarez and El Paso, Texas.

147.    Mr. Washburn flew without incident from Dublin to Frankfurt, from Frankfurt to São Paulo, São Paulo to Lima, and from Lima to Mexico City.

148.    Mr. Washburn arrived in Mexico City International Airport at around 6:45 P.M. on May 21, 2010. At customs, Mr. Washburn was escorted to a separate room where he was detained and questioned by Mexican Federal Protection officers until 11:30 P.M. Mr. Washburn missed his connecting flight to Ciudad Juarez, which was scheduled to depart at 8:25 P.M.

149.    At around 11:30 P.M., officers escorted Mr. Washburn to another room where he was detained overnight and not permitted to eat or drink anything except water.

150.    At around 8:00 A.M. the next morning, Mexican Federal Protection officers escorted Mr. Washburn to an aircraft that transported him to Ciudad Juarez.

151.    Mr. Washburn arrived at the Ciudad Juarez airport at around 11:00 A.M. and was met by three Mexican Federal Protection officers who took him to an office for questioning. The officers then took Mr. Washburn to a bridge on the U.S.-Mexico border and handed him off to U.S. Customs and Border Protection officers who were waiting for Mr. Washburn.

152.    CBP officers escorted Mr. Washburn through a check point and took him to a facility where he was detained, handcuffed to a chair for several hours, and questioned for at least one hour. Officers searched Mr. Washburn's belongings and photographed and fingerprinted him.

153.    At around 7:00 P.M., CBP officers released Mr. Washburn.

154.    Mr. Washburn presents no security threat to commercial aviation and knows of no reason why he would be placed on the No Fly List.

155.    Because Defendants have barred him from boarding commercial flights to or from the United States or over U.S. airspace, Mr. Washburn cannot visit is wife, who is a Spanish citizen and remains in Ireland because she currently lacks a visa for travel to the United States, or his step-daughter and her family who live in Dublin.

**Samir Mohamed Ahmed Mohamed**

156.    Plaintiff Samir Mohamed Ahmed Mohamed moved to the United States from Yemen as a child and became a naturalized U.S. citizen in 1999.  He lives in Lindsay, California, where he works in a clothing store and resides in housing provided by his employer. Mr. Mohamed's parents are both U.S. citizens who live in Buffalo, New York.  He has eleven siblings, all of whom are U.S. citizens who live in the United States.

157.    Since he moved to the United States as a child, Mr. Mohamed has traveled to Yemen three times to visit family.  Mr. Mohamed most recently traveled from Lindsay to Yemen in September 2009 to visit his wife and two children who live in Almasser, a city in southern Yemen.  In April 2010, after spending several months with them, Mr. Mohamed booked a ticket on Saudi Arabian Airlines to return to the United States.  He sought to fly from Sana'a to New York with a change of planes at King Abdulaziz International Airport near Jeddah, Saudi Arabia so that he could visit his parents and other relatives in New York for two weeks before flying to Fresno, California.

158.    On May 3, 2010, Mr. Mohamed flew on Saudi Arabian Airlines to King Abdulaziz International Airport without incident.  At the airport, he went to board Saudi Arabian Airlines Flight 25 to John F. Kennedy International Airport.  Mr. Mohamed proceeded through immigration with other passengers seeking to transfer to international flights.  Saudi immigration officials took Mr. Mohamed's passport and asked him to wait.  After some time, immigration

officials escorted Mr. Mohamed through the airport and took him downstairs to a room. An immigration official told him that the Saudi authorities received a message from U.S. authorities indicating that he was "not allowed on United States land." The official told Mr. Mohamed that he would not be permitted to fly to the United States and that the Saudi government would send him back to Yemen on a plane in two days, unless he purchased a ticket to return on an earlier flight.

159.    It was clear to Mr. Mohamed that he could not stay in Saudi Arabia because he did not have a visa to remain in that country. It was also clear to him that he would not be permitted to fly as planned on Saudi Arabian Airlines Flight 25 to New York. Mr. Mohamed purchased a ticket to fly from King Abdulaziz International Airport to Sana'a on May 4, the following day.

160.    Mr. Mohamed missed his flight to Sana'a the following day. He called the emergency number for the U.S. Embassy in Jeddah and was transferred to a consular official. Mr. Mohamed explained to the official that he was a U.S. citizen without a visa to stay in Saudi Arabia and that he had been stuck in Jeddah for twenty-three hours because he was denied boarding on a Saudi Arabian Airlines Flight from King Abdulaziz International Airport to New York the previous day. The consular official told Mr. Mohamed that the U.S. Embassy did not know why he was not permitted to fly and asked Mr. Mohamed if he knew why this was the case. Mr. Mohamed replied that he had no idea why he was denied boarding the previous day. He asked the official if he was on a government watch list that denied him the ability to fly. The official responded that he did not know and that because Mr. Mohamed did not have a valid visa for Saudi Arabia, he was unable to push Saudi authorities to permit Mr. Mohamed to fly to the United States.

PAGE 41 – FIRST AMENDED COMPLAINT

161.    During the course of May 4, Mr. Mohamed called the U.S. Embassy several times and spoke to the same consular official.  The official advised Mr. Mohamed to return to Yemen on the next available flight, which was scheduled to leave the following day. The official also told Mr. Mohamed that he would send a message to the U.S. Embassy in Yemen so that Mr. Mohamed would not have a problem entering Yemen.

162.    On Wednesday, May 5, 2010, Mr. Mohamed flew to Sana'a without incident using the ticket for the May 4 flight that he had missed.

163.    After his arrival, he immediately went to the U.S. Embassy in Sana'a. There, Mr. Mohamed spoke to an official who made several phone calls to inquire on his behalf. The official told him to return the following Saturday.

164.    On Saturday, May 8, 2010, Mr. Mohamed returned to the U.S. Embassy in Sana'a.  He was interviewed by two government officials, one of whom introduced herself as "Michelle."  Upon information and belief, the two government officials were FBI agents.  At the end of the interview, the officials told Mr. Mohamed that they would call him in one week to let him know the outcome of the interview.

165.    Mr. Mohamed never heard from the FBI agents.  Over the course of the next few weeks, he went to the U.S. Embassy in Sana'a several times to see if he would be permitted to fly.

166.    After about four weeks, Mr. Mohamed called the U.S. Embassy and reached one of the FBI agents who had interviewed him.  The agent stated that he would call Mr. Mohamed back in one hour.  One hour later, the agent called Mr. Mohamed and told him that he would not be permitted to fly on commercial airlines unless he provided the reason why he was placed on the government's No Fly List.  Mr. Mohamed stated that he knew of no reason why he

would be placed on the list and asked the official why his name appeared on the list.  The agent

stated that he could not tell Mr. Mohamed anything.  Mr. Mohamed asked the agent what he

should do to get home to the United States.  The agent stated that he could not do anything else

for him and could not advise him.  He suggested that Mr. Mohamed go to the U.S. Embassy and

speak with a counselor.

167.    On or around June 8, 2010, Mr. Mohamed went to the U.S. Embassy in

Sana'a to speak to a counselor.  A U.S. Embassy employee told him that he was on a U.S. watch

list and that he would not be permitted to board a commercial flight to the United States or over

U.S. airspace.

168.    On June 8, 2010, Mr. Mohamed submitted a completed DHS TRIP form.

He was assigned Redress Control Number 2101514.

169.    On or around June 17, 2010, Mr. Mohamed called one of the FBI agents

who had questioned him on May 8, 2010 to see if there were any developments regarding his

ability to fly.  The agent told Mr. Mohamed that he was still on the No Fly List and that he did

not know how long Mr. Mohamed would remain on the list.  The agent stated that Mr. Mohamed

could travel to the United States from Yemen by boat.  He advised Mr. Mohamed to call him

every week for any new information about his placement on the No Fly List.

170.    Mr. Mohamed presents no security threat to commercial aviation and

knows of no reason why he would be placed on the No Fly List.

171.    To this day, Mr. Mohamed cannot return home to the United States.  He

has been denied the ability to travel by commercial airline from abroad to the United States.  Mr.

Mohamed has been told by a government official that he will not be permitted to travel on any

commercial flight to the United States or over U.S. airspace.  Mr. Mohamed cannot afford the

cost of traveling from Yemen to the United States by boat and knows of no opportunity to make such a journey before October 2010. Because Defendants have barred him from boarding commercial flights to or from the United States or over U.S. airspace, Mr. Mohamed is unable to visit his relatives in the United States and to return to his job in a clothing store in California, and risks losing both his job and his employer-provided housing. He currently has no income and is borrowing money from others in order to support himself, his pregnant wife, and their two children.

### Abdullatif Muthanna

172.    Plaintiff Abdullatif Muthanna is a naturalized U.S. citizen and resident of Rochester, New York. Mr. Muthanna was born in Yemen and moved to the United States in 1996 to join his mother and step-father.

173.    Mr. Muthanna works for a clothing store in Rochester to support his wife and four children, who live in southern Yemen several hours outside the city of Aden. He travels to southern Yemen every few years to spend time with his family.

174.    Mr. Muthanna remains in the United States apart from his family in order to earn an income and to receive medical care for the serious medical conditions with which he has been diagnosed. Mr. Muthanna suffers from and receives treatment for digestive diseases and mental health conditions. His doctors, including his primary care physician, internist, and gastroenterologist, are all located in New York.

175.    On June 18, 2009, Mr. Muthanna traveled from Rochester to southern Yemen without incident in order to visit his wife and children. He planned to return to the United Statesby traveling on Saudi Arabian Airlines from Aden to New York with a change of aircraft in King Abdulaziz International Airport near Jeddah, Saudia Arabia.

PAGE 44 – FIRST AMENDED COMPLAINT

176.    On May 31, 2010, Mr. Muthanna traveled from Aden to King Abdulaziz International Airport without incident.  He had a three-day transit visa to stay in Jeddah while waiting to board his flight from King Abdulaziz International Airport to New York, which was scheduled to depart on June 3, 2010.

177.    On June 3, Mr. Muthanna went to King Abdulaziz International Airport to check in for Saudi Arabian Airlines Flight 0021 to New York.  Mr. Muthanna presented his ticket receipt and identification to an airline employee at the check-in counter.  The employee made a telephone call.  Afterwards, he showed Mr. Muthanna his computer screen.  The screen displayed Mr. Muthanna's name and flight number and indicated that there was no seat for Mr. Muthanna on the Saudi Arabian Airlines flight to New York.  Mr. Muthanna was confused and asked for an explanation.  The airline employee told him: "You are not allowed to fly to New York.  You cannot fly."

178.    The employee called officials from Saudi Arabian Immigration, who arrived at the    check-in counter.  An immigration official told Mr. Muthanna that he could not board his flight to New York and that he had to return to Yemen.

179.    The official explained to Mr. Muthanna that because there was no flight scheduled to depart from King Abdulaziz International Airport for Yemen that day, he would have to stay in Jeddah and return the next morning.

180.    Mr. Muthanna returned to King Abdulaziz International Airport on the morning of Friday, June 4, 2010.  Mr. Muthanna purchased a new ticket to fly to Sana'a on Yemenia Airways.  He went to the North Terminal of the airport to board his flight.

181.    A Saudi immigration official asked Mr. Muthanna for his passport and saw that his three-day transit visa for Saudi Arabia had expired on June 3 and that his passport

lacked a visa for Yemen.  The official told Mr. Muthanna that he would not be permitted to go

through immigration to board his flight to Yemen.  Mr. Muthanna explained that he had

overstayed his Saudi Arabian transit visa by only one day because he was unexpectedly

prevented from boarding his Saudi Arabian Airlines flight from King Abdulaziz International

Airport to New York on June 3, 2010.  He also explained that he did not have a visa for Yemen

because he was on his way home to New York.

   182. Mr. Muthanna returned to the South Terminal of King Abdulaziz

International Airport to attempt to board a Saudi Arabian Airlines flight bound for Yemen.  Once

again, a Saudi immigration official did not let him pass through immigration to board his flight

to Yemen because his three-day transit visa had expired and his passport lacked a valid visa for

Yemen.

   183. The immigration official told Mr. Muthanna that he was not validly in

Saudi Arabia and that he could be arrested and detained on that ground.  He said that Mr.

Muthanna should return to the United States.  Mr. Muthanna explained that he was trying to do

precisely that, but that he had been denied boarding on his flight home to New York the day

before.

   184. After some time, a supervisor arrived at Immigration.  Mr. Muthanna

explained his situation.  The supervisor made a copy of Mr. Muthanna's passport and issued a

letter granting Mr. Muthanna "special permission" to overstay his transit visa.  The supervisor

instructed him to speak with the U.S. Embassy in Sana'a.  By this time, Mr. Muthanna's flight to

Yemen had already departed.  The supervisor told Mr. Muthanna that there was a Yemenia

Airlines flight to Sana'a leaving that day.  Mr. Muthanna spent another 200 riyals to purchase a

ticket for this later flight.

PAGE 46 – FIRST AMENDED COMPLAINT

185.    Mr. Muthanna finally flew on Yemenia Airlines to Sana'a.  Because he arrived on a Friday and the U.S. Embassy was closed that day, he could not go to the U.S. Embassy to inquire about his situation.

186.    The next morning, Mr. Muthanna went to the U.S. Embassy.   He was instructed to speak with the Legal Attaché.

187.    The Legal Attaché introduced himself as Vincent Lisi.  Mr. Lisi questioned Mr. Muthanna for about half an hour.  Mr. Muthanna asked him if he was placed on a U.S. government list.  Mr. Lisi stated that Mr. Muthanna was not on a "black list," but that he was on a government list reserved for people who were not permitted to fly.  Mr. Lisi also stated that this list was reserved for people about whom the government needed information and that Mr. Muthanna would not be permitted to fly on commercial airplanes bound for the United States or over U.S. airspace.  Mr. Muthanna asked if he could fly to Mexico or Canada and cross over land into the United States.  The agent said that this would not be possible.  He advised Mr. Muthanna to return to the United States by ship.  Mr. Lisi told Mr. Muthanna that he would contact him in one week to let him know whether he could fly.

188.    Mr. Muthanna called Mr. Lisi two days later to see if there was any information about his situation.  Mr. Lisi instructed him to call back one week later.

189.    Mr. Muthanna returned to the U.S. Embassy in Sana'a one week later. The Legal Attaché questioned him further about his time in Yemen.  He again instructed Mr. Muthanna to call him back in one week for more information about his case.

190.    One week later, Mr. Muthanna called Mr. Lisi.  Again, Mr. Lisi questioned Mr. Muthanna.  At the end of the conversation, Mr. Lisi again instructed Mr. Muthanna to call him back in one week.

191.    On June 18, 2010, Mr. Muthanna completed a DHS Traveler Inquiry Form.  He was assigned Redress Control Number 2102791.

192.    Mr. Muthanna presents no security threat to commercial aviation and knows of no reason why he would be placed on the No Fly List.

193.    To this day, Mr. Muthanna cannot return home to the United States.  He has been denied the ability to travel by commercial airline from abroad to the United States.  Mr. Muthanna has been told by a U.S. official that he will not be permitted to travel on any commercial flight to the United States or over U.S. airspace.  He has searched for a way to travel from Yemen to the United States by boat and has not found any possibility of doing so.  Because Defendants have barred him from boarding commercial flights to or from the United States or over U.S. airspace, Mr. Muthanna is unable to return to his job or to seek the medical attention he needs from his providers in Rochester.  He currently has no income and is borrowing money from people in order to support himself, his wife, and their children.

**Nagib Ali Ghaleb**

194.    Plaintiff Nagib Ali Ghaleb is a naturalized U.S. citizen and San Francisco resident.  He moved to the United States from Yemen in 1996.  Mr. Ghaleb works in San Francisco as a janitor.

195.    Mr. Ghaleb's wife and four children, one of whom is a U.S. citizen, live in Yemen.  Several years ago, he submitted visa applications for his wife and three of his children so that they could immigrate to the United States.  Their visa petitions were approved, but there has been a long delay in processing their immigrant visa paperwork.

196.    Mr. Ghaleb traveled to Yemen to visit his family and to meet with the U.S. consul there in hopes of finding out the reason for the delay in processing his wife's and

children's visa applications. Mr. Ghaleb planned to travel to Yemen in August 2009 and to return to San Francisco in February 2010 so that he could resume his work.

197.    On August 17, 2009, Mr. Ghaleb flew from San Francisco to Sana'a without incident.

198.    On February 16, 2010, Mr. Ghaleb flew on Yemenia Airlines from Sana'a to Frankfurt without incident.

199.    At Frankfurt Airport, Mr. Ghaleb went to the check-in counter for United Airlines to secure a boarding pass for his United Airlines flight to San Francisco. An airline employee took his passport and asked him to sit down and wait. Some time later, several United Airlines supervisors arrived at the check-in counter.

200.    After some time, two U.S. officials wearing suits arrived at the United Airlines check-in counter. Upon information and belief, the officials were FBI agents. One FBI agent told Mr. Ghaleb that he would not be permitted to board his United Airlines flight to San Francisco. Mr. Ghaleb was confused and asked if this was really true. The FBI agents confirmed that it was. Mr. Ghaleb asked if he could fly to San Francisco on a different flight. One FBI agent stated: "You cannot go to America at all." The U.S. officials left.

201.    After some time, a German police officer arrived and escorted Mr. Ghaleb to a separate room for questioning. The police officer took Mr. Ghaleb's passport and searched him and his luggage. Another German officer arrived and questioned Mr. Ghaleb again. After Mr. Ghaleb had been searched and questioned for approximately three hours, a German police officer told him that he was free to go. Mr. Ghaleb told the officers that he had nowhere to go because he did not have any money to purchase a new ticket to fly back to Yemen. He explained that he had spent all of his money to purchase his ticket to fly from Frankfurt to San Francisco.

PAGE 49 – FIRST AMENDED COMPLAINT

The German officers told Mr. Ghaleb that Germany had no problem with him and that he was free to take a cab to the U.S. Embassy and to seek assistance there.

202.    Mr. Ghaleb called a friend who worked at a travel agency in Yemen for help.  His friend helped him secure an electronic ticket to fly from Frankfurt to Sana'a.  Mr. Ghaleb flew back to Yemen the same day.

203.    After arriving in Sana'a, Mr. Ghaleb went directly to the U.S. Embassy. He explained his situation to an embassy official and asked to speak with a consular official. Two consular officials, one who spoke Arabic and one who did not, escorted Mr. Ghaleb to a room where they questioned him for three hours.  Another consular official photocopied Mr. Ghaleb's passport.  He told Mr. Ghaleb that it would be impossible for him to enter the United States.  Mr. Ghaleb was shocked and confused.  The Arabic-speaking consular official told Mr. Ghaleb in Arabic that he would explain what the other official had said.  He stated that Mr. Ghaleb would not be permitted to board flights to the United States and asked Mr. Ghaleb: "What did you do wrong? You must be a terrorist."  The Arabic-speaking consular official said jokingly: "You can take a car to the United States."

204.    Approximately two weeks later, Mr. Ghaleb was contacted by an official from the U.S. Embassy in Sana'a and asked to come to the embassy for further questioning.

205.    Mr. Ghaleb went to the U.S. Embassy on or around March 1, 2010.  He was questioned for around one and one half hours by two officials, one of whom was the Arabic-speaking consular official who had questioned Mr. Ghaleb previously.  Upon information and belief, the other official was an FBI agent.  The interrogators knew what mosques Mr. Ghaleb attended in San Francisco and Oakland and that he was a highly regarded soccer player.  They were aware that Mr. Ghaleb knew many people and that many people in the Bay Area Yemeni

PAGE 50 – FIRST AMENDED COMPLAINT

community knew him. The interrogators said that they knew Mr. Ghaleb lived in San Francisco and had been trying for a long time to bring his family to the United States. The consular official said: "We know how much you love America and we can make it easy for you to go back."

206. Mr. Ghaleb showed them a letter from his attorney, Kip Evan Steinberg, that introduced Mr. Steinberg as his attorney and a letter from Mr. Steinberg to Senator Dianne Feinstein seeking assistance with Mr. Ghaleb's apparent placement on the No Fly List. The interrogators told Mr. Ghaleb that neither a lawyer nor Senator Feinstein could help him and that the only people who could help him were sitting in the room with him. They said it could take "years and years" for him to correct this problem "his way."

207. The interrogators offered to help Mr. Ghaleb if he would work with them. They offered to arrange for him to fly back to the United States immediately if he would agree to tell them who the "bad guys" were in Yemen and in San Francisco. Mr. Ghaleb refused, stating that he was not political and did not know about such things. The interrogators insisted that Mr. Ghaleb did know and could provide the names of people from his mosque and his community. One official emphasized that it would be impossible for no one in the Bay Area Muslim community to have spoken badly about the United States. He encouraged Mr. Ghaleb to report such instances to them, whether they took place in the United States or Yemen.

208. Mr. Ghaleb told the interrogators that he was not interested in spying in the Yemeni community. He stated: "I could give you false information about innocent people and claim they are the bad guys and help myself out of this situation, but these people will be harmed. Is this what you want?" Mr. Ghaleb raised his American passport and said: "What does this mean? I have rights. I am an American."

PAGE 51 – FIRST AMENDED COMPLAINT

209.    The interrogators told Mr. Ghaleb that if he did not cooperate, they would call the Yemeni government and have him arrested and sent to jail, where he would spend the rest of his life and never see his family or his home in America again.  They advised him to "think about it" and indicated that he could call Vincent Lisi at the U.S. Embassy if he wanted to get in touch.

210.    On or around March 2, 2010, Mr. Ghaleb submitted a completed DHS TRIP form online.  He was assigned Redress Control Number 2089829.

211.    Mr. Ghaleb received a letter dated April 6, 2010 from Jim Kennedy of the DHS Traveler Redress Inquiry Program stating that DHS had received his Traveler Inquiry Forms and supporting materials submitted through the TRIP system.  The letter stated:  "In response to your request, we have conducted a review of any applicable records in consultation with other Federal agencies, as appropriate.  Where it was determined that a correction to records was warranted, these records were modified to address any delay or denial of boarding that you may have experienced as a result of the watch list screening process."

212.    On May 3, 2010, Mr. Ghaleb again attempted to fly home to San Francisco.  He flew without incident on Emirates Airlines from Sana'a to Dubai.  In Dubai International Airport, Mr. Ghaleb was not permitted to board his Emirates Airlines flight to San Francisco.  Dubai police told Mr. Ghaleb that he was on the No Fly List and detained him for several days.  They berated him for attempting to fly when he knew that he was on the No Fly List and asked him why he had come to the United Arab Emirates.  They then returned him to Yemen by plane.

213.    Mr. Ghaleb called the FBI.  An FBI officer told Mr. Ghaleb that he would be taken off the No Fly List if he would agree to become an FBI informant in the California Yemeni community.

214.    On June 30, 2010, Mr. Ghaleb filed the instant action against the Defendants for violation of his constitutional rights, seeking removal of his name from any government watch list that has prevented him from flying or, in the alternative, a hearing in which he can confront any evidence against him and contest his unlawful designation.

215.     During the week of July 19, 2010, an FBI agent visited Mr. Ghaleb's brother in Detroit and questioned him about Mr. Ghaleb.  The agent told Mr. Ghaleb's brother that Mr. Ghaleb would be permitted to fly.  Mr. Ghaleb's brother relayed this information to him.

216.    Mr. Ghaleb called the U.S. Embassy in Sana'a.  An embassy official confirmed that he would be permitted to fly and should purchase tickets to fly to the United States.

217.    Mr. Ghaleb booked a flight from Sana'a to San Francisco via Frankfurt. He flew from Sana'a to Frankfurt, and from Frankfurt to San Francisco, without incident, and he arrived home on July 26, 2010.  CBP officers questioned and searched Mr. Ghaleb after he landed in the airport in San Francisco.  Mr. Ghaleb was permitted to enter the United States.

218.    Mr. Ghaleb's leave from his position as a janitor in San Francisco expired in February.  The management of the building at which he worked has been transferred to another company.  Mr. Ghaleb is not certain that his job will be available to him.

219.    Mr. Ghaleb presents no security threat to commercial aviation and knows of no reason why he would be placed on the No Fly List.

PAGE 53 – FIRST AMENDED COMPLAINT

220.    To this day, Mr. Ghaleb does not know whether he can fly commercial airlines to and from the United States or over U.S. airspace.  The Defendants denied him boarding on two commercial flights bound for the United States from abroad.  Mr. Ghaleb was not told why this occurred and was subsequently told by FBI agents that he would not be permitted to travel on any commercial flight to the United States.  After the commencement of this litigation, Mr. Ghaleb was told by a U.S. government official that he was permitted to fly to the United States and successfully flew home.  Mr. Ghaleb was not told, however, whether he had been granted a one-time waiver to fly home or whether his name had been removed from the No Fly List, permitting him to fly on commercial airlines to and from the United States or over U.S. airspace.  Mr. Ghaleb fears that his name remains on the No Fly List and that Defendants will prohibit him from traveling by commercial air to Yemen to visit his wife and children.

**Saleh A. Omar**

221.    Plaintiff Saleh A. Omar is a thirty-five year-old citizen of Yemen who has been a lawful permanent resident of the United States since March 19, 1996.  He has lived and worked in Detroit for fourteen years.  His father, three brothers, and uncle are all U.S. citizens.

222.    Since becoming a lawful permanent resident of the United States, Mr. Omar has resided continuously in the United States with no extended absences.  He meets the statutory definitions for a finding of "good moral character" and is eligible to apply for naturalization as a U.S. citizen.

223.    Mr. Omar lives in Detroit and works in a mechanic shop to support his wife and three children, who live in Yemen.  On December 7, 2009, Mr. Omar traveled to Yemen to visit his wife and children for a little over three months.  He planned to return to his

home and job in Detroit no later than March 9, 2010 by flying from Sana'a to Detroit on March

8, 2010, with stops in Jeddah and New York.

224.    On March 8, 2010, Mr. Omar traveled on Saudi Arabian Airlines from

Sana'a to King Abdulaziz International Airport near Jeddah without incident.  At the airport, Mr.

Omar presented his passport in order to board Saudi Arabian Airlines Flight 25 to John F.

Kennedy International Airport in New York.  A Saudi immigration official stopped Mr. Omar

and told him that he could not go to New York because his name was in their computer.  Mr.

Omar asked why this was the case, but he received no response.  The official returned Mr.

Omar's passport to him and his ticket to New York was canceled.

225.    Mr. Omar stayed in Jeddah for approximately thirty hours and took the

first available flight back to Yemen on Saudi Arabian Airlines.

226.    After arriving in Sana'a, he asked a Saudi Arabian Airlines agent why he

was prevented from  flying to New York and was told that his name was in their computer.  The

agent told Mr. Omar to go to the U.S. Embassy in Sana'a for more information.   Mr. Omar went

directly to the U.S. Embassy.

227.    At the U.S. Embassy, Mr. Omar asked to speak with someone who could

tell him why he was prevented from traveling to the United States on his Saudi Arabian Airlines

flight.  Mr. Omar spoke with an official who introduced himself as Dennis Brady.  Upon

information and belief, Mr. Brady is an FBI agent.  Mr. Brady questioned Mr. Omar.  During the

questioning, another U.S. embassy official entered the room and told Mr. Omar: "You can never

go to America."  Mr. Omar was confused and concerned, and asked why.  Mr. Brady and the

U.S. Embassy official told Mr. Omar that his name is on the No Fly List, but did not provide any

reason why.  Mr. Omar explained that he had lost hundreds of dollars by not being able to use

the ticket he had purchased to fly from Jeddah to New York.  He asked the officials to show him

the No Fly List.  The embassy official again told him: "You cannot go to the United States of

America.  Never."  Several days later, Mr. Omar called the U.S. Embassy in Sana'a to see if they

had any more information about his situation.  The embassy officials with whom he spoke

provided no information.

   228. Over the course of the next few weeks, Mr. Omar went to the U.S.

Embassy in Sana'a two more times to find out why was denied boarding on his U.S.-bound flight

at King Abdulaziz International Airport and for information about why his name was on the No

Fly List.  On at least one of these occasions, Mr. Omar met with and was questioned by Legal

Attaché Vincent Lisi.  Mr. Omar asked Mr. Lisi for help in returning home to Detroit so that he

could get back to his job.  He also asked when he would be permitted to travel to the United

States.  Mr. Lisi told Mr. Omar that he could not help him and that he would not be permitted to

travel to the United States.  Mr. Omar asked why.  Mr. Lisi did not reply.

   229. On June 16, 2010, Mr. Omar submitted a completed DHS TRIP form.  He

was assigned Redress Control Number 2102388.

   230. On June 30, 2010, Mr. Omar filed the instant action against the

Defendants for violation of his constitutional and statutory rights, seeking removal of his name

from any government watch list that has prevented him from flying or, in the alternative, a

hearing in which he can confront any evidence against him and contest his unlawful designation.

   231. On August 4, 2010, Mr. Omar called the U.S. Embassy in Sana'a.  An

embassy official told him to make air travel arrangements to fly home to Detroit.

   232. Mr. Omar presents no security threat to commercial aviation and knows of

no reason why he would be placed on the No Fly List.

PAGE 56 – FIRST AMENDED COMPLAINT

233.     Although Mr. Omar is now attempting to arrange for commercial air travel to the United States, he does not know whether he will be permitted to fly to and from the United States or over U.S. airspace.  He was denied the ability to travel by commercial airline from abroad to the United States and was subsequently told by U.S. officials that he would not be permitted to travel on any commercial flight to the United States.  After the commencement of this litigation, Mr. Omar was told by a U.S. official that he should make arrangements to fly to the United States on a commercial airline.  Mr. Omar was not told, however, whether he had been granted a one-time waiver to fly home or whether his name had been removed from the No Fly list, permitting him to fly on commercial airlines to and from the United States or over U.S. airspace.

234.     Mr. Omar knows of no way to travel from Yemen to the United States by boat.  If Mr. Omar is denied boarding on the flight to the United States that he is attempting to secure, he will be unable to return home and to resume working at his job in a mechanic shop.  If Mr. Omar is permitted to fly from Yemen to the United States and Defendants subsequently deny him boarding on a commercial flight, Mr. Omar will be unable to return to Yemen, where his relatives, including his elderly and ill father, reside.  Moreover, Mr. Omar fears that because he has been absent from the United States in excess of 180 days since, the government may seek to rescind his lawful permanent status, even though his absence from the United Stats since March 9, 2010 has been entirely involuntary and the result of the Defendants' actions.  Mr. Omar's involuntary and extended absence may also jeopardize his right to naturalize as a U.S. citizen.

**Abdul Hakeim Thabet Ahmed**

235.    Abdul Hakeim Thabet Ahmed is a citizen of Yemen who has been a lawful permanent resident of the United States since 1990, when he first arrived in the United States. He is a resident of Rochester and works as a vendor, selling merchandise from his van.

236.    Since becoming a lawful permanent resident of the United States, Mr. Ahmed has resided continuously in the United States with no extended absences. He meets the statutory definitions for a finding of "good moral character" and is eligible to apply for naturalization as a U.S. citizen.

237.    Mr. Ahmed's family, including his wife, children, and parents, reside in Yemen. As of the beginning of August 2009, Mr. Ahmed had not visited his family in Yemen for more than two years. Mr. Ahmed purchased a round-trip ticket to travel by Saudi Arabian Airlines from New York to Aden, Yemen with a change of aircraft and a three-day layover in Jeddah each way. According to this itinerary, Mr. Ahmed would arrive in Yemen on August 10, 2009, and return to the United States on February 1, 2010.

238.    On or around August 6, 2009, Mr. Ahmed flew without incident from New York to King Abdulaziz International Airport. During his three-day layover in Jeddah, Mr. Ahmed completed an *umrah*, the pilgrimage to Mecca undertaken by Muslims. Mr. Ahmed flew to Aden without incident on August 10, 2009.

239.    After visiting his family as planned, Mr. Ahmed began his return trip home to Rochester on February 1, 2010. He traveled without incident on Saudi Arabian Airlines from Aden to King Abdul Aziz International Airport . After spending his three-day layover in the city of Jeddah, Mr. Ahmed returned to King Abdul Aziz International Airport on February 4, 2010 to board his Saudi Arabian Airlines flight to New York.

240.    At the airport, Mr. Ahmed went to the Saudi Arabian Airlines check-in counter.  An airline employee told him that he could not board his flight because his name was on a list of people who could not travel.  Mr. Ahmed was confused.  The airline employee would not answer any questions and told him to go to the United States consulate in Jeddah to deal with the problem.

241.    Mr. Ahmed left the airport and went to the United States consulate in Jeddah.  There he explained his situation to a consulate staff member.  The staff member checked Mr. Ahmed's documents and told Mr. Ahmed that the denial of boarding was not an immigration problem, but a security problem. Mr. Ahmed made copies of all of his documents and provided them to the consulate staff member.  Mr. Ahmed was told to come back later.

242.    Over the course of the next month and a half, Mr. Ahmed remained in Jeddah and traveled to the U.S. Consulate several times to determine why he had been denied boarding on his Saudi Arabian Airlines flight and to find a way to fly back to the United States.  During his first few trips to the consulate, Mr. Ahmed was told to return later because the consular officer was traveling.  Mr. Ahmed thereafter met with the consular officer four times.  During the fourth meeting, the consular officer informed him that she could not assist him and that Mr. Ahmed would have to return to Yemen and follow up with the United States Embassy in Sana'a.

243.    That day, Mr. Ahmed went to the airport. Upon inspecting his documents, Saudi immigration officials told him that he had overstayed his three-day transit visa and that he would have to leave the country immediately.  A Saudi Arabian Airlines employee advised Mr. Ahmed to travel from Jeddah to Aden by bus and to seek reimbursement for his unused plane

PAGE 59 – FIRST AMENDED COMPLAINT

ticket from Jeddah to New York, rather than to exchange the unused ticket for a new plane ticket from Jeddah to Aden.

244.    On or around March 13, 2010, Mr. Ahmed purchased a bus ticket from Jeddah to Aden for 200 Saudi riyals.  He left the same day and reached Aden approximately twelve hours later.

245.    On March 17, 2010, Mr. Ahmed traveled to the U.S. Embassy in Sana'a, where he was interviewed by a consular officer. The officer told Mr. Ahmed that he was on the No Fly List and that he could not provide any reasons for his placement on this list.  The officer asked Mr. Ahmed whether he had traveled to Afghanistan or knew anyone who had done so. Mr. Ahmed responded that he had not, and that he did not know anyone who had.  The officer also asked Mr. Ahmed questions about the mosque he attended in the United States, including the name of the mosque and of the mosque's imam.  Mr. Ahmed answered their questions, but could not provide much information because he did not know much other than the imam's name. The officer told Mr. Ahmed that he would send an inquiry on his behalf and told Mr. Ahmed to return in two days to see if there was any response.

246.    Mr. Ahmed returned two days later and met with the consular officer who informed him that he had no updates. The officer asked Mr. Ahmed to leave his phone number and e-mail address, and told him that the consulate would call him if there were any developments in his case.

247.    The consular officer gave Mr. Ahmed a phone number to call and told him to check in every week. He was told that he should ask for "Dennis," a U.S. official, for any follow ups.

PAGE 60 – FIRST AMENDED COMPLAINT

248.    Mr. Ahmed has been unable to reach "Dennis" or to otherwise receive any information about his case by calling the phone number given to him by the consular officer. Several times, he has been unable to reach anyone at that number.  Other times, a U.S. official has answered and told him that there is no new information about his case, that Dennis is unavailable, or that Mr. Ahmed would have to "wait" and that there were "many people before him," presumably also inquiring about their inability to fly.

249.    Since his return to Yemen on March 17, 2010, Mr. Ahmed has traveled from Aden to the U.S. Embassy in Sana'a two or three times a month to find out why he was denied boarding and when he will be permitted to fly home, a trip that takes fourteen hours round-trip and requires Mr. Ahmed to stay overnight in Sana'a.  Usually, Mr. Ahmed is met by an embassy staff member who inspects his documents, tells him that there is still no news, and asks him to check in later.

250.    Mr. Ahmed has been unable to work since being denied boarding on his Saudi Arabian Airlines flight.  Mr. Ahmed lacked authorization to work in Jeddah.  He has been unable to find paid employment since his return to Yemen on March 22, 2010.  As a result, Mr. Ahmed has been forced to borrow money to support his family.  He has also had to borrow money to pay for the cost of recent hospitalizations of his wife and daughter due to serious medical conditions.  As a result, Mr. Ahmed has accumulated over $15,000 of debt.

251.    On July 27, 2010, Mr. Ahmed submitted a DHS TRIP form.  He was assigned Redress Control Number 2106577.

252.    Mr. Ahmed presents no security threat to commercial aviation and knows of no reason why he would be placed on the No Fly List.

253.    To this day, Mr. Ahmed cannot return home to the United States.  He has been denied the ability to travel by commercial airline from abroad to the United States.  Mr. Ahmed has been told by a U.S. official that he is on the No Fly List and that he will not be permitted to travel on any commercial flight to the United States or over U.S. airspace.  He knows of no way to travel from Yemen to the United States by boat and he cannot afford to attempt to fly to a third country and to risk detention or being turned back again.  Because Defendants have barred him from boarding commercial flights to and from the United States and over U.S. airspace, Mr. Ahmed is unable to return to Rochester and to resume his work as a vendor as he had planned to do so, which has resulted in extreme financial hardship to him.  Mr Ahmed fears that based on his absence from the United States in excess of 180 days since his departure from the United States on or around August 6, 2009, the government may seek to rescind his lawful permanent status, even though his absence has been entirely involuntary and the result of the Defendants' actions.  Mr. Ahmed's involuntary and extended absence from the United States may also jeopardize his right to naturalize as a U.S. citizen.

**Mohamed Sheikh Abdirahman Kariye**

254.    Plaintiff Mohamed Sheikh Abdirahman Kariye is a U.S. citizen and resident of Portland, Oregon.  He is also the imam, or religious leader, of Masjid As-Saber, which is also known as The Islamic Center of Portland.  This position requires Mr. Kariye to travel by commercial air to at least several speaking engagements and conferences each year.

255.    In early 2010, Mr. Kariye sought to visit his daughter, who is a high school student in Dubai.  He booked tickets to travel by plane from Portland to Dubai, with a change of aircraft in Amsterdam.

256.    On March 8, 2010, Mr. Kariye went to Portland International Airport to check in for his Delta Airlines Flight to Amsterdam.  He gave his passport and airline ticket receipts to the Delta employee at the check-in counter.  Several minutes later, the airline employee asked Mr. Kariye to wait.  After some time, Mr. Kariye asked the Delta Airlines employees at the check-in counter what was taking so long.  They did not answer his question.

257.    After at least two hours had passed, a police officer, detective, and U.S. Marshal approached Mr. Kariye at the counter.  Two other government officials also approached Mr. Kariye, but stood a little farther away from him.  Upon information and belief, those two officials were agents of the FBI.

258.    A Delta Airlines employee told Mr. Kariye: "You cannot fly.  You cannot board the plane."  Mr. Kariye expressed confusion and insisted to know why.  The employee replied:  "You are on a government list."  Mr. Kariye asked why he had been put on the list.  He explained that he had flown to Dubai from Portland as recently as July 2009 and from Portland to Chicago and back as recently as October 2009.  The Delta Airlines employee said that she did not know and could not help him further.

259.    The police officer approached Mr. Kariye and stated that Delta Airlines did not want him near the check-in counter.  Mr. Kariye asked the officer and agents why he was not permitted to fly and reiterated that he had flown as recently as July 2009 and October 2009.  The officer and agents said that they could not explain to him why he could not fly and that he had to leave the area.

260.    On May 3, 2010, Mr. Kariye submitted a completed DHS TRIP form.  He was assigned Redress Control Number 2097225.

261.    Several years earlier, on September 10, 2002, Mr. Kariye was arrested on a sealed indictment in Portland International Airport by an FBI-led Joint Terrorism Task Force while attempting to board a plane bound for Dubai with his brother and four children.  At the time, Mr. Kariye was traveling to Dubai to assume a teaching position.  A senior customs inspector alleged that there were trace amounts of TNT in two of the bags carried by Mr. Kariye's brother.  Although no bombs were found in the luggage, Mr. Kariye was subsequently held without bail.  After five weeks of detention, Mr. Kariye was released when lab tests showed there were no traces of any explosives.  He was never charged with any explosives-related violations.  Salim Jiwa and Mike Gudgell, *Muslim Cleric Released in Portland*, ABC News, Oct. 11, 2002, at http://abcnews.go.com/US/story?id=91141&page=1.

262.    Mr. Kariye presents no security threat to commercial aviation and knows of no reason why he would be placed on the No Fly List.

263.    To this day, Mr. Kariye cannot board commercial airlines to or from the United States or over U.S. airspace.  Because Defendants have barred him from boarding commercial flights to or from the United States or over U.S. airspace, he cannot visit his daughter in Dubai or his family in Somalia, cannot escort his elderly mother from Portland to Mecca, Saudi Arabia in November 2010 for the *Hajj* pilgrimage—a requirement of the Muslim faith—as planned, and has been forced to restrict his work-related travel.

**Ibraheim (Abe) Mashal**

264.    Plaintiff Ibraheim (Abe) Mashal is a thirty-year old U.S. citizen and veteran of the U.S. Marine Corps.  He was born and raised in the United States and lives in St. Charles, Illinois with his wife and three children.  Since his honorable discharge from the U.S. Marine Corps in 2003, Mr. Mashal has worked as a traveling dog trainer.

PAGE 64 – FIRST AMENDED COMPLAINT

265.    Mr. Mashal has provided dog-training services to clients in twenty-three U.S. states.  He often receives new clients through referrals from satisfied customers.

266.    During the week of April 12, 2010, Mr. Mashal received a call from a woman in Spokane, Washington who sought a dog trainer.  She had located his contact information and business description online.  The woman hired Mr. Mashal to train her dog in her home.  She agreed to pay the fare for his round-trip air travel from Chicago to Spokane, the cost of his hotel accommodations in Spokane, and his dog-training services fee.  Mr. Mashal secured a ticket on Southwest Airlines to travel from Chicago to Spokane via Salt Lake City.

267.    On the evening of April 19, 2010, Mr. Mashal tried to check in online for his Southwest Airlines flights, which were scheduled to depart the following day.  He was unable to do so.  Mr. Mashal called Southwest Airlines.  An airline representative instructed him to proceed directly to the Southwest Airlines ticketing counter to check in for his flights the following morning.

268.    On the morning of April 20, 2010, Mr. Mashal went to Chicago's Midway Airport to report for his 9:00 A.M. flight to Salt Lake City.  Mr. Mashal proceeded directly to the Southwest Airlines ticketing counter as instructed.  He handed the ticketing agent his driver's license.  The agent typed into her computer.  She gave Mr. Mashal a strange look and went into a back office.  When she returned several minutes later, Mr. Mashal turned around and saw that he was surrounded by approximately thirty government officials, including TSA officers and Chicago Police.  The ticketing agent returned with Mr. Mashal's driver's license.  She told him that he was on the No Fly List and that he would not be able to board any airlines.

269.    A Chicago police officer took Mr. Mashal's driver's license and checked to see if there were any outstanding warrants against him.  An officer told Mr. Mashal that FBI agents were at the airport and wanted to speak with him.

270.    A government official arrived at the ticket counter and introduced himself to Mr. Mashal as Agent Michael Dowler of the FBI.  Agent Dowler asked Mr. Mashal if he would mind going with him to a back room to answer a few questions.  Mr. Mashal agreed to do so and joked, "I only have one rule.  No waterboarding!"  Agent Dowler laughed and escorted Mr. Mashal to a back room.  Several TSA and Chicago police officers followed.

271.    Mr. Mashal was asked to sit down in a chair.  Two TSA officers sat down next to him.  Agent Dowler questioned Mr. Mashal for approximately thirty minutes.  The agent asked Mr. Mashal why he was traveling to Spokane.  Mr. Mashal explained that he had been hired by a client to train a dog in Spokane.  The agent requested the client's name and information.  Mr. Mashal provided the requested information.  Agent Dowler also asked Mr. Mashal if he had a passport and asked for his identifying information, including his social security number.  Mr. Mashal replied that he did not have a passport and provided the requested information.  Agent Dowler asked Mr. Mashal deeply personal questions, including questions about his religious identity and beliefs, his religious practice, and his family members.

272.    Mr. Mashal asked Agent Dowler why his name was on the No Fly List. The agent stated that he did not know why and that, even if he did, he could not tell Mr. Mashal.

273.    After making several phone calls, Agent Dowler told Mr. Mashal that he was free to leave.  Several TSA agents escorted Mr. Mashal outside of the airport.

274.    Mr. Mashal called his wife and explained to her what happened.  Forty minutes later, she arrived at the airport and drove him to their home.

PAGE 66 – FIRST AMENDED COMPLAINT

275.    Mr. Mashal called his client in Spokane.  He told her that his flight had been canceled and that he would not be able to travel to Spokane to train her dog.

276.    Two hours later, Mr. Mashal received a phone call from an Agent Mike Tsahiridis of the FBI.  The agent asked Mr. Mashal if he was home and stated that he was located five minutes away from Mr. Mashal's house.  Mr. Mashal indicated that he was at home.

277.    Five minutes later, two FBI agents arrived in front of Mr. Mashal's home. Mr. Mashal met them on the driveway outside of his house.  The agents showed Mr. Mashal their badges and introduced themselves as Mike Tsahiridis and Lukas Miller of the FBI.  The agents asked Mr. Mashal if they could ask him a few additional questions.  Mr. Mashal agreed and escorted the agents inside his home.

278.    Agents Tsahiridis and Miller questioned Mr. Mashal for approximately an hour.  The agents had a No Fly List question and answer sheet from which they read questions. Among other things, the agents asked Mr. Mashal for his email addresses, the name of his bank, and whether he has accounts on Facebook, Myspace, and Twitter.

279.    After the agents learned that Mr. Mashal was a veteran of the U.S. Marine Corps, they took out an additional question and answer sheet and asked him questions from that document.  The agents asked Mr. Mashal if he had ever received explosives training in the military.  Mr. Mashal responded that he had not.

280.    Later that day, on April 20, 2010, Mr. Mashal completed a DHS TRIP form online.  He was assigned Redress Control Number 2095831.

281.    Several days later, Mr. Mashal received a call from his client in Spokane. The client stated that an FBI agent had come to her home and asked her questions about Mr. Mashal.  She told Mr. Mashal that she was no longer comfortable with having him come to her

home to train her dog.  She requested that Mr. Mashal provide her a full refund of the costs she

had incurred in paying for his round-trip airline tickets, hotel accommodation in Spokane, and

dog training services fee.  Mr. Mashal returned approximately $2,000 to the client.

282.    Approximately one week after Mr. Mashal was denied boarding on his

Southwest Airlines flight, he received a call from Agent Tsahiridis.  The agent told Mr. Mashal

that he and Agent Miller would recommend that Mr. Mashal be removed from the No Fly List.

He stated that he would call Mr. Mashal again if he or Agent Miller had any additional questions

for him.  Agent Tsahiridis stated that he might be able to secure a temporary boarding pass so

that Mr. Mashal could fly to Spokane.  Mr. Mashal explained that because an FBI agent had

visited the Spokane client, she had canceled her request for dog training services from Mr.

Mashal.

283.    On or around June 21, 2010, Mr. Mashal received a phone call from Agent

Tsahiridis.  The agent stated that he had good news and that he wanted to meet with Mr. Mashal

later in the week to discuss the news.  Mr. Mashal asked if they could discuss the news over the

phone.  Agent Tsahiridis stated that he could not and requested that Mr. Mashal meet him at the

Embassy Suites Hotel in Schaumburg, Illinois.  The agent told Mr. Mashal that he would like to

buy him lunch and discuss the matter.

284.    On June 23, 2010, Mr. Mashal went at the Embassy Suites Hotel in

Schaumburg.  He called Agent Tsahiridis to let him know that he had arrived and was waiting in

the hotel lobby.

285.    Agent Tsahiridis met Mr. Mashal in the hotel lobby and asked if he would

mind coming up to a room.

PAGE 68 – FIRST AMENDED COMPLAINT

286.    Agent Tsahiridis escorted Mr. Mashal to a room on the fourth floor of the hotel, where Agent Miller was waiting for Mr. Mashal.  The agents asked Mr. Mashal to sit at a round table and to make himself at home, drink some coffee, eat donuts, and relax.  The room contained a large flat-screen television on which a soccer game was playing and a table with coffee and donuts.

287.    Agent Tsahiridis told Mr. Mashal that there was no mistake and that he was on the No Fly List.  The agents stated that Mr. Mashal was on the list because he had sent emails to the website and blog of a particular imam.  Mr. Mashal had emailed the imam between June 2008 and October 2009 to ask questions relating to deeply personal issues, including a family member's substance abuse problems and about how to raise Muslim children in an interfaith household.  Agent Tsahiridis told Mr. Mashal that the agents wanted him to help them find the imam.  He stated that if Mr. Mashal would help the FBI by serving as an informant, his name would be removed from the No Fly List and he would receive compensation.  Agent Miller emphasized that Mr. Mashal would be compensated if he were to work for the FBI.

288.    Mr. Mashal asked the agents if they were asking him to serve in the capacity of an independent contractor.  The agents explained that he would not be an independent contractor and that Mr. Mashal could not tell anyone, including his wife, that he was working with the FBI.  The agents explained that he would be an informant and that the FBI had informants all over the Midwestern United States, including at the mosque that Mr. Mashal attended.  The agents told Mr. Mashal that if he were to serve as an informant, he would be compensated for his time and that he would work with the agents by meeting with them at various hotels and using aliases to relay information.  The agents asked Mr. Mashal to log onto his email account on their laptop so that they could determine whether they could trust him.

289.    Mr. Mashal felt extremely uncomfortable with the request to serve as an FBI informant.  He told the agents that he was no longer comfortable answering their questions without his attorney present.  The agents promptly ended the meeting.

290.    Later that night, Agent Tsahiridis texted Mr. Mashal the following message: "Abe, hope your [sic] well.  Sorry our meeting ended so abruptly.  Please contact me if you would like to further discuss."

291.    Mr. Mashal consulted an attorney regarding whether he should speak to the FBI.  He decided that he would speak to the FBI with his attorney present.

292.    Several days later, Mr. Mashal called Agent Tsahiridis.  He left a message stating that he would be glad to meet with the agent and to go through emails in his personal email account with the agent either at his home or at his attorney's office with his attorney present.  Agent Tsahiridis did not return Mr. Mashal's phone call.

293.    Since Mr. Mashal was denied boarding on his Southwest flight on April 20, 2010, nine individuals not located within driving distance of St. Charles have contacted Mr. Mashal online and by phone to request that he provide them with dog training services.  Mr. Mashal has had to decline each of these requests because Defendants have barred him from boarding commercial flights to or from the United States or over U.S. airspace and because he has no other practical means of traveling to these clients.  If Mr. Mashal had provided dog training services to all nine of these potential clients, he would have generated approximately $18,000 of profit for his business and numerous referrals to new clients.

294.    Mr. Mashal presents no security threat to commercial aviation and knows of no reason why he would be placed on the No Fly List.

295.    To this day, Mr. Mashal cannot board a commercial flight to or from the United States or over U.S. airspace.  Mr. Mashal has been told by an airline employee and government officials that he will not be permitted to travel on any commercial flight departing from the United States.  Mr. Mashal's dog-training business has been seriously harmed because Defendants have prevented him from traveling on commercial flights over U.S. airspace and he is therefore unable to travel to potential clients who are not located within driving distance of St. Charles.  Because Defendants have barred Mr. Mashal from boarding commercial flights to or from the United States or over U.S. airspace, he is unable to travel for his business, has lost at least nine clients and $18,000 in profit, and will not be able to visit his sister-in-law in Hawaii in November 2010 with this extended family as planned.

**Salah Ali Ahmed**

296.    Plaintiff Salah Ali Ahmed is a fifty-eight year-old U.S. citizen and resident of Norcross, Georgia, where he works as an electrical technician.  Mr. Ahmed is of Somali and Yemeni descent was born and raised in Somalia.  He moved to Atlanta in 1992 and became a naturalized U.S. citizen in 2007.  His U.S.-citizen wife and six children, five of whom are U.S. citizens and one of whom is a legal permanent resident, live with him in Norcross.  His siblings, nieces, nephews, and other relatives live in Yemen.

297.    Mr. Ahmed planned to take four weeks of vacation from his job to visit relatives in Yemen, including his siblings, nieces, nephews and other relatives.  After securing permission to take this vacation in late June 2009, he purchased a round-trip ticket to travel on Lufthansa from Atlanta to Sana'a with a change of aircraft in Frankfurt.  He was scheduled to depart Atlanta on July 16, 2010 and to return on August 16, 2010.

298.    On July 16, 2010, Mr. Ahmed arrived at Hartsfield-Jackson Atlanta International Airport several hours before his 6:00 P.M. flight on Lufthansa was scheduled to depart for Frankfurt.  He went to the Lufthansa ticketing counter and provided his passport to an airline employee to obtain a boarding pass for his flight.  The Lufthansa employee scanned his passport.  After looking at her computer screen, she told Mr. Ahmed that his passport was "flagged" and that he could not board the flight.  Mr. Ahmed was confused.  The Lufthansa employee stated: "You cannot board any flight, even if it is within the United States."

299.    The Lufthansa employee gave Mr. Ahmed a document instructing him to write to TSA and to call a TSA Consumer Hotline at (866) 289-9673 regarding any "claims related to the screening of passengers and their baggage."  The document stated that TSA, "with limited exceptions, . . . will determine whether claims shall be paid and in what amount."  The document did not indicate how Mr. Ahmed could learn the reason why he was denied boarding on his Lufthansa flight, how he could contest those reasons, or how he could regain the ability to fly.  The airline employee asked Mr. Ahmed to step aside and proceeded to assist another customer.

300.    About forty-five minutes to one hour later, several government officials surrounded Mr. Ahmed where he stood next to the Lufthansa ticketing counter.  Upon information and belief, the officers included a U.S. Marshal and officers from the Atlanta Police Department and the TSA.

301.    The officers spoke to Mr. Ahmed for approximately thirty minutes.  The TSA officer took Mr. Ahmed's driver's license and passport to have copies made.  He asked Mr. Ahmed for his Social Security number and address and conducted a brief interview.  The TSA

officer stated that Mr. Ahmed and the officers should go to a back room to talk further. The U.S. Marshal rejected this idea and stated that the group should step aside to the hallway instead.

302.    The TSA officer told Mr. Ahmed that he was "flagged" and that he would not be allowed to board any flights. The officer told Mr. Ahmed that he could travel by car, but that he could not leave the country by plane. He explained that Mr. Ahmed could call the TSA Hotline to complain.

303.    The U.S. Marshal asked Mr. Ahmed where he lived, when he had last left the United States, and when he had last traveled to Yemen, among other things. Mr. Ahmed responded that he did not remember the precise details of his last trip and that all of the requested information was available in his passport. The U.S. Marshal insisted that Mr. Ahmed answer his questions. Mr. Ahmed responded to the best of his ability.

304.    After approximately thirty minutes of questioning, a government official who appeared to be a DHS official arrived and introduced himself. The DHS official told Mr. Ahmed that he could not explain why Mr. Ahmed had been denied boarding on his Lufthansa flight, but that it was possible that Mr. Ahmed was "flagged" because of his name. He explained that Mr. Ahmed might have the same name as an individual who is not permitted to fly and that, as a result, he might be a "false positive" match for a name on the No Fly List. Mr. Ahmed asked: "Where did this information come from? The FBI?" The DHS official replied: "Yes." Mr. Ahmed asked for documentation. The officers refused. Mr. Ahmed requested the officers' business cards and for the officers to identify themselves by name. The officers refused these requests and escorted Mr. Ahmed out of the airport. Mr. Ahmed returned home to his family.

305.    On July 27, 2010, Mr. Ahmed submitted a DHS TRIP form. He was assigned Redress Control Number 2106580.

PAGE 73 – FIRST AMENDED COMPLAINT

306.     Mr. Ahmed presents no security threat to commercial aviation and knows of no reason why he would be placed on the No Fly List.

307.     To this day, Mr. Ahmed cannot board a commercial flight in the United States.  Mr. Ahmed has been told by an airline employee and government officials that he will not be permitted to travel on any commercial flight departing from the United States.  Because Defendants have barred Mr. Ahmed from boarding commercial flights to or from the United States or over U.S. airspace, Mr. Ahmed is unable to travel to visit relatives or to address issues concerning land and other property he owns in Yemen, a country to which he has traveled on only one occasion—in 2008—since moving to the United States in 1992.

**Amir Meshal**

308.     Plaintiff Amir Meshal is a twenty-seven year-old U.S. citizen and resident of Tinton Falls, New Jersey.  He currently works as a cab driver in New Jersey.

309.     In or around May 2009, Mr. Meshal planned to travel from New Jersey to Orange County, California to visit friends.

310.     On June 9, 2009, Mr. Meshal went to the Continental Airlines ticketing counter at Newark International Airport to obtain a boarding pass for Continental Airlines Flight 387 to Irvine, California.  A ticketing agent attempted to check Mr. Meshal in for the flight.  The employee told Mr. Meshal that he needed to call the toll-free number for Continental Airlines. After the ticketing agent placed the call, he told Mr. Meshal that he had been placed on hold.

311.     After Mr. Meshal had waited for approximately forty-five minutes, two Port Authority police officers arrived at the Continental Airlines ticketing counter.  The officers were soon joined by several additional uniformed and plain-clothed colleagues.

PAGE 74 – FIRST AMENDED COMPLAINT

312.    The police officers questioned Mr. Meshal about his itinerary and whether he had ever been arrested.  Eventually, approximately thirty law enforcement officers stood in a phalanx around Mr. Meshal in the Continental Airlines ticketing area.

313.    One officer identified himself to Mr. Meshal as an FBI agent.  The agent explained to Mr. Meshal that the government maintains two lists, one that imposes heightened security measures on individuals whose names appear on the list and another that precludes a listed individual from flying altogether.  The FBI agent informed Meshal that he was on the latter list, i.e., the No Fly List.

314.    The FBI agent subjected Mr. Meshal's baggage to inspection by a bomb-sniffing dog.  The agent asked Meshal whether he was carrying explosives and admonished him to "be honest," lest the dog contradict him.  There were no explosives in Mr. Meshal's baggage.

315.    The FBI agent left the scene, then returned.  He told Mr. Meshal that he had called another FBI agent in New Jersey who "knows a lot about you" and that "your story checked out."  The FBI agent permitted Mr. Meshal to leave the airport.

316.    On June 10, 2009, Mr. Meshal filed a DHS TRIP form online.  He was assigned Redress Control Number 2061053.

317.    On September 22, 2009, Mr. Meshal's attorney sent a letter to Defendant Robert S. Mueller and Secretary of Homeland Security Janet Napolitano stating: "I write on behalf of my client, Amir Meshal, an American citizen from New Jersey who has been placed on the 'no-fly' list administered by the Federal Bureau of Investigation (FBI) and enforced by the Transportation Security Administration (TSA).  Mr. Meshal has not received any notice of the reason for his placement on the no-fly list or any meaningful opportunity to respond to the

government's basis for barring him from air travel. This letter constitutes a demand that the FBI and TSA promptly remedy their unconstitutional conduct."

318.    FBI agents subsequently offered Mr. Meshal the opportunity to serve as a government informant and, in exchange, promised, among other things, to help remove him from the No Fly List. One agent told Mr. Meshal: "If you help us, we can help get you off of the No Fly List."

319.    On June 21, 2010, Mr. Meshal received a letter from DHS in "further response" to his June 2009 TRIP form. It stated: "This letter is in further response to the October l3, 2009 letter that you received from the Department of Homeland Security (DHS) Traveler Redress Inquiry Program (TRIP), regarding the difficulties you experienced while traveling. After consultation with other federal agencies, as appropriate, it has been determined that no changes or corrections are warranted to any applicable records at this time." Mr. Meshal never received the October 13, 2009 letter from DHS TRIP referenced in the June 21, 2010 letter.

320.    In November 2006, Mr. Meshal traveled to Mogadishu, Somalia to enhance his understanding of Islam and to experience living in an area governed by Islamic law. After the eruption of hostilities between the authority in control of Mogadishu at the time and a U.S.-backed Ethiopian military force in December 2006, Mr. Meshal fled Somalia for safety in Kenya. He was apprehended in Kenya, near the border, and was subsequently detained for more than four months in three different countries—Kenya, Somalia, and Ethiopia. He was eventually released from custody and returned to the United States. He was not charged with any crime. In November 2009, the ACLU filed a lawsuit on behalf of Mr. Meshal in the United States District Court for the District of Columbia, challenging the conduct and participation of four FBI agents in his illegal detention, rendition, and coercive interrogation in Kenya, Somalia, and Ethiopia.

321.    Mr. Meshal presents no security threat to commercial aviation and knows of no reason why he would be placed on the No Fly List.

322.    To this day, Mr. Meshal remains unable to travel by commercial airline. He has been denied the ability to travel by commercial airline within the United States.  He has been told by FBI agents that he will not be permitted to travel on any commercial flight to or from the United States or over U.S. airspace.  Because Defendants have barred Mr. Meshal from boarding commercial flights to or from the United States or over U.S. airspace, he cannot fly for business or pleasure, cannot visit relatives in Florida or Minnesota, and cannot perform the *Hajj* pilgrimage in Saudi Arabia, which is a requirement of the Muslim faith.

### Stephen Durga Persaud

323.    Plaintiff Stephen Durga Persaud is a twenty-nine-year old U.S. citizen and resident of Irvine, California.  Mr. Persaud is a registered nurse.

324.    Mr. Persaud and his wife moved to St. Thomas in the U.S. Virgin Islands in January 2007 to visit family and attend nursing school.  They continued to maintain close ties with relatives in the Los Angeles-area.  In June 2009, Mr. Persaud, his wife, and their son flew from St. Thomas to Los Angeles.  There, they spent the summer with relatives and Mr. Persaud's wife worked as a nurse.  Mr. Persaud flew back to St. Thomas in August 2009.  His wife and son joined him in St. Thomas the following month.

325.    Mr. Persaud and his family planned to move back to California in May 2010 so that Mr. Persaud's wife could deliver their second child there and so that he could apply to and attend a graduate program in nursing.  Mr. Persaud purchased tickets for the family to fly from St. Thomas to Irvine with a change of planes in Miami International Airport.

326.    On May 11, 2010, Mr. Persaud, his wife, and their sixteen-month old son, went to Cyril E. King Airport in St. Thomas to commence their trip home to Irvine.  They went to the American Airlines check-in kiosk to obtain boarding passes for American Airlines Flight 842 to Miami International Airport.  The kiosk screen flashed an error sign when Mr. Persaud attempted to obtain the boarding passes.  An American Airlines employee came to the kiosk and said, "Let me see if I can take care of that."

327.    The American Airlines employee asked Mr. Persaud and his family to stand by the side of the ticket counter while she tried to figure out the problem.  The employee started helping other customers.

328.    Five government officials appeared and surrounded Mr. Persaud, his wife, and their son.  One introduced himself as FBI Agent Ricardo Hernandez.  Agent Hernandez told Mr. Persaud, "You were denied boarding and we have to find out why.  We just have to clear up some things real quick.  We should be able to get you on the plane."

329.    The agents separated Mr. Persaud from his wife and son and took him to a room for questioning by Agent Hernandez and another FBI agent.  Mr. Persaud's wife was taken to a separate room where she was questioned by two other FBI agents.  Several agents stood outside the rooms where Mr. Persaud and his wife were being questioned.

330.    FBI agents questioned Mr. Persaud about his overseas travels, including his time teaching English in Puntland, the area of northeastern Somalia, in 2006.  During this questioning, Agent Hernandez informed Mr. Persaud that he was on the No Fly List.  Agent Hernandez stated, "We know you were in Somalia.  We'd like to know where, why, and what parts you visited."

PAGE 78 – FIRST AMENDED COMPLAINT

331.    After two hours of questioning, Agent Hernandez and the other FBI agent made it clear that Mr. Persaud would not be able to fly.  Mr. Persaud was permitted to leave the interview room and rejoin his wife and son.

332.    At this point, although FBI agents had finished questioning Mr. Persaud's wife and permitted her to board the flight, American Airlines Flight 842 had already departed. Mr. Persaud's pregnant wife and son were forced to wait in the airport for an additional three hours to catch a new series of flights to Irvine.  This new itinerary required them to stop in two different cities to change planes.

333.    After his wife and son had left, Mr. Persaud remained in St. Thomas, unable to board a plane.

334.    The following day, on May 12, 2010, Mr. Persaud and his attorney met with Agent Hernandez.  Agent Hernandez and another agent questioned Mr. Persaud for three hours about his time teaching English in Puntland.  At no point did either agent tell Mr. Persaud why he had been denied boarding on his American Airlines flight.

335.    Approximately one week later, FBI agents contacted Mr. Persaud's father in New Jersey.  The agents convinced Mr. Persaud's father that he should fly to St. Thomas to persuade Mr. Persaud to speak further with the FBI.

336.    On or around May 25, 2010, Mr. Persaud's father arrived in St. Thomas. After discussing the situation with his father, Mr. Persaud decided not to speak further with the FBI.

337.    Mr. Persaud and his father desperately sought a way for Mr. Persaud to return to Irvine, where his pregnant wife and son waited for him, before the birth of his second

child.  Mr. Persaud obtained a ticket on a Carnival Cruise ship that was to depart from St. Thomas on June 1, 2010.

338.    On June 1, 2010, Mr. Persaud boarded the Carnival Cruise ship at St. Thomas.  The following morning, on June 2, 2010, the boat stopped in Old San Juan, Puerto Rico.  Agent Hernandez boarded the ship while it was docked.  Mr. Persaud was surprised to see Agent Hernandez and asked why he was following him onto a ship.  The agent told Mr. Persaud that his name would remain on the No Fly List and that this was a "symptom of a greater problem" that would be resolved only if Mr. Persaud cooperated with the FBI.  Agent Hernandez explained that the FBI could contact everyone who knows Mr. Persaud, which would make it harder for him to continue with his education and secure employment.  Agent Hernandez threatened to take Mr. Persaud off of the ship and to leave him in Puerto Rico if Mr. Persaud did not speak with him.

339.    Mr. Persaud told Agent Hernandez that he wanted a lawyer present during any questioning.  The agent responded that a lawyer would cost a lot of money and that Mr. Persaud would end up talking to the FBI anyway.  Agent Hernandez stated, "There is no judicial process for getting off the No Fly List.  The only way to get off the list is to talk to us."

340.    After five days of traveling by boat, Mr. Persaud arrived in Miami on June 5, 2010.  The following morning, he commenced a four-day journey to travel by train to his home in Irvine. Mr. Persaud arrived in Washington, D.C. on June 7, 2010, after a twenty-three hour trip from Miami.  He then traveled for sixteen hours from Washington, D.C. to Chicago, arriving on June 8, 2010.  Finally, he traveled for forty-one hours from Chicago to Los Angeles, and reached his destination on June 10, 2010.

341.    Agent Hernandez followed Mr. Persaud onto the train from Miami to Washington D.C.  The agent asked Mr. Persaud if he would work with the FBI by informing them if he came across anybody seeking to travel to Somalia or to become a terrorist.  Mr. Persaud responded that he does not associate with any such individuals.  Agent Hernandez insisted that because Mr. Persaud had been in Somalia, such persons would trust him.

342.    Mr. Persaud and his wife had a baby boy on June 30, 2010.

343.    On June 11, 2010, Mr. Persaud filed a completed DHS TRIP form.  He was assigned Redress Control Number 2102070.

344.    Mr. Persaud presents no security threat to commercial aviation and knows of no reason why he would be placed on the No Fly List.

345.    To this day, Mr. Persaud remains unable to travel by commercial airline. He has been denied the ability to travel by commercial airline from St. Thomas to San Francisco, via Miami. He has been told by an FBI agent that he will not be permitted to travel on any commercial flight to or from the United States or over U.S. airspace.  Because Defendants barred Mr. Persaud from boarding commercial flights to or from the United States or over U.S. airspace, he was delayed in returning to the United States from St. Thomas and required to postpone his application to a graduate program in nursing that would have placed him in a job, and he cannot fly for business or pleasure, cannot visit family in Tortola in the British Virgin Islands, and cannot travel to Saudi Arabia to perform the *Hajj* pilgrimage.

**Adama Bah**

346.    Plaintiff Adama Bah is a citizen of Guinea who moved to the United States with her family when she was two years old.  In 2007, Ms. Bah was granted political

asylum on the ground that she would be subject to persecution if deported to Guinea.  She currently lives in New York.

347.    Since 2008, Ms. Bah has worked in New York as a caregiver for two children and their mother, who is paralyzed from the waist down.  Her duties include accompanying the family on their vacations and other trips to care for the children and their mother.

348.    In March 2010, Ms. Bah's employers requested that she travel with them to Chicago on a trip to visit a relative suffering from cancer.  They purchased tickets for her to travel to Chicago's O'Hare International Airport on American Airlines.

349.    On March 31, 2010, Ms. Bah went to LaGuardia Airport to board American Airlines Flight 327 bound for Chicago.  She attempted to check in at the automatic ticket window but received the message "See an agent."

350.    Ms. Bah asked an airline employee to help.  An American Airlines employee scanned her ticket receipt and pulled something up on a computer.  An alert appeared on the screen.  The employee stated:  "I have to call my supervisor.  We have to work this out."

351.    An American Airlines supervisor and a female Port Authority officer arrived.  The Port Authority officer told Ms. Bah that she is on the No Fly List.  Several other officers and government officials arrived.

352.    The Port Authority officer asked Ms. Bah:  "Do you have any idea why this is happening?"  Ms. Bah responded that she had been detained by immigration authorities as a teenager but had been released without ever being charged with a crime.

353.    At the American Airlines check-in counter, an airline employee informed Ms. Bah that she is on the No Fly List.

PAGE 82 – FIRST AMENDED COMPLAINT

354.    FBI Special Agent Marc Fenichel and New York Police Department Detective Jon McCormack arrived at the airport, and Ms. Bah met with them in a private room, accompanied by counsel, who had also arrived.  The agents did not explain why Ms. Bah was not permitted to fly.

355.    When Ms. Bah was sixteen years old, she was arrested and detained on immigration grounds because her childhood visa was no longer valid.  She was held for six weeks in a juvenile detention center and faced deportation proceedings, but was permitted to remain in the United States after being granted asylum.  Ms. Bah has never been charged with any crime.

356.    On April 26, 2010, Ms. Bah submitted a completed DHS TRIP form.  She was assigned Redress Control Number 2096479.

357.    On June 30, 2010, Ms. Bah filed the instant action against the Defendants for violation of her constitutional rights, seeking removal of her name from any government watch list that has prevented her from flying or, in the alternative, a hearing in which she can confront any evidence against her and contest her unlawful designation.

358.    Ms. Bah received a letter dated July 27, 2010 from Jim Kennedy of the DHS Traveler Redress Inquiry Program stating that DHS had received her Traveler Inquiry Forms and supporting materials submitted through the TRIP system.  The letter stated:  "DHS has researched and completed our review of your case.  Security procedures and legal concerns mandate that we can neither confirm nor deny any information about you which may be within federal watchlists or reveal any law enforcement sensitive information.  However, we have made any corrections to records that our inquiries determined were necessary, including, as appropriate, notations that may assist in avoiding instances of misidentification."

359.    Ms. Bah presents no security threat to commercial aviation and knows of no reason why she would be placed on the No Fly List.

360.    To this day, Ms. Bah cannot board a commercial airline in the United States.  Ms. Bah has been told by an airline employee that she will not be permitted to travel on any commercial flight in the United States.  Because Defendants have barred her from boarding commercial flights to or from the United States or over U.S. airspace, Ms. Bah has been unable to visit close friends in Ohio, Denver and Atlanta as planned, and has lost the opportunity to earn wages that she would otherwise earn by providing caregiver services to her employer's family during their business or personal trips outside of New York City that involve plane travel.

**Halime Sat**

361.    Plaintiff Halime Sat is a twenty-eight year-old German citizen and lawful permanent resident of the United States.  She was born in Bursa, Turkey and raised in Cologne, Germany.  She is a resident of Corona, California, and has lived in the United States for approximately two years.  She is married to a U.S.-born citizen.

362.    Ms. Sat traveled by plane without incident as recently as December 2009 on a flight to St. Louis, Missouri.

363.    On April 23, 2010, Ms. Sat and her husband were scheduled to fly from Long Beach, California to Oakland, California on JetBlue Airways Flight B6 250 to attend a conference.  When Ms. Sat attempted to check in at the electronic kiosk, she was unable to do so. She went to the check-in counter and realized that her ticket had been booked incorrectly as "Halime Sat Mustafa."  "Mustafa" is the first name of Ms. Sat's husband, Mustafa Umar. JetBlue Manager Juan Gonzales told Ms. Sat that it would be no problem to change the name on

her ticket to her correct name.  He changed the name on the ticket to "Halime Sat" and said that he had to "clear it with security."

364.    Upon information and belief, Mr. Gonzales called the JetBlue security desk and the security desk told him to speak to a federal agent in Washington, D.C.  Mr. Gonzales was on the phone for approximately one hour, on hold with the agency waiting for information or clearance.

365.    Meanwhile, Mr. Gonzales recommended that Ms. Sat's husband proceed to the gate so that he would not miss the flight.  He did so and decided to wait for his wife by the gate until the final boarding call, hoping that she would receive clearance in time to join him and board the plane.  Her husband informed the gate agents that he was waiting for his wife and would board just before they were ready to close the gate.  The agents agreed to allow him to wait.  He waited by the gate for ten minutes until the gate agents received a message by radio. The agents then promptly shut the gate and would not allow him to board the plane.  When he asked them why, the agents responded that they were ordered not to allow him to board the plane.  Ms. Sat's husband then returned to the ticket counter where she continued to wait.

366.    At that point, Mr. Gonzales informed Ms. Sat and her husband that Ms. Sat was on the No Fly List and that because their tickets were booked together, he was not allowed to fly, either.

367.    Shortly thereafter, an airport police officer approached Ms. Sat and her husband.  He asked Ms. Sat's husband for his identification.  The officer read his name over his radio and at least five police or airport security officers came and surrounded Ms. Sat and her husband.

368.    The officers asked Ms. Sat and her husband to sit down in the check-in area lounge.  The officers watched over Ms. Sat and her husband in the lounge.  They did not inform Ms. Sat or her husband of any reason for Ms. Sat's placement on the No Fly List, for preventing them both from boarding their scheduled flight, or for their detention at the airport. Ms. Sat and her husband were embarrassed and humiliated by this experience.

369.    Approximately one half hour to an hour later, FBI Agents David Gates and Douglas M. Swain arrived.  The agents told Ms. Sat and her husband that Ms. Sat was on the No Fly List.  The agents asked Ms. Sat about the origin of her last name and about when the couple had last traveled by plane.  The couple refused to answer any additional questions without the assistance of a lawyer.

370.    On April 28, 2010, Ms. Sat completed a DHS TRIP form online.  She was assigned Redress Control Number 2096525.

371.    On May 10, 2010, Ms. Sat also submitted a Freedom of Information Act and Privacy Act request to the FBI, DHS, and Immigration and Customs Enforcement for information pertaining to her nomination to the No Fly List.

372.    On June 7, 2010, counsel for Ms. Sat spoke with FBI Agent David Gates who confirmed that Ms. Sat has a "real match" and is on the No Fly List.

373.    On June 14, 2010, counsel for Ms. Sat sent a complaint to the TSA Ombudsman's office regarding Ms. Sat's placement on the No Fly List, but has received no response.

374.    Ms. Sat received a letter dated June 22, 2010 from Jim Kennedy of the DHS Traveler Redress Inquiry Program stating that DHS had received her Traveler Inquiry Forms and supporting materials submitted through the TRIP system.  The letter stated: "DHS

has researched and completed our review of your case.  Security procedures and legal concerns

mandate that we can neither confirm nor deny any information about you which may be within

federal watchlists or reveal any law enforcement sensitive information.  However, we have made

any corrections to records that our inquiries determined were necessary, including, as

appropriate, notations that may assist in avoiding instances of misidentification."

375.    Ms. Sat presents no security threat to commercial aviation and knows of

no reason why she would be placed on the No Fly List.

376.    To this day, Ms. Sat cannot board a commercial flight in the United States.

Ms. Sat has been told that by an FBI agent that she is on the No Fly List and will not be

permitted to travel on any commercial flight to or from the United States or over U.S. airspace.

Because Defendants have barred her from boarding commercial flights to or from the United

States or over U.S. airspace, Ms. Sat was unable to attend a conference in the Bay Area, was

forced to withdraw from a competitive educational course in New York City that was to

commence at the end of June and to which she was accepted, was forced to cancel her plans to

attend her family reunion in Germany in July, and was forced to cancel her plans to travel to

Mecca, Saudi Arabia to perform the *Hajj* pilgrimage in November.

## CLAIMS

## COUNT I

## FAILURE TO PROVIDE NOTICE AND HEARING

### Procedural Due Process (Fifth Amendment)

377.    Defendants' actions deprive Plaintiffs of constitutionally protected liberty

interests, including but not limited to those identified below.

378.     Plaintiffs have a liberty interest in traveling free from unreasonable burdens within, to, or from the United States, or over U.S. air space.

379.     Plaintiffs have the right to be free from false governmental stigmatization as individuals associated with terrorist activity, when such harm arises in conjunction with the deprivation of their right to travel on the same terms as other travelers.

380.     Plaintiffs have the right to be free from false governmental stigmatization as individuals associated with terrorist activity, when such harm arises in conjunction with the deprivation of their liberty interest under the Fifth Amendment in travel free from unreasonable burdens.

381.     Plaintiffs have a liberty interest in nonattainder (i.e., the interest against being singled out for punishment without trial).  Defendants' actions have singled out Plaintiffs for punishments that include, but are not limited to, inability to travel by air to the United States, from the United States, and over U.S. airspace, effective banishment from the United States, and effective expatriation from the United States.

382.     Plaintiffs Omar and Abdul Hakeim Thabet Ahmed, lawful permanent residents (LPRs) with continual residence in the United States, have a liberty interest in maintaining their LPR status and a right—both statutory and constitutional—not to have their LPR status revoked, modified, or altered without due process of law.  Defendants have deprived Mr. Omar and Mr. Abdul Hakeim Thabet Ahmed of these rights by preventing them from returning to the United States and by preventing them from returning before the expiration of 180 days from the date of their respective departures from the United States.

383.     Plaintiffs Omar and Abdul Hakeim Thabet Ahmed also have a liberty interest in not having their eligibility for naturalization revoked, modified, or altered without due

process of law.  Defendants have deprived Mr. Omar and Mr. Abdul Hakeim Thabet Ahmed of these rights by preventing them from returning to the United States, by preventing them from returning to the United States before the expiration of 180 days from the date of their respective departures from this country, and by preventing them from returning before the expiration of one year from the date of such departures.

384.    Plaintiffs are entitled to a legal mechanism that affords them notice and an opportunity to contest their inclusion on terrorist watch lists.

385.    Plaintiffs are entitled to a legal mechanism that affords them notice and an opportunity to contest the deprivation of their liberty interests, including but not limited to their liberty interests in traveling, freedom from false stigmatization, and nonattainder due to their inclusion on terrorist watch lists that prevent them from flying on commercial airplanes.

386.    Defendants have violated Plaintiffs' rights without affording them due process of law and will continue to do so into the future if Plaintiffs are not afforded the relief demanded below.

## COUNT II

## VIOLATION OF U.S. CITIZENS' RIGHT TO RESIDE IN UNITED STATES AND TO REENTER THE UNITED STATES FROM ABROAD

### Right to Citizenship (Fourteenth Amendment)

**(Plaintiffs Latif, Knaeble, Kashem, Elias Mustafa Mohamed,**

**Samir Mohamed Ahmed Mohamed, and Muthanna against Defendants)**

387.    Defendants' actions described herein deprive Plaintiffs Latif, Knaeble, Kashem, Elias Mustapaha Mohamed, Samir Mohamed Ahmed Mohamed, and Muthanna of rights guaranteed by the Fourteenth Amendment to the U.S. Constitution.

388.    Plaintiffs Latif, Knaeble, Kashem, Elias Mustafa Mohamed, Samir

Mohamed Ahmed Mohamed, and Muthanna are U.S. citizens and therefore have an absolute

right to reside in the United States and to return to the United States from abroad.

389.    Defendants have violated and continue to violate the Fourteenth

Amendment right to U.S. citizenship of Plaintiffs Latif, Knaeble, Kashem, Elias Mustafa

Mohamed, Samir Mohamed Ahmed Mohamed, and Muthanna by depriving them of their rights

or the full effect of their rights to reside in the United States and to reenter the United States from

abroad by preventing them from boarding commercial flights to the United States or over U.S.

airspace, even though Plaintiffs Latif, Knaeble, Kashem, Elias Mustafa Mohamed, Samir

Mohamed Ahmed Mohamed, and Muthanna have no other practicable means of returning to the

United States.

## COUNT III

## FAILURE TO PROVIDE NOTICE OF IMMIGRATION CHARGES AND REMOVAL

## HEARING; VIOLATION OF THE IMMIGRATION AND NATIONALITY ACT

## 8 U.S.C. § 1229a and 8 U.S.C. § 1101(a)(20)

### (Plaintiffs Omar and Abdul Hakeim Thabet Ahmed against Defendants)

390.    Defendants' actions described herein deprive Plaintiffs Omar and Abdul

Hakeim Thabet Ahmed of rights guaranteed by the Immigration and Nationality Act (INA).

391.    As lawful permanent residents of the United States, Plaintiffs Omar and

Abdul Hakeim Thabet Ahmed have each been "lawfully accorded the privilege of residing

permanently in the United States as an immigrant in accordance with the immigration laws." 8

U.S.C. § 1101(a)(20).

392.    Defendants cannot deprive Mr. Omar and Mr. Abdul Hakeim Thabet Ahmed of the privilege of residing permanently in the United States without charging them and providing them each with a removal hearing before an immigration judge, in accordance with the procedures set forth in 8 U.S.C. § 1229a.

393.    Defendants have violated the INA by excluding Mr. Omar and Mr. Abdul Hakeim Thabet Ahmed from the United States and preventing their return to the United States without charge and without a removal hearing.

## COUNT IV

## UNLAWFUL AGENCY ACTION

## 5 U.S.C. §§ 702, 706

394.    Defendants' actions described herein were and are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

395.    Defendants' violations of Plaintiffs' constitutional and statutory rights constitute agency actions that are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity in violation of 5 U.S.C. § 706.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

a.   A declaratory judgment that:

   i.   Defendants' policies, practices, and customs violate the Fifth Amendment to the United States Constitution and the Administrative Procedure Act;

    ii.  Defendants' policies, practices, and customs violate the Fourteenth Amendment to the United States Constitution as to Plaintiffs Latif, Knaeble, Kashem, Elias Mustafa Mohamed, Samir Mohamed Ahmed Mohamed, and Muthanna; and

    iii.  Defendants' policies, practices, and customs violate the Immigration and Nationality Act as to Plaintiffs Omar and Abdul Hakeim Thabet Ahmed.

b.  An injunction that:

    i.  requires Defendants to remedy the constitutional violations identified above, including the removal of Plaintiffs from any watch list or database that prevents them from flying; or

    ii.  requires Defendants to provide Plaintiffs with meaningful notice of the grounds for their inclusion on a government watch list, and an opportunity to rebut the government's charges and to clear their names; and,

    iii.  requires Defendants to permit Plaintiffs Latif, Knaeble, Kashem, Elias Mustafa Mohamed, Samir Mohamed Ahmed Mohamed, Muthanna, Omar, and Abdul Hakeim Thabet Ahmed to return to the United States by air subject to suitable screening procedures.

c.  Awards attorneys' fees, costs, and expenses of all litigation.

d.  Grants such other relief as the Court may deem just and proper.

DATED this August 5, 2010

**American Civil Liberties Union Foundation**

_____/s/ Ben Wizner_____
Ben Wizner (Admitted *pro hac vice*)
  Email: bwizner@aclu.org
Nusrat Jahan Choudhury (Admitted *pro hac vice*)

Email: nchoudhury@aclu.org
125 Broad Street, 18th Floor
New York, NY 10004
Tel: 212.519.2500; Fax: 212.549.2654

**Tonkon Torp LLP**
<u>Steven M. Wilker</u>, OSB No. 911882
Email: steven.wilker@tonkon.com
1600 Pioneer Tower
888 SW 5th Avenue
Portland, OR 97204
Tel: 503.802.2040; Fax: 503.972.3740
Cooperating Attorney for the ACLU Foundation of Oregon

**ACLU Foundation of Oregon**
Kevin Díaz, OSB No. 970480
Email: kdiaz@aclu-or.org
P.O. Box 40585
Portland, Oregon  97240
Tel: 503.227.6928; Fax: 503.227.6948

**ACLU Foundation of Southern California**
Ahilan T. Arulanantham (Admitted *pro hac vice*)
Email: aarulanantham@aclu-sc.org
Jennifer Pasquarella (Admitted *pro hac vice*)
Email: jpasquarella@aclu-sc.org
1313 West Eighth Street
Los Angeles, CA 90017
Tel: 213.977.9500; Fax: 213.977.5297

**ACLU Foundation of Northern California**
Alan L. Schlosser  (Admitted *pro hac vice*)
Email: aschlosser@aclunc.org
Julia Harumi Mass  (Admitted *pro hac vice*)
Email: jmass@aclunc.org
39 Drumm Street
San Francisco, CA 94111
Tel: 415.621.2493; Fax: 415.255.8437

**ACLU Foundation of New Mexico**
Laura Schauer Ives (Admitted *pro hac vice*)
Email: lives@aclu-nm.org
P.O. Box 566
Albuquerque, NM 87103
Tel: 505.243.0046; Fax: 505.266.5916

PAGE 93 – FIRST AMENDED COMPLAINT

**Salahi Law**
Reem Salahi (Admitted *pro hac vice*)
   Email: rsalahi@salahilaw.com
429 Santa Monica Blvd, Suite 550
Santa Monica, CA 90401
Tel: 510.225.8880
Cooperating Attorney for the ACLU Foundation of
Southern California

Attorneys for Plaintiffs: Ayman Latif, Mohamed Sheikh
Abdirahman Kariye, Raymond Earl Knaeble IV, Faisal
Nabin Kashem, Elias Mustafa Mohamed, Steven William
Washburn, Samir Mohamed Ahmed Mohamed, Abdullatif
Muthanna, Nagib Ali Ghaleb, Saleh A. Omar, Abdul
Hakeim Thabet Ahmed, Ibraheim Y. Mashal, Salah Ali
Ahmed, Amir Meshal, Stephen Persaud, Adama Bah, and
Halime Sat