TONY WEST
Assistant Attorney General
Civil Division

SANDRA M. SCHRAIBMAN
Deputy Branch Director
Federal Programs Branch

DIANE KELLEHER
diane.kelleher@usdoj.gov
AMY POWELL
amy.powell@usdoj.gov
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W
Washington, D.C.  20001
Phone: (202) 514-4775
Fax:    (202) 616-8470
*Attorneys for Defendant*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| AYMAN LATIF, et al., <br><br> *Plaintiffs*, | Case 3:10-cv-00750-BR |
|---|---|
| v. <br><br> ERIC H. HOLDER, JR.,  et al., | **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OR FOR SUMMARY JUDGMENT** |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

# <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

INTRODUCTION..................................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND............................................ 4

PROCEDURAL BACKGROUND.......................................................................... 14

ARGUMENT......................................................................................................... 15

I.      DISMISSAL IS REQUIRED BECAUSE TSA IS A NECESSARY
        AND INDISPENSABLE PARTY THAT CANNOT BE JOINED, AND
        THIS COURT LACKS JURISDICTION OVER PLAINTIFFS'
        CHALLENGES TO THE DHS TRIP REDRESS PROCESS ........................ 15

II.     SUMMARY JUDGMENT SHOULD BE ENTERED FOR
        DEFENDANTS ON PLAINTIFFS' CLAIMS THAT THEY HAVE
        BEEN DENIED THE RIGHT TO RE-ENTER THE UNITED STATES
        AND RESIDE THEREIN. .......................................................................... 20

        A.      The Entry Claims Are Moot Because all the Plaintiffs Who Were
                Outside the Country and Wished to Return at the Outset of this
                Lawsuit Have Returned........................................................................ 21

        B.      The Right to Enter the Country Is a Right to Enter at a U.S. Port
                of Entry, and Citizen Plaintiffs Have Not Been Denied that Right. ..... 24

                1.      U.S. Citizens Have a Right to Enter the Country, Not to the
                        Most Convenient Means of Travel. ......................................... 24

                2.      Citizen Plaintiffs Have Not Been Prevented from Entry or
                        Return to the United States. ................................................... 28

III.   DHS TRIP ADEQUATELY BALANCES THE GOVERNMENT'S
       NATIONAL SECURITY INTERESTS IN PROTECTING WATCHLIST
       INFORMATION WITH AN INDIVIDUAL'S RIGHT TO TRAVEL............................ 32

       A.    Current Redress Process for Individuals Denied Boarding.................................. 34

       B.    Plaintiffs Have Not Articulated a "Private Interest" That Requires
             More Process Than What DHS TRIP Provides. ..................................................... 36

       C.    There is Little Risk of Erroneous Deprivation Given the Quality
             Controls Over the TSDB (and the even Smaller Subset of the No-Fly
             List) and the Right to Appeal Redress Decisions in the Courts of Appeal. .......... 39

       D.    Protecting Watchlisting Status, and the Underlying Information, is
             Crucial to the Government's Counter-Terrorism Efforts....................................... 40

             1.    Likely Harms From Disclosure of Information Related to
                   Watchlisting. ........................................................................................ 40

             2.    TRIP Provides Adequate Process for Persons Who Allege
                   they Have Been Denied Boarding ............................................................ 43

IV.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
       PLAINTIFFS' INA CLAIMS . ................................................................................... 47

V.     THE GOVERNMENT'S REDRESS POLICY IS NOT
       ARBITRARY, CAPRICIOUS, OR CONTRARY TO LAW. ........................................... 52

CONCLUSION. ..................................................................................................................... 55

# TABLE OF AUTHORITIES

**CASES**                                                                            **PAGE(S)**

*Acosta v. Gaffney*,
558 F.2d 1153 (3rd Cir. 1977). ...................................................... 25, 26

*Al Haramain Islamic Foundation, Inc. v. U.S. Dept. of Treasury*,
585 F. Supp. 2d 1233 (D. Or. 2008). ................................................ 44

*Alvarez-Barajas v. Gonzales*,
418 F.3d 1050 (9th Cir. 2005). ...................................................... 48

*Alvear v. Kirk*,
87 F. Supp. 2d 1241 (D.N.M. 2000). ................................................ 51

*America Cargo Transport v. U.S.*,
- F.3d -, 2010 WL 4367040 (9th Cir. 2010)...................................... 22

*Ammex, Inc. v. Cox*,
351 F.3d 697 (6th Cir. 2003). ....................................................... 22

*Armstrong v. Manzo*,
380 U.S. 545 (1965)................................................................ 34, 46

*Arredondo v. Holder*,
--- F.3d ----, 2010 WL 4291391, at *2 (9th Cir. November 2, 2010)...................... 44

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009)............................................................... 32

*Balzac v. Porto Rico*,
258 U.S. 298 (1922)................................................................. 25

*Banco Nacional de Cuba v. Sabbatino*,
376 U.S. 398 (1964)................................................................. 31

*Barnard v. DHS*,
531 F. Supp. 2d 131 (D.D.C. 2008). ................................................ 41

*Bassouini v. CIA*,
392 F.3d 244 (7th Cir. 2004). ....................................................... 40

*Bassiouni v. FBI*,
436 F.3d 712 (7th Cir. 2006). ....................................................... 53

-iii-

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007). ............................................................................... 32

*Beta Upsilon Chi Upsilon Chapter at the University of Florida v. Machen*,
    586 F.3d 908 (11th Cir. 2009). ............................................................. 22

*Blum v. Yaretsky*,
    457 U.S. 991 (1982). ............................................................................... 23

*Boddie v. Connecticut*,
    401 U.S. 371 (1971). ............................................................................... 34

*Brem-Air Disposal v. Cohen*,
    156 F.3d 1002 (9th Cir. 1998). ............................................................. 53

*Buckingham v. Secretary of U.S. Dept. of Agr.*,
    603 F.3d 1073 (9th Cir. 2010). ..................................................... 34, 53

*Califano v. Aznavorian*,
    439 U.S.  170 (1978). ......................................................... 24, 25, 26

*Camins v. Gonzales*,
    500 F.3d 872 (9th Cir. 2007). ............................................................. 49

*Camp v. Pitts*,
    411 U.S. 138 (1973). ............................................................................... 52

*Citizens to Preserve Overton Park, Inc. v.  Volpe*,
    401 U.S. 402 (1971). ............................................................................... 52

*City of Houston v. FAA*,
    679 F.2d 1184 (5th Cir. 1982). ............................................................. 26

*City of Las Vegas, Nev. v. FAA*,
    570 F.3d 1109 (9th Cir. 2009). ............................................................. 44

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983). ............................................................................... 23

*Clarke v. U.S.*,
    915 F.2d 699 (D.C. Cir. 1990). ..................................................... 21, 23

*Cleveland Bd. of Educ. v. Loudermill*,
    470 U.S. 532 (1985). ............................................................................... 34

-iv-

*Matter of Collado*,
    21 I & N. Dec., ¶ 1061 (BIA 1998)........................................................................... 49

*Cramer v. Skinner*,
    931 F.2d 1020 (5th Cir. 1991). ........................................................................... 26

*Ctr. for Nat'l Sec. Studies v. DOJ*,
    331 F.3d 918 (D.C. Cir. 2003). ........................................................................... 54

*De Vega v. Gonzalez*,
    503 F.3d 45 (1st Cir. 2006)............................................................................... 50

*Dep't of Navy v. Egan*,
    484 U.S. 518 (1988)......................................................................... 46, 47, 54

*Disabled Rights Action Committee v. Las Vegas Events, Inc.*,
    375 F.3d 861 (9th  Cir. 2004). ........................................................................... 15

*EEOC v. Fed. Express Corp.*,
    558 F.3d 842 (9th Cir. 2009). ........................................................................... 21

*Federal Deposit Ins. Corp. v. Mallen*,
    486 U.S. 230 (1988).......................................................................................... 33

*Fisher v. Reiser*,
    610 F.2d 629 (9th Cir. 1979). ........................................................................... 26

*Fishermen's Finest, Inc. v. Locke*,
    593 F.3d 886 (9th Cir. 2010). ........................................................................... 53

*Fitzgibbon v. CIA*,
    911 F.2d 755 (D.C. Cir. 1990). ........................................................................... 46

*Forest Guardians v. U.S. Forest Serv.*,
    329 F.3d 1089 (9th Cir.2003). ........................................................................... 21

*Foretich v. U.S.*,
    351 F.3d 1198 (D.C. Cir. 2003). ........................................................................... 38

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
    528 U.S. 167 (2000).......................................................................................... 21, 22

*Gilbert v. Homar*,
    520 U.S. 924 (1997)......................................................................... 33, 34, 35

-v-

*Gildernew v. Quarantillo*,
    594 F.3d 131 (2nd Cir. 2010)...................................................................... 51

*Gilmore v. Gonzales*,
    435 F.3d 1125 (9th Cir. 2006). ................................................................ passim

*Global Relief Foundation, Inc. v. O'Neill*,
    315 F.3d 748 (7th Cir. 2002). ....................................................................... 45

*Gordon v. FBI*,
    388 F. Supp. 2d 1028 (N.D. Cal. 2005). ....................................................... 41

*Green v. TSA*,
    351 F. Supp. 2d 1119 (W.D. Wash. 2005)................................................ 26, 38

*Haig v. Agee*,
    453 U.S. 280 (1981).................................................................................passim

*Halkin v. Helms*,
    598 F.2d 1 (D.C. Cir. 1978). ....................................................................... 47

*Hernandez v. Kramer*,
    913 F.2d 230 (5th Cir. 1990). ..................................................................... 25

*Holder v. Humanitarian Law Project*,
    130 S. Ct. 2705, 2010 WL 2471055 (2010)............................................ passim

*Holy Land Foundation for Relief and Development v. Ashcroft*,
    333 F.3d 156 (D.C. Cir. 2003). .................................................................... 45

*Ibrahim v. DHS*,
    538 F.3d 1250 (9th Cir. 2008). ................................................................ 19, 20

*Islamic American Relief Agency v. Unidentified FBI Agents*,
    394 F. Supp. 2d 34 (D.D.C. 2005). ............................................................. 45

*Jifry v. FAA*,
    370 F.3d 1174 (D.C. Cir. 2004). ................................................................. 43

*Jones v. Flowers*,
    547 U.S. 220 (2006)..................................................................................... 33

*Khodagholian v. Ashcroft*,
    335 F.3d 1003 (9th Cir. 2003). ................................................................... 48

-vi-

*Krikorian v. Dep't of State*,
    984 F.2d 461 (D.C. Cir. 1993). ........................................................ 54

*Landon v. Plasencia*,
    459 U.S. 21 (1982)........................................................................ 48

*Makah Indian Tribe v. Verity*,
    910 F.2d 555 (9th Cir. 1990). ......................................................... 17

*Manybeads v. U.S.*,
    209 F.3d 1164 (9th Cir. 2000). ....................................................... 18

*Matthews v. Eldridge*,
    424 U.S. 319 (1976)................................................................ 34, 35, 46

*Miller v. Reed*,
    176 F.3d 1202 (9th Cir. 1999). ....................................................... 25

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)........................................................................ 52

*Munaf v. Geren*,
    553 U.S. 674 (2008)...................................................................... 31

*National Council of Resistance of Iran ("NCRI") v. Dep't of State*,
    251 F.3d 192 (D.C. Cir. 2001). .................................................... 45, 47

*Natural Resources Defense Council v. EPA*,
    526 F.3d 591 (9th Cir. 2008). ......................................................... 44

*Neely v. Henkel*,
    180 U.S. 109 (1901)...................................................................... 27

*Newton v. INS*,
    736 F.2d 336 (6th Cir. 1984). ......................................................... 27

*Nguyen v. INS*,
    533 U.S. 53 (2001)........................................................................ 25

*Nixon v. Administrator of General Services*,
    433 U.S. 425 (1977)...................................................................... 37

*Paradissiotis v. Rubin*,
    171 F.3d 983 (5th Cir. 1999). ......................................................... 37

-vii-

*Patterson v. FBI*,
    893 F.2d 595 (3d Cir. 1990)............................................................... 45

*Paul v. Davis*,
    424 U.S. 693 (1976)....................................................................... 38

*Phillippi v. CIA*,
    546 F.2d 1009 (D.C. Cir. 1976). ........................................................ 13

*Pit River Home and Agr. Co-op. Ass'n v. U.S.*,
    30 F.3d 1088 (9th Cir. 1994). ...................................................... 18, 19

*Ragsdale v. Turnock*,
    841 F .2d 1358 (7th Cir.1988). ........................................................ 22

*Rahman v. Chertoff*,
    530 F.3d 622 (7th Cir. 2008). .................................................. <u>passim</u>

*Republic of Philippines v. Pimentel*,
    553 U.S. 851 (2008)....................................................................... 17

*Rio Grande Silvery Minnow v. Bureau of Reclamation*,
    601 F.3d 1096 (10th Cir. 2010). ....................................................... 22

*Rouse v. U.S. Dept. of State*,
    567 F.3d 408 (9th Cir. 2009). .......................................................... 31

*Scherfen v. DHS*,
    2010 WL 456784 (M.D. Pa. Feb. 2, 2010). .................................. <u>passim</u>

*Selective Serv. Sys. v. Minn. Pub. Interest Research Group*,
    468 U.S. 841 (1984)....................................................................... 37

*Snepp v. U.S.*,
    444 U.S. 507 (1980)....................................................................... 42

*Stehney v. Perry*,
    101 F.3d 925 (3d Cir. 1996)......................................................... 43, 46

*Tooley v. Bush*,
    2006 WL 3783142 (D.D.C. 2006). ................................................ 40, 41

*Tooley v. Napolitano*,
    586 F.3d 1006 (D.C. Cir. 2006). ...................................................... 40

*Torbet v. United Airlines*,
   298 F.3d 1087 (9th Cir. 2002). ........................................................... 47

*Town of Southold v. Town of East Hampton*,
   477 F. 3d 38 (2nd Cir. 2007)............................................................... 26

*In re U.S.*,
   1 F.3d 1251, 1993 WL 262656 (Fed. Cir. 1993). ................................ 47

*U. S. ex rel. Siegel v. Shinnick*,
   219 F. Supp. 789 (E.D.N.Y. 1963). ..................................................... 27

*U.S. v. $124,570 U.S. Currency*,
   873 F.2d 1240 (9th Cir. 1989). ............................................................ 29

*U.S. v. Arnold*,
   533 F.3d 1003 (9th Cir. 2008). ....................................................... 27, 28

*U.S. v. Bell*,
   464 F.2d 667 (2d Cir. 1972).................................................................. 29

*U.S. v. Flores-Montano*,
   541 U.S. 149 (2004)........................................................................ 27, 28

*U.S. v. Hartwell*,
   436 F.3d 174 (3rd Cir. 2006). .............................................................. 29

*U.S. v. Marquez*,
   410 F.3d 612 (9th Cir. 2005). .............................................................. 29

*United States ex rel. Mezei v. Shaughessy*,
   345 U.S. 206 (1953).............................................................................. 48

*United States v. Ginsburg*,
   37 U.S. 422 (1917)................................................................................ 51

*United States v. Hawkins*,
   249 F.3d 867 (9th Cir. 2001). .............................................................. 54

*Velez v. Levy*,
   401 F.3d 75 (2d Cir. 2005).................................................................... 39

*Vo v. Benov*,
   447 F.3d 1235 (9th Cir. 2006). ............................................................ 27

-ix-

*Wayte v. U.S.,*
    470 U.S. 598 (1985)..................................................................................... 33

*Worthy v. Herter,*
    270 F.2d 905 (D.C. Cir. 1959) .................................................................. 27

*Worthy v. U.S.,*
    328 F.2d 386 (5th Cir 1964) ...................................................................... 25

*Zadvydas v. Davis,*
    533 U.S. 678 (2001).................................................................................... 54

## **STATUTES**

5 U.S.C. § 704............................................................................................ 53

5 U.S.C. § 706(2)....................................................................................... 52

6 U.S.C. § 111 ............................................................................................. 5

8 U.S.C. § 1101(13).............................................................................. 49, 50

8 U.S.C. § 1182(a)...................................................................................... 50

8 U.S.C. § 1225 ......................................................................................... 48

8 U.S.C. § 1227(a)...................................................................................... 50

8 U.S.C. § 1229a................................................................................... 47, 48

8 U.S.C. § 1252........................................................................................... 48

8 U.S.C. § 1427 ..................................................................................... 50, 51

19 U.S.C. §§ 1431, 1433............................................................................ 30

22 U.S.C. § 2671(b)(2)(B).......................................................................... 30

28 U.S.C. § 533........................................................................................... 5

42 U.S.C. § 264........................................................................................... 25

49 U.S.C. § 114.................................................................................... <u>passim</u>

-x-

49 U.S.C. § 44903.......................................................................................... passim

49 U.S.C. § 44926.......................................................................... 11, 12, 13, 16

49 U.S.C. § 46110.......................................................................................... passim

50 U.S.C. § 404o(a)&(d)(1)................................................................................ 4

Aviation and Transportation Security Act,
    Pub. L. No. 107-71, 115 Stat. 597 (2001)................................................... 5

Intelligence Reform and Terrorism Prevention Act of 2004,
    Pub. L. No. 108-458, Title IV, § 4071, 118 Stat. 3729 (Dec. 17, 2004)............... 30

## RULES AND REGULATIONS

8 C.F.R. § 316.5.............................................................................................. 50

19 C.F.R. § 4.7(b)........................................................................................... 30

28 C.F.R. § 0.85(l)............................................................................................ 5

49 C.F.R. pt. 1520......................................................................................... passim

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 19(b)..................................................................................... passim

## LEGISLATIVE MATERIAL

H.R. Rep. No. 107-296 (2001), as reprinted in 2002 U.S.C.C.A.N. 589...................... 6

## UNITED STATES CONSITUTION

U.S. Const. art. II, § 2, cl. 1............................................................................. 46

U.S. Const. art III § 2..................................................................................... 21

U.S. Const., Amend. VI................................................................................... 42

Defendants' Motion for Summary Judgment
Latif v. Holder, No. 3:10-cv-00750-BR

## **MISCELLANEOUS**

9/11 Commission Report, Executive Summary, available at
http://govinfo.library.unt.edu/911/report/911Report_Exec.htm. ..................................................... 9

Homeland Security Presidential Directive 6, at
http://www.dhs.gov/xabout/laws/gc_1214594853475.shtm#1 ..................................................... 8

-xii-

# INTRODUCTION

In the aftermath of the September 11 attacks, Congress and the Executive Branch have devoted extensive resources to enhancing aviation security.  Multiple federal agencies have worked together to strengthen the security of our Nation, including by creating and utilizing a consolidated terrorist watchlist, the Terrorist Screening Database ("TSDB"), to facilitate the identification by United States ("U.S.") authorities of those individuals suspected of engaging in terrorist activity.  Throughout this process, Congress and the Executive Branch have worked to balance the civil rights and liberties of the traveling public with the paramount need to ensure that air travel is safe and secure.  For example, pursuant to statutory authority and Executive Branch action, individuals who believe they have been wrongfully placed on a terrorist watchlist can file for redress with the Department of Homeland Security's Travelers Redress Program ("DHS TRIP").

Plaintiffs are U.S. citizens, lawful permanent residents, and an asylum seeker who allege that they have been denied boarding on flights to, from, and within the U.S. and assume, therefore that they are on the government's No Fly List, a subset of the TSDB.  They claim a constitutional right to fly to, from, and within the U.S. and also argue that any infringement on their ability to fly into the U.S. from abroad is essentially a denial of their constitutional right to re-enter the country, in contravention of their Fourteen Amendment right to U.S. citizenship and their statutory rights under the Immigration and Nationality Act ("INA").  They claim that the DHS TRIP process established for redress of complaints regarding perceived placement on the No Fly List fails to satisfy procedural due process protections.  Plaintiffs seek removal of their names from any watchlist that precludes them from flying within U.S. jurisdiction, or meaningful notice of the grounds for their inclusion on a government watchlist and an opportunity to rebut

any grounds for inclusion.  However, not only have Plaintiffs failed to demonstrate any cognizable constitutional or statutory violation, they attempt to bypass the appropriate redress mechanisms already in place.  Plaintiffs seek relief from the wrong court and, in any event, they seek relief which this Court cannot provide.

A key aspect of the relief Plaintiffs seek – namely, significant changes to the way that the government provides redress to travelers who allege they have been denied boarding on an aircraft – necessarily requires action by agencies which Plaintiffs deliberately did not include as Defendants in this action.  By law, DHS and the Transportation Security Administration ("TSA") are responsible for security measures surrounding transportation, including implementation of the No Fly List and the boarding of individuals on flights, and take a lead role in administering redress, including through DHS TRIP.  DHS TRIP determination letters responding to complaints of denied or delayed boarding constitute final orders by TSA, whose Office of Transportation Security Redress was designated by the DHS Secretary to be the lead agent managing DHS TRIP.  Challenges to DHS TRIP determination letters by individuals alleging denied or delayed airline boarding must be filed in the U.S. Courts of Appeal, pursuant to 49 U.S.C. § 46110, because they are final orders of TSA.  In this case, all of the Plaintiffs have filed complaints with DHS TRIP and received final determination letters, but they have not filed this lawsuit in the appropriate forum or included necessary parties.  Thus, at the outset, this case must be dismissed for failure to include necessary parties that cannot be sued on such grounds in the district court.

In addition, Plaintiffs' case rests largely on their overarching, and erroneous, theory that they have a constitutional right to fly to, from, and within the U.S.  However, as the United

States Court of Appeals for the Ninth Circuit held in *Gilmore v. Gonzales*, 435 F.3d 1125, 1136 (9th Cir. 2006), the "Constitution does not guarantee the right to travel by any particular form of transportation." Plaintiffs within the U.S. have access to other modes of transportation, including by rail, car, and bus. And, as the experiences of several of the Plaintiffs reflect, those persons denied boarding aircraft outside the U.S. also had access to alternative means of returning to the U.S. The claim that denial of boarding is equivalent to denial of the rights and benefits of U.S. citizenship is thus belied by Plaintiffs' own complaint. Indeed, as the facts show in this case, all of the Plaintiffs who were abroad and wanted to return to the U.S. have now done so, some pursuant to their own independent efforts, and others through the parties' coordinated efforts. The immigration claims of two of the permanent resident plaintiffs are similarly unavailing. In sum, none of Plaintiffs' constitutional or statutory rights have been violated, even if the denial of boarding required them to take alternative forms of transport, including flights that were not directly bound for a U.S. designation.

Further, even if this Court were to determine that it has jurisdiction over this action and that Plaintiffs' liberty interest in traveling was diminished as a result of the denial of boarding, DHS TRIP provides sufficient process to review the government's actions and therefore satisfies due process requirements. The redress process necessarily requires a balance between the interests of travelers in being able to challenge perceived impediments to their ability to travel and the government's compelling interests in ensuring the security of air travel and the protection of information giving rise to placement on the No Fly List. Plaintiffs' requested relief – which would require either removal of persons from their perceived placement on the No Fly List or hearings and disclosure of the underlying reasons for such inclusion – might require the

3

government to turn over classified and otherwise sensitive information to persons it reasonably suspects are associated with terrorism, a result the Constitution does not compel.

Nor can the polices, practices, and procedures at issue here reasonably be considered arbitrary and capricious.  In maintaining and managing the TSDB, and its No Fly List subset specifically, the government is acting pursuant to legislation passed by Congress in the wake of the September 11, 2001 terrorist attacks to protect the security of the U.S. and air passengers. Repeated attempts by terrorists in the intervening years – including attempts during the past year and most recently in the past several weeks – establish unequivocally that airplanes remain a primary target and that terrorists will attempt to exploit any perceived deficiencies in the air security system.   By asking the Court to make decisions about who can and cannot board airplanes to, from, and within the U.S., Plaintiffs seek to involve the Court in second-guessing determinations made by the Executive Branch regarding national security risks imposed by particular individuals.  But as the Supreme Court has made clear, courts should avoid taking on such a role:  "when it comes to collecting evidence and drawing factual inferences in [the national security context], the lack of competence on the part of the courts is marked, and respect for the Government's conclusions is appropriate."  *Holder v. Humanitarian Law Project* *("HLP")*, --- U.S. ---, 130 S. Ct. 2705, 2727 (2010).  Accordingly, summary judgment should be entered for Defendants.

## STATUTORY AND REGULATORY BACKGROUND

At present, several different components of the federal government work together to secure the nation (and its airways) from terrorist threats.  The Federal Bureau of Investigation ("FBI") has responsibility for investigating and analyzing intelligence relating to both

4

international and domestic terrorist activities, and the National Counterterrorism Center

("NCTC") serves as the primary organization for analyzing and integrating intelligence relating

to international terrorism and counterterrorism.  *See* 28 U.S.C. § 533; 28 C.F.R. § 0.85(l); 50

U.S.C. §§ 4040(a)&(d)(1).  The Department of Homeland Security ("DHS") is primarily charged

with "prevent[ing] terrorist attacks within the U.S.," and "reduc[ing] the vulnerability of the U.S.

to terrorism."  6 U.S.C. § 111.  Within DHS, U.S. Customs and Border Protection ("CBP") is

responsible for securing the U.S. border against terrorist threats, and the Transportation Security

Administration ("TSA") is responsible for transportation – including aviation – security.  *See* 6

U.S.C. §§ 111(b)(1), 202(1); 49 U.S.C. § 114.  Finally, the Terrorist Screening Center ("TSC"),

which was established by Executive Order in 2003, maintains a consolidated database of

identifying information about persons known or reasonably suspected of being involved in

terrorist activity.  TSC then feeds that information to front-line screening agencies and law

enforcement officials so that they can positively identify known or suspected terrorists trying to

obtain visas, enter the country, board aircraft, or engage in other activity of concern.  All of these

agencies are involved in the effort to stop known or suspected terrorists from boarding planes

traveling to, from, or within the U.S.[1]

## Creation of TSA After 9/11

In response to the terrorist attacks on the U.S. on September 11, 2001, Congress enacted

the Aviation and Transportation Security Act (Pub. L. No. 107-71, 115 Stat. 597 (2001)), which

---

[1]   In support of these arguments, Defendants cite from the following declarations Declaration of Christopher Piehota, Deputy Director, Terrorist Screening Center ("Piehota Dec."); Declaration of Mark F. Giuliano, Assistant Director, Counterterrorism Division, Federal Bureau of Investigation ("Giuliano Dec."); Declaration of James G. Kennedy, Jr., the Director of the Office of Transportation Security Redress (OTSR), Transportation Security Administration (TSA) ("Kennedy Dec."); Declaration of Kevin K. McAleenan, Deputy Assistant Commissioner, Office of Field Operations, Customs and Border Protection ("McAleenan Dec."); Declaration of Sharon Raya, Paralegal, Federal Programs Branch, Civil Division, Department of Justice ("Raya Dec.").

5

created TSA within the Department of Transportation.  The legislation charged TSA with

overseeing the "security screening operations for passenger air transportation."  *See* 49 U.S.C. §

114.  In enacting this law, and creating an agency tasked with aviation security, Congress

legislated a "fundamental change in the way it approaches the task of ensuring the safety and

security of the civil air transportation system" as a result of the "terrorist hijacking and crashes of

passenger aircraft on September 11, 2001, which converted civil aircraft into guided bombs for

strikes against the U.S. . . ."  H.R. Rep. No. 107-296, at 53-54 (2001), as reprinted in 2002

U.S.C.C.A.N. 589, 590.  The new statute provided that the Administrator for TSA was to be an

Under Secretary of the Department of Transportation.  49 U.S.C. §§ 114(a), (b).[2]

The TSA Administrator is responsible for "day-to-day Federal security screening

operations for passenger air transportation and intrastate air transportation under sections 44901

and 44935."  49 U.S.C. § 114(e)(1).   Pursuant to Sections 114 and 44903, Congress also tasked

TSA with a number of duties, including the issuance of regulations and orders with respect to

screening passengers and securing commercial air travel.  *See* 49 U.S.C. § 44903(b); 49 U.S.C. §

114(l)(2)(A).

TSA is required by statute to take measures to secure commercial air travel against the

threat of terrorism including by establishing, maintaining, and updating lists of "individuals on

passenger lists who may be a threat to civil aviation or national security."  49 U.S.C. § 114(h)(3).

*See also* 49 U.S.C. § 44903(j)(2)(A) (requiring TSA to use a sanctioned screening system to

---

[2]   TSA was subsequently transferred to DHS as part of the Homeland Security Act of 2002.  *See* Pub. L. No. 107-296, §§ 403, 423, 424, 116 Stat. 2135, 2178, 2185 (2002).  Within DHS, the Under Secretary of Transportation for Security underwent a title change to Administrator of TSA, *see* 49 C.F.R. § 1500.3, and now is also known as the Assistant Secretary of Homeland Security for TSA, *see, e.g.*, 49 U.S.C. § 44925(b)(1).

6

"evaluate all passengers before they board an aircraft" and to ensure that "individuals selected by the system and their carry-on and checked baggage are adequately screened."). Section 114(h)(3) requires that TSA work "in consultation with other appropriate Federal agencies and air carriers." 49 U.S.C. § 114(h)(3). That section further requires TSA "to use information from government agencies" to identify travelers who may pose a threat to national security, and to "prevent [those] individual[s] from boarding an aircraft." *Id.* § 114(h)(3)(A), (B); *see also* Piehota Dec., ¶¶ 2-4.

As part of its prescreening functions, TSA is required to provide redress to travelers who have been delayed or denied airline boarding. Under 49 U.S.C. § 44903(j)(2)(C)(iii), enacted as part of the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), P.L. 108-458, provides that in assuming the passenger prescreening function, the Assistant Secretary of Homeland Security, *e.g.*, TSA, is required to "establish a procedure to enable airline passengers, who are delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat, to appeal such determination and correct information contained in the system." The Assistant Secretary is further required to "establish a timely and fair process for individuals identified as a threat under one or more of subparagraphs (C), (D), and (E) to appeal to the [TSA] the determination and correct any erroneous information." 49 U.S.C. § 44903(j)(2)(G)(i).[3] A similar requirement is prescribed for international passengers. Under 49 U.S.C. § 44909(c)(6), the Secretary is required

---

[3] The process must "include the establishment of a method by which the Assistant Secretary will be able to maintain a record of air passengers and other individuals who have been misidentified and have corrected erroneous information. To prevent repeated delays of misidentified passengers and other individuals, the Transportation Security Administration record shall contain information determined by the Assistant Secretary to authenticate the identity of such a passenger or individual." 49 U.S.C. § 44903(j)(2)(G)(ii).

7

to "compare passenger information for any international flight to or from the United States against the consolidated and integrated terrorist watchlist maintained by the Federal Government before departure of the flight" and to "establish a timely process for individuals identified as a threat" to appeal the determination to the Department and correct any erroneous information.

Congress also directed TSA to "prescribe regulations prohibiting the disclosure of information obtained or developed in carrying out security . . . if the Under Secretary decides that disclosing the information would . . . be detrimental to the security of transportation." 49 U.S.C. § 114(r)(1)(c) (formerly § 114(s)). Such information is known as Sensitive Security Information ("SSI"), and TSA is authorized by Congress to determine whether particular material is SSI, and, if so, whether and to what extent it may be disclosed. *See id.*; 49 C.F.R. Pt. 1520. As a general matter, SSI may only be disclosed to "covered persons who have a need to know, unless otherwise authorized in writing by TSA, the Coast Guard, or the Secretary of DOT." 49 C.F.R. § 1520.9(a)(2); *see also* 49 U.S.C. § 114(r). For example, SSI may be released to covered individuals or entities (such as law enforcement agencies or airline or airport personnel) to "carry out security activities approved, accepted, funded, recommended, or directed by DHS or DOT." 49 C.F.R. § 1520.11(a)(1); ); *id.* § 1520.7 (defining covered persons). The regulations impose on covered persons an express duty to protect the information. *See id.* § 1520.9. Among other things, the regulations specifically require that covered persons "[t]ake reasonable steps to safeguard SSI . . . from unauthorized disclosure," and "[r]efer requests by other persons for SSI to TSA or the applicable component or agency within DOT or

8

DHS." *Id.* § 1520.9(a).  Violation of these and related additional non-disclosure requirements "is grounds for a civil penalty and other enforcement or corrective action." *Id.* § 1520.17.[4]

## Creation of the Terrorist Screening Center

In 2003, the President ordered the establishment of a governmental organization that would "consolidate the Government's approach to terrorism screening and provide for the appropriate and lawful use of Terrorist Information in screening processes." *See* Homeland Security Presidential Directive 6.  *See* Giuliano Dec., ¶ 5; Piehota Dec., ¶ 6.  The creation of TSC satisfied this Presidential Directive.[5]  *See* Giuliano Dec., ¶ 5.  The creation of the TSC was driven by the 9/11 Commission's conclusion that the lack of intelligence-sharing across federal agencies had created vulnerabilities in the nation's security.[6]  Before TSC, multiple terrorist watchlists were maintained separately in different agencies; the TSC has consolidated and centralized the watchlists, as the 9/11 Commission recommended.  Piehota Dec., ¶¶ 5-6.

---

[4]   Department of Homeland Security Appropriations Act of 2007, Public Law No. 109-295, § 525(d), 120 Stat. 1382 (Oct. 4, 2006), as reenacted by the Consolidated Appropriations Act of 2008, Pub. L. No. 110-161, § 522, 121 Stat. 2069 (Dec. 26, 2007); the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009, Pub. L. No. 110-329, § 510, 122 Stat. 3682 (Sept. 30, 2008); and the Legislative Branch Appropriations and Continuing Appropriations Resolution of 2010, Pub. L. 111-68, Division B, § 101, --- Stat. --- (Oct. 1, 2009).  For example, Section 525 allows the disclosure of some SSI in civil discovery in federal court to a "party or party's counsel" under certain circumstances.  *See id.* § 525(d).  If Plaintiffs seek such access, Section 525 contains several statutory prerequisites that must be satisfied.

[5]   TSC is an interagency entity that was created through a Memorandum of Understanding entered into by the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of Central Intelligence in order to fulfill the requirements of HSPD 6.  *See* Piehota Decl., ¶ 2; Kennedy Decl. ¶ 9.  TSC is administered by the Department of Justice (through the FBI); it is staffed by officials from a variety of agencies, including TSA, CBP, and the Department of State.  Piehota Decl., ¶ 2.

[6]   *See* 9/11 Commission Report, Executive Summary, available at http://govinfo.library.unt.edu/911/report/911Report_Exec.htm ("The missed opportunities to thwart the 9/11 plot were also symptoms of a broader inability to adapt the way government manages problems to the new challenges of the twenty-first century.  Action officers should have been able to draw on all available knowledge about al Qaeda in the government.  Management should have ensured that information was shared and duties were clearly assigned across agencies, and across the foreign-domestic divide.")

The TSC is responsible for maintaining the federal government's consolidated terrorist watchlist, the TSDB, which contains identifying information about individuals known or suspected to be engaged or aiding in terrorist related conduct.  *See* Stipulated Facts, ¶ 1; Piehota Dec., ¶¶ 7, 22; Giuliano Dec., ¶ 6.  Government agencies (intelligence community agencies and the FBI) nominate individuals to be included in the TSDB if there is sufficient identifying information, and certain minimum substantive criteria are met, including a conclusion that the supporting information shows that the government has a "reasonable suspicion" based on the "totality of circumstances and intelligence reviewed" that the individual is a known or suspected terrorist.  Piehota Dec., ¶ 21; *see also* Giuliano Dec., ¶ 12.  The substantive information supporting a TSDB nomination is known as the "derogatory information."  Piehota Dec., ¶ 19; *see generally* Giuliano Dec., ¶¶ 7-8.  The TSDB contains terrorist identity information.  *See* Piehota Dec., ¶¶ 6, 22; Giuliano Dec., ¶ 7.

The TSDB only includes identifying information; it does not include the underlying derogatory information.  Separating the names from the underlying derogatory information allows identifying information to be shared with government and law enforcement officials who may lack appropriate security clearances; this, in turn, means that a broad array of screening and law enforcement officials have access to TSDB data to positively identify known or suspected terrorists trying to obtain visas, enter the country, board aircraft, or engage in other activity that may pose a risk to national security.  *See* Piehota Dec., ¶ 11; Giuliano Dec., ¶¶ 9-10; *see also* Stipulated Facts, ¶ 3.  Because intelligence is continually evolving, the composition of the TSDB, including the identifying information about known or suspected terrorists, is regularly updated.  *See* Piehota Dec., ¶¶ 10, 23; Giuliano ¶ 9.

10

## No Fly and Selectee Lists

The No Fly and Selectee Lists are subsets of the TSDB.  *See* Stipulated Facts, ¶ 2; Piehota Dec., ¶ 11.  The No Fly List is defined as "a list of individuals who are prohibited from boarding an aircraft" and the Selectee List as "a list of individuals who must undergo additional security screening before being permitted to board an aircraft."  *Id.,* ¶ 12.  To be included on the No Fly or Selectee Lists, an individual must be on the TSDB and meet additional criteria, beyond the "reasonable suspicion" standard generally required for inclusion in the TSDB.  *Id.,* ¶ 8; Stipulated Facts, ¶¶, 16, 17.

The government treats the No Fly and Selectee criteria (as well as the watchlist status of an individual) as SSI; as a result, neither the No Fly and Selectee criteria, nor the implementation guidance, are publicly released.  *See* 49 C.F.R. § 1520.5(b)(9)(i); Piehota Dec., ¶ 13; Stipulated Facts, ¶ 18.[7]  There is no bar to including U.S. citizens or lawful permanent residents on either the No Fly or Selectee Lists.  Piehota Dec., ¶¶ 15-16; *see also infra* at 32.  If a person is denied boarding and wishes to file a complaint about that denial, he or she may do so with DHS TRIP, as explained below.  *See* Stipulated Facts, ¶¶ 4-5; Piehota Dec., ¶ 30; Kennedy Dec., ¶¶ 4-5.

## Redress Procedures for Travelers Denied Boarding

Since 9/11, the government has developed several programs to redress the complaints of passengers who allege they have been denied boarding or subjected to additional screening at airports.  *See generally* Kennedy Dec., ¶ 3.  As discussed above, Congress required TSA to create redress procedures for passengers who are delayed or denied airline boarding.  *See* 49

---

[7]  Procedures for SSI are explained in 49 C.F.R. part 1520.  Some of the information filed in support of this memorandum includes SSI; those portions of the declarations are redacted, and unredacted copies have been filed *ex parte in camera.*  Defendants have also filed an *ex parte, in camera* supplement that discusses the SSI as it relates to the government's legal arguments.

U.S.C. § 44903(j)(2)(C); 49 U.S.C. § 44909(c)(6).  Congress also enacted 49 U.S.C. § 44926, as part of the legislation implementing the recommendations of the 9/11 Commission.  This provision requires DHS, *inter alia*, to "establish a timely and fair process for individuals who believe they have been delayed or prohibited from boarding a commercial aircraft because they were wrongly identified as a threat under the regimes utilized by the Transportation Security Administration, U.S. Customs and Border Protection, or any other office or component of the Department of Homeland Security."  *Id.* § 44926(a).

In February 2007, DHS launched the current redress process for such complaints, known as DHS TRIP.  DHS TRIP is the central administrative redress process for individuals who have, for example, been denied or delayed airline boarding; denied or delayed entry into or exit from the U.S. at a port of entry; or been repeatedly referred to additional (secondary) screening.  *See* Stipulated Facts, ¶¶ 4-7; Kennedy Dec., ¶ 4; Piehota Dec., ¶ 30.  By designation from the Secretary of DHS, TSA's Office of Transportation Security Redress ("OSTR"), which predated the establishment of DHS TRIP, acts as DHS's lead agent managing DHS TRIP.  *See* Kennedy Dec., ¶¶ 3-4.

Persons who have been denied boarding, or been subject to additional screening, may file a complaint with DHS TRIP.  *See* Stipulated Facts, ¶¶ 4-7; Kennedy Dec., ¶ 4.  They are required to complete a traveler inquiry form, either on-line or via e-mail or hard copy.  *See* Stipulated Facts, ¶ 6; Kennedy Dec., ¶ 6.  If the applicable DHS component determines that the complainant is an exact or near match to an identity in the TSDB, the matter is referred to the

12

TSC Redress Unit.  *See* Stipulated Facts, ¶ 8; Kennedy Dec., ¶ 9; Piehota Dec., ¶¶ 33-34.[8]  To

date, less than 1% of all DHS TRIP complaints relate to persons actually included in the TSDB

(or by extension, the No Fly or Selectee Lists).  *See* Kennedy Dec., ¶ 9; Piehota Dec., ¶ 33.

The TSC Redress Unit reviews the available information to determine whether the DHS

TRIP complainant is an exact match to a TSDB identity, and if so, whether the individual's

status should be modified.  *See* Stipulated Facts, ¶ 9; Piehota Dec., ¶ 33.  As part of this process,

TSC contacts the agency that originally nominated the individual for the TSDB and

"determine[s] whether the complainant's current status in the TSDB is suitable based on the most

current, accurate, and thorough information available."  Piehota Dec., ¶ 34; *see also* Stipulated

Facts, ¶ 9.  The TSC Redress Unit makes a determination as to whether any adjustment in the

individual's status, including modification or removal, is required and informs DHS TRIP

accordingly; DHS TRIP, in conjunction with TSA OSTR, subsequently sends a determination

letter to the complainant as required under 49 U.S.C. §§ 44903 and 44926.  *See* Stipulated Facts,

¶ 10; Piehota Dec., ¶¶ 35, 36; Kennedy Dec., ¶10.  Pursuant to the government's current

"Glomar" policy, the letter does not confirm or deny whether the individual is in the TSDB, or

on the No Fly or Selectee subset lists.  *See* Stipulated Facts, ¶ 11; Piehota Dec., ¶ 36; Kennedy

Dec. ¶¶ 8, 10.[9]

---

[8]  This interagency review process is described in the Memorandum of Understanding on Watchlist Redress Procedures, which was executed on September 19, 2007, by the secretaries of State, Treasury, Defense, and Homeland Security, the Attorney General, the FBI Director, the NCTC Director, the Central Intelligence Director, the Director of National Intelligence, and the TSC Director.  *See* Piehota Dec., ¶ 32.
[9]  "Glomar" refers to a "neither confirm nor deny" response.  This response was first judicially recognized in the national security context, *see Phillippi v. CIA*, 546 F.2d 1009, 1013 (D.C. Cir. 1976), which raised the issue of whether CIA could refuse to confirm or deny its ties to Howard Hughes' submarine retrieval ship, the Glomar Explorer.

The DHS TRIP determination letters that respond to complaints regarding delayed or denied boarding are final orders of TSA pursuant to 49 U.S.C. § 46110.  *See* Kennedy Dec. ¶ 11. Judicial review of such letters is available only in the Courts of Appeal.  *See Scherfen v. DHS*, No. 08-154, 2010 WL 456784, at *11 (M.D. Pa. Feb. 2, 2010) (holding that DHS TRIP was established pursuant to "a statute encompassed by the jurisdictional grant conferred by 46110 over security related orders issues pursuant to statutory authority established in 49 U.S.C. §§ 40101 through 46507").

## PROCEDURAL BACKGROUND

Plaintiffs are thirteen U.S. citizens, three lawful permanent residents ("LPRs") and one asylee who allege they have been denied boarding on flights to, from, and within the U.S..  *See* Amended Complaint ("Compl."), ¶ 3.  Plaintiffs Ayman Latif, Raymond Earl Knaeble IV, Faisal Nabin Kashem, Elias Mustafa Mohamed, Steven William Washburn, Samir Mohamed Ahmed Mohamed, Abdullatif Muthanna, Nagib Ali Ghaleb, Saleh Omar and Abdul Hakeim Thabet Ahmed allege they were "denied boarding on international flights to the U.S. and/or over U.S. airspace when seeking to return home to the U.S. from abroad."  Compl., ¶ 2.  Plaintiffs Mohamed Sheikh Abdirahman Kariye, Ibraheim Y. Mashal, Salah Ali Ahmed, Amir Meshal, and Stephen Durga Persaud are U.S. citizens who allege they were "denied boarding on flights originating in the U.S. or in U.S. territory."  *Id.*  Adama Bah and Halime Sat are aliens who allege they were "denied boarding on flights originating in the U.S."  *Id.*  Plaintiffs assert four claims, two for alleged Constitutional violations (procedural due process and the Fourteenth Amendment), one for alleged violations of the INA; the last for alleged violations of the Administrative Procedure Act.  Compl., p. 87-94.  All Plaintiffs have filed complaints with DHS

14

TRIP, and to date, all have received responses. *See* Stipulated Facts, ¶ 13; Kennedy Dec. ¶ 13, Exhibits A and B.   None of the Plaintiffs have filed administrative appeals of the DHS TRIP determinations or sought relief in the Court of Appeals. *See* Stipulated Facts, ¶ 14.

At the outset of this litigation, several Plaintiffs were located outside the U.S. and wished to return home by traveling on commercial airlines.  Compl., ¶ 2.  Plaintiffs subsequently filed a motion for a preliminary injunction on behalf of those Plaintiffs ("PI Plaintiffs"), asking the Court to require Defendants to allow them to return to the U.S. by air, consistent with "suitable screening procedures." *See* Pls. PI Memo., Docket # 21, at 39.  As a result of the parties' efforts, the PI Plaintiffs who wished to return to the U.S. did so, and Plaintiffs then withdrew their Motion for a Preliminary Injunction. *See* Docket #33.  The Court set a briefing schedule for the parties' dispositive motions. *See* Docket #36.

## ARGUMENT

## I.    DISMISSAL IS REQUIRED BECAUSE TSA IS A NECESSARY AND INDISPENSABLE PARTY THAT CANNOT BE JOINED, AND THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CHALLENGES TO THE DHS TRIP REDRESS PROCESS

Plaintiffs ask this Court to require the government to provide them with meaningful notice of the basis for their alleged inclusion on the watchlist and to remove them from any watchlist that prevents them from flying.  Yet, Plaintiffs have failed to include two necessary parties – DHS and TSA – in this suit.   Including DHS and TSA in this case is required by Rule 19(b); without DHS and TSA, the Court cannot "fashion[ ] meaningful relief as between the parties." *Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 879 (9th Cir. 2004).  TSA, however, cannot be joined as a defendant in this Court because its final orders may

15

only be challenged in the Court of Appeals.  *See* 49 U.S.C. § 46110(a).[10]  As discussed above,

DHS TRIP determination letters regarding complaints about denied or delayed airline boarding

are final orders by TSA, which administers DHS TRIP.  The Complaint should be dismissed as a

result, pursuant to Rule 19(b) of the Federal Rules of Civil Procedure, and judgment should be

entered for Defendants because TSA is a necessary party that cannot be joined.

     As explained above, TSA is responsible for identifying travelers who pose a threat to

national security, preventing those individuals from boarding an aircraft, and for redress.  *See* 49

U.S.C. §§ 114(h)(3), 114(f)(1)-(4), 44903.  TSA and DHS are responsible for providing redress

to travelers who complain that they have been delayed or denied boarding due to wrongful

placement on a government watchlist.  *See* Kennedy Dec. ¶¶ 3-4; 49 U.S.C. § 44926(a); *see also*

49 U.S.C. §§ 44903(j)(2)(C), 44909(c)(6).  Plaintiffs' procedural due process claim centers on

alleged inadequacies with the DHS TRIP, to which they have all submitted complaints related to

their denials of boarding.  *See* Compl., ¶¶ 4, 38, 39, 211, 358, 374.  As a result, both DHS and

TSA should be included as defendants in the case.

     Pursuant to 49 U.S.C. § 46110(a), however, challenges to the adequacy of DHS TRIP

responses to complaints regarding denied or delayed airline boarding may only be brought in the

Courts of Appeals, because such DHS TRIP determination letters are final orders of TSA.  *See*

---

[10]   49 U.S.C. § 46110(a) provides that "[e]xcept for an order related to a foreign air carrier subject to
disapproval by the President under section 41307 or 41509 (f) of this title, a person disclosing a
substantial interest in an order issued by the Secretary of Transportation (or the Under Secretary of
Transportation for Security with respect to security duties and powers designated to be carried out by the
Under Secretary or the Administrator of the Federal Aviation Administration with respect to aviation
duties and powers designated to be carried out by the Administrator) in whole or in part under this part,
part B, or subsection (l) or (s) of section 114 may apply for review of the order by filing a petition for
review in the U.S. Court of Appeals for the District of Columbia Circuit or in the court of appeals of the
U.S. for the circuit in which the person resides or has its principal place of business. The petition must be
filed not later than 60 days after the order is issued. The court may allow the petition to be filed after the
60th day only if there are reasonable grounds for not filing by the 60th day."

*Scherfen*, 2010 WL 456784, at *11.  The letters Plaintiffs received from DHS TRIP informed

them that they could seek judicial review in the Courts of Appeal, by stating, "[t]his letter

constitutes our final agency decision, which is reviewable by the U.S. Court of Appeals under 49

U.S.C. § 46110."  *See* Kennedy Dec., ¶¶ 11, 13, Exhibits A and B.  Plaintiffs cannot leave out

key defendants merely because they prefer to litigate in district court.

    Rule 19(b) provides the factors that a Court should consider to determine whether, "in

equity and good conscience, the action should proceed among the existing parties or should be

dismissed."  Fed. R. Civ. P. 19(b).  These factors include:  (1) the extent to which a judgment

rendered in the person's absence might prejudice that person or the existing parties; (2) the

extent to which any prejudice could be lessened or avoided by shaping the judgment or the relief;

(3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the

plaintiff would have an adequate remedy if the action were dismissed.  *See Makah Indian Tribe

v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990) (internal citations omitted) (applying Rule 19(b)

factors).  The Rule 19(b) factors support dismissal here.

    The first two factors weigh in favor of dismissal.  The Court cannot order DHS and TSA

to improve the DHS TRIP process if they are not parties to the suit.  DHS and TSA have a

significant stake in how DHS TRIP operates.  DHS and TSA have been charged by Congress

with satisfying the Congressional command that a "timely and fair [redress] process" be

established for persons delayed or denied boarding; through DHS TRIP and TSA OSTR, TSA

and DHS thus fulfill the statutory command to provide redress to persons who allege they were

wrongfully denied or delayed boarding.  *See supra* at 11-13.  As a result, the judgment cannot be

shaped to exclude DHS and TSA but still provide relief.  Moreover, a judgment regarding

17

Plaintiffs' status or rights via-a-vis the No Fly or Selectee Lists without DHS and TSA will be inadequate.  The Court cannot effectively order any changes to DHS TRIP without including the entities responsible for DHS TRIP.  In such circumstances, the Court is not in a position to order an "adequate" judgment.  *See, e.g., Republic of Phil. v. Pimentel*, 553 U.S. 851, 870 (2008).  Plaintiffs' complaint refers at times to TSA's role in airline security (*see* Compl., ¶¶ 31, 33), but they chose not to sue TSA, likely because they knew they would face a jurisdictional bar to district court litigation if they did so.  A party's *preference* for a particular forum does not change a Court's Rule 19(b) analysis.

Under Rule 19, the Court must examine the "practical effect" of a lawsuit, rather than what a party claims is at stake.  *See Manybeads v. U.S.*, 209 F.3d 1164, 1166 (9th Cir. 2000).  In this case, the practical effect is clear; a successful outcome for Plaintiffs would likely require changes to the way DHS TRIP operates; require DHS and TSA to alter their redress and screening practices; and require TSA to alter its orders prohibiting boarding.  Plaintiffs may not escape the "practical effect" of their lawsuit by trivializing TSA's role in DHS TRIP as a "front line screening agency."  Compl., ¶ 39.[11]

Critically, Plaintiffs have an alternative remedy, the last factor implicated by Rule 19(b); they can challenge the DHS TRIP determination letters in the Court of Appeals.  Congress has explicitly required that all suits challenging TSA final orders proceed in the Court of Appeals.  Plaintiffs' preference for litigation in district court cannot trump TSA's statutory immunity from

---

[11]  In *Manybeads v. U.S.*, 209 F.3d 1164, 1166 (9th Cir. 2000), the Ninth Circuit upheld dismissal of an action challenging the constitutionality of a federal statute that partitioned land between the Hopi and Navajo tribes, because the "practical effect" of plaintiff's suit was not only the invalidation of the statute, but also the abrogation of previously-agreed upon settlement agreements "to the substantial prejudice of the Hopi Tribe."  *Id.*  Plaintiff disclaimed any motive to upset the agreements; she contended her only goal was to invalidate the statute — but to no avail.  *Id.*

this district court litigation.  The Ninth Circuit has held as much even where there was no

alternative remedy whatsoever.  *See Pit River Home and Agr. Co-op. Ass'n v. U.S.*, 30 F.3d

1088, 1102-03 (9th Cir. 1994) (dismissing suit despite fact that plaintiff "does not have an

alternative forum in which it may seek injunctive and declaratory relief against the government"

because council was a "federally recognized governing body of the Pit River Indian Tribe" and

as such, could not be sued in federal court).

Plaintiffs may cite *Ibrahim v. DHS*, 538 F.3d 1250 (9th Cir. 2008), in response.  In that

case, the court rejected the government's position that the No Fly List was "'inescapably

intertwined' with [TSA's] orders and [was] therefore still reviewable under section 46110."  538

F.3d at 1255.  The court therefore held that the district court "retain[ed] original jurisdiction over

[the plaintiff's] APA claim regarding the placement of her name on the No Fly List."  *Id.* at

1256.  *Ibrahim* is distinguishable from the instant case.

First, redress was not an issue in the Ninth Circuit's decision.  This distinction was noted

by the district court in *Scherfen*, 2010 WL 456784, at *10 ("Significantly, *Ibrahim* did not

involve a determination made by DHS following receipt of a Traveler Inquiry Form from the

affected person.  Thus, *Ibrahim* did not present for consideration the issue of whether a DHS

TRIP determination letter constitutes an order falling within § 46110.").  In *Scherfen*, the  court

dismissed the case because "the existence of TRIP determination letters in this case means that,

unlike *Ibrahim,* there are orders issued by an agency named with § 46110."  *Id.* at *11.  In

addition, a DHS TRIP determination means that a reviewing court would have access to an

administrative record to review.  *See Scherfen*, 2010 WL 456784, at *7 ("One of the reasons that

the majority in *Ibrahim* found that the placement of a person on the No Fly List fell outside the

19

scope of § 46110 was the absence of any administrative record to review. Where, however, the

TRIP process has been invoked, there is indeed a record for review by the appellate court.").

Plaintiffs' DHS TRIP determination letters state that "any applicable records" have been

reviewed.  *See* Kennedy Dec., ¶ 13, Exhibits A and B (attaching letters).  Accordingly, the

instant case is not controlled by *Ibrahim*, and Section 46110 divests the Court of jurisdiction over

this action because TSA cannot be joined as a defendant.

## II.    SUMMARY JUDGMENT SHOULD BE ENTERED FOR DEFENDANTS ON PLAINTIFFS' CLAIMS THAT THEY HAVE BEEN DENIED THE RIGHT TO RE-ENTER THE UNITED STATES AND RESIDE THEREIN

In the second count of their Amended Complaint, Plaintiffs Latif, Knaeble, Kashem,

Elias Mohamed, Samir Mohamed, and Muthanna allege that the government has denied them

their rights to reside in and reenter the United States because they were denied boarding on direct

flights to the United States.  *See* Compl., ¶¶ 387-389.[12]  In the third count, Plaintiffs Omar and

Ahmed argue that Defendants have violated the INA by "excluding" them from the United

States.  Compl. ¶ 393.  Because all Plaintiffs who wished to return to the United States have now

done so, these claims should be dismissed as moot.  Moreover, Plaintiffs' position appears to be

that the only way to reach the United States is by air travel, and any infringement on that travel is

a *per se* denial of their asserted right to return to the U.S.  But the Constitution does not provide a

right for a preferred mode of travel.  But the Constitution does not provide a right for a preferred

mode of travel.  Moreover, Plaintiffs' own allegations demonstrate that Plaintiffs Washburn and

Knaeble found that alternate modes of travel to the U.S. are available.  Not a single U.S. citizen

---

[12] The Plaintiffs who have not been denied boarding on a flight to the United States – Bah, Sat, Kariye, Meshal, Mashal, Samir Ahmed, and Persaud – do not assert claims under the Fourteenth Amendment in the Amended Complaint.

Plaintiff in this action has been or, in general, would be denied entry to the United States once a CBP Officer is satisfied of the individual's status as a U.S. citizen.  *See* McAleenan Dec., ¶ 12; *see also* 8 C.F.R. § 235.1(b).

### A. The Entry Claims Are Moot Because all the Plaintiffs Who Were Outside the Country and Wished to Return at the Outset of this Lawsuit Have Returned

Every Plaintiff who has presented himself or herself at a port of entry in the United States has been allowed in the country, and Plaintiffs have made no credible allegation of future injury. Plaintiffs' Fourteenth Amendment and INA claims are therefore moot because there is no existing injury that the Court can redress.

The mootness doctrine is based on the Constitution's case-or-controversy requirement. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 180, (2000) (citing U.S. Const. art III § 2).  Whereas standing is determined at the time the lawsuit is filed, the question of mootness arises during the pendency of the lawsuit: "[t]he requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Id*. at 189 (citing quotations omitted).  A case is moot if the issues are no longer live and the court is unable to grant effective relief.  *EEOC v. Fed. Express Corp.*, 558 F.3d 842, 846-47 (9th Cir. 2009).  Thus, even if there is a live controversy when the case is filed, courts should refrain from deciding issues "if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future."  *See Clarke v. U.S.*, 915 F.2d 699, 701 (D.C. Cir. 1990) (internal quotation marks omitted). Here, all plaintiffs who wished to do so have arrived in the United States, thereby mooting their Fourteenth Amendment and INA claims.

21

Although there are exceptions to the mootness doctrine, none apply here. *EEOC*, 558 F.3d at 847. Plaintiffs may argue that this is a case of voluntary cessation, which ordinarily will not moot a case unless it is clear that the allegedly wrongful behavior could not reasonably be expected to recur. *See Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1095 (9th Cir. 2003) (quoting *Laidlaw Envtl. Servs.*, 528 U.S. at 189). Although ordinarily "[c]ourts are understandably reluctant to declare a case moot based on the defendant's voluntary cessation of the challenged activity," "[c]essation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties." *America Cargo Transp. v. U.S.*, - F.3d -, 2010 WL 4367040 (9th Cir. 2010) (quoting *Ragsdale v. Turnock*, 841 F .2d 1358, 1365 (7th Cir.1988)). *See also Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1117 (10th Cir. 2010); *Beta Upsilon Chi Upsilon Chapter at the Univ. of Florida v. Machen*, 586 F.3d 908, 916-17 (11th Cir. 2009); *Ammex, Inc. v. Cox,* 351 F.3d 697, 705 (6th Cir. 2003).

Here, Plaintiffs allege in the Amended Complaint that they have been prevented from returning to the United States. All Plaintiffs who wish to return to the United States have now done so, *see* Joint Status Report (Docket # 28), and at least two did so prior to the filing of Plaintiffs' motion for a preliminary injunction and without using flights into U.S. airspace. *See* Washburn PI Decl., Docket # 19-10, at ¶¶ 18-25; Knaeble PI Decl., Docket # 19-7, at ¶¶ 28-39; Docket # 28 at p. 3. Further, although the government has provided no assurances with respect to future air travel, there is no indication that Plaintiffs would be prohibited from being permitted to come into the United States in the future; generally, U.S. citizens who arrive at a port of entry in the U.S. are permitted to enter the country once they establish to the satisfaction of a CBP

22

officer that they are in fact U.S. citizens.  *See* McAleenan Dec., ¶ 12; *see also* 8 C.F.R. §
2351(b).[13]

Moreover, there is no additional relief the Court could order to remedy the claims based
on alleged denial of entry.  For example, it would be beyond the Court's power to order that
Plaintiffs always be permitted to board flights to the United States or to prescribe the screening
and security procedures that would be applied in such an instance, and Plaintiffs do not appear to
be seeking such future relief.  *See, e.g., Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) (a plaintiff
"who has been subject to injurious conduct of one kind [does not] possess . . . by virtue of that
injury the necessary stake in litigating conduct of another kind, although similar, to which he has
not been subject.").  Any future decisions about watchlisting or screening are sensitive, highly
fact-specific assessments that depend on the facts and resources available at the future time to the
responsible agencies; the information is regularly updated, making it impossible to give future
guarantees about an individual's status.  *See generally* Piehota Dec. ¶¶ 7, 19; Giuliano Dec. ¶ 9;
Stipulated Facts, ¶ 12.

Accordingly, "events have so transpired that the decision will neither presently affect the
parties' rights nor have a more-than-speculative chance of affecting them in the future."  *Clarke*,
915 F.2d at 701.  No injunctive relief regarding future travel is appropriate because Plaintiffs
bear the burden of showing immediate, certain denial of entry.  *See City of Los Angeles v. Lyons*,
461 U.S. 95, 102 (1983) (requiring "real and immediate threat of repeated injury"); *Scherfen*,

_____

[13] Nor is this a case that is capable of repetition yet evading review.  Any future actions on Plaintiffs' part
to leave the country and return would constitute a separate and distinct action.  If they were actually
prevented from returning to the country, they could raise a new claim at that time.

2010 WL 456784 at *13 (finding No Fly List claims moot).  Under these facts, Plaintiffs simply cannot show that future denial of entry is in any way likely.

### B.    U.S. Citizen Plaintiffs Have Not Been Denied the Right to Enter the Country at a U.S. Port of Entry

The U.S. citizen Plaintiffs assert that they have been denied a right of "citizenship" based on their alleged inclusion on the No Fly List.  In particular, they claim that they have a constitutional right to travel by plane back to the United States.  The Constitution, however, does not ensure that U.S. citizens have a right to the most convenient means of travel.  To the extent that U.S. law requires entry of citizens at a U.S. port of entry, not a single Plaintiff in this action has been denied such entry.

### 1.    U.S. Citizens Have a Right to Enter the Country, Not to the Most Convenient Means of Travel

As an initial matter, there is no right to international travel, and such travel is "subordinate to national security and foreign policy considerations."  *See Haig v. Agee*, 453 U.S. 280, 306-07 (1981).  Unlike the right to interstate travel, the freedom to travel internationally is simply an aspect of the liberty protected by the due process clause, and the restrictions on international travel are permissible unless "wholly irrational."  *Califano v. Aznavorian*, 439 U.S. 170, 177 (1978).  Accordingly, the only right even arguably at issue in Plaintiffs' Count II is the right to actually enter the country.

Although the source of that right is unclear, a U.S. citizen's ability to enter and reside in the United States has a constitutional dimension.  Such a right is not delineated in the Constitution, and there have been very few occasions for courts to pass upon the contours of the citizen's "right" to enter and reside in the United States.  In their withdrawn motion for a

24

preliminary injunction, Plaintiffs cited *dicta* from two Supreme Court cases. *See Balzac v. Porto Rico*, 258 U.S. 298 (1922) (holding that right to a jury trial did not extend to Puerto Rican citizens); *Nguyen v. INS*, 533 U.S. 53 (2001) (holding that requirements for establishing citizenship by a child born abroad to a U.S. citizen father do not violate Equal Protection clause). *Balzac* notes in *dicta* that a statute conferring U.S. citizenship on Puerto Rican citizens enabled such citizens to move into the United States; in other words, it recognized a right to *domestic* travel for U.S. citizens in Puerto Rico, *cf. Califano*, 439 U.S. at 177 (distinguishing right to domestic travel from liberty interest in international travel). *Nguyen* notes in *dicta* that citizenship includes a right to enter the United States. Neither case stands for the proposition that the "right to re-enter" is any broader than the actual right to enter at the border.[14]

Plaintiffs seem to conflate the "right to enter" with a right to unimpeded international travel to the United States. But even in the context of interstate travel, which is recognized as a fundamental right, courts have repeatedly held that there is no right to any particular means of travel, even if the most convenient means of travel is restricted. *See Gilmore v. Gonzales,* 435 F.3d 1125 (9th Cir. 2006) (holding there is no right to air travel)*; Miller v. Reed,* 176 F.3d 1202

---

[14]   Three other cases cited by Plaintiffs from other circuits do not define the nature of this right, and none are in this Circuit. The Third Circuit held that the parents of an infant U.S. citizen could be deported even though it effectively meant that the infant citizen must leave with her deported parents. *See Acosta v. Gaffney*, 558 F.2d 1153 (3rd Cir. 1977). In so holding, the court noted in *dicta* that the infant citizen had the absolute right to re-enter the country. *Id.* at 1157. The court did not analyze whether such a right was burdened by the deportation of her caregivers. In *Hernandez v. Cremer*, the Fifth Circuit found that the Immigration and Naturalization Service had arbitrarily deprived a U.S. citizen of Fifth Amendment due process by excluding him from the country while processing him for an exclusion hearing intended for aliens. *See* 913 F.2d 230 (5th Cir. 1990). There, Hernandez had actually been denied entry, and the court based its decision on denial of due process, not on any 14th Amendment right of citizenship. An older Fifth Circuit case held that such a right to entry does exist, but did so in the context of holding that a U.S. citizen cannot be subject to criminal penalty for re-entering the country without a passport. *See Worthy v. U.S.,* 328 F.2d 386, 394 (5th Cir 1964).

(9th Cir. 1999) (holding there is no right to drive); *Green v. Transp. Sec. Admin.*, 351 F. Supp. 2d 1119, 1130 (W.D. Wash. 2005) (holding there is no right to travel "without any impediments" and burdens on a "single" form of transportation are not unreasonable); *see also Town of Southold v. Town of East Hampton*, 477 F.3d 38 (2nd Cir. 2007) ("travelers do not have a constitutional right to the most convenient form of travel"); *Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991) (same); *City of Houston v. FAA*, 679 F.2d 1184 (5th Cir. 1982) (same). For example, in *Gilmore*, the Ninth Circuit upheld certain requirements for air travel because the plaintiff "does not possess a fundamental right to travel by airplane even though it is the most convenient mode of travel for him." 435 F.3d at 1137. The court accepted as true for the purposes of that decision Gilmore's allegation that "air travel is a necessity and not replaceable by other forms of transportation." *Id.* at 1136. The Ninth Circuit nonetheless held that there was no infringement on his Constitutional right to domestic travel because other means of travel remained possible. Moreover, the Ninth Circuit issued this ruling even though restrictions on interstate travel – unlike international travel – may be subject to higher scrutiny. *See, e.g., Fisher v. Reiser*, 610 F.2d 629 (9th Cir. 1979); *see also Califano*, 439 U.S. at 177. If restrictions on a specific means of interstate travel do not trigger or offend the Constitution, this is even more clearly true for international travel. It may be less convenient or more expensive to travel by ship or bus, but this factor does not impinge on a constitutional right to travel.

Defendants have found no authority for striking down Congressional or Executive action that may have made it much more difficult for a U.S. citizen to travel overseas and return to the country. It is clear that a citizen's ability to return to the United States is qualified insofar as the government may, and routinely does, engage in acts that might burden this asserted right. In

26

fact, the Sixth Circuit has upheld government action that had the practical effect of removing a citizen from the country. *Acosta v. Gaffney*, 558 F.2d 1153, 1158 (3rd Cir. 1977); *see also Newton v. INS*, 736 F.2d 336 (6th Cir. 1984). The United States has enacted a variety of laws that might make entering the country more difficult or time-consuming for citizens, all of which have been upheld by the courts. The United States can deny or revoke a passport, *see generally Agee*, 453 U.S. at 280; *Worthy v. Herter*, 270 F.2d 905 (D.C. Cir. 1959); can conduct lengthy and intrusive searches and inspections of anyone entering the country, *see U.S. v. Flores-Montano*, 541 U.S. 149, 152-53 (2004); *U.S. v. Arnold*, 533 F.3d 1003 (9th Cir. 2008); *Rahman v. Chertoff*, 530 F.3d 622, 624 (7th Cir. 2008); and impose quarantines, *see, e.g.,* 42 U.S.C. § 264; *U. S. ex rel. Siegel v. Shinnick*, 219 F. Supp. 789, 791 (E.D.N.Y. 1963). The U.S. can even extradite its citizens to face trial and imprisonment in another country, which could permanently prevent the return of a citizen. *See, e.g., Neely v. Henkel,* 180 U.S. 109 (1901); *Vo v. Benov*, 447 F.3d 1235 (9th Cir. 2006). These actions – all of which have been upheld as lawful – can delay, complicate or render prohibitively expensive or impossible international travel, including one's return to the United States. As the Supreme Court held in *Flores-Montano*, 541 U.S. at 153, "[i]t is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity."[15]

---

[15]  In *Haig v. Agee*, the Supreme Court upheld the revocation of a citizen's passport even though a passport was "the only means by which an American can lawfully leave the country or return to it." 453 U.S. at 293. Agee's activities abroad were deemed to pose a danger to the national security and foreign policy of the United States. The Court upheld this severe restriction on his international travel, explaining that it is "obvious and unarguable that no governmental interest is more compelling than the security of the Nation." *Id.* at 307; *see also HLP*, 2010 WL 2471055 (2010) (referring to "sensitive and weighty interests of national security and foreign affairs"). The Court noted in a footnote that the government had provided temporary papers that would permit Agee to travel back to the United States from his location in Europe, but Agee never returned to the United States. *Haig*, 453 U.S. at 289 n.15. Agee's return was necessarily limited in time by the nature of his temporary papers, subject to the existence of appropriate

2.    **Citizen Plaintiffs Have Not Been Prevented from Entry or Return to the United States**

Citizen Plaintiffs have not been "banished" from the United States and have all been permitted entry at the border.  In general, it is well-established that U.S. citizens who arrive at a U.S. port of entry are permitted to enter the United States after they prove to the satisfaction of a CBP officer that they are in fact citizens.  *See* McAleenan Dec., ¶ 12; 8 C.F.R. § 235.1(b).  Even if the right to enter were as broad as Plaintiffs have claimed, any restrictions imposed on these Plaintiffs are constitutionally permissible.  Plaintiffs Knaeble and Washburn were able to enter the United States on their own; all other Plaintiffs located outside the country have been able to return to the United States by plane.  Each of the U.S. citizen Plaintiffs who attempted entry has faced no barrier to entry at the border, only routine search and questioning.  *See* Knaeble PI Decl., Docket # 19-7, at ¶ 39, Washburn PI Decl., Docket # 19-10, at ¶¶ 24-25.  While Plaintiffs claim that they were subject to searches and questioning, even if all allegations were true, such border stops are clearly permissible.  *See Flores-Montano*, 541 U.S. at 152-53, *Arnold*, 533 F.3d at 1006-07; *Rahman*, 530 F.3d at 624.

Plaintiffs also complain that their alleged inclusion on the No Fly List has made it inconvenient or expensive to return to the United States.  Even if Plaintiffs are on the No Fly List, such inclusion does not pose an insurmountable or unreasonable barrier to entry.  Defendants fully acknowledge that any citizen placed on the No Fly List may face some additional complication in traveling to the United States.  Modern commercial air travel has

---

flights, and could theoretically have been impracticable if other countries would not accept his temporary papers.  The Court's conclusion, however, was not influenced by any such considerations.  Rather, the Court found that the legitimate national security concerns of the government amply justified the revocation of his passport.

28

made international travel far more convenient and accessible than it ever was before. It has also, of course, yielded additional dangers as well. As recent events have underscored once again, planes are known as attractive terrorist targets and possess enormous deadly force as potential weapons. *See U.S. v. Marquez*, 410 F.3d 612, 618 (9th Cir. 2005) ("As illustrated over the last three decades, the potential damage and destruction from air terrorism is horrifically enormous."); *U.S. v. $124,570 U.S. Currency*, 873 F.2d 1240, 1242 (9th Cir. 1989) ("[A]irline travel . . . gives terrorists and other criminals a unique opportunity for inflicting death and destruction."); *U.S. v. Hartwell*, 436 F.3d 174 (3rd Cir. 2006) ("[T]here can be no doubt that preventing terrorist attacks on airplanes is of paramount importance."); *U.S. v. Bell*, 464 F.2d 667, 669-70 (2d Cir. 1972) ("[T]he political terrorist and the criminal extortioner . . . have in recent years discovered that an airplane in flight, despite all of its engineering sophistication, is a uniquely fragile and vulnerable target when a passenger or crew member is threatened by a weapon or an explosive.").

The Complaint alleges without explanation that Plaintiffs "have no other practicable means of returning to the United States." Compl. ¶ 389. Plaintiffs posit that other means of travel to the United States are too infrequent or expensive for individual citizens. Plaintiffs Knaeble and Washburn returned to the U.S. without receiving any assistance or assurances from the U.S. government regarding their right to enter; all other Plaintiffs overseas who wished to return arrived in the United States after some coordination of the parties. Even for persons on the No Fly List, U.S. law does not bar flights that do not infringe on U.S. airspace, such as many flights into Mexico, South America or parts of the Caribbean, from which travel by ship or land is available. Moreover, for those for whom expense poses a real barrier to return, they may be

29

eligible for low interest loans from the State Department.  *See* 22 U.S.C. § 2671(b)(2)(B); 7

FAM 370 (available at http://www.state.gov/m/a/dir/regs/fam/07fam/0300/index.htm).  Contrary

to Plaintiffs' suggestion, the Constitution does not require frequent or cheap travel options, and

there is simply no right to the least expensive form of travel.

    Persons who believe they will be denied boarding on flights may be able to travel by

ship.[16]  Even for those who are unable to fly into nearer countries, counsel's research shows that

passenger ships frequently cross the Atlantic.  *See* Declaration of Sharon Raya, Dep't of Justice

Paralegal, dated Nov. 6, 2010, at ¶¶ 5-6.  Such travel tends to require some advance planning, but

a search for itineraries shows that there are multiple, frequent options from Europe.  *Id.* ¶¶ 4-6.

Declarant Raya was able to locate two itineraries that could be booked one month in advance, at

the approximate costs of $1175 or $1600, plus applicable fees, depending on booking details.  *Id.*

¶¶ 5-6.  Flights to Europe from the Middle East are readily available.  *Id.* ¶ 7.  Although freighter

travel appears to be somewhat more expensive than plane travel at this time, Plaintiffs have not

alleged that it is prohibitively more expensive.  Notably, none of the Plaintiffs who ultimately

returned into U.S. airspace alleges that they conducted any research into alternative means of

travel to the United States, despite claiming to be "stranded" overseas for "months."[17]

---

[16]  DHS does have some authority to screen passengers on vessels.  *See* 19 U.S.C. §§1431, 1433; 19
C.F.R. § 4.7(b); *see also* Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-
458, Title IV, § 4071, 118 Stat. 3729 (Dec. 17, 2004) (codified at 46 U.S.C. §70101, note).  No Plaintiff
alleges that he or she even attempted to purchase such a ticket, let alone that he or she has been denied
boarding on a vessel.

[17]  Plaintiffs alleged in their withdrawn motion for a preliminary injunction that visa requirements for
ports of call render ship travel difficult because visas would be required.  For United States citizens, this
is unlikely to be a problem because many countries do not require visas for short visits by U.S. citizens.
*See* Schengen Fact Sheet, available at http://travel.state.gov/travel/cis_pa_tw/cis/cis_ 4361.html; *see also*
Raya Decl. ¶¶  9-10.  The Department of State lists entry and exit requirements for many countries on its
website.  *See* http://travel.state.gov/travel/cis_pa_tw/cis/cis_4965.html.  For lawful permanent residents,

Finally, Plaintiffs also claim that their alleged placement on the No Fly List is unconstitutional because their ability to return could be constrained by actions of third party countries, which could deny them entry.  This claim fails for two reasons.  First, Plaintiffs who travel internationally always take the risk that they will be detained or denied admission to foreign countries.  Even U.S. citizens are subject to the actions of foreign governments when abroad.  *See, e.g., Rouse v. U.S. Dept. of State*, 567 F.3d 408, 418-19 (9th Cir. 2009) (U.S. citizen arrested by the Philippines had no private right of action against U.S. government for alleged failure to assist him); *see also Munaf v. Geren*, 553 U.S. 674, 694-95 (2008) (Constitution does not prevent US citizens abroad from being subject to foreign law); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 417-418 (1964) ("To permit the validity of the acts of one sovereign State to be reexamined and perhaps condemned by the courts of another would very certainly imperil the amicable relations between governments and vex the peace of nations.") (internal quotation marks omitted).  As the State Department notes, "When you are in a foreign country, you are subject to its laws, and American officials are limited as to how they can assist you."  *See* http://travel.state.gov/travel/tips/tips_1232.html.  Plaintiffs' argument is particularly puzzling with respect to the Plaintiffs who traveled from Yemen because there are no direct flights to the United States from Yemen.  *See* Raya Dec., ¶ 8.  In other words, their travel to the United States is always contingent on their passage through third countries, as well as the approval of both the United States and Yemen.  Second, these allegations are entirely speculative and seek to hold the United States responsible for actions by foreign nations.  Such allegations

---

there may or may not be additional visa requirements, but Plaintiffs have not alleged any facts demonstrating the existence of this barrier.

cannot form the basis for a claim for relief under settled standing principles.  In light of the

documented ability of the Plaintiffs to enter third countries and return to the United States, their

allegations do not meet the requirements for standing or the pleading standards set out in *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937,

1949-50 (2009) because Plaintiffs have set forward no reason to believe that third party countries

pose a real barrier to entry.

Finally, granting the relief Plaintiffs seek – and effectively mandating that U.S. citizens

be permitted to board flights bound to the U.S. as a requirement of the Fourteenth Amendment –

would do the government's air safety program serious harm and would pose grave danger to

national security.  No matter how great a risk, citizens would be allowed to fly into U.S. airspace.

For good reason, the relevant statutory authorities speak of *individuals* – not foreigners – who

pose risks to civil aviation.  *See* 49 U.S.C. § 114(h)(3).  By asserting an absolute right to reenter

by airplane, Plaintiffs effectively seek to place themselves above all of the standard screening

that applies to all persons seeking to fly in and out of the United States, simply because of their

status as citizens or LPRs.

## III.    DHS TRIP ADEQUATELY BALANCES THE GOVERNMENT'S NATIONAL SECURITY INTERESTS IN PROTECTING WATCHLIST INFORMATION WITH AN INDIVIDUAL'S RIGHT TO TRAVEL

As noted above, this Court does not have jurisdiction over Plaintiffs' claims regarding

DHS TRIP because DHS TRIP determination letters regarding complaints about denied or

delayed airline boarding are final orders of TSA, and thus, may only be challenged in the Courts

of Appeal.  *See supra* Section I.  Nevertheless, even if appropriately filed in this Court,

Plaintiffs' due process challenge fails.  Even assuming Plaintiffs have alleged a deprivation of

some constitutionally-protected liberty interest, *see supra* at Section II, given the nature of the terrorist screening programs at issue, DHS TRIP provides a sufficient opportunity for Plaintiffs to receive notice and be heard.   Summary judgment should therefore be entered for Defendants on Count I of Plaintiffs' Complaint.  *See* Compl., ¶¶ 377-386.

"[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (internal citation omitted).  Instead, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id.*[18]  "[A]ssessing the adequacy of a particular form of notice requires balancing the 'interest of the State' against 'the individual interest sought to be protected.'"  *Jones v. Flowers*, 547 U.S. 220, 229 (2006) (internal quotation marks omitted).  In cases involving national security and the possibility of terrorist activities, the government's interest is at its zenith.   "[N]o governmental interest is more compelling than the security of the Nation."  *Agee*, 453 U.S. at 307; *see also Wayte v. U.S.*, 470 U.S. 598, 612 (1985) ("Unless a society has the capability and will to defend itself from the aggression of others, constitutional protections of any sort have little meaning.").  As explained below, TSDB information – including an individual's TSDB status and the reasons why he or she was placed on the TSDB – is extremely sensitive; disclosure of such information would seriously undermine the government's counter-terrorism efforts.  As a result, the "process" that is due in cases

---

[18]   Plaintiffs do not appear to be asserting a claim that persons on the No Fly List should have received pre-deprivation notice.  The Supreme Court has held that "due process is not denied when postponement of notice and hearing is necessary" to ensure prompt government action in a variety of circumstances, such as where advance warning might frustrate the purpose of the action by allowing the property interest to be destroyed, transferred or removed from the jurisdiction. *See Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 679 (1974).  *See also FDIC v. Mallen*, 486 U.S. 230, 240-41 (1988).  The need for postponement of notice is clearly present here, particularly given the government's compelling interest in combating terrorism and preventing known or suspected terrorists from boarding planes traveling to, from, or within the U.S.

involving the TSDB cannot, and should not, require (as Plaintiffs suggest) a judicial hearing with the presentation of evidence and examination of witnesses.  *See Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) ("[t]he judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances.").

The fundamental requirement of due process is "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  Plaintiffs allege that they are entitled to a "legal mechanism that affords them notice and opportunity to contest their inclusion on terrorist watch lists."  Compl., ¶ 384.  Due process procedures may vary "'depending upon the importance of interests involved and the nature of the subsequent proceedings."  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971)).  At bottom, the due process evaluation "is flexible and calls for such procedural protections as the *particular situation demands*."  *Buckingham v. Secretary of U.S. Dept. of Agr.*, 603 F.3d 1073, 1083 (9th Cir. 2010) (emphasis added).

## A.  Current Redress Process for Individuals Denied Boarding

Currently, the process provided to individuals who contend they have been denied boarding consists of two parts.  Such individuals are directed to file a complaint with DHS TRIP; DHS TRIP then reviews those complaints.  *See* Stipulated Facts, ¶¶ 4-5; Kennedy Dec., ¶¶ 5-8. If the denial of boarding resulted from a match to a name on the No Fly List, the complaint is referred from DHS TRIP to TSC.  *See* Stipulated Facts, ¶ 8; Kennedy Dec., ¶ 9; Piehota Dec., ¶ 33.  TSC then reviews the complaint and the underlying information related to the original nomination; TSC also conducts a *de novo* review of any additional derogatory or other available

34

information and determines whether the individual should remain on the No Fly List. *See* Piehota Dec., ¶¶ 33-4; *see also* Stipulated Facts, ¶ 9. Once the determination is made, DHS TRIP sends out a letter to the individual. *See* Stipulated Facts, ¶¶ 9-10; Kennedy Dec., ¶ 10; Piehota Dec., ¶ 35-36. The letter does not confirm or deny whether the individual is on the No Fly List, but informs the complainant that his or her records have been reviewed and that he or she may (in some cases, after a certain amount of time) pursue judicial review in the Courts of Appeal. *See* Kennedy Dec., ¶¶ 11, 13, Exhibits A and B; *see also* Stipulated Facts, ¶ 11.

In cases where individuals believe they have been denied the ability to board a plane as a result of being included on the No Fly List, the government's procedures permit them to file a complaint, receive a response, and challenge the decision in the Court of Appeals. This is more than sufficient, particularly in light of the compelling national security concerns related to the No Fly List and the Ninth Circuit's holding that there is no constitutional right to fly. No further process is required.

In evaluating whether the government has provided sufficient due process, the Court should consider three factors: (1) "'the private interest that will be affected by the official action'"; (2) "'the risk of an erroneous deprivation of such interests through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards'"; and (3) "'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *Gilbert*, 520 U.S. at 931-32; *Mathews*, 424 U.S. at 335. In this matter, all of the factors support the process the government provides.

### B. Plaintiffs Have Not Articulated a "Private Interest" That Requires More Process Than What DHS TRIP Provides

35

The private interests advanced by Plaintiffs do not require any additional process beyond what is already provided.  Any liberty interest in traveling has not been significantly diminished, since the Ninth Circuit has already held that there is no constitutional right to travel by plane. *Gilmore,* 435 F.3d at 1136.   Moreover, there has been no denial of the underlying right to enter the country – as demonstrated by the fact that all of the Plaintiffs who wished to return to the U.S. have done so.  Individuals placed on the No Fly List remain free to travel by other means. *Id.* (holding that even if air travel is "a necessity and not replaceable . . . it does not follow that Defendants violated [Gilmore's] right to travel, given that other forms of travel remain possible").  Passengers who are denied boarding may choose to drive, take a train, or travel by ship, as other Plaintiffs in this case did. *See supra* at 27-31.  Indeed, in the nearly four months between Plaintiffs' denials of boarding (earliest allegations of boarding denials are in February 2010) and the filing of the Complaint (June 30, 2010), it is not difficult to imagine that all of the Plaintiffs could not have found other ways home, just as other Plaintiffs did. *See supra* at 27-31; Compl., ¶¶ 147-154 (detailing Plaintiff Washburn's return to the U.S.); Compl., ¶¶ 338-341 (detailing Plaintiff Persaud's return to the U.S.); Declaration of Knaeble, Docket #19-7 at 11-12 (detailing Plaintiff Knaeble's return to the U.S.).   Defendants' own research shows that other travel options were available within that timeframe. *See supra* at 27-31.  While Plaintiffs have asserted they prefer to travel by plane, *e.g.,* Compl., ¶ 70-71, 293, 345, the government's interest in protecting commercial aviation is of a much higher magnitude, and the balance is accordingly struck in Defendants' favor.

Plaintiffs also assert that they have a liberty interest in nonattainder — "not being singled out for punishment without trial" (Compl., ¶ 381), as well as a "right to be free from false

36

governmental stigmatization as individuals associated with terrorist activity, when such harm

arises in conjunction with the deprivation of their right to travel on the same terms as other

travelers" and "their liberty interest under the Fifth Amendment in travel free from unreasonable

burdens" (Compl., ¶¶ 379-80).  None of these interests was infringed when Plaintiffs were

denied boarding.

A bill of attainder is "a *law* that legislatively determines guilt and inflicts punishment

upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v.*

*Administrator of General Services*, 433 U.S. 425, 468 (1977) (emphasis added).  Here, however,

there is no law enacted by Congress that placed the specific Plaintiffs on the No Fly List.

Instead, Congress has enacted laws requiring passengers to be screened for risks to civil aviation;

the Executive branch is then responsible for identifying the passengers who pose such risks.  *See*

*supra*  at 5-10.   There is no bill of attainder.  *See Paradissiotis v. Rubin,* 171 F.3d 983, 988-89

(5th Cir. 1999) (declining to apply bill of attainder clause to "regulatory" list of persons subject

to Treasury's Libyan sanctions regime).  Moreover, while persons who allege they were

wrongfully denied boarding due to a mistaken placement on the No Fly List are not provided

with a "trial," they are provided with the opportunity to assert grievances via DHS TRIP, and to

obtain judicial review of the DHS TRIP decision in the Courts of Appeal.  *See supra* at 11-13.

Finally, even if Plaintiffs had a statute to challenge, the No Fly List does not qualify as

"punishment."  *See Selective Serv. Sys. v. Minn. Pub. Interest Research Grou*p, 468 U.S. 841,

852 (1984) (setting forth relevant factors).  First, precluding air travel is not within the historical

meaning of punishment; second, Congress' concern with air security (especially in the wake of

the 9/11 attacks) can more than reasonably be said to "further nonpunitive legislative purposes,";

37

and finally, the legislative record related to the establishment of TSA and the need for passenger screening does not evidence a Congressional "an intent to punish." *Id.*  Ultimately, there are no similarities between Plaintiffs and the "historical experience with bills of attainder in England and the U.S. . . . include[ing] sentences of death, bills of pains and penalties, and legislative bars to participation in specified employments or professions." *Foretich v. U.S.*, 351 F.3d 1198, 1218 (D.C. Cir. 2003).

Likewise, Plaintiffs have not been stigmatized "in conjunction with their right to travel on the same terms as other travelers."  Compl., ¶ 379.  Procedural due process protections apply to reputational harm only when a plaintiff suffers stigma from governmental action plus alteration or extinguishment of "a right or status previously recognized by state law." *Paul v. Davis*, 424 U.S. 693, 711 (1976).   This is known as a "stigma-plus" claim. *See Green*, 351 F. Supp. 2d at 1129-30.  The Constitution contains no reference, implied or otherwise, to a right to "travel on the same terms as other travelers." *See supra* at Section II.   As a result, Plaintiffs cannot meet the standards required for a stigma-plus claim. *See Green*, 351 F. Supp. at 1130 (rejecting plaintiffs' claim that delayed boarding due to mistaken association with the No Fly List sufficed for stigma-plus claims).  The *Green* court held that plaintiffs could not make out a stigma-plus claim, because they did "not have a right to travel without any impediments"; because "burdens on a single mode of transportation do not implicate the right to interstate travel"; and because plaintiffs "have not alleged any tangible harm to their personal or professional lives that is attributable to their association with the No-Fly List, and which would rise to the level of a Constitutional deprivation of a liberty right."  351 F. Supp. 2d at 1130.  The same is true here, for three reasons.

38

First, Plaintiffs have not articulated any other "right or status previously recognized under state law" of which they have been deprived. *See* supra at Section II. Second, there must be a "connection" between the stigma and the plus, which is not present in this case because Plaintiffs had available alternative means of travel. *See Velez v. Levy*, 401 F.3d 75, 90 (2d Cir. 2005). Third, Plaintiffs' allegations of harm from delay or the passage of time must be put into context of their travels, which involved wholesale relocations or absences from the U.S. ranging from several months to more than a year. *See* Compl., ¶¶ 72, 74, 131, 157, 175, 196, 223. Accordingly, to the extent Plaintiffs allege they suffered harm from being out of the country, those absences were not entirely due to the denial of boarding.

## C. There is Little Risk of Erroneous Deprivation Given the Quality Controls Over the TSDB (and the even Smaller Subset of the No-Fly List) and the Right to Appeal Redress Decisions in the Courts of Appeal

The government's current procedures for including individuals on the No Fly List protect against erroneous or unnecessary infringements of liberty. The TSDB is regularly updated daily; it is also reviewed and audited on a regular basis to comply with quality control measures. *See* Piehota Dec., ¶ 23. Nominations for the No Fly List are reviewed by TSC personnel to ensure that they meet the required criteria. Piehota Dec., ¶¶ 19-23. To the extent an individual is denied boarding, and wishes to complain, he or she can file a complaint with DHS TRIP, which then triggers a subsequent review of the individual's status. *See* Stipulated Facts, ¶¶ 4, 5, 8; Kennedy Dec., ¶¶ 5-8; Piehota Dec. 30-33. If the individual is unsatisfied with the DHS TRIP Determination letter he or she receives, then the individual may choose to file a Petition for Review against TSA in the relevant Court of Appeals. *See* Kennedy Dec., ¶¶ 11, 13, Exhibits A and B; *see also* Stipulated Facts, ¶ 11.

**D.    Protecting Watchlisting Status, and the Underlying Information, is Crucial to the Government's Countererrorism Efforts**

Finally, the government has a paramount interest in ensuring that TSDB information can be broadly shared across the government to maximize the nation's security, without fear that such information will be disclosed whenever anyone cannot travel as he or she chooses.  Courts have recognized the vital role watchlisting plays in securing our nation.  *See Tooley v. Bush*,  No. 06-306 (CKK), 2006 WL 3783142, at *20 (D.D.C. 2006), *judgment aff'd, Tooley v. Napolitano*, 586 F.3d 1006 (D.C. Cir. 2009) ("[I]f TSA were to confirm in one case that a particular individual was not on a watch list, but was constrained in another case merely to refuse to confirm or deny whether a second individual was on a watch list, the accumulation of these answers over time would tend to reveal [sensitive security information]."); *Cf. Bassouini v. CIA*, 392 F.3d 244, 245-46 (7th Cir. 2004) (explaining that if the "CIA opens its files most of the time and asserts the state-secrets privilege only when the information concerns a subject under investigation or one of its agents, then the very fact of asserting the exemption reveals that the request has identified a classified subject or source").

**1.    Likely Harms From Disclosure of Information Related to Watchlisting**

The FBI and TSC declarations submitted in support of this motion explain in detail the reasons the government protects information related to an individual's TSDB status.  Defendants have determined that any disclosures of information related to TSDB status can reasonably be expected to cause serious harm to national security.  The TSDB is the federal government's consolidated terrorist "watchlist," containing identifying information about persons known or reasonably suspected by the government to have ties to domestic or international terrorism. Giuliano Dec., ¶ 6; Piehota Dec., ¶ 6.  The decision to include an individual in the TSDB as a

40

known or suspected terrorist is based on intelligence-gathering and investigative efforts by the FBI and other agencies within the intelligence community.  Giuliano Dec., ¶ 8; Piehota Dec.,¶¶ 8, 21.

The government does not publicly confirm or deny whether particular individuals are now or ever have been listed in the TSDB, because to do so would in effect disclose the fact that the individuals in question are currently or once were the subjects of counterterrorism intelligence-gathering or investigative activity by the federal government.  *See* Giuliano Dec., ¶¶ 16-17, 21-22; Piehota Dec., ¶¶ 25-29.  Moreover, if the government were to disclose watchlist status, individuals who know they are on the TSDB could take steps to avoid detection and circumvent surveillance.  Giuliano Dec., ¶ 14.  Similarly, the disclosure that someone is *not* on the TSDB might lead that person to take advantage of that fact, so that he or she is in a better position to commit a terrorist act against the U.S. before he or she comes to the attention of government authorities.  Giuliano Dec., ¶ 15.[19]  For these reasons, courts have regularly upheld the government's ability to withhold this kind of information.  *See, e.g., Tooley*, 2006 WL 3783142, at *20; *Gordon v. FBI*, 388 F. Supp. 2d 1028, 1037 (N.D. Cal. 2005)  (rejecting FOIA request for information about No Fly List; "'[r]equiring the government to reveal whether a particular person is on the watch lists would enable criminal organizations to circumvent the purpose of the watch lists by determining in advance which of their members may be questioned.'"); *Barnard v. DHS*, 531 F. Supp. 2d 131, 134 (D.D.C. 2008)  (same) (upholding withholding of records in response to plaintiff's request to "obtain records related to him that

---

[19]   Some Plaintiffs allege they were told they were on (or off) the No Fly List by government officials, but, even if true, such allegations do not diminish the risks of official disclosure.  *See* Giuliano Dec., ¶ 14.

could explain why he has been detained, questioned, and/or searched in airports during and after his international trips beginning in January 2003").

Even if the government were to inform individuals on the No Fly List of their status, that information would not satisfy Plaintiffs' demands, as it would still leave open the question of how to challenge such status. In their Complaint, Plaintiffs' ask the Court to order Defendants to provide them "with meaningful notice of the grounds for their inclusion on a government watch list, and an opportunity to rebut the government's charges and to clear their names." Compl. at at Prayer for Relief.[20] This kind of process would require the government to disclose the classified intelligence and otherwise sensitive derogatory information underlying a TSDB nomination, such as FBI investigative files. Giuliano Dec., ¶¶ 18-20; Piehota Dec., ¶ 29. Release of this material would put FBI sources and methods at risk, as well as eliminate any investigative advantages the FBI has over persons legitimately placed on the No Fly List. Giuliano Dec., ¶¶ 18-20, 22; Piehota Dec., ¶ 29. "The Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service." *Snepp v. U.S.*, 444 U.S. 507, 510 n.3 (1980) (*per curiam*). These important government interests circumscribe the process that must be provided.

Requiring disclosures of any and all information associated with No Fly List nominations would harm national security. DHS TRIP strikes the right balance between the weighty government interests at stake in air security and the travel burdens imposed by pre-screening

---

[20]   While Plaintiffs are not specific about the kind of process they want, their references to an ability to "confront" or "rebut" (Compl.,¶ 39), evokes a hearing involving the submission of evidence and the examination of witnesses. *See* U.S. Const., Amend. VI (Confrontation Clause).

passengers on planes to, from, and within the U.S.  *See Jifry v. FAA*, 370 F.3d 1174, 1183-84

(D.C. Cir. 2004) (in determining whether plaintiffs posed threats to civil aviation, "substitute

procedural safeguards may be impracticable [in those cases] and, in any event, are unnecessary"

because of "the governmental interests at stake and the sensitive security information" involved;

as a result, due process did not require that plaintiffs be given the "specific evidence" upon

which the determinations are based); *Stehney v. Perry*, 101 F.3d 925, 936 (3d Cir. 1996) (agency

may revoke a security clearance without affording the holder of the clearance "[t]he right to

confront live witnesses, review information from prior investigations, or to present live

testimony" because affording those rights would not "improve[] the fairness of the revocation

process.").  Plainly, the government cannot, consistent with national security, give notice to

known or suspected terrorists regarding their inclusion on the TSDB, and the No Fly List subset,

and the reasons for their inclusion, all so that they may obtain an evidentiary hearing where such

classified intelligence and sensitive law enforcement information can be challenged.

### 2.    TRIP Provides Adequate Process for Persons Who Allege they Have Been Denied Boarding

The DHS TRIP redress process is appropriate and adequate to protect Plaintiffs' alleged

liberty interests.  Plaintiffs' complaints about DHS TRIP's inadequacies stem from the fact that

the process does not give them the right "confront, or to rebut" the grounds for their alleged

inclusion on a terror watchlist.  But confrontation and rebuttal are not general requirements for

all government proceedings, especially in cases where the information at issue may be highly

sensitive.  Moreover, as discussed above, DHS TRIP determination letters pertaining to

allegations of denied or delayed airline boarding, may be directly challenged in the Courts of

Appeals, which ensures that the government's actions can be reviewed.  *See* Stipulated Facts,

¶ 11; Kennedy Dec., ¶¶ 11, 13, Exhibits A and B.  The Court of Appeals can request and review the records supporting the redress decision, or otherwise act on the petition.  The court may deny the petition.  *See, e.g.*, *City of Las Vegas, Nev. v. FAA*, 570 F.3d 1109, 1118-19 (9th Cir. 2009) (denying petition for review after determining that "that the FAA did not act arbitrarily or capriciously").  If the court grants the petition, it may remand for further fact-finding or conclude that the agency's action was unlawful.  *Compare Arredondo v. Holder*, --- F.3d ----, 2010 WL 4291391, at *2 (9th Cir. Nov. 2, 2010) *with Nat'l Res. Def. Council v. EPA*, 526 F.3d 591, 608 (9th Cir. 2008).

Plaintiffs demand that they be given all information about their alleged status on the No Fly List, including any underlying derogatory information which may include classified national security information.  For the reasons discussed above, such disclosure is not possible.  Any such information is extremely sensitive and may be classified.  Moreover, requiring the government to turn over such information to any individual who files suit alleging that he or she is on the No Fly List could force the government to disclose possibly classified national security information to persons it reasonably suspects to be associated with terrorism.  *See* Giuliano Dec., ¶ 20; Piehota Dec., ¶¶ 25-29.  Due process does not require the government to put national security at risk.  *See HLP*, 130 S. Ct. at 2727 ("national security and foreign policy concerns arise in connection with efforts to confront evolving threats in an area where information can be difficult to obtain and the impact of certain conduct difficult to assess.").  As Judge King found in *Al Haramain Islamic Found., Inc. v. U.S. Dept. of Treasury*, 585 F. Supp. 2d 1233, 1259 *(*D. Or. 2008), in a case involving a challenge to the government's designation of Al-Haramain as an organization that supports Al-Queda based partly on classified, undisclosed information, "the

44

government's interest in keeping material secret takes precedence over AHIF-Oregon's due process right to review the record against it."  Both the D.C. and Seventh Circuits have reached similar conclusions.  *See Nat'l Council of Resistance of Iran ("NCRI") v. Dep't of State*, 251 F.3d 192, 207 (D.C. Cir. 2001) ("[T]hat strong interest of the government [in protecting against the disclosure of classified information] clearly affects the nature . . . of the due process which must be afforded petitioners."); *Holy Land Found. for Relief and Development v. Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2003) (rejecting "claim that the use of classified information disclosed only to the court *ex parte* and *in camera*" in designation of a foreign terrorist organization violated due process); *Global Relief Foundation, Inc. v. O'Neill*, 315 F.3d 748 (7th Cir. 2002) (statute not unconstitutional because it "authorizes the use of classified evidence that may be considered *ex parte* by the district court. . . .  The Constitution would indeed be a suicide pact if the only way to curtail enemies' access to assets were to reveal information that might cost lives."  (internal citation omitted).[21]

By providing an opportunity for judicial review without requiring the government to reveal information that ought not to be revealed, DHS TRIP balances the public and private interests fairly and provides a suitable substitute for an evidentiary hearing.  DHS TRIP gives an individual who has experienced difficulties during travel screening at airports or been prohibited from boarding an opportunity to be heard at a meaningful time and in a meaningful manner by permitting that individual to complain with specificity to the appropriate authorities about the

---

[21]  *See also Islamic American Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 45 (D.D.C. 2005), *aff'd in part*, 477 F.3d 728 (D.C. Cir. 2007) (recognizing in IEEPA context plaintiff's review of the administrative record is "limited only to those portions of the administrative record that are not classified" while the Court "has before it both the classified and unclassified administrative record"); *Patterson v. Fed. Bureau of Investigation*, 893 F.2d 595, 600 n.9, 604-05 (3d Cir. 1990) (unfairness remedied by "*in camera* examination by the trial court of the withheld documents and any supporting or explanatory affidavits").

difficulties that he or she has experienced; to have his or her watchlist status reviewed; to have appropriate changes made to applicable records; and if unsatisfied, to seek direct review in a federal appellate court. *See Mathews*, 424 U.S. at 333 (quoting *Armstrong*, 380 U.S. at 552). Indeed, it is difficult to understand how some Plaintiffs can even claim that the DHS TRIP process is inadequate because they filed their DHS TRIP complaints shortly before the original and amended complaint were filed. *See* Compl., ¶¶ 124, 191, 229, 251, 305. They had not, therefore, even had time to see what the outcomes of their DHS TRIP filings would be before they filed suit.

Moreover, Plaintiffs' suggestion that due process requires disclosure of all of the evidence supporting a No Fly nomination be given to the person it concerns contravenes precedent holding that the Executive alone is responsible for protecting classified information, and for assessing the risks—like those discussed above—inherent in its disclosure. *See, e.g., Stehney*, 101 F.3d at 931-32 (finding that judicial review of the merits of an Executive Branch decision to grant or deny a security clearance would violate separation of powers principles). Even a protective order requiring information to be disclosed notwithstanding the Executive's classification — let alone a full-blown evidentiary hearing in which such information is disclosed and subject to cross-examination — raises serious separation of powers issues. *See* U.S. Const. art. II, § 2, cl. 1; *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988) ("[the Executive's] authority to classify and control access to information bearing on national security . . . flows primarily from this constitutional investment of power in the President").[22] "[T]hat

---

[22]   Faced with similar issues, courts addressing the protection of classified information have consistently acknowledged the Executive's authority and expertise in such matters. *See, e.g, Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) ("The assessment of harm to intelligence sources, methods and operations

46

strong interest of the government [in protecting against the disclosure of classified information] clearly affects the nature . . . of the due process which must be afforded petitioners." *NCRI*, 251 F.3d at 207. As the D.C. Circuit explained in *NCRI*, disclosure of classified information "is within the privilege and prerogative of the executive, and we do not intend to compel a breach in the security which that branch is charged to protect." *See id.* at 208-09. Because DHS TRIP strikes that balance in a manner that is both appropriate and necessary, it provides a remedy to Plaintiffs that fully meets the requirements of due process.

## IV.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' INA CLAIMS

Plaintiffs Omar and Ahmed assert that they are being denied their LPR status without a hearing, in violation of the INA and the Due Process clause. In fact, however, there has been no such denial; both Omar and Ahmed currently retain their LPR status, and both are currently located in the U.S. *See* McAleenan Dec., ¶¶ 4-5, 10-11. Ahmed has been issued a Notice to Appear for a removal hearing before an Immigration Judge; his LPR status will not be terminated without all the process due under the INA, including in this case, a hearing. *See* McAleenan Dec., ¶ 11; *see also* 8 U.S.C. § 1229a (detailing procedures for deciding the

---

is entrusted to the Director of Central Intelligence, not to the courts.") (internal citation omitted); *In re U.S.*, 1 F.3d 1251 (Table), 1993 WL 262656 at * 9 (Fed. Cir. 1993) (finding that, under separation of powers principles, "decisions of the Executive [regarding who may have access to classified information] may not be countermanded by *either* coordinate Branch") (emphasis in original). *See also Halkin v. Helms*, 598 F.2d 1, 7 (D.C. Cir. 1978) ("It is not to slight judges, lawyers, or anyone else to suggest that any [] disclosure [of classified information] carries with it [the] serious risk that highly sensitive information may be compromised.") (internal quotations omitted). Indeed, in *Egan*, the Supreme Court held that "[f]or reasons . . . too obvious to call for enlarged discussion, . . . the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it." 484 U.S. at 529 (internal quotation omitted). In so holding, the Supreme Court emphasized that "[c]ertainly, it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment . . . [n]or can such [an outside nonexpert] body determine what constitutes an acceptable margin of error in assessing the potential risk." *Id.*

inadmissibility or deportability of an alien, including the right to a hearing before an immigration judge, to be present at the hearing, to present evidence and cross-examine witnesses and to be represented by counsel at the alien's expense).[23]

Ahmed's allegations of "forced exile" fail to withstand scrutiny.  He has now returned to the United States and received a notice to appear.  McAleenan Dec., ¶ 11.  At the resulting hearing, he will receive all procedural protections to which he is entitled.  *Id*.  This is precisely the process envisioned by the INA.  *See* 8 U.S.C. §1229a.  Any arguments Ahmed has made about the validity of his LPR status can be made to the immigration judge and, if appropriate, in a Petition for Review in the Court of Appeals.  *See* 8 U.S.C. § 1252(a)(5) ("Notwithstanding any other provision of law . . . , a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter."); *Alvarez-Barajas v. Gonzales*, 418 F.3d 1050, 1052 (9th Cir. 2005).  Indeed, Ahmed must exhaust his administrative remedies before seeking judicial review of an immigration decision.  8 U.S.C. § 1252(d).  It would be extraordinary and unwarranted for the Court to preempt a decision by the Immigration Judge as to Ahmed's admissibility.[24]

---

[23] We also note that a LPR does not have an unqualified right to a hearing under 8 U.S.C. § 1229a prior to being denied admission into the U.S. as plaintiff asserts.  *See United States ex rel. Mezei v. Shaughessy,* 345 U.S. 206 (1953) (concluding that an alien who had previously legally resided in the country for 25 years could be summarily excluded following a 19 month absence); *Landon v. Plasencia*, 459 U.S. 21, 33 (1982) (noting with approval that in *Mezei* "this Court rejected the argument of an alien who had left the country for some twenty months that he was entitled to due process in assessing his right to admission on his return.").  Expedited removal is also available under 8 U.S.C. § 1225.

[24] At this time, the government takes no position on the validity of Ahmed's arguments, but Ahmed may argue to the Immigration Judge that his absence from the U.S. was involuntary.  *See, e.g., Khodagholian v. Ashcroft*, 335 F.3d 1003 (9th Cir. 2003).

48

Moreover, the Government did not expel or otherwise force Ahmed to leave the country. Rather, he *voluntarily* departed despite knowing full well that he would likely be treated as an applicant for admission when he returned.   According to his own admissions, and despite what was implied in his affidavit, Ahmed intended to stay out of the United States for more than 180 days at the time that he departed.  *See* 8 U.S.C. § 1101(13)(C)(ii) (stating that a returning LPR may be treated as an applicant for admission if he has been "absent from the United States for a continuous period in excess of 180 days"); *Matter of Collado*, 21 I & N. Dec., ¶ 1061, 1065 (BIA 1998) ("[U]nder section [1]101(a)(13)(C)(ii) of the Act any absence of a lawful permanent resident for a continuous period in excess of 180 days is now determinative of whether the alien is to be deemed to be seeking admission.").

Ahmed claims that he departed the country "on or around" Aug. 6, 2009, *see* Ahmed Decl., Docket # 19-1, ¶ 6, and that he "attempted to fly home less than six months after departing."  Plaintiffs' PI Br., Docket # 19, p. 32.   In fact, however, Ahmed left the United States on July 27, 2009.  *See* McAleenan Dec., ¶ 7.  At the time he left, he planned to return to the United States on February 4, 2010, *see* Ahmed PI Decl., Docket # 19-1, ¶¶ 5,7 (stating that he had purchased a round-trip ticket and that his return flight was scheduled for February 4, 2010, from Jeddah, Saudi Arabia to New York).   Had he returned on February 4 as planned, he would have been absent from the United States for 192 days.  McAleenan Dec., ¶ 8.  Ahmed made these plans despite knowing full well that an LPR who is absent from the United States in excess of 180 days is considered an applicant for admission upon return.  *See* Ahmed PI Decl., Docket # 19-1, ¶ 23 (stating his "fear that based on my absence from the United States in excess of 180 days . . . the government may seek to rescind my legal permanent resident status."); *see*

*also* 8 U.S.C. § 1101(a)(13)(C)(ii); *Camins v. Gonzales*, 500 F.3d 872, 878-89 (9th Cir. 2007) (adopting Board of Immigration Appeals' conclusion that "a returning [LPR] who is described in [8 U.S.C. § 1101(13)(C)] shall be regarded as 'seeking an admission' into the United States.") (citations omitted); *De Vega v. Gonzalez*, 503 F.3d 45, 48 (1st Cir. 2007) ("[T]he INA deems a lawful permanent resident, who leaves the United States and then returns, to be 'seeking admission' if that person fits within any of the six categories enumerated in 8 U.S.C. § 1101(a)(13)(C)."). As a result, Ahmed cannot now claim that it is the government's actions that put him in the position of having been absent from the United States for more than 180 days; rather, he intentionally put himself in that position voluntarily and with full knowledge of the consequences.[25]

Ahmed also claims a totally unconvincing "fear" that his extended absence "may jeopardize [his] right to naturalize," Ahmed PI Decl., Docket # 19-1, at ¶ 24. But as Ahmed avers, he became an LPR in 1990. Compl., ¶ 235. As a result, he has been eligible to begin the process of naturalization since 1995. *See* 8 U.S.C. §§ 1427; 1445 (describing a five year continuous residency requirement as a pre-condition to naturalization and explaining that LPRs are eligible to apply for naturalization three months prior to meeting the five year requirement). Nonetheless, Ahmed *voluntarily* departed the country in 2009 and *planned* to stay abroad for more than 180 days, despite the fact that an absence of more than six months is considered to break the continuity of residence that is a requirement of naturalization, thereby putting the burden on the applicant to establish that he did not abandon his residence. *See* 8 U.S.C. §

---

[25]   Moreover, a determination that an LPR may be treated as an applicant for admission is not determinative as to whether or not he or she will ultimately be admitted to the United States. Instead, as Plaintiffs acknowledge, that determination simply makes the alien subject to grounds of inadmissibility found in 8 U.S.C. § 1182(a), rather than the deportability grounds found in 8 U.S.C. § 1227(a).

1427(b); 8 C.F.R. § 316.5 ("Absences from the United States for continuous periods of between six (6) months and one (1) year during the periods for which continuous residence is required [to naturalize] shall disrupt the continuity of such residence . . . unless the applicant can establish otherwise to the satisfaction of the Service."); *Alvear v. Kirk*, 87 F. Supp. 2d 1241, 1242 (D.N.M. 2000) ("An applicant [for naturalization] cannot be absent from the United States for more than six months without having to prove he or she did not abandon their residence.")  In any event, it is clear that his absence extended beyond six months even prior to being denied boarding.  Accordingly, no alleged action by the Defendants caused his absence for more than six months and no order from this Court can cure it.  *See Gildernew v. Quarantillo*, 594 F.3d 131 (2nd Cir. 2010) (finding that alien who claimed that he was absent only due to alleged placement on the No Fly List still could not be naturalized apparently because of his lengthy voluntary absence).[26]

Omar's claims are similarly meritless.  He claims to have been an LPR in the United States since 1996, Compl., ¶ 221, and eligible to begin the naturalization process since 2001.  *See* 8 U.S.C. §§ 1427; 1445   On August 16, 2010, he was permitted to enter the United States as a lawful permanent resident.  *Id*.  Accordingly, he has not been deprived of any status that would require a hearing under the INA.

Finally, it is worth emphasizing that, even if Omar and Ahmed's allegations were true, they were not "forced" to stay outside the United States.  Rather, and as discussed in more detail

---

[26] As the Supreme Court has emphatically stated, "No alien has the slightest right to naturalization unless all statutory requirements are complied with."  *United States v. Ginsburg*, 243 U.S. 472, 475 (1917).  Even if Ahmed had returned to the United States on February 4, 2010, as he originally intended, he would have had – as a result of his own voluntarily planned itinerary – at best an uphill battle to establish that he met the residency requirements.  Moreover, he has presented no basis for a finding that he meets the other requirements for naturalization.  *See* 8 U.S.C. 1427(a)(3).

above, *see supra* at Section II, the LPR Plaintiffs have at most been prevented from returning to

the United States by a single means of transportation -- commercial air.  They could still return to

the United States by ship, or by traveling to the Caribbean, Canada or Mexico, and then arriving

at a port of entry by ship, personal vehicle, train, bus or foot.  This is in fact the route taken by

other Plaintiffs.  *See* Washburn PI Decl., Docket # 19-10, at ¶ 24; Knaeble PI Decl., Docket # 19-

7, ¶¶ 38-39.  The alleged expense and difficulty of such means of travel are irrelevant to their

alleged statutory rights under the INA.  Such claims are particularly weak with respect to these

Plaintiffs.  Plaintiff Ahmed claims to have been exiled and forced to accumulate debt since he

was first denied boarding in February 2010 (Ahmed PI Dec., Docket # 19-1), but he does not

allege that he ever attempted any means of travel other than air travel.  Omar similarly attempted

no other means of travel, and does not claim to have even researched other ways to return to the

United States.  *See* Omar PI Dec., Docket # 19-8, at ¶ 17.  Such allegations do not constitute a

credible allegation of "exile."

## V.    THE GOVERNMENT'S REDRESS POLICY IS NOT ARBITRARY, CAPRICIOUS, OR CONTRARY TO LAW

Judgment should also be entered for Defendants on Plaintiffs' APA Claims.  Pursuant to

the APA's limited waiver of sovereign immunity, a reviewing court must uphold an agency

decision unless it is (1) arbitrary and capricious; (2) an abuse of discretion; or (3) otherwise not

in accordance with law.  *See* 5 U.S.C. § 706(2)(A); *Citizens to Preserve Overton Park, Inc. v.

Volpe*, 401 U.S. 402, 416 (1971).  The scope of judicial review under this standard is a narrow

and deferential one, and a court cannot substitute its judgment for that of the agency.  *See Motor

Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Under arbitrary

and capricious review, the court does not undertake its own fact-finding; rather, the court must

review the administrative record as prepared by the agency.  *See Camp v. Pitts*, 411 U.S. 138,

142 (1973).  As long as the agency's decision was supported by a rational basis, it must be

affirmed.  *See, e.g., Buckingham v. Sec'y of U.S. Dept. of Agr.*, 603 F.3d 1073, 1080 (9th Cir.

2010); *Fishermen's Finest, Inc. v. Locke*, 593 F.3d 886, 899 (9th Cir. 2010).

Plaintiffs make no new allegations in this claim, nor cite any authority for the proposition

that the APA requires something more than what the Constitution does in this context.

Defendants have followed Congress' command that all passengers be screened, and that all

persons (including U.S. citizens) who pose a threat to civil aviation on any flight, be denied

boarding.  Moreover, Plaintiffs have availed themselves of a redress process as mandated by

Congress, and the substance of any such decision must be reviewed in the Court of Appeals.

Consequently, Defendants have acted reasonably and in accordance with law, and the Complaint

does not identify any final agency action that is arbitrary or capricious in violation of the APA.

Moreover, the availability of judicial review under Section 46110 constitutes an alternative

remedy, and therefore no action will lie under the APA.  *See* 5 U.S.C. § 704; *Brem-Air Disposal*

*v. Cohen*, 156 F.3d 1002, 1004 (9th Cir. 1998).  Judgment should thus be entered for Defendants

on County IV of Plaintiffs' Complaint.

With respect to any of Plaintiffs' claims, the requested remedy is inappropriate.  Asking

the Court to assume responsibility for decisions about who should and should not be on the No

Fly List turns ordinary administrative law principles on their head, and it is particularly

troublesome in this national security context.  Plaintiffs want the Court to reassess the security

risks at issue in maintenance of the No Fly List and to establish new substantive and procedural

rules in a process that Congress and the President have assigned to DHS and TSC.  Plaintiffs'

53

request is improper because courts "owe considerable deference to [the Executive] branch's assessment in matters of national security," *Bassiouni v. FBI*, 436 F.3d 712, 724 (7th Cir. 2006), and must be "reluctant to intrude upon the authority of the Executive" in such affairs. *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988). Matters of national security "are rarely proper subjects for judicial intervention." *Haig*, 453 U.S. at 292.27 The Supreme Court's recent decision in *HLP*, 130 S. Ct. 2705, underscores the deference due to both the Legislative and Executive Branches in review of factual conclusions and legal matters that implicate national security, even when constitutional concerns are raised. *See* 130 S. Ct. at 2727 ("But when it comes to collecting evidence and drawing factual inferences in [national security and foreign relations], the lack of competence on the part of the courts is marked, and respect for the Government's conclusions is appropriate.") (internal quotation marks and citation omitted); *see also Rahman*, 530 F.3d at 627-28 ("modesty is the best posture for the branch that knows the least about protecting the nation's security and that lacks the full kit of tools possessed by the legislative and executive branches"). Plaintiffs' requested relief plainly treads upon sensitive national security Executive functions that are committed to the political branches.

---

[27]    *See also United States v. Hawkins*, 249 F.3d 867, 873 n.2 (9th Cir. 2001) (government interest in "ensuring national security" is "important in [itself] . . .but courts have long recognized that the Judicial Branch should defer to decisions of the Executive Branch that relate to national security."); *Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 926, 927-28 (D.C. Cir. 2003) (holding "that the courts must defer to the executive on decisions of national security. In so deferring, we do not abdicate the role of the judiciary. Rather, in undertaking a deferential review we simply recognize the different roles underlying the constitutional separation of powers. It is within the role of the executive to acquire and exercise the expertise of protecting national security. It is not within the role of the courts to second-guess executive judgments made in furtherance of that branch's proper role."); *Zadvydas v. Davis*, 533 U.S. 678, 696 (2001); *Krikorian v. Dep't of State*, 984 F.2d 461, 464-65 (D.C. Cir. 1993).

## **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment should be granted.


Dated: November 17, 2010                                   Respectfully submitted,

                                                          TONY WEST
                                                          Assistant Attorney General

                                                          SANDRA SCHRAIBMAN
                                                          Assistant Branch Director
                                                          Federal Programs Branch

                                                          *\s\ Diane Kelleher*
                                                          _____

                                                          DIANE KELLEHER
                                                          AMY POWELL
                                                          Attorneys
                                                          U.S. Department of Justice
                                                          Civil Division, Federal Programs Branch
                                                          20 Massachusetts Avenue, N.W.
                                                          Washington, D.C.  20001
                                                          Tel:     (202) 514-4775
                                                          Fax:     (202) 616-8470
                                                          E-Mail: diane.kelleher@usdoj.gov
                                                          E-mail:  amy.powell@usdoj.gov

                                                          *Counsel for Defendants*

55