Steven M. Wilker, OSB No. 911882
Email: steven.wilker@tonkon.com
**Tonkon Torp LLP**
1600 Pioneer Tower
888 SW 5th Avenue
Portland, OR 97204
Tel.: (503) 802-2040; Fax: (503) 972-3740
Cooperating Attorney for the ACLU Foundation of Oregon

Hina Shamsi (Admitted *pro hac vice*)
Email: hshamsi@aclu.org
Nusrat Jahan Choudhury (Admitted *pro hac vice*)
Email: nchoudhury@aclu.org
**American Civil Liberties Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 519-2500; Fax: (212) 549-2654

Kevin Díaz, OSB No. 970480
Email: kdiaz@aclu-or.org
**ACLU Foundation of Oregon**
P.O. Box 40585
Portland, OR  97240
Tel.: (503) 227-6928; Fax: (503) 227-6948

Ahilan T. Arulanantham (Admitted *pro hac vice*)
Email: aarulanantham@aclu-sc.org
Jennifer Pasquarella (Admitted *pro hac vice*)
Email: jpasquarella@aclu-sc.org
**ACLU Foundation of Southern California**
1313 West Eighth Street
Los Angeles, CA 90017
Tel.: (213) 977-9500; Fax: (213) 977-5297

Alan L. Schlosser  (Admitted *pro hac vice*)
Email: aschlosser@aclunc.org
Julia Harumi Mass  (Admitted *pro hac vice*)
Email: jmass@aclunc.org
**ACLU Foundation of Northern California**
39 Drumm Street
San Francisco, CA 94111
Tel.: (415) 621-2493; Fax: (415) 255-8437

Laura Schauer Ives (Admitted *pro hac vice*)
Email: lives@aclu-nm.org
**ACLU Foundation of New Mexico**

1 – THIRD AMENDED COMPLAINT

P.O. Box 566
Albuquerque, NM 87103
Tel.: (505) 243-0046; Fax: (505) 266-5916

Mitchell P. Hurley (Admitted *pro hac vice*)
Email:  mhurley@akingump.com
Christopher M. Egleson (Admitted *pro hac vice*)
Email:  cegleson@akingump.com
Justin H. Bell (Admitted *pro hac vice*)
Email:  bellj@akingump.com
**Akin Gump Strauss Hauer & Feld LLP**
One Bryant Park
New York, NY 10036
Tel.:  (212) 872-1011; Fax: (212) 872-1002

Attorneys for Plaintiffs

2 – THIRD AMENDED COMPLAINT

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**PORTLAND DIVISION**

| | |
|---|---|
| AYMAN LATIF, MOHAMED SHEIKH ABDIRAHMAN KARIYE, RAYMOND EARL KNAEBLE IV, FAISAL NABIN KASHEM, ELIAS MUSTAFA MOHAMED, STEVEN WILLIAM WASHBURN, ABDULLATIF MUTHANNA, NAGIB ALI GHALEB, MASHAAL RANA, IBRAHEIM Y. MASHAL, SALAH ALI AHMED, AMIR MESHAL, and STEPHEN DURGA PERSAUD, | No. 10-cv-750 (BR) |

Plaintiffs,

v.

ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States; ROBERT S. MUELLER, III, in his official capacity as Director of the Federal Bureau of Investigation; and TIMOTHY J. HEALY, in his official capacity as Director of the Terrorist Screening Center,

Defendants.

**THIRD AMENDED AND SUPPLEMENTAL COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

**(Violation of Fifth Amendment Rights and the Administrative Procedure Act)**

**INTRODUCTION**

1.      The United States' system of screening commercial airline passengers against databases of suspected terrorists is broken.  Thousands of people have been barred altogether from commercial air travel without any opportunity to confront or rebut the basis for their inclusion, or apparent inclusion, on a government watch list known as the "No Fly List."  The result is a vast and growing list of individuals whom, on the basis of error or innuendo, the government deems too dangerous to fly, but too harmless to arrest.  Many of these individuals,

3 – THIRD AMENDED COMPLAINT

like the Plaintiffs in this action, are citizens and lawful permanent residents of the United States; some, including four Plaintiffs in this action, are veterans of the United States Armed Forces. Some U.S. citizens and lawful permanent residents were placed on the list while traveling abroad and found themselves stranded in foreign countries, without explanation or appropriate visas, unable to return home to their families, jobs, and needed medical care in the United States. The Constitution does not permit such a fundamental deprivation of rights to be carried out under a veil of secrecy and in the absence of even rudimentary process.

2.      Plaintiffs are U.S. citizens and lawful permanent residents of the United States who were denied boarding on flights to or from the United States, or over U.S. airspace.

3.      Plaintiffs believe that they are on the No Fly List. Agents of the Federal Bureau of Investigation, other U.S. officials, and local law enforcement officers have told many of the Plaintiffs that they are on the No Fly List. Plaintiffs pose no threat to aviation security and do not know why they are on the No Fly List or how they can get off it. Before they were placed on the No Fly List, Plaintiffs had flown numerous times to, from, and within the United States in recent years without incident.

4.      Plaintiffs have submitted applications for "redress" through the only available government mechanism, to no avail. Each Plaintiff has sought explanations from the Department of Homeland Security, but no government official or agency has offered any explanation for Plaintiffs' apparent placement on the No Fly List or any other watch list that has prevented them from flying. Nor has any government official or agency offered any of the Plaintiffs any meaningful opportunity to contest his or her placement on such a list.

5.      Through this action for declaratory and injunctive relief, Plaintiffs seek a fair hearing in which they can confront any evidence against them and contest their unlawful

4 – THIRD AMENDED COMPLAINT

designation.  Plaintiffs also seek the removal of their names from any government watch list or database that has prevented them from flying.

## PARTIES

6.    Plaintiff Ayman Latif is a thirty-five-year-old U.S. citizen and disabled veteran of the U.S. Marine Corps.  He was born and raised in Miami, Florida, and currently resides in Stone Mountain, Georgia with his wife and two children.

7.    Plaintiff Mohamed Sheikh Abdirahman Kariye is a fifty-one-year-old U.S. citizen and resident of Portland, Oregon.  He is the Imam at the Masjid As-Saber in Portland.

8.    Plaintiff Raymond Earl Knaeble IV is a thirty-two-year-old U.S. citizen and U.S. Army veteran.  He was born and raised in California and currently resides in Chicago, Illinois, where he works as a truck driver.

9.    Plaintiff Faisal Nabin Kashem is a twenty-five-year-old citizen of the United States and a resident of Connecticut.  He is a university student.

10.    Plaintiff Elias Mustafa Mohamed is a twenty-three-year-old citizen of the United States and a resident of Seattle, Washington.  He is a university student.

11.    Plaintiff Steven William Washburn is a fifty-seven-year-old U.S. citizen and U.S. Air Force veteran.  Mr. Washburn was born and raised in Las Cruces, New Mexico, where he currently resides.

12.    Plaintiff Nagib Ali Ghaleb is a thirty-four-year-old U.S. citizen and resident of San Francisco, California.

13.    Plaintiff Abdullatif Muthanna is a thirty-year-old U.S. citizen and a resident of Rochester, New York.

5 – THIRD AMENDED COMPLAINT

14.     Plaintiff Mashaal Rana is a twenty-six-year-old U.S. citizen and a resident of New York.  She was born and raised in New York and is a housewife.

15.     Plaintiff Ibraheim (Abe) Y. Mashal is a thirty-three-year-old U.S. citizen and veteran of the U.S. Marine Corps.  He was born and raised in the United States, resides with his wife and three children in St. Charles, Illinois, and works as a traveling dog trainer.

16.     Plaintiff Salah Ali Ahmed is a sixty-year-old U.S. citizen and resident of Norcross, Georgia, where he works as an electrical technician.

17.     Plaintiff Amir Meshal is a thirty-year-old U.S. citizen and resident of Minnesota, where he works as a bus driver.

18.     Plaintiff Stephen Durga Persaud is a thirty-two-year-old U.S. citizen.  He is a registered nurse and resident of Irvine, California, where he lives with his wife and two children.

19.     Defendant Eric H. Holder, Jr. is the Attorney General of the United States and heads the Department of Justice ("DOJ"), a department of the United States government that oversees the Federal Bureau of Investigation ("FBI").  The FBI in turn administers the Terrorist Screening Center ("TSC"), which was created to consolidate the government's approach to terrorism screening.  The TSC develops and maintains the federal government's consolidated Terrorist Screening Database (the "watch list"), of which the No Fly List is a component. Defendant Holder is sued in his official capacity.

20.     Defendant Robert S. Mueller is the Director of the FBI, which administers the TSC.  Defendant Mueller is sued in his official capacity.

21.     Defendant Timothy J. Healy is the Director of the TSC and is sued in his official capacity.

**JURISDICTION AND VENUE**

22.    This is a complaint for injunctive and declaratory relief based upon civil rights violations committed by the Terrorist Screening Center, Federal Bureau of Investigation, and U.S. Department of Justice in violation of the Fifth Amendment to the U.S. Constitution and the Administrative Procedure Act ("APA").

23.    This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702, which waives the sovereign immunity of the United States with respect to any action for injunctive relief under 28 U.S.C. § 1331.

24.    This Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

25.    Under the APA, 5 U.S.C. § 706, this Court has the power to compel agency action unlawfully withheld or unreasonably delayed and to hold unlawful and set aside the challenged agency actions.  The Due Process Clause itself also provides this Court with authority to order the injunctive relief requested against Defendants.

26.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants are officers of agencies of the United States sued in their official capacity and because this judicial district is where Plaintiff Mohamed Sheikh Abdirahman Kariye resides and where a substantial part of the events or omissions giving rise to the claim occurred.

**FACTUAL ALLEGATIONS**

A.    **The Federal Government's Terrorist Watch List**

27.    In September 2003, Attorney General John Ashcroft established the Terrorist Screening Center to consolidate the government's approach to terrorism screening.  The TSC,

7 – THIRD AMENDED COMPLAINT

which is administered by the FBI, develops and maintains the federal government's consolidated Terrorist Screening Database (the "watch list"). TSC's consolidated watch list is the federal government's master repository for suspected international and domestic terrorist records used for watch list-related screening.

28. The TSC sends records from its terrorist watch list to other government agencies, which in turn use those records to identify suspected terrorists. For example, applicable TSC records are provided to the Transportation Security Administration ("TSA") for use by airlines in pre-screening passengers and to U.S. Customs and Border Protection ("CBP") for use in screening travelers entering the United States. Front-line agencies, like the TSA and CBP, carry out the screening function by conducting a name-based search of an individual to determine whether he or she has been placed on a watch list by the TSC.

29. Although the TSA, CBP, and other agencies may use the records provided by the TSC, it is the TSC that maintains and controls the database of suspected terrorists.

30. Two government entities are primarily responsible for "nominating" individuals for inclusion in the terrorist watch list—the National Counterterrorism Center ("NCTC") and the FBI. The TSC makes the final decision on whether a nominated individual meets the minimum requirements for inclusion into the watch list as a "known or suspected terrorist" and which screening systems will receive the information about that individual.

31. The TSC determines whether a nominated individual is "reasonably suspected" of having possible links to terrorism. According to the TSC, "reasonable suspicion requires articulable facts which, taken together with rational inferences, reasonably warrant the determination that an individual is known or suspected to be or has been engaged in conduct constituting, in preparation for, in aid of or related to terrorism and terrorist activities."

8 – THIRD AMENDED COMPLAINT

32.     Defendants have not stated publicly what standards or criteria are applied to determine whether an individual on the consolidated watch list will be placed on the No Fly List that is distributed to the TSA.

33.     A 2007 Government Accountability Office ("GAO") report found that the TSC rejects approximately one percent of nominations to the watch list.

34.     In response to intelligence failures that permitted Nigerian citizen Umar Farouk Abdulmutallab, a would-be bomber, to fly from Amsterdam to Detroit on December 25, 2009, the Defendants have dramatically expanded the watch list as a whole and the No Fly List in particular.

## B.     Inadequacy of Redress Process

35.     The government entities and individuals involved in the creation, maintenance, support, modification, and enforcement of the No Fly List, including Defendants, have not provided travelers with a fair and effective mechanism through which they can challenge the TSC's decision to place them on the No Fly List.

36.     An individual who has been barred from boarding an aircraft due to apparent placement on the No Fly List has no avenue for redress with the TSC, the government entity responsible for maintaining an individual's inclusion on, or removing an individual from, the list. The TSC does not accept redress inquiries directly from the public, nor does it directly provide final orders or disposition letters to individuals who have submitted redress inquiries.

37.     Rather, individuals who seek redress after being prevented from flying must complete a standard form and submit it to the Department of Homeland Security Traveler Redress Inquiry Program ("DHS TRIP").  DHS TRIP transmits traveler complaints to the TSC, which determines whether any action should be taken.  The TSC has provided no publicly

9 – THIRD AMENDED COMPLAINT

available information about how it makes that decision. The TSC is the final arbiter of whether an individual's name is retained on or removed from the list.

38.    Once the TSC makes a final determination regarding a particular individual's status on the watch lists, including the No Fly List, the TSC advises DHS that it has completed its process. DHS TRIP then responds to the individual with a letter that neither confirms nor denies the existence of any terrorist watch list records relating to the individual. The letters do not set forth any basis for inclusion in a terrorist watch list, do not state how the government has resolved the complaint at issue, and do not specify whether an individual will be permitted to fly in the future. Thus, the only "process" available to individuals who are prevented from boarding commercial flights is to submit their names and other identifying information to a government entity that has no authority to provide redress and to hope that an unspecified government agency corrects an error or changes its mind.

39.    As alleged below, each of the Plaintiffs made at least one redress request through DHS TRIP. Each Plaintiff received a letter as described in paragraph 38 above.

## C.    Plaintiffs' Allegations

### Ayman Latif

40.    Plaintiff Ayman Latif moved with his wife and family to Egypt in November 2008 so that he could study Arabic.

41.    Mr. Latif and his wife purchased tickets to fly with their children from Cairo, Egypt to Miami, Florida in April 2010 to visit relatives, including his mother, who was elderly and very ill.

42.    On April 13, 2010, Mr. Latif and his family were denied boarding on their flight to Miami at the Cairo International Airport on instruction from the U.S. Embassy.

43.     About one month later, Mr. Latif was questioned on two consecutive days by two FBI agents, one of whom told Mr. Latif that he was on the No Fly List.

44.     In or around the middle of May 2010, Mr. Latif learned from family in Florida that the U.S. Department of Veterans Affairs ("VA") had written to advise him that his service-connected disability benefits would be reduced from $899.00 to $293.00.

45.     Mr. Latif called the VA and was told that he had been scheduled to attend a Disability Evaluation on April 15, 2010, which he had missed.  Because he had been denied boarding on his April 13, 2010 flight, Mr. Latif was not in Florida on April 15, 2010 and could not have attended the evaluation.

46.     Mr. Latif was unable to reschedule his Disability Evaluation because he was unable to fly from Egypt to the United States due to his placement on the No Fly List.

47.     Mr. Latif received a July 27, 2010 letter from the Disabled American Veterans National Service Office stating that his disability benefits would be cut to zero, effective October 1, 2010.

48.     Mr. Latif's monthly disability benefit was subsequently reduced.

**Raymond Earl Knaeble IV**

49.     Plaintiff Raymond Earl Knaeble IV moved to Kuwait in 2006 to work for ITT Systems Corporation ("ITT Systems"), a multinational company specializing in global defense and security.

50.     On March 1, 2010, ITT Systems offered Mr. Knaeble a position in Qatar.  The effective date of employment was contingent upon Mr. Knaeble's passage of a pre-employment medical exam that was to be scheduled within days of acceptance of the offer.  ITT Systems

11 – THIRD AMENDED COMPLAINT

indicated that a medical exam administered in the United States would be processed more quickly than one administered in a foreign country.

51.    Mr. Knaeble accepted the ITT Systems position and scheduled his physical examination to take place in Killeen, Texas on March 16, 2010. Prior to moving to Qatar to start his new job, Mr. Knaeble planned to travel to Bogota, Colombia so that he could marry his fiancé, a Colombian citizen, and spend some time with her family and his relatives. He also planned to visit his daughter in Texas and his mother and sisters in California while in the United States following his scheduled medical examination and before moving to Qatar with his new wife.

52.    Mr. Knaeble booked airline tickets to travel from Kuwait to Bogota and then from Bogota to the United States.

53.    On March 10 and 11, 2010, Mr. Knaeble flew from Kuwait to Bogota without incident. On March 14, 2010, however, Mr. Knaeble was denied boarding on his flight to the United States at Aeropuerto Internacional El Dorado in Bogota. An airline official told him that no airline would permit him to board a U.S.-bound flight. He was instructed to contact the U.S. Embassy in Bogota.

54.    Mr. Knaeble subsequently met with and was questioned by two FBI agents at the U.S. Embassy. Despite Mr. Knaeble's repeated questions, neither agent told him why he had been placed on the No Fly List or why they were questioning him.

55.    On April 13, 2010, Mr. Knaeble received a letter from ITT Systems indicating that because he had not taken the required physical exam in Killeen as planned, the firm had withdrawn the offer for a position in Qatar.

12 – THIRD AMENDED COMPLAINT

56.     Mr. Knaeble tried to find an alternative way to return to the United States.  On May 11, 2010, he purchased a ticket to fly from Santa Marta to Nuevo Laredo, Mexico, with stops in Bogota and Mexico City.  He hoped to enter the United States over land by crossing the border between Nuevo Laredo and Laredo, Texas.

57.     When Mr. Knaeble landed in Mexico City the following day, Mexican government agents met him at the gate of the plane, questioned him, detained him for fifteen hours, and refused to allow him to board his flight to Nuevo Laredo or to travel by bus or any other means to the U.S.-Mexico border.  The agents placed Mr. Knaeble on a flight back to Bogota the following day.  Mr. Knaeble was unauthorized to work in Colombia and unable to secure paid employment.

58.     Mr. Knaeble ultimately returned to the United States in August 2010 by traveling for twelve days, mostly over land, from Santa Marta, Colombia to Mexicali, California.  During the journey, foreign authorities interrogated, detained, and searched him.

**Faisal Nabin Kashem**

59.     Plaintiff Faisal Nabin Kashem graduated from the University of Connecticut in 2005 with a degree in accounting.  He worked for some time for a Connecticut-based consulting firm.

60.     In January 2010, Mr. Kashem enrolled in a fully-funded two-year Arabic language certificate program at the Islamic University of Al-Madinah Al-Munawwarah in Medina, Saudi Arabia.  He planned to complete the program and subsequently enroll in a four-year Islamic Studies degree program at the university.

61.     On or around January 7, 2010, Mr. Kashem flew without incident from New York to Medina and commenced his studies.

13 – THIRD AMENDED COMPLAINT

62.     Mr. Kashem planned to return home to Connecticut for his summer vacation from June to August 2010.  On June 23, 2010, Mr. Kashem flew without incident from Medina to Jeddah, Saudi Arabia, but was denied boarding on his flight from Jeddah to New York.  An airline employee told him that he was on the No Fly List and that the United States had barred him from flying.

63.     Mr. Kashem was subsequently questioned by FBI agents who informed him that he would not be permitted to fly to the United States.

**Elias Mustafa Mohamed**

64.     Plaintiff Elias Mustafa Mohamed has lived in Seattle with his family since the age of six.  Mr. Mohamed's parents, stepfather, and seven siblings are all U.S. citizens and live in the United States.

65.     In 2008, Mr. Mohamed was granted admission to the two-year Arabic language certificate program at the Islamic University of Al-Madinah Al-Munawwarah in Medina.

66.     In January 2010, Mr. Mohamed flew without incident from Washington, D.C. to Medina and began his studies.

67.     Mr. Mohamed planned to return home to Seattle for his summer vacation from June to August 2010.  On June 25, 2010, he flew from Medina to Jeddah without incident, but was denied boarding on his flight from Jeddah to New York.  An airline employee told him that he was not permitted to fly.

68.     On July 6, 2010, Mr. Mohamed was questioned by two FBI agents who confirmed that he was on the No Fly List.

14 – THIRD AMENDED COMPLAINT

**Steven William Washburn**

69.    Plaintiff Steven William Washburn is a U.S. citizen and veteran of the U.S. Air Force.  In August 2008, Mr. Washburn and his wife moved to Riyadh, Saudi Arabia so that he could work for a technology company.  After one and a half years there, they decided to move back to the United States.

70.    Mr. Washburn and his wife purchased airline tickets to travel from Riyadh to Las Cruces, New Mexico, where Mr. Washburn's parents live.  They planned to spend a one-week layover in Ireland with Mr. Washburn's step-daughter, who was pregnant at the time.

71.    Mr. Washburn and his wife flew from Riyadh to Dublin without incident.  On February 5, 2010, Mr. Washburn attempted to check in for his flight from Shannon Airport Ireland to Boston.  An airline employee denied him a boarding pass and informed Mr. Washburn that he was on the No Fly List.

72.    Mr. Washburn purchased a new set of airline tickets to travel from Dublin to Ciudad Juarez, Mexico, with changes of aircraft in London and Mexico City.  He planned to enter the United States by walking over a bridge located at the border between Ciudad Juarez and El Paso, Texas.

73.    On February 12, 2010, Mr. Washburn flew from Dublin to London without incident.  He was permitted to board his flight from London to Mexico City.  Approximately three and a half hours after the plane took off, however, the aircraft turned around and flew back to London.

74.    Upon information and belief, Mr. Washburn's flight returned to London because, after he had boarded the flight, U.S. officials instructed airline officials not to fly over U.S. airspace with Mr. Washburn on board due to his placement on the No Fly List.

15 – THIRD AMENDED COMPLAINT

75.     When Mr. Washburn's flight landed in London, airport security and New Scotland Yard officials met him at the gate of the plane, detained and interrogated him for more than nine hours, photographed and fingerprinted him, subjected him to a DNA test, and seized the life savings that Mr. Washburn carried with him.  New Scotland Yard officials escorted Mr. Washburn to another aircraft, which took him back to Ireland.

76.     Mr. Washburn ultimately returned to the United States in May 2010 by flying from Dublin to Ciudad Juarez, with stops in Germany, Brazil, Peru, and Mexico City, and by then crossing the land border between Ciudad Juarez and El Paso.  During this journey, foreign authorities detained and questioned him.

**Abdullatif Muthanna**

77.     Plaintiff Abdullatif Muthanna was born in Yemen and moved to the United States in 1996 to join his mother and stepfather.

78.     Mr. Muthanna is a naturalized U.S. citizen and works in Rochester to support his wife and four children, who live in southern Yemen.  He travels to Yemen every few years to spend time with his family.

79.     Mr. Muthanna also remains in the United States apart from his family in order to receive medical care for serious medical conditions.  Mr. Muthanna suffers from and receives treatment for digestive diseases and mental health conditions.  His doctors, including his primary care physician, internist, and gastroenterologist, are all located in New York.

80.     On June 18, 2009, Mr. Muthanna flew from Rochester to Yemen without incident in order to visit his wife and children.  He planned to return to the United States by flying from Aden to New York via Jeddah.

16 – THIRD AMENDED COMPLAINT

81.    On May 31, 2010, Mr. Muthanna flew from Aden to Jeddah without incident. On June 3, he went to the airport for his flight to New York. Mr. Muthanna attempted to check in, but was told by an airline employee that he was not permitted to fly to the United States. A Saudi immigration official confirmed that he was prohibited from boarding his flight.

82.    Mr. Muthanna flew back to Yemen. An official at the U.S. Embassy in Sana'a told him that he was on a U.S. government list of people who were not permitted to fly.

83.    On September 29, 2010, Mr. Muthanna ultimately returned home to Rochester through what is understood to be a "one-time" waiver from U.S. authorities to fly to the United States. In Rochester, Mr. Muthanna received needed medical care, and worked in a clothing store and in wholesale to support his family. After being separated from his wife and children for more than one year, however, Mr. Muthanna missed his family and sought to fly to Yemen to visit them.

84.    On June 18, 2012, Mr. Muthanna attempted to check in for his flight from New York to Abu Dhabi. He was denied a boarding pass.

85.    Distraught by his separation from his family, Mr. Muthanna sought to travel from New York to Yemen by boat and over land. He booked a thirty-six-day long passage by cargo freighter from Philadelphia to Jebel Ali, United Arab Emirates via Antwerp, Belgium. He hoped to travel from Jebel Ali to Yemen by car or bus.

86.    Mr. Muthanna traveled from Rochester to Philadelphia by car. On August 12, 2012, after Mr. Muthanna had boarded the cargo freighter in the Philadelphia port, the captain denied him passage. The captain informed Mr. Muthanna that his decision was based on the recommendation of U.S. Customs and Border Protection, and that Mr. Muthanna would be denied passage on the freighter sailing from Antwerp to Jebel Ali for the same reason. Upon

17 – THIRD AMENDED COMPLAINT

information and belief, CBP recommended that Mr. Muthanna be denied passage on these ships because his name is on the No Fly List.

87. Mr. Muthanna has found no way to travel from the United States to Yemen without flying from the United States or over U.S. airspace, or sailing from a U.S. port.

88. Mr. Muthanna submitted a DHS TRIP complaint concerning his denial of passage on the ship and was assigned a Redress Control Number. DHS TRIP has not issued him a determination letter regarding this complaint.

**Nagib Ali Ghaleb**

89. Plaintiff Nagib Ali Ghaleb moved to the United States from Yemen in 1996 and is a naturalized U.S. citizen. He works in San Francisco as a janitor.

90. Mr. Ghaleb's wife and four children, one of whom is a U.S. citizen, live in Yemen. Mr. Ghaleb flew from California to Yemen in August 2009 to visit his family and to meet with the U.S. consul there in hopes of finding out the reason for the delay in processing his wife's and children's visa applications. Mr. Ghaleb planned to fly home to San Francisco in February 2010 so that he could resume his work.

91. On February 16, 2010, Mr. Ghaleb flew from Sana'a to Frankfurt without incident. At Frankfurt Airport, Mr. Ghaleb was denied boarding on his flight to San Francisco. Two U.S. officials who, upon information and belief, were FBI agents met Mr. Ghaleb at the check-in counter and told him that he would not be permitted to fly to the United States.

92. Mr. Ghaleb flew back to Sana'a. An official at the U.S. Embassy in Sana'a told him that he was not permitted to board flights to the United States.

93. Mr. Ghaleb was subsequently questioned at the U.S. Embassy by two officials, one of whom, upon information and belief, was an FBI agent. The interrogators knew details

18 – THIRD AMENDED COMPLAINT

about Mr. Ghaleb's life, including the names of mosques he attended in the Bay Area, that he was a highly regarded soccer player and was well-known in the Bay Area Yemeni community, and that he had been trying for a long time to bring his family to the United States. The interrogators offered to arrange for Mr. Ghaleb to fly back to the United States immediately if he would agree to tell them who the "bad guys" were in Yemen and in San Francisco. The interrogators insisted that Mr. Ghaleb could provide the names of people from his mosque and his community. When Mr. Ghaleb told the interrogators that he was not interested in spying on the Yemeni community, they told Mr. Ghaleb that if he did not cooperate, they would have him arrested and jailed in Yemen. They advised him to "think about it."

94.    On May 3, 2010, Mr. Ghaleb again attempted to fly home to San Francisco. He flew without incident from Sana'a to Dubai. In Dubai, he was denied boarding on his flight to San Francisco. Dubai police told Mr. Ghaleb that he was on the No Fly List.

**Mashaal Rana**

95.    Plaintiff Mashaal Rana was born and raised in New York. Her parents and three brothers are all U.S. citizens and live in New York.

96.    In 2008, Ms. Rana graduated from Hunter College with a degree in community health medicine. She sought to pursue a master's degree in Islamic Studies and enrolled in the International Islamic University of Islamabad, which was located near her extended family in Pakistan.

97.    In January 2009, Ms. Rana flew to Pakistan. After attending the International Islamic University for several months, she decided to return home to the United States. Ms. Rana purchased tickets to fly from Lahore, Pakistan to New York via Manchester, United Kingdom.

19 – THIRD AMENDED COMPLAINT

98.    On February 17, 2010, Ms. Rana went to the Lahore airport with her parents. Moments before the family reached the ticketing counter, Ms. Rana's mother received a call on her mobile phone from an airline official who said that Ms. Rana would be denied boarding.  The official said that he saw Ms. Rana's name on a security list.

99.    Ms. Rana went to the U.S. Embassy in Islamabad.  FBI agents in Pakistan subsequently questioned her on four separate occasions.  An FBI official told Ms. Rana's father that if Ms. Rana agreed to be questioned by the FBI, he could "look into" getting her name taken off "the list."

100.    Ms. Rana was married in Pakistan in July 2010.  She became pregnant in April 2012.

101.    In October 2012, Ms. Rana sought to fly back to the United States to deliver her child and access needed medical care.  She contacted U.S. Embassy officials to request a "waiver" to return to the United States by plane.  Three weeks before her intended travel date, Ms. Rana's brother provided her proposed itinerary to an FBI agent.  The agent told Ms. Rana's brother that she was cleared to fly on the proposed flights.

102.    On the morning of Ms. Rana's scheduled November 3, 2012 flight, the FBI agent called Ms. Rana's brother and told him that Ms. Rana would be denied boarding on her flight.

103.    Ms. Rana remains in Pakistan.

**Mohamed Sheikh Abdirahman Kariye**

104.    Plaintiff Mohamed Sheikh Abdirahman Kariye is a U.S. citizen and the imam, or religious leader, of Masjid As-Saber, also known as The Islamic Center of Portland.  His job requires him to travel by commercial air to several speaking engagements and conferences each year.

105.    In early 2010, Mr. Kariye sought to visit his daughter, who is a high school student in Dubai.  He booked tickets to travel by plane from Portland to Dubai, via Amsterdam.

106.    On March 8, 2010, Mr. Kariye was denied boarding on his flight to Amsterdam at the Portland International Airport.  An airline employee told Mr. Kariye that he could not fly because he was on a government watch list.

### Ibraheim (Abe) Mashal

107.    Plaintiff Ibraheim (Abe) Mashal was born and raised in the United States and lives in St. Charles, Illinois with his wife and three children.  Since his honorable discharge from the U.S. Marine Corps in 2003, Mr. Mashal has worked as a traveling dog trainer.

108.    Mr. Mashal has provided dog-training services to clients in twenty-three U.S. states.  He often receives new clients through referrals from satisfied customers.

109.    In early 2010, a woman in Spokane, Washington hired Mr. Mashal to train her dog.  She paid for his round-trip air travel from Chicago to Spokane, his hotel accommodations in Spokane, and his dog-training services fee.  Mr. Mashal planned to fly from Chicago to Spokane via Salt Lake City for the job.

110.    On April 20, 2010, Mr. Mashal was denied boarding on his flight to Spokane at Chicago's Midway Airport.  The ticketing agent told Mr. Mashal that he was on the No Fly List and that he would not be able to board any flights.

111.    Several days later, Mr. Mashal's client in Spokane requested a refund after having been questioned about Mr. Mashal by an FBI agent.  Mr. Mashal returned approximately $2,000 to the client.

112.    On June 23, 2010, two FBI agents told Mr. Mashal that if he would help the FBI by serving as an informant, his name would be removed from the No Fly List and he would

receive compensation.  When Mr. Mashal asked to speak with them in the presence of his attorney, the agents promptly ended the meeting.

### Salah Ali Ahmed

113.   Plaintiff Salah Ali Ahmed is of Somali and Yemeni descent and was born and raised in Somalia.  He moved to Atlanta in 1992 and became a naturalized U.S. citizen in 2007.  His U.S.-citizen wife and six children, five of whom are U.S. citizens and one of whom is a lawful permanent resident, live with him in Norcross, Georgia, where he works as an electrical technician.  His siblings, nieces, nephews, and other relatives live in Yemen.

114.   Mr. Ahmed planned to fly to Yemen for a four-week vacation to visit relatives.  He was scheduled to fly from Atlanta to Sana'a via Frankfurt on July 16, 2010 and to return on August 16, 2010.

115.   On July 16, 2010, Mr. Ahmed was denied boarding on his flight to Frankfurt at Hartsfield-Jackson Atlanta International Airport.  An airline employee told Mr. Ahmed that his passport was "flagged" and that he would not be permitted to board any flight.

116.   A TSA officer also told Mr. Ahmed that he was "flagged" and that he would not be allowed to board any flights.  The officer told Mr. Ahmed that he could travel by car, but that he could not leave the country by plane.

### Amir Meshal

117.   Plaintiff Amir Meshal was born and raised in New Jersey.  He currently works as a bus driver in Minnesota.

118.   In or around May 2009, Mr. Meshal planned to travel from New Jersey to Orange County, California to visit friends.

22 – THIRD AMENDED COMPLAINT

119.    On June 9, 2009, Mr. Meshal was denied boarding on his flight to Irvine, California at Newark International Airport.

120.    Approximately thirty uniformed and plainclothes officers surrounded Mr. Meshal at the check-in counter.  One officer, who identified himself as an FBI agent, informed Mr. Meshal that he was on a government list that prohibited him from flying.

121.    FBI agents subsequently offered Mr. Meshal the opportunity to serve as a government informant and, in exchange, promised to help remove him from the No Fly List, among other things.  One agent told Mr. Meshal: "If you help us, we can help get you off of the No Fly List."

**Stephen Durga Persaud**

122.    Plaintiff Stephen Durga Persaud is a registered nurse who lives with his wife and children in Irvine, California.

123.    Mr. Persaud moved with his family to St. Thomas in the U.S. Virgin Islands in January 2007 to visit family and attend nursing school.  They planned to return to California in May 2010 so that Mr. Persaud's wife could deliver their second child there and so that Mr. Persaud could attend a graduate program in nursing.  Mr. Persaud purchased tickets for the family to fly from St. Thomas to Irvine with a change of planes in Miami.

124.    On May 11, 2010, Mr. Persaud, his wife, and their sixteen-month old son went to the airport in St. Thomas to commence their trip home.  Mr. Persaud was denied boarding on his flight.

125.    Five government officials, including four FBI agents, appeared and surrounded Mr. Persaud, his wife, and their son at the airport.  An FBI agent informed Mr. Persaud that he was on the No Fly List.

23 – THIRD AMENDED COMPLAINT

126.    Mr. Persaud's wife and son flew to Irvine.  Mr. Persaud remained in St. Thomas, unable to board a plane.

127.    Desperate to join his family in Irvine before the birth of his second child, Mr. Persaud commenced a nine-day journey by ship and train on June 1, 2010.  He reached home after traveling for five days by ship from St. Thomas to Miami and for four days by train from Miami to Los Angeles.

128.    An FBI agent followed Mr. Persaud during his journey.  On the ship, the agent told Mr. Persaud that his name would remain on the No Fly List and that the "problem" would be resolved only if Mr. Persaud cooperated with the FBI.  The agent told Mr. Persaud, "There is no judicial process for getting off the No Fly List.  The only way to get off the list is to talk to us."

**Common Post Denial-of-Travel Allegations**

129.    After Plaintiffs Ahmed, Ghaleb, Kashem, Knaeble, Latif, Mohamed, Mashal, Rana, and Washburn were prevented from flying, U.S. officials known or believed to be FBI agents questioned each of them about their religious beliefs, religious practices, political opinions, academic studies, reading and writing on the internet and in email, and/or associations with persons of particular ethnic, national origin, or religious backgrounds.  Upon information and belief, these Plaintiffs' religious beliefs and practices, political opinions, academic studies, reading and writing on the internet and in email, and associations with others formed a basis for the government's decision to include them on the No Fly List.

130.    Subsequent to each Plaintiff first being denied travel via commercial aircraft to or from the United States, or over U.S. airspace, each Plaintiff completed at least one DHS TRIP form online and was assigned at least one Redress Control Number.  Each Plaintiff received a letter as described in paragraph 38 above.

24 – THIRD AMENDED COMPLAINT

131.    Each Plaintiff has exhausted administrative remedies.

132.    Following the commencement of this action and shortly after the filing of an August 16, 2010 preliminary injunction motion, U.S. officials communicated with those Plaintiffs who were still abroad, except for Plaintiff Rana, and instructed them to make the necessary travel arrangements to return to the United States under what was understood to be a "one-time waiver."  On November 10, 2012, U.S. officials communicated with Ms. Rana in Pakistan and instructed her to make the necessary travel arrangements to return to the United States under what was understood to be a "one-time waiver."

133.    All Plaintiffs who were unable to return home due to their inability to fly commercial airlines to or from the United States, or over U.S. airspace, have now done so except Plaintiffs Kashem, Mohamed, and Rana.

134.    Plaintiffs Kashem, Mohamed, and Rana have not returned to the United States because Defendants have expressly refused to make any assurances about future travel. Plaintiffs Kashem and Mohamed fear that if they return to the United States, they will be unable to fly back to Saudi Arabia to resume their studies.  Plaintiff Rana fears that if she returns to the United States, she will be unable to fly back to Pakistan, where her husband resides.

135.    Plaintiffs do not present a security threat to commercial aviation.  Plaintiffs do not know of any reason why they would be placed on the No Fly List.

136.    All of the Plaintiffs believe they are still on the No Fly List.

137.    Because Defendants have barred Plaintiffs from flying commercial airlines to and from the United States, and over U.S. airspace, Plaintiffs have suffered, and continue to suffer, various types of harm including the inability to travel domestically and internationally for familial, educational, social, religious, legal, business and employment reasons.

25 – THIRD AMENDED COMPLAINT

## FIRST CLAIM FOR RELIEF

## FAILURE TO PROVIDE POST-DEPRIVATION NOTICE AND HEARING IN VIOLATION OF THE FIFTH AMENDMENT RIGHT TO PROCEDURAL DUE PROCESS
(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

138.    Each of the Plaintiffs learned that he or she was placed on the No Fly List and sought to challenge such placement.

139.    Defendants' actions as described above in refusing to provide Plaintiffs with any reason or basis for their placement on the No Fly List and in refusing to provide Plaintiffs with a meaningful opportunity to challenge their continued inclusion on the No Fly List deprive Plaintiffs of constitutionally protected liberty interests, including but not limited to those identified in paragraphs 140, 141, and 142 below.

140.    Plaintiffs have a liberty interest in traveling free from unreasonable burdens within, to, and from the United States, and over U.S. air space.

141.    Plaintiffs have a right to be free from false governmental stigmatization as individuals who are "known or suspected to be" terrorists, or who are otherwise associated with terrorist activity, when such harm arises in conjunction with the deprivation of their right to travel on the same terms as other travelers and/or the deprivation of their liberty interest under the Fifth Amendment in travel free from unreasonable burdens.

142.    Plaintiffs have a liberty interest in nonattainder (i.e., the interest against being singled out for punishment without trial).  Defendants' actions have singled out Plaintiffs for punishments that include, but are not limited to, inability to travel by air to and from the United States, and over U.S. airspace, false association with a list of individuals suspected of terrorism, involuntary exile from the United States, and effective expatriation from the United States.

26 – THIRD AMENDED COMPLAINT

143.    Plaintiffs, having been denied boarding on commercial flights and having sought to challenge their placement on the No Fly List, are entitled to a constitutionally adequate legal mechanism that affords them notice of the reasons and bases for their placement on the No Fly List and a meaningful opportunity to contest their continued inclusion on the No Fly List.

144.    By failing to provide Plaintiffs with such a constitutionally adequate legal mechanism, Defendants have deprived Plaintiffs of their protected liberty interests, including but not limited to their liberty interests in traveling, freedom from false stigmatization, and nonattainder, and thus have violated Plaintiffs' constitutional rights without affording them due process of law and will continue to do so into the future if Plaintiffs are not afforded the relief demanded below.

## SECOND CLAIM FOR RELIEF

### DEPRIVATION OF PROTECTED LIBERTIES IN VIOLATION OF FIFTH AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

145.    Because Plaintiffs do not present a security threat to commercial aviation, Defendants' actions as described above in including Plaintiffs on a watch list that prevents them from boarding commercial flights to and from the United States, and over U.S. airspace, are arbitrary, lack even a rational relationship to any legitimate government interest, and have unreasonably deprived Plaintiffs of constitutionally protected rights, including their liberty interests in travel, freedom from false stigmatization, and nonattainder.

146.    Defendants have thus violated Plaintiffs' constitutional rights without affording them due process of law and will continue to do so into the future if Plaintiffs are not afforded the relief demanded below.

27 – THIRD AMENDED COMPLAINT

**THIRD CLAIM FOR RELIEF**

**UNLAWFUL AGENCY ACTION IN VIOLATION OF
THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 702, 706
(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**

147.    Defendants' actions described herein were and are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

148.    Defendants' failure to provide Plaintiffs, who had been denied boarding on commercial flights and sought to challenge their placement on the No Fly List, with a constitutionally adequate mechanism that affords them notice of the reasons and bases for their placement on the No Fly List and a meaningful opportunity to contest their continued inclusion on the No Fly List is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

149.    Because Plaintiffs do not present a security threat to commercial aviation, Defendants' actions as described above in including Plaintiffs on a watch list that prevents them from boarding commercial flights to and from the United States, and over U.S. airspace, are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request:

1.    A declaratory judgment that Defendants' policies, practices, and customs violate the Fifth Amendment to the United States Constitution and the Administrative Procedure Act;

28 – THIRD AMENDED COMPLAINT

2.       An injunction that:

    a.   requires Defendants to remedy the constitutional and statutory violations identified above, including the removal of Plaintiffs from any watch list or database that prevents them from flying; and

    b.   requires Defendants to provide Plaintiffs with a legal mechanism that affords them notice of the reasons and bases for their placement on the No Fly List and a meaningful opportunity to contest their continued inclusion on the No Fly List.

3.       An award of attorneys' fees, costs, and expenses of all litigation, pursuant to 28 U.S.C. § 2412; and

4.       Such other and further relief as the Court may deem just and proper.

DATED this January 11, 2013

Respectfully submitted,

/s/ Hina Shamsi
Hina Shamsi (Admitted *pro hac vice*)
Email: hshamsi@aclu.org
Nusrat Jahan Choudhury (Admitted *pro hac vice*)
Email: nchoudhury@aclu.org
**American Civil Liberties Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 519-2500; Fax: (212) 549-2654

Steven M. Wilker, OSB No. 911882
Email: steven.wilker@tonkon.com
**Tonkon Torp LLP**
1600 Pioneer Tower
888 SW 5th Avenue
Portland, OR 97204
Tel.: (503) 802-2040; Fax: (503) 972-3740
Cooperating Attorney for the ACLU Foundation of Oregon

Kevin Díaz, OSB No. 970480
Email: kdiaz@aclu-or.org
**ACLU Foundation of Oregon**

29 – THIRD AMENDED COMPLAINT

P.O. Box 40585
Portland, OR  97240
Tel.: (503) 227-6928; Fax: (503) 227-6948

Ahilan T. Arulanantham (Admitted *pro hac vice*)
Email: aarulanantham@aclu-sc.org
Jennifer Pasquarella (Admitted *pro hac vice*)
Email: jpasquarella@aclu-sc.org
**ACLU Foundation of Southern California**
1313 West Eighth Street
Los Angeles, CA 90017
Tel.: (213) 977-9500; Fax: (213) 977-5297

Alan L. Schlosser  (Admitted *pro hac vice*)
Email: aschlosser@aclunc.org
Julia Harumi Mass  (Admitted *pro hac vice*)
Email: jmass@aclunc.org
**ACLU Foundation of Northern California**
39 Drumm Street
San Francisco, CA 94111
Tel.: (415) 621-2493; Fax: (415) 255-8437

Laura Schauer Ives (Admitted *pro hac vice*)
Email: lives@aclu-nm.org
**ACLU Foundation of New Mexico**
P.O. Box 566
Albuquerque, NM 87103
Tel.: (505) 243-0046; Fax: (505) 266-5916

Mitchell P. Hurley (Admitted *pro hac vice*)
Email:  mhurley@akingump.com
Christopher M. Egleson (Admitted *pro hac vice*)
Email:  cegleson@akingump.com
Justin H. Bell (Admitted *pro hac vice*)
Email:  jbell@akingump.com
**Akin Gump Strauss Hauer & Feld LLP**
One Bryant Park
New York, NY 10036
Tel.:  (212) 872-1011; Fax: (212) 872-1002

Attorneys for Plaintiffs: Ayman Latif, Mohamed Sheikh
Abdirahman Kariye, Raymond Earl Knaeble IV, Faisal
Nabin Kashem, Elias Mustafa Mohamed, Steven William
Washburn, Abdullatif Muthanna, Nagib Ali Ghaleb,
Mashaal Rana, Ibraheim Y. Mashal, Salah Ali Ahmed,
Amir Meshal, and Stephen Persaud

30 – THIRD AMENDED COMPLAINT