STUART F. DELERY
Acting Assistant Attorney General

DIANE KELLEHER
Assistant Branch Director

AMY POWELL
amy.powell@usdoj.gov
LILY FAREL
lily.farel@usdoj.gov
SCOTT RISNER
scott.risner@usdoj.gov
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W
Washington, D.C.  20001
Phone: (202) 514-2395
Fax:    (202) 616-8470
*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# DISTRICT OF OREGON

| AYMAN LATIF, et al.,<br><br>          *Plaintiffs,* | Case 3:10-cv-00750-BR |
|---|---|
| v.<br><br>ERIC H. HOLDER, JR.,  et al.,<br><br>          *Defendants.* | **MEMORANDUM IN OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 4

I.  The Redress Process Adequately Protects The Right To Travel While Ensuring That The Government's National Security Interests Are Met ..................................................... 4

  A.  Plaintiffs Have Not Articulated a "Private Interest" That Requires More Than What the Current Redress Process Provides .................................................. 5

    1.  Terrorism Screening Does Not Deprive Plaintiffs of Any Liberty Interest in Travel ........................................................................... 6

    2.  Plaintiffs Have Not Shown Any Stigma Resulting in a Dimunition of Rights Guaranteed by State Law ........................................... 10

  B.  There Is Little Risk Of Erroneous Deprivation, Given The Quality Controls And Review Procedures Implemented By The Government ................................ 11

  C.  The Existing Process Appropriately Balances The Government's Substantial Interest In National Security and the Importance of Effective Counterterrorism Efforts with the Protections Of Due Process ........................... 16

    1.  Plaintiffs Fail To Recognize The Government's Substantial Interest in Protecting National Security Through Effective Security Screening ........................................................................... 17

    2.  Defendants Can Neither Confirm Nor Deny Placement on a Watchlist ........................................................................... 20

    3.  Defendants Need Not Disclose the Substantive Reasons for Inclusion on a Watchlist or Otherwise Provide Classified Information ........................................................................... 24

    4.  In These Circumstances, Due Process Does Not Require Additional Notice or Hearing ..................................................... 28

II.  The Government's Redress Policy Is Not Arbitrary, Capricious, Or Contrary to Law.... 31

CONCLUSION ..................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**

*Asarco, Inc. v. U.S. Envt'l Prot. Agency,*
  616 F.2d 1153 (9th Cir. 1980) ........................................................ 34

*Al Haramain Islamic Found. v. Dep't of Treasury,*
  686 F.3d 965 (9th Cir. 2012) ......................................................... 23

*Am.-Arab Anti-Discrimination Comm. v. Reno,*
  70 F.3d 1045, (9th Cir. 1995) ........................................................ 30

*Aptheker v. Sec'y of State,*
  378 U.S. 500 (1964) .................................................................... 7

*Arjmand v. DHS,*
  No. 12-71748 (9th Cir. filed June 2012) ...................................... 13, 31

*Armstrong v. Manzo,*
  380 U.S. 545 (1965) ................................................................. 4, 16

*Banco Nacional de Cuba v. Sabbatino,*
  376 U.S. 398 (1964) .................................................................... 9

*Boddie v. Connecticut,*
  401 U.S. 371 (1971) ................................................................... 17

*Buckingham v. Sec'y of U.S. Dep't of Agric.,*
  603 F.3d 1073 (9th Cir. 2010) ....................................................... 32

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ................................................................... 18

*Clapper v. Amnesty International USA,*
  133 S. Ct. 1138 (2013) ............................................................... 22

*Cleveland Bd. of Educ. v. Loudermill,*
  470 U.S. 532 (1985) ........................................................ 2, 17, 28, 30

*DeNieva v. Reyes,*
  966 F.2d 480 (9th Cir. 1992) ......................................................... 7

*Dep't of the Navy v. Egan,*
  484 U.S. 518 (1988) ............................................................... 25, 35

*Doe v. City of Lafayette, Ind.,*
  377 F.3d 757 (7th Cir. 2004) ......................................................... 6

*Dorfmont v. Brown,*
  913 F.2d 1399 (9th Cir. 1990) ....................................................... 25

*Fla. Power & Light Co. v. Lorion,*
   470 U.S. 729 (1985) ........................................................................................ 34

*Gilbert v. Homar,*
   520 U.S. 924 (1997) ........................................................................... 4, 6, 17, 19

*Gilmore v. Gonzales,*
   435 F.3d 1125 (9th Cir. 2006) ................................................................ 6, 7, 23

*Global Relief Found., Inc. v. O'Neill,*
   315 F.3d 748 (7th Cir. 2002) ............................................................................ 29

*Goldberg v. Kelly,*
   397 U.S. 254 (1970) ......................................................................................... 18

*Goss v. Lopez,*
   419 U.S. 565 (1975) ......................................................................................... 18

*Green v. Transp. Sec. Admin.,*
   351 F. Supp. 2d 1119 (W.D. Wash. 2005) ...................................................... 11

*Haig v. Agee,*
   453 U.S. 280 (1981) ............................................................................... 7, 17, 20

*Hamdi v. Rumsfeld,*
   542 U.S. 507 (2004) ................................................................................... 29, 30

*Hernandez v. Cremer,*
   913 F.2d 230 (5th Cir. 1990) ..................................................................... 8, 30, 31

*Holder v. Humanitarian Law Project,*
   130 S. Ct. 2705 (2010) ................................................................................ 17, 20

*Holy Land Found. for Relief & Dev. v. Ashcroft,*
   333 F.3d 156 (D.C. Cir. 2003) ........................................................................ 23

*Hunt v. CIA,*
   981 F.2d 1116 (9th Cir. 1992) .................................................................... 20, 21

*Ibrahim v. DHS,*
   538 F.3d 1250 (9th Cir. 2008) ......................................................................... 13

*Ibrahim v. Dep't of Homeland Sec.,*
   No. C 06-00545 WHA (N.D. Cal. Feb. 15, 2013) ..................................... 23, 25

*Ibrahim v. DHS,*
   2012 WL 6652362 ............................................................................................ 24

*In re Gault,*
   387 U.S. 1 (1967) ............................................................................................. 30

*In re Guantanamo Bay Detainee Litig.*,
  2009 WL 50155 (D.D.C. Jan 9, 2009) .......................................................... 27

*In re Guantanamo Detainee Cases*,
  344 F. Supp. 2d 174 (D.D.C. 2004) ............................................................ 27

*In re Sealed Case*,
  856 F.2d 268 (D.C. Cir. 1988) .................................................................... 26

*In re U.S. Dep't of Homeland Security*,
  459 F.3d 565 (5th Cir. 2006) ....................................................................... 26

*Irvine Med. Ctr. v. Thompson*,
  275 F.3d 823 (9th Cir. 2002) ....................................................................... 32

*Jifry v. FAA*,
  370 F.3d 1174 (D.C. Cir. 2004) ................................................................... 29

*Jones v. Flowers*,
  547 U.S. 220 (2006) ..................................................................................... 17

*Latif v. Holder*,
  686 F.3d 1122 (9th Cir. 2012) ..................................................................... 13

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ............................................................................ 4, 5, 31

*Memphis Light, Gas and Water Div. v. Craft*,
  436 U.S. 1 (1978) ......................................................................................... 18

*Miller v. Cal. Dep't of Soc. Servs.*,
  355 F.3d 1172 (9th Cir. 2004) ..................................................................... 10

*Milner v. Dep't of Navy*,
  131 S. Ct. 1259 (2011) ................................................................................. 26

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*,
  463 U.S. 29 (1983) ....................................................................................... 32

*Munaf v. Geren*,
  553 U.S. 674 (2008) ....................................................................................... 9

*Nat'l Council of Resistance of Iran v. Dep't of State*,
  251 F.3d 192 (D.C. Cir. 2001) ............................................................... 17, 23

*Paul v. Davis*,
  424 U.S. 693 (1976) ..................................................................................... 10

*Rahman v. Chertoff*,
  2010 WL 1335434 (N.D. Ill. Mar. 31, 2010) ............................................. 24

*Rahman v. Chertoff*,
  244 F.R.D. 443 (N.D. Ill. 2007) ................................................................. 24

*Rahman v. Chertoff*,
    530 F.3d 622 (7th Cir. 2008) .................................................................. 24

*Rahman v. Chertoff*,
    2008 WL 4534407 (N.D. Ill. Apr. 16, 2008) ...................................... 24

*Records Litig.*,
    671 F.3d 881 (9th Cir. 2011) .................................................................. 17

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ................................................................................ 30

*Stehney v. Perry*,
    101 F.3d 925 (3d Cir. 1996) .................................................................. 29

*U.S. v. Marquez*,
    410 F.3d 612 (9th Cir. 2005) .................................................................. 18

*Ulrich v. City & County of San Francisco*,
    308 F.3d 968 (9th Cir. 2002) .................................................................. 10

*United States v. Hawkins*,
    249 F.3d 867 (9th Cir. 2001) .................................................................. 20

*United States v. Reynolds*,
    345 U.S. 1 (1953) .................................................................................... 28

*Velez v. Levy*,
    401 F.3d 75 (2d Cir. 2005) .................................................................... 11

*Wayte v. U.S.*,
    470 U.S. 598 (1985) ................................................................................ 17

**Statutes**

5 U.S.C. § 706 ............................................................................................ 32

6 U.S.C. § 111 ............................................................................................ 32

18 U.S.C. app. III ...................................................................................... 28

49 U.S.C. § 114 .......................................................................... 22, 26, 32, 33

49 U.S.C. § 44903 ...................................................................................... 33

**Regulations**

8 C.F.R. § 235.12(b)(2) .............................................................................. 21

19 CFR §§ 4.7b ............................................................................................ 8

19 CFR § 4.64 .............................................................................................. 8

49 C.F.R. § 1520.5(a)(3) ............................................................................ 25

49 C.F.R. § 1520.9(a)(2) ............................................................................ 26

## INTRODUCTION

Plaintiffs in this case are thirteen individuals who allege that they have been denied boarding on flights to, from, and, within the United States and who assume, therefore, that they are on the No Fly List.  They contend that the government has denied them the right to fly without adequate procedural protection.  Plaintiffs' arguments fail as a matter of law.[1]

First, Plaintiffs overstate the liberty interests at issue in the security screening undertaken for air travel.  There is no right to travel by any particular means, such as an airplane, nor is there a cognizable liberty interest in traveling by the most convenient or preferred method.  The No Fly List and the Terrorist Screening Database ("TSDB") are utilized to ensure that air travel is safe and secure, and to leave individuals on a watchlist free to travel by other means.  A review of Plaintiffs' challenge to the procedures available for individuals who allege placement on a terrorist watchlist must account for the limited private interests that exist in air travel.

Second, there is little risk of erroneous deprivation of those interests.  Plaintiffs' briefs rely at length on several outdated reports that describe the TSDB as it existed years ago.  These reports have little application here, as Plaintiffs themselves allege that they were able to fly without incident until at least January 2009.  *See* Pls.' Opp'n 6; Pls.' Mot. 5.  Moreover, the government has, since the issuance of the reports identified by Plaintiffs, strengthened the quality

---

[1] The arguments in this memorandum are submitted both in the reply in support of Defendant's motion for partial summary judgment, ECF No. 85, and the opposition to Plaintiffs' cross-motion for partial summary judgment, ECF No. 91.  This memorandum also addresses additional arguments relevant to the parties' motions raised in the amicus brief filed by The Constitution Project ("TCP"), ECF No. 99.  For a complete statement of the statutory and regulatory background, the Court is respectfully referred to Defendants' memorandum in support of their motion for partial summary judgment.  *See* ECF No. 85-1, at 4-9.

controls applied to the TSDB and further developed the redress process available to individuals who are delayed or denied boarding.

Most importantly, Plaintiffs' argument fails because it improperly weighs the governmental interests at issue. Plaintiffs' briefs evince a flawed and overly rigid understanding of procedural due process protections. Due process procedures may vary "depending upon the importance of the interests involved and the nature of the subsequent proceedings," *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985), yet Plaintiffs' analysis of governmental interests is disconnected from the effect that additional procedures will have on those interests. Plaintiffs seem content to rest on the assertion that due process requires "more" than what is currently provided, but they cannot simultaneously request additional protections and disclaim the consequences of those measures.

While Plaintiffs do not specify precisely what they believe due process requires, the broad contours of their argument are clear. Plaintiffs contend that the government must confirm whether they are on the No Fly List and, if they are, provide them with the reasons for their inclusion and an opportunity to rebut that information. A consideration of each requested measure shows that its potential impact on national security is serious. As Defendants' motion and declaration demonstrate, protecting watchlist status and the information underlying particular individuals' inclusion on the list is crucial to the government's counterterrorism efforts. *See* Defs.' Mot. 23-28. Plaintiffs contend that there are "calibrated tools" that could minimize the harms of disclosure. *See* Pls.' Opp'n 32; Pls.' Mot. 10. But they fail to identify those tools or explain how they would be utilized here, and they do not explain how, in this context, there is any way that the government could be required to disclose information –

2 – MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
Latif v. Holder, No. 3:10-cv-00750-BR

including classified information – without raising all of the concerns identified in Defendants'

motion.  And while Plaintiffs contend that they personally are of no concern to those responsible

for maintaining government watchlists – an assertion which Defendants neither confirm nor deny

– the additional procedural measures they call for would be made available to anyone, including

those individuals who are of such concern.  Plaintiffs do not account for the indisputable fact that

the procedures they demand would require the disclosure of privileged and classified information

to terrorists included on the No Fly List.

Plaintiffs' argument is, at bottom, that "more" process must be provided, without a proper

consideration of the implication that additional measures would have for the national security

interests at issue.  Plaintiffs rely on cases about the deprivation of monetary benefits or the

imposition of punitive measures, but such analogies demonstrate a fundamental

misunderstanding of the interests at issue.  Through the administration of the TSDB and the No

Fly List, the government does not seek to punish anyone or take anything away from anyone;

rather, the government seeks to prevent additional terrorist attacks and to ensure the safety and

security of the traveling public.  Security screening is inherently predictive and raises interests

and concerns that are far different than the suspension of government benefits.  A proper

balancing of the private and governmental interests demonstrates that the government's redress

process comports with any procedural due process owed to Plaintiffs.  Plaintiffs' response and

cross-motion fail to show otherwise, and judgment should be entered for Defendants.

<u>**ARGUMENT**</u>

I.    **THE REDRESS PROCESS ADEQUATELY PROTECTS THE RIGHT TO TRAVEL WHILE ENSURING THAT THE GOVERNMENT'S NATIONAL SECURITY INTERESTS ARE MET.**

The fundamental requirement of due process is "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  But "due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances."  *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (internal citation omitted).  In evaluating whether the government has provided due process, the Court should consider three factors: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Mathews*, 424 U.S. at 335.

Plaintiffs fail to show a deprivation of due process, for several reasons.  First, they overstate the private interests at issue, as they do not identify a constitutionally-protected liberty interest implicated by security screening for air travelers.  While they point to cases concerning the right to travel, they fail to account for the fact that there is no right to travel by particular means, such as an airplane.  That air travel has become a more convenient or preferred means of travel does not mean that it has risen to the level of a constitutional right, and security screening does not lead to the deprivation of a liberty interest.

Even assuming Plaintiffs have alleged the deprivation of a constitutionally-protected liberty interest, they have not shown that the process available is insufficient. The current redress process and subsequent judicial review comport to the standard outlined in *Mathews*. 424 U.S. at 335. The current administrative redress process provides individuals with multiple layers of review, designed to ensure that individuals are appropriately watchlisted when there is a need to do so. These layers of review are sufficient to diminish or negate the possibility of erroneous deprivation. Moreover, the process afforded to Plaintiffs and any individual who alleges that they are on the No Fly List is appropriate given the significant national security concerns at stake in this inquiry. Summary judgment should therefore be entered for Defendants.

### A.     Plaintiffs Have Not Articulated a "Private Interest" That Requires More Than What the Current Redress Process Provides.

Plaintiffs advance two arguments in support of their contention that the private interests at issue require additional process beyond what is already provided. First, they contend that security screening significantly diminishes their liberty interests in traveling. Second, they contend that they have suffered a due process violation in the form of a reputational injury resulting from being stigmatized "in conjunction with their right to travel on the same terms as other travelers." Third Am. Compl., ¶ 141. Each argument fails.[2] The Constitution does not guarantee U.S. citizens a right to the most convenient means of travel, nor does it create a liberty interest in travel by airplane in particular. As a result, any liberty interest Plaintiffs have in

---

[2] Defendants' motion also explains that Plaintiffs cannot show that terrorism screening constitutes a bill of attainder. *See* Defs.' Mot. 16-17. Plaintiffs' briefs indicate that they no longer rely on that argument in support of their procedural due process claim. *See* Pls.' Opp'n 9 n.19; Pls.' Mot. 8 n.19.

traveling has not been significantly diminished by virtue of security screening for air travelers. The private interests advanced by Plaintiffs do not require any additional process beyond what is already provided, and Plaintiffs' claim of a reputational injury fails as a matter of law.

**1.    Terrorism Screening Does Not Deprive Plaintiffs of Any Liberty Interest in Travel.**

In considering due process, courts look first to "the private interest that will be affected by the official action." *Gilbert*, 520 U.S. at 924. Defendants' motion explains that the private interests advanced by Plaintiffs do not require any additional process because any liberty interest Plaintiffs have in traveling has not been significantly diminished. As the Ninth Circuit has held, there is no constitutional right to travel by plane. *Gilmore v. Gonzales*, 435 F.3d 1125, 1137 (9th Cir. 2006) ("Gilmore does not possess a fundamental right to travel by airplane even though it is the most convenient mode of travel for him.").

Plaintiffs have not alleged the deprivation of a right or liberty interest recognized by law. Instead, they contend that any action that "burdens the liberty interest in travel . . . triggers the need for procedural safeguards against undue deprivations." Pls.' Opp'n 11; Pls.' Mot. 11. Plaintiffs' argument relies on an overbroad understanding of the liberty interests that attach to travel. *See, e.g., Doe v. City of Lafayette, Ind.*, 377 F.3d 757, 768-69 (7th Cir. 2004). While courts have recognized a general liberty interest in international and interstate travel, it is not the case that every restriction on travel amounts to a deprivation of a liberty interest. Plaintiffs are not challenging a deprivation of their right to travel, but rather the deprivation of their ability to travel by airplane. But as the Ninth Circuit has recognized, the denial of a preferred method of travel – even if that method is the most convenient – does not constitute the deprivation of any

right to travel.  *See Gilmore*, 435 F.3d at 1136 (holding that, even if air travel is "a necessity and not replaceable . . . it does not follow that Defendants violated [Gilmore's] right to travel, given that other forms of travel remain possible").  *See also* Defs.' Mot. 14 (gathering cases in which courts have held that there is no right to any particular means of travel).  Without showing such a deprivation, a plaintiff cannot show that additional due process protections are required.

Plaintiffs rely at length on the Ninth Circuit's decision in *DeNieva v. Reyes*, 966 F.2d 480 (9th Cir. 1992), wherein the court considered the due process protections applicable to the confiscation of the plaintiff's passport.  *Id.* at 485.  The court held that the individual was entitled to a post-deprivation hearing of some type because the confiscation of his passport *entirely* deprived him of the freedom to travel internationally.  *Id.* at 485.  Here, Plaintiffs claim far less; at most, their complaint alleges that they have been denied the ability to travel by a particular method of transportation, namely commercial air travel.

Plaintiffs also point to cases concerning interests in international and interstate travel that are likewise inapposite because they concern situations in which individuals were effectively denied *all* means of travel.  *See Haig v. Agee*, 453 U.S. 280, 307 (1981) (revocation of passport); *Aptheker v. Sec'y of State*, 378 U.S. 500, 514 (1964) (making it a criminal offense for certain individuals to apply for a passport); *DeNieva*, 966 F.2d at 485 (confiscation of passport).

While Plaintiffs rely on cases concerning broad deprivations of the right to travel, the facts before the Court demonstrate that individuals such as Plaintiffs are able to travel by other means.  At most, placement on the No Fly List would affect the convenience and speed of travel, as passengers who are denied boarding on planes may choose to drive, take a train, or travel by ship.  In arguing otherwise, Plaintiffs overstate the effects that can be traced to inclusion in the

No Fly List. Plaintiffs contend that placement on the No Fly List bars citizens "from sailing on ships departing from, or arriving in, the United States." Pls.' Opp'n 14; *see also* Pls.' Mot. 12. That is incorrect. Customs and Border Protection ("CBP") reviews inbound and outbound passenger lists for all commercial vessels, and may recommend to a carrier that a person not be boarded if the person poses a risk to transportation security or, if an alien, may be found inadmissible upon arrival to the United States. CBP does not bar the individual's boarding; rather, that is a decision that is left to the vessel's operator.[3] Indeed, Plaintiff Muthanna alleges no more than that; his declaration indicates that the private operator of a cargo freighter denied him boarding following a "recommendation" from CBP. Muthanna Decl., ECF No. 91-27, ¶ 20.

The experiences of other Plaintiffs confirm the availability of other means of travel. *See* Third Am. Compl., ¶ 76 (detailing Plaintiff Washburn's return to the U.S. by air and land); *id.* ¶ 127 (detailing Plaintiff Persaud's return to the U.S. by ship and train); Knaeble Decl., ECF No. 91-6, ¶ 16 (detailing Plaintiff Knaeble's return to the U.S. by bus). It is also undisputed that all of the Plaintiffs who wished to return to the United States have done so.[4] This includes Mr. Muthanna, who was permitted to return to the United States from Yemen in September 2010. *See* Muthanna Decl., ¶ 10; *see also id.* ¶ 23 (describing subsequent departure on flight from New York to Dubai, United Arab Emirates in February 2013).

---

[3] CBP's regulations regarding requirements for the provision of passenger and crew member manifests from commercial vessel carriers to CBP are included in 19 CFR §§ 4.7b and 4.64. Neither regulation includes a requirement for commercial vessel carriers to remove an individual from a vessel or prevent the individual from boarding at CBP's request.

[4] *See, e.g.*, Knaeble PI Decl., ECF No. 19-7, at ¶ 39, Washburn PI Decl., ECF No.19-10, at ¶¶ 24-25. Plaintiffs' reliance on cases concerning a right to enter the United States is thus misplaced. *See* Pls.' Opp'n 11; Pls.' Mot. 11-12 (citing *Hernandez v. Cremer*, 913 F.2d 230, 237 (5th Cir. 1990), concerning the denial of entry at the Mexican border to a U.S. citizen).

Plaintiffs also cannot show that they have been deprived of constitutionally-protected liberty interests by arguing that the No Fly List is shared with foreign governments.  *See* Pls.' Opp'n 14 n.23; Pls.' Mot. 13 n.22.  Even if the United States shares intelligence information with other countries, the decision by another country to act on that information would not trigger due process protections.  Anyone who travels abroad always takes the risk that they will be detained or otherwise subjected to foreign law, and they cannot hold the United States responsible for the actions of foreign nations.  *See Munaf v. Geren*, 553 U.S. 674, 694-95 (2008) (Constitution does not prevent U.S. citizens abroad from being subject to foreign law); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 417-18 (1964) ("To permit the validity of the acts of one sovereign state to be [reexamined] and perhaps condemned by the courts of another would very certainly imperil the amicable relations between governments and vex the peace of nations.") (internal quotation marks omitted).  Moreover, an individual denied boarding on commercial flights traveling between two foreign airports that do not cross U.S. airspace is not deprived of any cognizable liberty interest since there is no right or liberty interest in traveling via commercial aircraft even *within* U.S. airspace.

In conclusion, commercial airlines may have made international travel easier than it has been in the past, but that convenience does not suddenly give rise to a constitutional right to travel by plane.  While Plaintiffs may prefer to travel by plane, no court has recognized a liberty interest in the most convenient means of travel.  As a result, Plaintiffs cannot show that security screening that results in a denial of boarding onto a commercial flight deprives an individual of a constitutionally-protected liberty interest.

**2.      Plaintiffs Have Not Shown Any Stigma Resulting in a Diminution of Rights Guaranteed by State Law.**

Defendants' motion also explains that Plaintiffs cannot show a procedural due process violation in the form of a reputational injury resulting from being stigmatized "in conjunction with their right to travel on the same terms as other travelers." Third Am. Compl., ¶ 141. *See* Defs.' Mot. 17-19. To show a "stigma-plus" claim, "a plaintiff must show the public disclosure of a stigmatizing statement by the government, the accuracy of which is contested, *plus* the denial of 'some more tangible interest[]' or the alteration of a right or status recognized by state law." *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 982 (9th Cir. 2002) (quoting *Paul v. Davis*, 424 U.S. 693, 711 (1976)).

Plaintiffs fail to satisfy the "plus" component of a stigma-plus claim. "[T]he 'plus' must be a deprivation of a liberty or property interest by the state that directly affects the plaintiffs' rights." *Miller v. Cal. Dep't of Soc. Servs.*, 355 F.3d 1172, 1178 (9th Cir. 2004). Plaintiffs contend in their complaint that they have been denied "their right to travel on the same terms as other travelers," Third Am. Compl., ¶ 141, but no such right exists. Indeed, Plaintiffs' opposition memorandum appears to disclaim that argument. *See* Pls.' Opp'n 17. Plaintiffs now argue that their alleged inclusion on the No Fly List alters their legal status by denying them the opportunity to travel by commercial aircraft. However, that purported denial does not demonstrate "the alteration of a right or status recognized by state law," *Ulrich*, 308 F.3d at 982, because there is no right to travel by plane, *see supra* at Section I(A)(1). Moreover, even assuming there were a right to travel by airplane, there must be a "connection" between the

stigma and the plus, which is not present because Plaintiffs have available alternative means to travel domestically and internationally.  *See Velez v. Levy*, 401 F.3d 75, 90 (2d Cir. 2005).

On this, the court's analysis in *Green v. Transp. Sec. Admin.*, 351 F. Supp. 2d 1119 (W.D. Wash. 2005), is instructive.  In *Green*, the court rejected the plaintiffs' claims that delayed boarding due to a mistaken association with the No Fly List sufficed for a stigma-plus claim.  *Id.* at 1130.  Plaintiffs' attempt to distinguish the court's analysis in *Green* fails.  Plaintiffs contend that an individual who is on the No Fly List faces tremendous obstacles while an individual who is mistakenly believed to be on the No Fly List faces only "incidental" burdens.  Even if that were true, the *Green* court rejected the "stigma-plus" claim in that case on the grounds that individuals do "not have a right to travel without any impediments," and "burdens on a single mode of transportation do not implicate the right to interstate travel."  *Id.*  This is true whether an individual is mistakenly believed to be on the No Fly List or is actually on the list, and Plaintiffs' stigma-plus claim does not set forth a basis for relief.

**B.      There Is Little Risk of Erroneous Deprivation, Given the Quality Controls and Review Procedures Implemented By the Government.**

Defendants' motion also demonstrates that the government's current procedures for including individuals on the No Fly List protect against erroneous or unnecessary infringements of liberty.  *See* Defs.' Mot. 19-23.  Plaintiffs suggest that, because the Defendants do not reveal the facts underlying an individual's nomination to a watchlist when he or she seeks redress through DHS TRIP, that process results in "an unacceptably high risk of erroneous deprivation."  Pls.' Opp'n 26; *see also* Pls.' Mot. 25.  This assertion is incorrect.  The government's watchlisting procedures, including DHS TRIP, are calculated to ensure that

individuals can draw the government's attention to any possible errors so that they can be corrected. Those procedures also help to ensure that watchlists are based on the most recent and complete information.

As explained in Defendants' opening brief and declaration, the Terrorist Screening Center ("TSC") has implemented extensive quality controls to monitor the contents of the TSDB by taking affirmative steps to ensure that the database contains only individuals who are properly placed there. First, the TSDB is updated daily. *See* Declaration of Cindy Coppola (submitted with Defendants' Motion for Partial Summary Judgment) ("Coppola Decl."), ECF No. 85-2, ¶ 23. The TSDB is also reviewed and audited on a regular basis to comply with quality control measures and to ensure that information in the TSDB is accurate, up to date, and appropriately categorized. *Id.* Those reviews are especially frequent and thorough for the small percentage of U.S. citizens or lawful permanent residents who are in the TSDB and its subset lists. *See id.*

In addition to ensuring the overall integrity of the database, individuals who file complaints with DHS TRIP receive further individualized review. After an individual files a complaint alleging denial of boarding, and if the individual's name matches a name on the No Fly List, the complaint is referred to TSC. *See* Stipulated Facts, ECF No. 84, ¶ 8; Coppola Decl., ¶¶ 47-50. TSC reviews the complaint and the underlying information related to the original nomination, and then also conducts a searching review of any additional derogatory or other available information and determines whether the individual meets the required criteria for inclusion on the No Fly List. *See* Coppola Decl., ¶¶ 20-21, 49-51; Stipulated Facts, ¶ 9; *see also* Testimony of Timothy J. Healy, Former Director, Terrorist Screening Center, Before the Senate Committee on Homeland Security and Governmental Affairs, Washington, DC, March 10, 2010

(available at *http://www.fbi.gov/news/testimony/the-lessons-and-implications-of-the-christmas-day-attack-watchlisting-and-pre-screening*) (generally describing the criteria for placement on an aviation watchlist).  This two-level review is effective and regularly results in TSC removing or downgrading those individuals who no longer meet the criteria for inclusion in the TSDB or its subset lists.  Coppola Decl., ¶ 52.

Moreover, judicial review of TSC's determination regarding the individual's placement is available.  If an individual who alleges No Fly status is unsatisfied with the result, he is given notice that he may avail himself of an administrative appeal process and that he may file a challenge in the court of appeals.[5]  *See* Stipulated Facts, ¶ 11. The process that Defendants provide following a DHS TRIP complaint is more than sufficient to satisfy Plaintiffs' need for review, particularly in light of the compelling national security concerns related to the No Fly List and the Ninth Circuit's holding that there is no constitutional right to fly.

In arguing that a serious risk of erroneous deprivation exists, Plaintiffs rely on selective citations to reports by the Offices of the Inspector General ("OIG") of DOJ and DHS, and the U.S. Government Accountability Office ("GAO"), to paint a one-sided picture of the TSDB.  *See* Pls.' Opp'n 28-29; Pls.' Mot. 25-26; *see also* TCP Br. 4 (citing reports and providing Internet links).  Much of the information on which Plaintiffs rely is outdated, and Defendants do not

---

[5] While individuals may choose to bring claims in the district court, that does not mean that they are required to do so.  *Latif v. Holder*, 686 F.3d 1122, 1129 (9th Cir. 2012).  Individuals may still obtain review in the court of appeals in order to challenge a specific redress decision issued through the DHS TRIP process as a result of a complaint for delayed or denied boarding by TSA.  *Ibrahim v. DHS*, 538 F.3d 1250, 1256-57 (9th Cir. 2008).  For example, in *Arjmand v. DHS*, the government recently submitted a record for the court's review in a challenge to a DHS TRIP response letter.  *Arjmand v. DHS*, ECF No. 34, No. 12-71748 (9th Cir. filed June 2012).

agree that it reflects an accurate portrayal of the current TSDB, which has been modified over time to account for developing security needs and assessments.  Even if the reports were accurate, though, they do not apply to Plaintiffs.  Plaintiffs themselves allege that they have only recently been denied boarding, after years of flying without incident.  *See* Pls.' Opp'n 6; Pls.' Mot. 5.  Reports about the maintenance of watchlists in 2007 have little bearing on individuals who allege that they were able to fly until at least January 2009, particularly in light of the changes that Defendants have made over time.  *See id.*

Indeed, Plaintiffs ignore the reports' recognition that Defendants have strengthened the quality assurance processes as the watchlists have developed.  For example, the DOJ OIG recognized that "TSC's actions to review records as part of a targeted special project successfully ensured the quality of the data."  *See* U.S. Dep't of Justice, Office of the Inspector General, Audit Division, Audit Report 07-41, *Follow-Up Audit of the Terrorist Screening Center* iii (2007) (*available at http://www.justice.gov/oig/reports/FBI/a0741/final.pdf*).  The most recent report cited by Plaintiffs further recognizes Defendants' successful implementation of affirmative steps to improve the watchlists and to further decrease the risks of erroneous deprivation.  The GAO's 2012 report explains that, while the TSDB does contain some errors, as any database does, Defendants have taken affirmative steps to create new safeguards to ensure that mistakes are minimized and that a process exists to correct those mistakes.  U.S. Gov't Accountability Office, GAO-12-476, *Terrorist Watchlist: Routinely Assessing Impacts of Agency Actions since the December 25, 2009, Attempted Attack Could Help Inform Future Efforts* (2012) (*available at http://www.gao.gov/assets/600/591312.pdf*) ("GAO Report").

As reported by the GAO, in the wake of the attempted bombing of a Northwest Airlines Flight on December 25, 2009, the watchlisting community promulgated revised Watchlisting Guidance. This new guidance included changes that were intended to address vulnerabilities and gaps in processes that were exposed by the attempted attack.[6]  For example, DHS now "conducts continuous checks (on a 24/7 basis) of cleared individuals against the watchlist every time the watchlist is updated."  GAO Report at 45.   These continuous checks ensure that:

> (1) the office is promptly notified when an individual who is determined by DHS TRIP as not being the subject of a watchlist record – and, therefore, has been put on the department's list of individuals who are 'cleared' to travel – is subsequently added to the watchlist and (2) redress applicants are provided additional information regarding the resolution of their cases.

*Id.*  Plaintiffs also neglect to note that DHS has implemented a new program, known as Secure Flight, which significantly reduces the number of misidentifications that occur when an individual who has the same or a similar name as someone who is in the TSDB is mistakenly flagged as a watchlist match.  By the middle of 2011, Secure Flight was fully implemented, and TSA, rather than the airlines, now matches passenger data against TSDB records to confirm if individuals match someone on the watchlist.  *See* GAO Report at 41.  This change has been highly beneficial to travelers, and Secure Flight has "improved watchlist matching."  *Id.* at 17.

Accordingly, with these recent improvements, there is little risk of erroneous deprivation.

---

[6] In its amicus brief, TCP suggests that the attempted bombing in 2009 demonstrates the need for the government to adopt certain prescriptive measures regarding the "collect[ion] and understand[ing]" of intelligence and the administration of the No Fly List.  *See* TCP Br. 26. Amicus lacks the expertise or authority to determine how the Executive should evaluate intelligence concerning the prevention of further attacks.  Moreover, TCP fails to account for the fact that, following that incident, Defendants promulgated revised guidance and strengthened the existing redress procedures.  This underscores the need to consider the policies and procedures as they currently exist, rather than circumstances as they were several years ago.

**C.    The Existing Process Appropriately Balances the Government's Substantial
Interest in National Security and the Importance of Effective
Counterterrorism Efforts with the Protections of Due Process.**

Even if the Court determines that Plaintiffs have identified a relevant liberty interest and

demonstrated a risk of erroneous deprivation, their claim should still fail because the

government's interest in this area weighs heavily against providing Plaintiffs with the additional

process they request.  Plaintiffs allege that they are entitled to "notice and an opportunity to

contest the relevant determination" of their alleged inclusion on the No Fly List.  Pls.' Opp'n 19;

Pls.' Mot. 19 (*quoting Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (internal citations

omitted).  But rather than fully account for the consequences that such measures would have for

national security and the government's ability to protect classified information, Plaintiffs fail to

indicate what their suggested process would look like.  In order to permit a proper balancing of

the interests at stake, it is insufficient for Plaintiffs to simply say that they want "more" process

and to cite the boilerplate of due process cases.  It is essential to consider the impact of the

specific measures Plaintiffs would implement.  When the Court considers the basic rudiments of

the additional process plaintiffs are actually requesting – the official confirmation of status on a

watchlist and the disclosure of the reasons for inclusion, which will often consist primarily of

classified information – it becomes clear that the measures requested by Plaintiffs would

threaten national security and the government's protection of classified information.

In arguing that they are entitled to additional process without accounting for the

consequences of that process, Plaintiffs do not recognize that due process "is not a technical

conception with a fixed content unrelated to time, place and circumstances."  *Gilbert*, 520 U.S.

at 930 (internal quotation omitted).  Due process procedures may vary "depending upon the

16 – MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
Latif v. Holder, No. 3:10-cv-00750-BR

importance of the interests involved and the nature of the subsequent proceedings." *Loudermill*, 470 U.S.at 545 (quoting *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971)).  Analysis "requires balancing the interest of the State against the individual interest sought to be protected." *Jones v. Flowers*, 547 U.S. 220, 229 (2006) (internal quotation marks omitted).  This balancing test is "flexible and calls for such procedural protections as the situation demands." *In re Nat'l Sec. Agency Telecomms. Records Litig.*, 671 F.3d 881, 902 (9th Cir. 2011) (internal quotation marks omitted).  "[T]hat strong interest of the government clearly affects the nature" of the due process.  *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 207 (D.C. Cir. 2001).  Here, the national security concerns at stake cannot be overstated, and the balance between the government's interest and the individual interest must be measured accordingly.  In these circumstances, the redress procedures provided by Defendants are sufficient.

### 1.   Plaintiffs Fail to Recognize the Government's Substantial Interest in Protecting National Security Through Effective Security Screening.

Plaintiffs do not dispute that "[t]he Government's interest in combating terrorism is an urgent objective of the highest order."  *Holder* v. *Humanitarian Law Project ("HLP")*, 130 S. Ct. 2705, 2724 (2010); *see also Haig*, 453 U.S. at 307.  Indeed, in cases involving national security, the government's interest is at its zenith.  "[N]o governmental interest is more compelling than the security of the Nation."  *Haig*, 453 U.S. at 307; *see also Wayte v. U.S.*, 470 U.S. 598, 612 (1985) ("Unless a society has the capability and will to defend itself from the aggression of others, constitutional protections of any sort have little meaning.").  Given the events of the past two decades, preventing terrorism on airplanes is of particular significance.  Underscoring that point, the Ninth Circuit has recognized stated that "[a]s illustrated over the last three decades, the

potential damage and destruction from air terrorism is horrifically enormous." *U.S. v. Marquez*, 410 F.3d 612, 618 (9th Cir. 2005).

It is critical to the due process analysis to recognize that this case concerns the government's ability to prevent further terrorist attacks, and that the government has a tremendous interest in protecting the types of information of which Plaintiffs seek to compel disclosure. The sensitivity of the information at the heart of Plaintiffs' claims makes their case easily distinguishable from the cases cited to support Plaintiffs' demand for an opportunity to "confront or rebut the allegations." Pls.' Opp'n 24; Pls.' Mot. 22. Indeed, Plaintiffs try to analogize the government's interest in national security to the government's interest in, for example, utility subsidies or welfare benefits. *See, e.g., Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1, 16 (1978) (requiring an in-person hearing prior to termination of utility subsidies); *Califano v. Yamasaki*, 442 U.S. 682, 696 (1979) (requiring a hearing for recovery of excess Social Security payments); *Goldberg v. Kelly*, 397 U.S. 254 (1970) (requiring a hearing prior to termination of welfare benefits); *Goss v. Lopez*, 419 U.S. 565, 581 (1975) (requiring a hearing prior to temporary school suspension). In those cases, the individuals' interests did not infringe on any national security concerns, nor was the information involved of a sensitive or strategic nature. Therefore, the balancing of private and government interests is dramatically different than the analysis before the Court in this case. Reliance on these cases is inappropriate here, where the nation's interest in securing our airplanes is real, immediate, and enormous.

The TSDB is one of the country's primary tools in combatting terrorism on airplanes. Watchlisting provides a centralized means of sharing information among various government agencies to carry out law enforcement and national security functions. Such information sharing

is critical to carrying out those functions, and the lack of it was cited by the 9/11 Commission. *The 9/11 Commission Report*, Exec. Summary (2004) (specifically noting that "not expanding no-fly lists to include names from terrorist watchlists" was an operational failure that made 9/11 possible). The government has a paramount interest in ensuring that TSDB information can be broadly shared across the government, without fear that such information will be disclosed whenever anyone cannot travel as he or she might choose. *See Gilbert*, 520 U.S. at 931-32 (discussing the balance between the government's interest and a personal deprivation). The current watchlisting process allows the intelligence community to share information in order to help identify, detect, and deter terrorists and to make predictive assessments about which persons are likely to pose a risk of engaging in or preparing for terrorism or terrorist activities, before those individuals attempt to commit a terrorist act. Establishing a watchlisting program that is both forceful and flexible is thus a matter of national security, and the process available now represents the government's efforts to provide both redress and security.

Plaintiffs suggest that Defendants demand total deference to their determination of the harm that would result from disclosure of an individual's watchlist status. *See* Pls.' Opp'n 29-30; Pls.' Mot. 26-27. But this overstates Defendants' position. Defendants ask only for the appropriate amount of deference given the national security concerns at stake. *See HLP*, 130 S. Ct. at 2727 ("respect for the Government's conclusions is appropriate."). The current redress process represents the government's best efforts to provide redress in the sensitive area of watchlisting. National security matters "are rarely proper subjects for judicial intervention." *Haig*, 453 U.S. at 292; *see also United States v. Hawkins*, 249 F.3d 867, 873 n.2 (9th Cir. 2001) (government interest in "ensuring national security" is "important in [itself] . . . but courts have

long recognized that the Judicial Branch should defer to decisions of the Executive Branch that relate to national security"). The declaration submitted by Defendants explains the reasons why the disclosure of information related to watchlisting, including watchlist status and the reasons for an individual's inclusion, could cause serious harm to the national security. Coppola Decl., ¶¶ 26-39. This declaration reflects the government's best judgment gained from its counterterrorism experience, and the Court should not rely on the contrary (and uninformed) armchair assessments of Plaintiffs or TCP regarding the best means to combat such threats. When the Court looks each of the additional procedural measures suggested by Plaintiffs, it becomes clear that Plaintiffs' position ignores the harms such measures would cause to the governmental interests at issue, and the third *Mathews* factor weighs in favor of granting summary judgment to Defendants.

### 2.   Defendants Can Neither Confirm Nor Deny Placement on a Watchlist.

Plaintiffs first contend that due process requires the government to notify individuals when they have been placed on the No Fly List. Pls.' Opp'n 20-24; Pls.' Mot. 19-21. No such notice is required where the very act of giving notice undermines national security. *See Hunt v. CIA*, 981 F.2d 1116, 1119 (9th Cir. 1992) ("To confirm or deny the existence of [CIA] records on [a particular individual] could . . . reveal intelligence sources or targets"). As explained in the Coppola Declaration, providing such notice has the possibility to harm national security and law enforcement interests by alerting individuals as to whether or not they are the subject of active counter-terrorism investigations. To reveal that an individual is, or is not, the

subject of such an investigation could significantly compromise its effectiveness.[7]  Coppola

Decl., ¶¶ 27-34.  Once aware that they are the confirmed targets of investigations, individuals

may alter the patterns of their behavior in order to hinder investigative efforts, and may also

take steps to destroy relevant evidence.  *Id.*  Disclosure may also jeopardize the efforts of

undercover employees who seek to establish and maintain the trust of suspected terrorists, and,

in some cases, may endanger the safety of undercover employees and other sources.  *Id.*

Disclosure may also risk revealing law enforcement techniques and procedures by, for

example, permitting the targets of investigations to deduce the methods the government is

using to monitor them, or the source the government used to learn of their terrorist activity.  *Id.*

---

[7] Plaintiffs assert that Defendants' *Glomar* policy is undermined by the informal, unofficial statements of certain unidentified law enforcement officers or airline employees who have indicated that certain individuals are prohibited from boarding because of their inclusion on a watchlist.  *See* Pls.' Opp'n 31; Pls.' Mot. 27-28; *see also* TCP Br. 16.  This argument conflates unofficial and unauthorized statements with official confirmation or denial of status on the No Fly List.  Pursuant to the government's current *Glomar* policy, government officials cannot confirm or deny whether an individual is in the TSDB, or on the No Fly subset lists.  Coppola Decl., ¶ 26.  Allegations that an individual Plaintiff was told by some unnamed government official of his watchlist status do not diminish the risks of official disclosure.  *See id.*, ¶ 36.  Nor does merely being interviewed by the FBI mean that an individual is the "subject of a law enforcement or intelligence-gathering investigation," as Plaintiffs suggest.  Pls.' Mot. 27.  Plaintiffs further assert that the government discloses watchlist status every time it grants membership in CBP's Global Entry program, a trusted traveler program that facilitates the processing of low risk air travelers into the United States.  But membership in CBP's Global Entry program does not serve as official confirmation of watchlist status.  Applicants can be denied for a variety of reasons: the applicant provides false or incomplete information on the application; the applicant has been arrested or convicted of any criminal offense; the applicant is a subject of an investigation; or the applicant cannot satisfy CBP of his/her low-risk status or meet other program requirements.  *See* 8 C.F.R. § 235.12(b)(2) (stating that an individual is ineligible if CBP determines that the individual presents a potential risk for terrorism, criminality (such as smuggling), or is otherwise not a low risk traveler)  All of these alleged disclosures are far afield of the "official" notice Plaintiffs are demanding, which Plaintiffs presumably conceded, since they contend they need "official" notice.

Similar consequences would result if the government adopted a procedure which would confirm when individuals are *not* in the database while refusing to confirm or deny when an individual *is* in the database.  If the government did so, the failure to identify status would effectively confirm that the individual is, in fact, in the database.  *Id.* ¶¶ 33-36.  Confirmation that an individual is not on a watchlist would be of considerable value to terrorist groups seeking to identify individuals who are not the subject of ongoing investigations and who are thus more useful in future terrorist activity because they are more likely to escape scrutiny.  *Id.*  For these reasons, due process in this case does not require notice of one's placement on a watchlist.

While Plaintiffs suggest that such information could be disclosed through the use of "a variety of calibrated tools," Pls.' Mot. 10; *see also* Pls.' Opp'n 32; they fail to explain how their suggested measures, such as protective orders, could safeguard the interests at stake while still providing them the information they seek.[8]  As explained in the Coppola Declaration, notice of placement on the No Fly List would harm national security, which distinguishes the cases cited by Plaintiffs.  Plaintiffs rely heavily on cases where the government designates an organization as a terrorist organization.  *See* Pls.' Mot. 19; Pls.' Opp'n 20, citing *Al Haramain Islamic Found. v. Dep't of Treasury*, 686 F.3d 965 (9th Cir. 2012); *Holy Land*

---

[8] The Supreme Court recently rejected a similar argument in *Clapper v. Amnesty International USA*, 133 S. Ct. 1138 (2013).  There, it was suggested that the government could confirm to the court whether it was intercepting certain persons' communications, in order to help resolve whether standing existed in the case.  *Id.* at 1149.  The Supreme Court rejected that argument, for reasons not relevant here, but went on to say that the use of a protective order (*i.e.*, one of the "calibrated tools" Plaintiffs suggest here) would fail to safeguard national security interests because the government's disclosure in such circumstances would still have the effect of revealing to an individual "whether his name was on the list of surveillance targets."  *Id.* at 1149 n.4.  That is true here, as well.  No matter what "calibrated tools" are employed, the purpose of Plaintiffs' requested process is to ensure that such information is disclosed.

*Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003); *Nat'l Council of Resistance of Iran*, 251 F.3d 192. But those decisions have limited value in this case. In the cases involving the designation of individuals or entities for economic sanctions, the designations are publicly announced, and there is no operational harm in confirming the existence of the designation. No such public disclosure is possible in these circumstances, for the reasons cited above. Moreover, the blocking of assets by the Office of Foreign Assets Control "deprive[s] [the organization] of its ability to use any funds whatsoever, for any purpose." *Al Haramain Islamic Found.*, 686 F.3d at 985-86. By contrast, alleged restrictions on Plaintiffs' ability to fly by commercial airplane have limited effects on their liberty interests in light of the Ninth Circuit's recognition that there is no constitutional right to travel by airplane.[9] *See Gilmore*, 435 F.3d at 1136.

TCP argues that *Ibrahim v. DHS*, No. C-06-00545 WHA (N.D. Cal.), which is currently pending before a district court in the Northern District of California, is instructive for this case. TCP cites the district court's opinion on defendants' motion to dismiss to support its argument that "to burden the right to travel by plane based on inaccurate data with an effective means of redress . . . would be unconstitutional." TCP Br. 10. As an initial matter, there is no right to travel by plane, and the *Ibrahim* court did not find otherwise. *See generally Ibrahim*, 2012 WL

---

[9] In *Al Haramain*, the Ninth Circuit considered a challenge to the government's designation of Al-Haramain as an organization that supports Al-Qaeda based on a record that included classified information filed *ex parte* and *in camera*. 686 F.3d at 985. While the court found that the *Mathews* factors supported Al-Haramain's due process challenge, it required only that the government consider steps to mitigate any burden from reviewing classified information *in camera* and *ex parte*, not to actually disclose the classified information in full to the other side. *Id.* at 988-89.

6652362, at *7.  Moreover, as TCP itself indicates, the district court was considering defendants'

motion to dismiss for lack of standing, a different posture from this case.  *See TCP Br. 10 n.26.*

And last, the plaintiff in *Ibrahim* does not challenge the adequacy of DHS TRIP, a process that

she has never utilized.  As such, *Ibrahim* has no bearing on Plaintiffs' challenge in this case.[10]

### 3.    Defendants Need Not Disclose the Substantive Reasons for Inclusion on a Watchlist or Otherwise Provide Classified Information.

Plaintiff also improperly fail to weigh the governmental interests at issue in their request

that individuals on the No Fly List be provided the substantive reasons for their inclusion.  To the

extent that any Plaintiff is any watchlist, the information underlying such placement is likely to be

classified.  As Defendants' motion and declaration explain, nominations to the TSDB (and the No

Fly List) are typically based on classified information obtained from a variety of intelligence

sources.[11]  *See Defs.' Mot. 27-28; Coppola Decl., ¶¶ 40-44.  In their briefs, Plaintiffs fail to

---

[10] On this issue, amicus TCP relies at length on an opinion in *Rahman v. Chertoff*, No. 05 C3761, 2008 WL 4534407, at *5 (N.D. Ill. Apr. 16, 2008).  *See TCP Br. 14-16.*  This decision is no longer good law.  The opinion cited by TCP was drafted by a magistrate judge, *see id.*, and then adopted by the district court judge in an opinion dated July 26, 2007, in which the court also granted the plaintiffs' motion for class certification.  *Rahman v. Chertoff*, 244 F.R.D. 443 (N.D. Ill. 2007).  On appeal, the Seventh Circuit reversed the district court's ruling on class certification, while also noting that it was questionable why the case had ever even survived a motion to dismiss.  *Rahman v. Chertoff*, 530 F.3d 622, 627 (7th Cir. 2008).  The Seventh Circuit then reversed and remanded the case back to the district court.  *Id.*  Upon remand, the district court granted defendants' motion to dismiss for failure to state a claim.  *See Rahman v. Chertoff*, 2010 WL 1335434, at *5 (N.D. Ill. Mar. 31, 2010).   In any event, the opinion is wrong as a matter of law for the reasons explained above.

[11] Amicus TCP is plainly wrong in asserting that hearings regarding watchlist status would not implicate classified material.  In support of that argument, TCP relies on an order from *Ibrahim v. DHS*, in which the district court indicated that classified information was not at issue in that case.  *See TCP Br. 24-25.*  Contrary to the court's indication at that time, plaintiff's discovery requests in that case did implicate classified information, and the government (through
[*footnote continued on next page*]

account for the government's substantial interest in the protection of such information.  The authority to determine who may have access to classified information "is committed by law to the appropriate agency of the Executive Branch."  *See Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988); *Dorfmont v. Brown*, 913 F.2d 1399, 1401 (9th Cir. 1990).  The grant of a security clearance requires a favorable determination by the Executive branch that an individual is trustworthy for access to classified information and, in addition, a separate determination by an official within the Executive branch that an individual has a demonstrated "need to know" classified information.  A "need to know" is a that the individual "requires access to specific classified information in order to perform or assist in a lawful and authorized governmental function."  *See* Exec. Order No. 13,526, 2009 WL 6066991, 75 FR 707 (Dec. 29, 2009), §§ 4.1(a)(3), 6.1(dd).  As the Ninth Circuit recognized, that decision is committed to the Executive branch.  *Dorfmont*, 913 F.2d at 1401 (holding that security clearance determinations are committed to Executive branch, not to non-expert outside body, including federal courts) (citing *Egan*, 484 U.S. at 529).

In addition, records underlying a nomination to or placement on the No Fly List are likely to include information designated as Sensitive Security Information ("SSI").  SSI is information the disclosure of which TSA has determined would "[b]e detrimental to the security of transportation," 49 C.F.R. § 1520.5(a)(3), and is protected by statutes and regulations from disclosure, *see* 49 U.S.C. § 114(r)(1)(C) (requiring TSA to prohibit the disclosure of information

---

declarations of the Attorney General and the Director of National Intelligence) has invoked the state secrets privilege as a result.  *See Ibrahim v. Dep't of Homeland Sec.*, No. C 06-00545 WHA, ECF 471, 472 (N.D. Cal. Mar. 15, 2013).

that "would be detrimental to the security of transportation"); 49 C.F.R. § 1520.9(a)(2) ("A

covered person must . . . [d]isclose . . . SSI only to covered persons who have a need to know,

unless otherwise authorized in writing by TSA.").  Similarly, the underlying records are also

likely to include law enforcement sensitive information that is subject to the law enforcement

privilege, the disclosure of which "would jeopardize on-going investigations by prematurely

revealing facts and investigatory materials to potential subjects of those investigations."  *In re*

*Sealed Case*, 856 F.2d 268, 272 (D.C. Cir. 1988).[12]  Although the law enforcement privilege is

qualified, the government's interest in maintaining confidentiality outweighs any countervailing

interest for confrontation or rebuttal.  For these reasons, courts have regularly upheld the

government's ability to withhold this kind of information.  *See* Defs.' Mot. 26-27 (collecting

cases).

Plaintiffs cannot overcome the government's substantial interest in protecting

information that is classified, SSI, or protected by the law enforcement privilege.  Plaintiffs

assert that "the government is routinely required to disclose, or at least summarize, classified or

otherwise sensitive information in numerous [national security] contexts."  Pls.' Opp'n 22; *see*

*also* Pls.' Mot. 29.  Likewise, TCP asserts that "courts routinely rule on matters involving

sensitive or classified security information." TCP Br. 17.  Both Plaintiffs and TCP urge this

Court to find guidance in the context of detainee litigation and criminal cases. *Id.; see also* Pls.'

---

[12] As another court has recognized, the justification for the law enforcement privilege is
particularly "compelling" where "the compelled production of government documents could
impact highly sensitive matters relating to national security." *In re U.S. Dep't of Homeland*
*Security*, 459 F.3d 565, 569 (5th Cir. 2006). *See also Milner v. Dep't of Navy*, 131 S. Ct. 1259,
1272-73 (2011) (Alito, J., concurring) (reasoning that the privilege protects information relating
to the government's prevention of crime).

Opp'n 22; Pls.' Mot. 29.  But each of these contexts is unique and inapplicable to Plaintiffs' current case.

The Guantanamo habeas cases, in which detainees at Guantanamo Bay filed habeas petitions challenging the lawfulness of their detention, present unique circumstances not applicable here.  In the Guantanamo habeas litigation, which involved the detainees' liberty interests, the government consented to a protective order in part to regulate habeas counsel's access to sensitive and classified information, including such information known by the detainees themselves, and in part to allow counsel access to the secure Guantanamo Bay facility. *See In re Guantanamo Bay Detainee Litig.,* Misc. No. 08-0442, 2009 WL 50155 (D.D.C. Jan 9, 2009); *In re Guantanamo Detainee Cases*, 344 F. Supp. 2d 174 (D.D.C. 2004).  There is no parallel in this case.  Plaintiffs are not in custody, nor does this case raise practical issues concerning access to a secure military facility.  Thus, the reasons that the government agreed to grant access to some classified information to private counsel in Guantanamo habeas cases are not applicable here, and the terms of those orders are not appropriate in this case.

The application of procedures utilized in criminal cases is similarly unhelpful for this case.  This is not a criminal case.  In that context, Congress has specifically passed legislation – the Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. 3 – which governs such use. By its plain terms, however, CIPA has no application to civil cases.  *See* CIPA, Pub. L. No. 96-456, 94 Stat. 2025 (1980) (codified at 18 U.S.C. App. III) ("An act to provide certain pretrial, trial and appellate procedures for criminal cases involving classified information.").   As the Supreme Court observed in *Reynolds*, there are key differences between civil litigation and criminal prosecutions.  In the latter, the government may, as a last resort, choose to withdraw

evidence, dismiss charges, or dismiss an indictment rather than disclose classified information. Thus, in a criminal case, "the Government can invoke its evidentiary privileges only at the price of letting the defendant go free." *United States v. Reynolds*, 345 U.S. 1, 12 (1953); *see also* 18 U.S.C. App. III §§ 7(a), 6(e) (CIPA provisions stating that if a court orders disclosure of classified information in a criminal case, the government may seek an interlocutory appeal, or cause the court to dismiss an indictment). This principle, however, "has no application in a civil forum where the [g]overnment is not the moving party, but is a defendant only on terms to which it has consented." *Reynolds*, 345 U.S. at 12.

> **4.      In These Circumstances, Due Process Does Not Require Additional Notice or Hearing.**

Plaintiffs demand a hearing where they can "confront or rebut the allegations or evidence supporting their inclusion on the No Fly List." Pls.' Opp'n 25; Pls.' Mot. 22. But the scope of the process due must be commensurate with the right infringed (s*ee Loudermill*, 470 U.S. at 545), and confrontation and rebuttal are not absolute requirements for all government proceedings, especially in cases such as this one, where the information at issue may be highly sensitive. *See Jifry v. FAA*, 370 F.3d 1174, 1183-84 (D.C. Cir. 2004) (In determining whether plaintiffs posed threats to civil aviation, "substitute procedural safeguards may be impracticable [in those cases] and, in any event, are unnecessary" because of "the governmental interests at stake and the sensitive security information" involved; as a result, due process did not require that plaintiffs be given the "specific evidence" upon which the determinations are based.); *Stehney v. Perry*, 101 F.3d 925, 936 (3d Cir. 1996) (agency may revoke a security clearance without affording the holder of the clearance "[t]he right to confront live witnesses, review

information from prior investigations, or to present live testimony" because affording those rights would not "improve[] the fairness of the revocation process."). TSDB information – including TSDB status and the reasons why an individual was placed on the TSDB – is extremely sensitive; disclosure of such information would seriously undermine the government's counterterrorism efforts. *Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 754 (7th Cir. 2002) ("The Constitution would indeed be a suicide pact if the only way to curtail enemies' access to assets were to reveal information that might cost lives.") (internal citation omitted).

For the reasons stated *supra* at Section I(A)(1), Plaintiffs' alleged inability to fly commercially does not implicate any right or liberty interest protected by the Constitution. Even if such a right were implicated, the process due to them would not be the same as if Plaintiffs were, for example, facing detention or some other fundamental loss of liberty. As such, *Hamdi v. Rumsfeld*, where the Court considered the "fundamental nature of a citizen's right to be free from involuntary confinement by his own government," does not inform the analysis of what process, if any, is due to Plaintiffs in the context of restrictions on a particular means of travel. 542 U.S. 507, 531 (2004). Similarly, a very different process was appropriate in *American-Arab Anti-Discrimination Comm. v. Reno*, in which the individuals both faced a "loss of his right to work and support his family."[13]  70 F.3d 1045, 1062, (9th Cir. 1995).  In *In re Gault*, the Court

---

[13] More generally, Plaintiffs' reliance upon *American-Arab Anti-Discrimination Committee* is misplaced.  As an initial matter, the Supreme Court found that there was no jurisdiction to hear the case.  525 U.S. 471 (1999).  In that case, moreover, "INS regulations [explicitly] required that all issues of statutory eligibility for immigration benefits, including legalization, be determined solely on the basis of information in the record disclosed to the applicant."  70 F.3d at 1067.  The Ninth Circuit ruled that the use of undisclosed classified evidence in making such eligibility determinations violated that regulatory requirement.  The Ninth Circuit emphasized [*footnote continued on next page*]

evaluated the process available for juveniles facing detention.  387 U.S. 1, 27 (1967) (noting that

"the boy is committed to an institution where he may be restrained of liberty for years.").  The

greater the right or liberty interest, the greater the process that must be afforded, and accordingly,

the process afforded to an individual who may lose his liberty should be, as the Court concluded,

expansive.  *See also Loudermill*, 470 U.S. at 545.  Similarly, in *Hernandez v. Cremer*, which

addressed the right of re-entry (which is not at issue here), the Fifth Circuit noted that "our

analysis is colored here by the fact that the consequences of a mistaken determination may

result in a lengthy exile for the citizen while he awaits final determination of his citizenship

claim." 913 F.2d 230, 238 (5th Cir. 1990).  Plaintiffs' alleged deprivation of rights due to their

purported placement on the No Fly list is incomparable to either juvenile detention or exile.

Plaintiffs also bypass the availability of judicial review for individuals who pursue the

current redress process.[14]  Such review is necessarily limited by the government's substantial

interest in the non-disclosure of status and the classified information underlying an individual's

inclusion on the No Fly List.  Additionally, the "process" that is due in cases involving the

TSDB cannot be a judicial hearing with the presentation of evidence and examination of

this point, holding "there is no statutory or regulatory basis supporting the Government's interest
in the use of classified information in legalization decisions pursuant to § 1255a."  *Id.* at 1068.
Although the court did hold that the *ex parte* procedure was also unconstitutional, it did so after
finding that the government had not demonstrated a strong interest in protecting its information
given the pre-existing Executive Branch determination that disclosure was warranted.  *Id.* at
1070.  Here, by contrast, the Executive Branch has consistently maintained that watchlist status
may *not* be disclosed to litigants and that disclosure would cause harm to national security.

[14] Plaintiffs' assertion in footnote 33 of their opposition and footnote 37 of their motion for
partial summary judgment that recipients of DHS TRIP letters "do not know what to appeal,
whether to appeal, or how best to advocate for themselves on appeal" is belied by the individuals
who have already sought or are seeking judicial review of their DHS determination in circuit
court.  *See, e.g., Arjmand v. DHS*, ECF No. 34, No. 12-71748 (9th Cir. filed June 2012).

witnesses due to the sensitive nature of the information.  *See Mathews*, 424 U.S. at 348 ("The judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances.").   DHS TRIP, which provides to Plaintiffs the opportunity for judicial review in the court of appeals, strikes an appropriate balance between the weighty government interests at stake in preventing terrorist attacks on commercial aircraft and Plaintiffs' interests in using a particular mode of transportation.

## II.    THE GOVERNMENT'S REDRESS POLICY IS NOT ARBITRARY, CAPRICIOUS, OR CONTRARY TO LAW.

Defendants' motion also explains that judgment should be entered for Defendants on Plaintiffs' claim that the redress policy is unlawful under the Administrative Procedure Act ("APA").  *See* Third Am. Compl., ¶¶ 147-48.

Plaintiffs first contend that the redress policy is "contrary to constitutional right, power, privilege, or immunity," in violation of 5 U.S.C. § 706(2)(B).  *See* Pls.' Opp'n 33.  Yet Plaintiffs offer no authority for the proposition that the APA requires something more than the Constitution.  Instead, it is clear that Plaintiffs' APA claim mirrors their constitutional claim. *See id.* at 34 ("Because Defendants' redress procedures violate Plaintiffs' due process rights, they also violate APA Section 706(2)(B).").  For the reasons set forth above, and in Defendants' motion, the redress policy does not deny Plaintiffs procedural due process, and Plaintiffs' related claim under the vehicle of the APA also fails.

The bulk of Plaintiffs' APA argument concerns their contention that the redress policy is arbitrary and capricious under 5 U.S.C. § 706(2)(A).  Plaintiffs present a flawed standard of review, as "[t]he review of whether an agency's action 'was arbitrary or capricious is highly

deferential, presuming the agency action to be valid.'"  *Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073, 1080 (9th Cir. 2010) (quoting *Irvine Med. Ctr. v. Thompson*, 275 F.3d 823, 830-31 (9th Cir. 2002)).  The Court need only find that there is a "rational connection" between Congress's directives and the "facts found and the [agency] choice made."  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).  The scope of review "is narrow and a court is not to substitute its judgment for that of the agency."  *Id.*

Here, Defendants have followed Congress' statutory directives.  Congress has charged DHS with "prevent[ing] terrorist attacks within the United States," and "reduc[ing] the vulnerability of the United States to terrorism."  6 U.S.C. § 111.  Within DHS, TSA is responsible for transportation – including aviation – security.  49 U.S.C. § 114.  TSA is required by statute to take measures to secure commercial air travel against the threat of terrorism, and specifically to establish, maintain, and update lists of "individuals on passenger lists who may be a threat to civil aviation or national security."  49 U.S.C. § 114(h)(3).  Congress has required TSA, "in consultation with other appropriate Federal agencies and air carriers," to use information from other agencies in order to identify travelers who may pose a threat to national security and to "prevent [those] individual[s] from boarding an aircraft."  *Id.*

As part of its prescreening functions, DHS is also required to provide redress to travelers who have been delayed or denied airline boarding.  Under 49 U.S.C. § 44903(j)(2)(C)(iii), which was enacted as part of the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), Pub. L. 108-458, DHS is required to "establish a procedure to enable airline passengers, who are delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat, to appeal such

determination and correct information contained in the system." *See also* 49 U.S.C.

§ 44903(j))(2)(G)(i) (requiring DHS to "establish a timely and fair process for individuals

identified as a threat under one or more of subparagraphs (C), (D), and (E) to appeal to the

[DHS] the determination and correct any erroneous information").

Defendants have satisfied these directives. DHS has followed Congress's command that

all passengers be screened, and that all persons (including U.S. citizens) who pose a threat to

civil aviation on any flight be denied boarding. In February 2007, DHS launched DHS TRIP.

As discussed above, DHS TRIP serves as the central administrative redress process for

individuals who have, for example, been denied or delayed airline boarding, been denied or

delayed entry into or exit from the U.S. at a port of entry, or been repeatedly referred to

additional (secondary) screening. *See* Stipulated Facts, ¶¶ 5-6; Coppola Decl., ¶¶ 45-51.

Plaintiffs have availed themselves of the redress process mandated by Congress, and the

substance of any resulting determinations regarding Plaintiffs is subject to review in court.

Congress provided the authority to design and implement the screening system,

including a corresponding redress process. Plaintiffs contend that the process is arbitrary and

capricious because it does not provide individuals who are on the No Fly List with an

explanation for the reasons or bases for their inclusion, and yet Congress has never required that

such information be disclosed. In requiring a procedure for reviewing claims of delayed or

denied boarding, Congress said nothing about the disclosure of such sensitive information

(which often includes classified information) to the complainant.

Finally, while Plaintiffs' APA claim fails as a matter of law, it is nonetheless important to

recognize that the proper remedy for an APA challenge would be a remand to the agency.

Because the focus of APA review is on the agency's decisionmaking process rather than the wisdom of the decision itself, "[i]f the court determines that the agency's course of inquiry was insufficient or inadequate, it should remand the matter to the agency for further consideration." *Asarco, Inc. v. U.S. Envt'l Prot. Agency*, 616 F.2d 1153, 1160 (9th Cir. 1980); *see also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("The factfinding capacity of the district court is . . . typically unnecessary to judicial review of agency decisionmaking.").   As explained in Defendants' motion, the remedy requested by Plaintiffs – an injunction creating "a legal mechanism that affords them notice of the reasons and bases for their placement on the No Fly List and a meaningful opportunity to contest their continued inclusion on the No Fly List" (Third Am. Compl., p. 29) – is inappropriate because it subverts the remedial scheme for claims under the APA and requires the Court to assume responsibility for reweighing the security risks at issue in maintenance of the No Fly List.  *See* Defs.' Mot. 29-30.  Rather than construct the substantive and procedural rules for a new redress process, the Court should be "reluctant to intrude upon the authority of the Executive" in this area.  *Egan*, 484 U.S. at 530.  Even if the Court finds merit in Plaintiffs' APA claim, the proper recourse is a remand to afford the government the opportunity to consider how best to modify the procedures at issue.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for partial summary judgment should be granted and Plaintiffs' cross-motion for partial summary judgment should be denied.

Dated: April 26, 2013.                                      Respectfully submitted,

STUART F. DELERY
Acting Assistant Attorney General

DIANE KELLEHER
Assistant Branch Director

__ /s/ Scott Risner_____
AMY POWELL
LILY FAREL
SCOTT RISNER
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C.  20001
Tel:    (202) 514-2395
Fax:    (202) 616-8470
E-mail:  amy.powell@usdoj.gov
E-mail: lily.farel@usdoj.gov
E-mail: scott.risner@usdoj.gov
*Counsel for Defendants*