IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

AYMAN LATIF, MOHAMED SHEIKH ABDIRAHM
KARIYE, RAYMOND EARL KNAEBLE IV,
STEVEN WILLIAM WASHBURN, NAGIB ALI
GHALEB, ABDULLATIF MUTHANNA, FAISAL
NABIN KASHEM, ELIAS MUSTAFA MOHAMED,
IBRAHEIM Y. MASHAL, SALAH ALI AHMED,
AMIR MESHAL, STEPHEN DURGA PERSAUD,
and MASHAAL RANA,

        Plaintiffs,

v.

ERIC H. HOLDER, JR., in his official
capacity as Attorney General of the
United States; JAMES B. COMEY, in his
official capacity as Director of the
Federal Bureau of Investigation; and
CHRISTOPHER M. PIEHOTA, in his
official capacity as Director of the
FBI Terrorist Screening Center,

        Defendants.

3:10-cv-00750-BR

OPINION AND ORDER

**STEVEN M. WILKER**
Tonkon Torp LLP
888 S.W. 5th Avenue, Ste. 1600
Portland, OR 97204
(503) 802-2040

**HINA SHAMSI**
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

**KEVIN DIAZ**
American Civil Liberties Union
P.O. Box 40585
Portland, OR 97240
(503) 227-6928

**ALEXANDRA F. SMITH**
**LAURA SCHAUER IVES**
ACLU Foundation of New Mexico
P.O. Box 566
Albuquerque, NM 87103
(505) 266-5915

**AHILAN ARULANANTHAM**
**JENNIFER PASQUARELLA**
ACLU Foundation of Southern California
1313 West 8th Street
Los Angeles, CA 90017
(213) 977-5211

**ALAN L. SCHLOSSER**
**JULIA HARUMI MASS**
ACLU of Northern California
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493

**CHRISTOPHER M. EGLESON**
**JUSTIN H. BELL**
**MITCHELL P. HURLEY**
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
(212) 872-1039

**REEM SALAHI**
Salahi Law
429 Santa Monica Boulevard, Ste. 550
Santa Monica, CA 90401
(510) 225-8880

     Attorneys for Plaintiffs

**DEVIN N. ROBINSON**
Stewart Shadduck & Robinson LLC
6110 N. Lombard Street, Ste. B
Portland, OR 97203
(503) 228-7020

**RITA M. SIEMION**
637 Kenyon Street NW
Washington, DC 20010
(703) 655-1467

     Attorneys for *Amicus Curiae* The Constitution Project

**ERIC H. HOLDER, JR.**
United States Attorney General
**AMY ELIZABETH POWELL**
United States Department of Justice
Civil Division
20 Massachusetts Avenue N.W., Suite 5377
Washington, DC 20010
(202) 514-9836

**S. AMANDA MARSHALL**
United States Attorney
**JAMES E. COX, JR.**
Assistant United States Attorney
District of Oregon
1000 S.W. Third Avenue, Ste. 600
Portland, OR 97204
(503) 727-1026

     Attorneys for Defendants

**BROWN, Judge.**

     This matter comes before the Court on Defendants' Motion

(#85) for Partial Summary Judgment and Plaintiffs' Cross-Motion

3 - OPINION AND ORDER

(#91) for Partial Summary Judgment.  The parties each seek summary judgment on Plaintiffs' Claim One of the Third Amended Complaint (#83) (that Defendants violated Plaintiffs' right to procedural due process under the Fifth Amendment to the United States Constitution) and Claim Three (that Defendants violated Plaintiffs' rights under the Administrative Procedure Act (APA), 5 U.S.C. § 706).  In their claims Plaintiffs specifically challenge the adequacy of Defendants' redress procedures for persons on the No-Fly List (sometimes referred to as "the List"). In addition to the parties' briefs, the record includes an Amicus Curiae Brief (#99) in Support of Plaintiffs' Cross-Motion filed by The Constitution Project.

On June 21, 2013, after the Court first heard oral argument on the parties' Motions, the Court took these issues under advisement.  On August 28, 2013, the Court issued an Opinion and Order (#110) granting in part Plaintiffs' Cross-Motion, denying in part Defendants' Motion, and deferring ruling on the remaining portions of the pending Motions to permit additional development of the factual record and supplemental briefing.  In that Opinion and Order the Court concluded Plaintiffs established the first factor under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), because Plaintiffs had protected liberty interests in their rights to travel internationally by air and rights to be free from false governmental stigmatization that were affected by

their inclusion on the No-Fly List.  The Court, however, found
the record was not sufficiently developed to balance properly
Plaintiffs' protected liberty interests on the one hand against
the procedural protections on which Defendants rely, the utility
of additional safeguards, and the government interests at stake
in the remainder of the *Mathews* analysis.  *See id.*

   After the parties filed a Third Joint Statement of
Stipulated Facts (#114) and completed their respective
supplemental briefing, the Court heard oral argument on March 17,
2014, and again took the Motions under advisement.

   For the reasons that follow,[1] the Court **GRANTS** Plaintiffs'
Cross-Motion (#91)[2] and **DENIES** Defendants' Motion (#85).

----

   [1] In order to complete the procedural due-process analysis
in this Opinion and Order that the Court began in its August 28,
2013, Opinion and Order (#110), the Court repeats and summarizes
herein many of the facts and analyses from the prior Opinion and
Order to ensure a clear and comprehensive record.

   [2] Plaintiffs also seek a declaratory judgment that
Defendants' policies, practices, and customs violate the Fifth
Amendment of the United States Constitution and the APA and also
seek an injunction requiring Defendants (1) to remedy such
violations, including removal of Plaintiffs' names from any watch
list or database that prevents them from flying; (2) to provide
Plaintiffs with notice of the reasons and bases for their
inclusion on the No-Fly List; and (3) to provide Plaintiffs with
the opportunity to contest inclusion on the List.  Although the
Court concludes Plaintiffs are entitled to summary judgment on
the bases described herein, the issues concerning the substance
of any declaratory judgment and/or injunction remain for further
development

**PLAINTIFFS' CLAIMS**

Plaintiffs are citizens and lawful permanent residents of the United States (including four veterans of the United States Armed Forces) who were not allowed to board flights to or from the United States or over United States airspace.  Plaintiffs believe they were denied boarding because they are on the No-Fly List, a government terrorist watch list of individuals who are prohibited from boarding commercial flights that will pass through or over United States airspace.  Federal and/or local government officials told some Plaintiffs that they are on the No-Fly List.

Each Plaintiff submitted applications for redress through the Department of Homeland Security Traveler Redress Inquiry Program (DHS TRIP).  Despite Plaintiffs' requests to officials and agencies for explanations as to why they were not permitted to board flights, explanations have not been provided and Plaintiffs do not know whether they will be permitted to fly in the future.

Plaintiffs allege in their Third Amended Complaint (#83), Claim One, that Defendants have violated Plaintiffs' Fifth Amendment right to procedural due process because Defendants have not given Plaintiffs any post-deprivation notice nor any meaningful opportunity to contest their continued inclusion on the No-Fly List.  In Claim Three Plaintiffs assert Defendants'

actions have been arbitrary and capricious and constitute "unlawful agency action" in violation of the APA.

## PROCEDURAL BACKGROUND

Plaintiffs filed this action on June 30, 2010.  On May 3, 2011, this Court issued an Order (#69) granting Defendants' Motion (#43) to Dismiss for failure to join the Transportation Security Administration (TSA) as an indispensable party and for lack of subject-matter jurisdiction on the ground that the relief Plaintiffs sought could only come from the appellate court in accordance with 49 U.S.C. § 46110(a).  Plaintiffs appealed the Court's Order to the Ninth Circuit.  *See Latif v. Holder*, 686 F.3d 1122 (9th Cir. 2012).

On July 26, 2012, the Ninth Circuit issued an opinion in which it reversed this Court's decision and held "the district court . . . has original jurisdiction over Plaintiffs' claim that the government failed to afford them an adequate opportunity to contest their apparent inclusion on the List."  *Id.* at 1130.  The Court also held "[49 U.S.C.] § 46110 presents no barrier to adding TSA as an indispensable party."  *Id.*  The Ninth Circuit issued its mandate on November 19, 2012, remanding the matter to this Court.

As noted, the parties subsequently filed Motions for Partial Summary Judgment.

7 - OPINION AND ORDER

**FACTUAL BACKGROUND**

The following facts are undisputed unless otherwise noted:

## I.   The No-Fly List

The Federal Bureau of Investigation (FBI), which administers the Terrorist Screening Center (TSC), develops and maintains the federal government's consolidated Terrorist Screening Database (TSDB or sometimes referred to as "the watch list").  The No-Fly List is a subset of the TSDB.

TSC provides the No-Fly List to TSA, a component of the Department of Homeland Security (DHS), for use in pre-screening airline passengers.  TSC receives nominations for inclusion in the TSDB and generally accepts those nominations on a showing of "reasonable suspicion" that the individuals are known or suspected terrorists based on the totality of the information. TSC defines its reasonable-suspicion standard as requiring "articulable facts which, taken together with rational inferences, reasonably warrant the determination that an individual 'is known or suspected to be, or has been engaged in conduct constituting, in preparation for, in aid of or related to, terrorism or terrorist activities.'"  Joint Statement of Stipulated Facts (#84) at 4.

The government also has its own "Watchlisting Guidance" for internal law-enforcement and intelligence use, and the No-Fly

List has its own minimum substantive derogatory criteria.  The government does not release these documents.[3]

## II.  DHS TRIP Redress Process

DHS TRIP is the mechanism available for individuals to seek redress for any travel-related screening issues experienced at airports or while crossing United States borders; *i.e.*, denial of or delayed airline boarding, denial of or delayed entry into or exit from the United States, or continuous referral for additional (secondary) screening.

### A.    Administrative Review

Travelers who have faced such difficulties may submit a Traveler Inquiry Form to DHS TRIP online, by email, or by regular mail.  The form prompts travelers to describe their complaint, to produce documentation relating to the issue, and to provide identification and their contact information.  If the traveler is an exact or near match to an identity within the TSDB, DHS TRIP deems the complaint to be TSDB-related and forwards the traveler's complaint to TSC Redress for further review.

On receipt of the complaint, TSC Redress reviews the available information, including the information and

---

[3] The Court has reviewed the minimum substantive derogatory criteria for the No-Fly List and a summary of the guidelines contained within the Watchlisting Guidance submitted to the Court by Defendants *ex parte* and *in camera*.  Because this information constitutes Sensitive Security Information, the Court does not refer to its substance in this Opinion and Order.

documentation provided by the traveler, and determines
(1) whether the traveler is an exact match to an identity in the
TSDB and (2) whether the traveler should continue to be in the
TSDB if the traveler is an exact match.  When making this
determination, TSC coordinates with the agency that originally
nominated the individual to be included in the TSDB.  If the
traveler has been misidentified as someone who is an exact match
to an identity in the TSDB, TSC Redress informs DHS of the
misidentification.  DHS, in conjunction with any other relevant
agency, then addresses the misidentification by correcting
information in the traveler's records or taking other appropriate
action.

When DHS and/or TSC finish their review, DHS TRIP sends a
determination letter advising the traveler that DHS TRIP has
completed its review.  A DHS TRIP determination letter neither
confirms nor denies that the complainant is in the TSDB or on the
No-Fly List and does not provide any further details about why
the complainant may or may not be in the TSDB or on the No-Fly
List.  In some cases a DHS TRIP determination letter advises the
recipient that he or she can pursue an administrative appeal of
the determination letter with TSA or can seek judicial review in

a United States court of appeals pursuant to 49 U.S.C. § 46110.[4]

Determination letters, however, do not provide assurances about the complainant's ability to undertake future travel. In fact, DHS does not tell a complainant whether he or she is in the TSDB or a subset of the TSDB or give any explanation for inclusion on such a list at any point in the available administrative process. Thus, the complainant does not have an opportunity to contest or knowingly to offer corrections to the record on which any such determination may be based.

**B.   Judicial Review**

When a final determination letter indicates the complainant may seek judicial review of the decisions represented in the letter, it does not advise whether the complainant is on the No-Fly List or provide the legal or factual basis for such inclusion. If the complainant submits a petition for review to the appropriate court, the government furnishes the court (but not the petitioner) with the administrative record.

---

[4] 49 U.S.C. § 46110(a) provides in part: "[A] person disclosing a substantial interest in an order issued by the Secretary of Transportation . . . in whole or in part under this part . . . may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business." When the relief sought from judicial review of a DHS TRIP inquiry requires review and modification of a TSC order, original jurisdiction lies in the district court. *Arjmand v. United States Dep't of Homeland Sec.*, 745 F.3d 1300, 1302-03 (9th Cir. 2014).

If the administrative DHS TRIP review of a petitioner's redress file resulted in a final determination that the petitioner is not on the No-Fly List, the administrative record will inform the court of that fact. If, on the other hand, the administrative DHS TRIP review of a petitioner's redress file resulted in a final determination that the petitioner is and should remain on the No-Fly List, the administrative record will include the information that the government relied on to maintain that listing. The government may have obtained this information from human sources, foreign governments, and/or "signals intelligence." The government may provide to the court *ex parte* and *in camera* information that is part of the administrative record and that the government has determined is classified, Sensitive Security Information, law-enforcement investigative information, and/or information otherwise privileged or protected from disclosure by statute or regulation.

The administrative record also includes any information that the petitioner submitted to the government as part of his or her DHS TRIP request, and the petitioner has access to that portion of the record. As noted, at no point during the judicial-review process does the government provide the petitioner with confirmation as to whether the petitioner is on the No-Fly List, set out the reasons for including petitioner's name on the List,

or identify any information or evidence relied on to maintain the petitioner's name on the List.

For a petitioner who is on the No-Fly List, the court will review the administrative record submitted by the government in order to determine whether the government reasonably determined the petitioner satisfied the minimum substantive derogatory criteria for inclusion on the List.  If after review the court determines the administrative record supports the petitioner's inclusion on the No-Fly List, it will deny the petition for review.  If the court determines the administrative record contains insufficient evidence to satisfy the substantive derogatory criteria, however, the government takes the position that the court may remand the matter to the government for appropriate action.

## III. Plaintiffs' Pertinent History

Solely for purposes of the parties' Motions (#85, #91) presently before the Court, Defendants do not contest the following facts as asserted by Plaintiffs:[5]

---

[5] As a matter of policy, the United States government does not confirm or deny whether an individual is on the No-Fly List nor does it provide any other details as to that issue. Accordingly, Defendants have chosen not to refute Plaintiffs' allegations that they are on the No-Fly List for purposes of these Motions only.  The Court, therefore, assumes for purposes of these Motions only that Plaintiffs' assertions regarding their inclusion on the No-Fly List are true.

Plaintiffs are thirteen United States citizens who were denied boarding on flights over United States airspace after January 1, 2009, and who believe they are on the United States government's No-Fly List. Airline representatives, FBI agents, or other government officials told some Plaintiffs that they are on the No-Fly List.

Each Plaintiff filed DHS TRIP complaints after being denied boarding and each received a determination letter that does not confirm or deny any Plaintiff's name is on any terrorist watch list nor provide a reason for any Plaintiff to be included in the TSDB or on the No-Fly List.

Many of these Plaintiffs cannot travel overseas by any mode other than air because such journeys by boat or by land would be cost-prohibitive, would be time-consuming to a degree that Plaintiffs could not take the necessary time off from work, or would put Plaintiffs at risk of interrogation and detention by foreign authorities. In addition, some Plaintiffs are not physically well enough to endure such infeasible modes of travel.

While Plaintiffs' circumstances are similar in many ways, each of their experiences and difficulties relating to and arising from their alleged inclusion on the No-Fly List is unique as set forth in their Declarations filed in support of their Motion and summarized briefly below.

**Ayman Latif**:  Latif is a United States Marine Corps veteran
and lives in Stone Mountain, Georgia, with his wife and children.
Between November 2008 and April 2010 Latif and his family were
living in Egypt.  When Latif and his family attempted to return
to the United States in April 2010, Latif was not allowed to
board the first leg of their flight from Cairo to Madrid.  One
month later Latif was questioned by FBI agents and told he was on
the No-Fly List.  Because he was unable to board a flight to the
United States, Latif's United States veteran disability benefits
were reduced from $899.00 per month to zero as the result of
being unable to attend the scheduled evaluations required to keep
his benefits.  In August 2010 Latif returned home after the
United States government granted him a "one-time waiver" to fly
to the United States.  Because the waiver was for "one time,"
Latif cannot fly again, and therefore, he is unable to travel
from the United States to Egypt to resume studies or to Saudi
Arabia to perform a *hajj*, a religious pilgrimage and Islamic
obligation.

**Mohamed Sheikh Abdirahm Kariye**:  Kariye lives in Portland,
Oregon, with his wife and children.  In March 2010 Kariye was not
allowed to board a flight from Portland to Amsterdam, was
surrounded in public by government officials at the airport, and
was told by an airline employee that he was on a government watch
list.  Because Kariye is prohibited from boarding flights out of

the United States, he could not fly to visit his daughter who was studying in Dubai and cannot travel to Saudi Arabia to accompany his mother on the *hajj* pilgrimage.

**Raymond Earl Knaeble IV**:  Knaeble is a United States Army veteran and lives in Chicago, Illinois.  In 2006 Knaeble was working in Kuwait.  In March 2010 Knaeble flew from Kuwait to Bogota, Colombia, to marry his wife, a Colombian citizen, and to spend time with her family.  On March 14, 2010, Knaeble was not allowed to board his flight from Bogota to Miami.  Knaeble was subsequently questioned numerous times by FBI agents in Colombia. Because Knaeble was unable to fly home for a required medical examination, his employer rescinded its job offer for a position in Qatar.  Knaeble attempted to return to the United States through Mexico where he was detained for over 15 hours, questioned, and forced to return to Bogota.  Knaeble eventually returned to the United States in August 2010 by traveling for 12 days from Santa Marta, Colombia, to Panama City and then to Mexicali, California.  United States and foreign authorities detained, interrogated, and searched Knaeble on numerous occasions during that journey.

**Faisal Nabin Kashem**:  In January 2010 Kashem traveled from the United States to Saudi Arabia to attend a two-year Arabic language-certification program and eventually to enroll in a four-year Islamic studies program.  In June 2010 Kashem attempted

16 - OPINION AND ORDER

to fly from Jeddah, Saudi Arabia, to New York for summer vacation; was denied boarding; and was told by an airline employee that he was on the No-Fly List.  FBI agents later questioned Kashem and told him that he was on the No-Fly List. After Kashem joined this lawsuit, the United States government offered him a "one-time waiver" to return to the United States, which he has so far declined because United States officials have refused to confirm that he will be able to return to Saudi Arabia to complete his studies.

**Elias Mustafa Mohamed**:   In January 2010 Mohamed traveled from the United States to Saudi Arabia to attend a two-year Arabic language-certification program.  In June 2010 Mohamed attempted to fly from Jeddah, Saudi Arabia, to his home in Seattle, Washington, via Washington, D.C., but he was not allowed to board his flight and was told by an airline employee that he was on the No-Fly List.  FBI agents later questioned Mohamed and told him that he was on the No-Fly List.  After joining this lawsuit, the United States government offered Mohamed a "one-time waiver" to return to the United States, which he has so far declined because United States officials have refused to confirm that he will be able to return to Saudi Arabia to complete his studies.

**Steven William Washburn**:   Washburn is a United States Air Force veteran and lives in New Mexico.  In February 2010 Washburn

17 - OPINION AND ORDER

was not allowed to board a flight from Ireland to Boston.  He later attempted to fly from Dublin to London to Mexico City. Although he was allowed to board the flight from Dublin to London, on the London to Mexico City flight the aircraft turned around 3½ hours after takeoff and returned to London where Washburn was detained.  On numerous later occasions FBI agents interrogated Washburn.  In May 2010 Washburn returned to New Mexico by taking a series of five flights that eventually landed in Juarez, Mexico, where he crossed the United States border on foot.  During this trip Mexican officials detained and interrogated Washburn.  In June 2012 an FBI agent told Washburn that the agent would help remove Washburn's name from the No-Fly List if he agreed to speak to the FBI.  Since May 2010 Washburn has been separated from his wife who is in Ireland because she has been unable to obtain a visa to come to the United States and Washburn is unable to fly to Ireland.

**Naqib Ali Ghaleb**:  Ghaleb lives in Oakland, California.  In February 2010 Ghaleb attempted to travel from Yemen where his wife and children were living to San Francisco via Frankfurt. Ghaleb was not allowed to board his flight from Frankfurt to San Francisco.  FBI agents later interrogated Ghaleb and offered to arrange to fly him back to the United States if he agreed to tell them who the "bad guys" were in Yemen and San Francisco and to provide names of people from his mosque and community.  The

agents threatened to have Ghaleb imprisoned.  In May 2010 Ghaleb
again attempted to return to the United States.  He was able to
fly from Sana'a, Yemen, to Dubai, but he was not allowed to board
his flight from Dubai to San Francisco.  In July 2010 Ghaleb
accepted a "one-time waiver" offered by the United States
government to return to the United States.  Because Ghaleb cannot
fly, he cannot go to Yemen to be with his ill mother or to see
his brothers or sisters.

**Abdullatif Muthanna**:  Muthanna lives in Rochester, New York.
In June 2009 Muthanna left Rochester to visit his wife and
children who live in Yemen.  In May 2010 Muthanna was to return
to the United States on a flight from Aden, Yemen, to New York
via Jeddah, Saudi Arabia, but he was not allowed to board his
flight from Jeddah to New York.  In September 2010 Muthanna
accepted a "one-time waiver" offered by the United States
government to return home.  In June 2012 Muthanna wanted to be
with his family and attempted to fly to Yemen, but he was not
allowed to board a flight departing from New York.  In August
2012 Muthanna attempted a journey of thirty-six days over land
and by ship from Rochester to Yemen, but a ship captain refused
to let Muthanna sail on a cargo freighter departing from
Philadelphia on the recommendation of United States Customs and
Border Protection.  Muthanna was not allowed to board flights on

four separate occasions before he finally boarded a flight from New York to Dubai in February 2013.

**Mashaal Rana**:  Rana moved to Pakistan to pursue a master's degree in Islamic studies in 2009.  In February 2010 Rana was not allowed to board a flight from Lahore, Pakistan, to New York.  An FBI agent later interrogated Rana's brother, who lives in the United States.  In October 2012 Rana was six-months pregnant and again attempted to return to New York to receive needed medical care and to deliver her child.  Rana's brother worked with United States officials to clear Rana to fly.  Rana received such clearance, but five hours before her flight was to depart she received notice that she would not be allowed to board.  Rana was not able to find a safe alternative to travel to the United States before the birth of her child.  In November 2010 the United States government offered Rana a "one-time waiver," which she has not used because she fears she would not be able to return to Pakistan to be with her husband.

**Ibraheim Y. Mashal**:  Mashal is a United States Marine Corps veteran.  Mashal was not allowed to board a flight from Chicago, Illinois, to Spokane, Washington, and was told by an airline representative that he was on the No-Fly List.  FBI agents later questioned Mashal and told him that his name would be removed from the No-Fly List and he would receive compensation if he helped the FBI by serving as an informant.  When Mashal asked to

have his attorney present before answering the FBI's questions, the agents ended the meeting.  Mashal owns a dog-training business.  Because he is unable to fly, he has lost clients; had to turn down business; and has been prevented from attending his sister-in-law's graduation in Hawaii, the wedding of a close friend, the funeral of a close friend, and fundraising events for the nonprofit organization that he founded.

**Salah Ali Ahmed**:  Ahmed lives in Norcross, Georgia.  In July 2010 Ahmed attempted to travel from Atlanta to Yemen via Frankfurt and was not allowed to board the flight in Atlanta. FBI agents later questioned Ahmed.  Because he is unable to fly, Ahmed was unable to travel to Yemen in 2012 when his brother died and is unable to travel to Yemen to visit his extended family and to manage property that he owns in Yemen.

**Amir Meshal**:  Meshal lives in Minnesota.  In June 2009 Meshal was not allowed to board a flight from Irvine, California, to Newark, New Jersey.  FBI agents told Meshal that he was on a government list that prohibits him from flying.  In October 2010 FBI agents offered Meshal the opportunity to serve as a government informant in exchange for assistance in removing his name from the No-Fly List.  Because Meshal is unable to fly, he cannot visit his mother and extended family in Egypt.

**Stephen Durga Persaud**:  Persaud lives in Irvine, California. In May 2010 Persaud was not allowed to board a flight from

St. Thomas to Miami.  An FBI agent told Persaud that he was on the No-Fly List, interrogated him, and told him the only way to get off the No-Fly List was to "talk to us."  In June 2010 Persaud took a five-day boat trip from St. Thomas to Miami and a four-day train ride from Miami to Los Angeles so he could be home for the birth of his second child.  Because he cannot fly, Persaud cannot travel to Saudi Arabia to perform the *hajj* pilgrimage.

## STANDARDS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Washington Mut. Ins. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  *See also* Fed. R. Civ. P. 56(a).  The moving party must show the absence of a dispute as to a material fact.  *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).  In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine dispute as to a material fact for trial.  *Id.*  "This burden is not a light one. . . .  The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted).

A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The court must draw all reasonable inferences in favor of the nonmoving party. *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010).  "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citation omitted).  A "mere disagreement or bald assertion" that a genuine dispute as to a material fact exists "will not preclude the grant of summary judgment." *Deering v. Lassen Cmty. Coll. Dist.*, No. 2:07-CV-1521-JAM-DAD, 2011 WL 202797, at *2 (E.D. Cal., Jan. 20, 2011) (citing *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989)).  When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009)(citation omitted).

The substantive law governing a claim or a defense determines whether a fact is material. *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment. *Id.*

**DISCUSSION**

As noted, Plaintiffs allege Defendants have violated
Plaintiffs' Fifth Amendment rights to procedural due process
because Defendants have not provided Plaintiffs with any post-
deprivation notice nor any meaningful opportunity to contest
their continued inclusion on the No-Fly List.  Plaintiffs also
allege Defendants violated Plaintiffs' rights under the APA.

## I.    Claim One:  Procedural Due-Process

"Procedural due process imposes constraints on governmental
decisions which deprive individuals of 'liberty' or 'property'
interests within the meaning of the Due Process Clause of the
Fifth or Fourteenth Amendment."  *Mathews*, 424 U.S. at 332.  *See
also MacLean v. Dep't of Homeland Sec.*, 543 F.3d 1145, 1151 (9th
Cir. 2008).  "The fundamental requirement of due process is the
opportunity to be heard 'at a meaningful time and in a meaningful
manner.'"  *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*,
380 U.S. 545, 552 (1965)).  *See also Villa-Anguiano v. Holder*,
727 F.3d 873, 881 (9th Cir. 2013).  Due process, however, "'is
flexible and calls for such procedural protections as the
particular situation demands.'"  *Mathews*, 424 U.S. at 334
(quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).  *See
also Wynar v. Douglas Cnty. School Dist.*, 728 F.3d 1062, 1073
(9th Cir. 2013).

The court must weigh three factors when evaluating the sufficiency of procedural protections:  (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. *See also Vasquez v. Rackauckas*, 734 F.3d 1025, 1044 (9th Cir. 2013).

## A.    First Factor:  Private Interest

Plaintiffs contend the first factor under *Mathews* weighs in their favor because Defendants' inclusion of Plaintiffs on the No-Fly List has deprived Plaintiffs of their constitutionally-protected liberty interests in travel and reputation.

### 1.    Right to Travel

"The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment." *Kent v. Dulles*, 357 U.S. 116, 125 (1958).  *See also Eunique v. Powell*, 302 F.3d 971, 976-77 (9th Cir. 2002).  "[T]he [Supreme] Court has consistently treated the right to *international* travel as a liberty interest that is protected by the Due Process Clause of the Fifth Amendment."

*DeNieva v. Reyes*, 966 F.2d 480, 485 (9th Cir. 1992)(emphasis added).  *See also Eunique*, 302 F.3d at 973.

Relying primarily on *Gilmore v. Gonzales*, 435 F.3d 1125 (9th Cir. 2006), and *Green v. Transp. Sec. Admin.*, 351 F. Supp. 2d 1119 (W.D. Wash. 2005), Defendants argue there is not a constitutional right to travel by airplane or by the most convenient form of travel.  Defendants, therefore, contend Plaintiffs' rights to travel are not constitutionally burdened because the No-Fly List only prohibits travel by commercial aviation.

As the Court found in its Opinion and Order (#110), *Gilmore* and *Green* are distinguishable from this case for a number of reasons.  First, those cases involve burdens on the right to *interstate* as opposed to *international* travel.  Although there are viable alternatives to flying for domestic travel within the continental United States such as traveling by car or train, the Court disagrees with Defendants' contention that international air travel is a mere convenience in light of the realities of our modern world.  Such an argument ignores the numerous reasons that an individual may have for wanting or needing to travel overseas quickly such as the birth of a child, the death of a loved one, a business opportunity, or a religious obligation.  In *Ibrahim v. Department of Homeland Security* the court rejected an argument similar to the one that Defendants make in this case:

> While the Constitution does not ordinarily
> guarantee the right to travel by any particular
> form of transportation, given that other forms of
> travel usually remain possible, the fact remains
> that for *international* travel, air transport in
> these modern times is practically the only form of
> transportation, travel by ship being prohibitively
> expensive. . . . Decisions involving *domestic* air
> travel, such as the *Gilmore* case, are not on
> point.

No. C 06-00545 WHA, 2012 WL 6652362, at *7 (N.D. Cal. Dec. 20,
2012). Other cases Defendants cite are similarly
distinguishable. *See, e.g., Miller v. Reed*, 176 F.3d 1202 (9th
Cir. 1999)(restrictions on interstate travel as it relates to the
right to drive); *Town of Southold v. Town of E. Hampton*, 477 F.3d
38 (2d Cir. 2007)(restrictions on interstate travel as it relates
to riding ferries); *Cramer v. Skinner*, 931 F.2d 1020 (5th Cir.
1991)(restrictions on interstate air service to one airport).

Second, the burdens imposed by the restrictions on the
plaintiffs in *Green* and *Gilmore* are far less than the alleged
burdens in this matter. *Gilmore* involved the requirement that
passengers present photo identification before boarding a
commercial flight and *Green* involved passengers being subjected
to enhanced security screening because they had been mistakenly
identified as being on a terrorist watch list. Unlike the
security-screening restrictions in *Green* and *Gilmore*, Plaintiffs'
placement on the No-Fly List operates as a complete and
indefinite ban on boarding commercial flights.

The Court also disagrees with Defendants' assertion that *all* modes of transportation must be foreclosed before any infringement of an individual's due-process right to international travel is triggered.  In *DeNieva* the Ninth Circuit found the plaintiff's protected liberty interest in her right to international travel had been infringed in that "retention of [her] passport infringed upon her ability to travel internationally" because "[w]ithout her passport, she could travel internationally *only with great difficulty, if at all*." *DeNieva*, 966 F.2d at 485 (emphasis added).  In other words, her protected liberty interest in international travel had been infringed even though she may not have been completely banned from traveling.

As Plaintiffs' difficulties with international travel demonstrate, placement on the No-Fly List is a significant impediment to international travel.  It is undisputed that inclusion on the No-Fly List completely bans listed persons from boarding commercial flights to or from the United States or over United States airspace.  In addition, the realistic implications of being on the No-Fly List are far-reaching.  For example, TSC shares watch-list information with 22 foreign governments, and United States Customs and Border Protection makes recommendations to ship captains as to whether a passenger poses a risk to transportation security.  Thus, having one's name on the watch

list can also result in interference with an individual's ability
to travel by means other than commercial airlines as evidenced by
some Plaintiffs' experiences as they attempted to travel
internationally or return to the United States by sea and by
land.  In addition, the ban on air travel has exposed some
Plaintiffs to extensive detention and interrogation at the hands
of foreign authorities.  With perhaps the exception of travel to
a small number of countries in North and Central America, a
prohibition on flying turns routine international travel into an
odyssey that imposes significant logistical, economic, and
physical demands on travelers.  Thus, while the nature of the
deprivation in this case may be different from the retention of
the plaintiff's passport in *DeNieva*, placement on the No-Fly
List, as noted, results in an individual being able to "travel
internationally only with great difficulty, if at all."  *Id.*

　　　Accordingly, the Court concludes on this record that
Plaintiffs have constitutionally-protected liberty interests in
traveling internationally by air, which are significantly
affected by being placed on the No-Fly List.

　　　The first step of the *Mathews* inquiry, however, does
not end with mere recognition of a liberty interest.  The Court
must also weigh the liberty interest deprived against the other
factors.  *See Wilkinson v. Austin*, 545 U.S. 209, 225 (2005).

As noted, placement on the No-Fly List renders most international travel very difficult or impossible. One need not look beyond the hardships suffered by Plaintiffs to understand the significance of the deprivation of the right to travel internationally. Due to the major burden imposed by inclusion on the No-Fly List, Plaintiffs have suffered significantly including long-term separation from spouses and children; the inability to access desired medical and prenatal care; the inability to pursue an education of their choosing; the inability to participate in important religious rites; loss of employment opportunities; loss of government entitlements; the inability to visit family; and the inability to attend important personal and family events such as graduations, weddings, and funerals. The Court concludes international travel is not a mere convenience or luxury in this modern world. Indeed, for many international travel is a necessary aspect of liberties sacred to members of a free society.

Accordingly, on this record the Court concludes Plaintiffs' inclusion on the No-Fly List constitutes a significant deprivation of their liberty interests in international travel.

### 2. Stigma-Plus - Reputation

Plaintiffs also assert the first factor under *Mathews* has been satisfied because Plaintiffs have been stigmatized "in

conjunction with their right to travel on the same terms as other travelers." First Am. Compl. ¶ 141.

Under the "stigma-plus" doctrine, the Supreme Court has recognized a constitutionally-protected interest in "a person's good name, reputation, honor, or integrity." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). *See also Miller v. Cal.*, 355 F.3d 1172, 1178-79 (9th Cir. 2004). "To prevail on a claim under the stigma-plus doctrine, Plaintiffs must show (1) public disclosure of a stigmatizing statement by the government, the accuracy of which is contested; *plus* (2) the denial of some more tangible interest such as employment, or the alteration of a right or status recognized by state law." *Green*, 351 F. Supp. 2d at 1129 (emphasis added)(citing *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 982 (9th Cir. 2002), and *Paul v. Davis*, 424 U.S. 693, 701, 711 (1976)). "'The plus must be a deprivation of a liberty or property interest by the state that directly affects the [Plaintiffs'] rights.'" *Green*, 351 F. Supp. 2d at 1129 (quoting *Miller*, 355 F.3d at 1178). Under the "plus" prong, a plaintiff can show he has suffered a change of legal status if he "legally [cannot] do something that [he] could otherwise do." *Miller*, 355 F.3d at 1179 (discussing *Constantineau*, 400 U.S. 433 (1971)).

Plaintiffs contend, and Defendants do not dispute, that placement on the No-Fly List satisfies the "stigma" prong because

31 - OPINION AND ORDER

it carries with it the stigma of being a suspected terrorist that is publicly disclosed to airline employees and other travelers near the ticket counter. According to Defendants, however, Plaintiffs cannot meet the "plus" prong of the test because (1) Plaintiffs do not have a right to travel by commercial airline and (2) there is not a "connection" between the stigma and the "plus" in light of the fact that Plaintiffs have alternative means of travel.

As noted, the Court has concluded Plaintiffs have constitutionally-protected liberty interests in the right to travel internationally by air. In addition, the Court concludes Plaintiffs have satisfied the "plus" prong because being on the No-Fly List means Plaintiffs are legally barred from traveling by air at least to and from the United States and over United States airspace, which they would be able to do but for their inclusion on the No-Fly List. Thus, Plaintiffs have suffered a change in legal status because they "legally [cannot] do something that [they] otherwise could do." *Miller*, 355 F.3d at 1179. The Court, therefore, concludes on this record that Plaintiffs have constitutionally-protected liberty interests in their reputations.

On the other hand, Plaintiffs' private interests at the heart of their stigma-plus claim are not as strong. Although placement on the No-Fly List carries with it the significant

stigma of being a suspected terrorist and Defendants do not
contest the fact that the public disclosure involved may be
sufficient to satisfy the stigma-plus test, the Court notes the
limited nature of the public disclosure in this case mitigates
Plaintiffs' claims of injury to their reputations.  Because the
No-Fly List is not released publicly, the "public" disclosure is
limited to a relatively small group of individuals in the same
area of the airport as the traveler when the traveler is denied
boarding.  Notwithstanding the fact that being denied boarding an
airplane and, in some instances, being arrested or surrounded by
security officials in an airport is doubtlessly stigmatizing, the
Court notes the breadth and specificity of the public disclosure
in this case is more limited than in the ordinary "stigma-plus"
case.  *See, e.g.*, *Paul v. Davis*, 424 U.S. 693, 694-96
(1976)(distribution of a list and mug shots of "active
shoplifters" to approximately 800 merchants); *Constantineau*, 400
U.S. at 435-36 (posting a list of the identities of those who
have caused harm "by excessive drinking" in all retail liquor
outlets); *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968,
973 (9th Cir. 2002)(filing of an adverse action report with the
California Medical Board and the National Practitioner Data Bank
detailing the reasons why a psychologist relinquished his
privileges at a hospital).  Nevertheless, the Court concludes the
injury to Plaintiffs' reputations is sufficient to implicate

33 - OPINION AND ORDER

Plaintiffs' constitutionally-protected interests in their reputations.

On this record the Court concludes Plaintiffs' claims raise constitutionally-protected liberty interests both in international air travel and in reputation, and, therefore, the first factor under the *Mathews* test weighs heavily in Plaintiffs' favor.

**B.   Second Factor:   Risk of Erroneous Deprivation**

As noted, in the second *Mathews* factor the Court weighs "the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335. *See also Vasquez*, 734 F.3d at 1044.

**1.   Risk of Erroneous Deprivation**

When considering the risk of erroneous deprivation, the Court considers both the substantive standard that the government uses to make its decision as well as the procedural processes in place. *See Santosky v. Kramer*, 455 U.S. 745, 761-64 (1982).

As noted, nominations to the TSDB are generally accepted based on a "reasonable suspicion" that requires "articulable facts which, taken together with rational inferences, reasonably warrant the determination that an

individual" meets the substantive derogatory criteria.[6]  Joint

Statement of Stipulated Facts (#84) ¶ 16.  This "reasonable

suspicion" standard is the same as the traditional reasonable

suspicion standard commonly applied by the courts.  *See Terry v.

Ohio*, 392 U.S. 1, 21 (1968)(permitting investigatory stops based

on a reasonable suspicion supported by "articulable facts which,

taken together with rational inferences from those facts,

reasonably warrant the intrusion.").  *See also Ramirez v. City of

Buena Park*, 560 F.3d 1012, 1020-21 (9th Cir. 2009).  "The

reasonable-suspicion standard is not a particularly high

threshold to reach."  *United States v. Valdez-Vega*, 738 F.3d

1074, 1078 (9th Cir. 2013).  Although reasonable suspicion

requires more than "a mere 'hunch,'" the evidence available "need

not rise to the level required for probable cause, and . . .

falls considerably short of satisfying a preponderance of the

evidence standard."  *United States v. Arvizu*, 534 U.S. 266, 274

(2002)(quoting *Terry*, 392 U.S. at 27).

It is against the backdrop of this substantive standard

that the Court considers the risk of erroneous deprivation of the

protected interests; *i.e.*, the risk that travelers will be placed

_____

[6] As noted, the Court has reviewed *in camera* and considered
the additional substantive derogatory criteria for the No-Fly
List, but the Court does not refer to the substance of those
criteria or the Watchlisting Guidance.

on the No-Fly List under Defendants' procedures despite not having a connection to terrorism or terrorist activities.

Defendants argue there is little risk of erroneous deprivation because the TSC has implemented extensive quality controls to ensure that the TSDB includes only individuals who are properly placed there. Defendants point out that the TSDB is updated daily and audited for accuracy and currentness on a regular basis and that each entry into the TSDB receives individualized review if the individual files a DHS TRIP inquiry. Finally, Defendants argue judicial review of the DHS TRIP determination further diminishes the risk of erroneous deprivation.

Plaintiffs, in turn, cite a 2007 report by the United States Government Accountability Office and a 2009 report by the Department of Justice Office of the Inspector General that concludes the TSDB contains many errors and that the TSC has failed to take adequate steps to remove or to modify records in a timely manner even when necessary. In addition, Plaintiffs maintain the lack of notice of inclusion on the No-Fly List or the reasons therefor forces aggrieved travelers to guess about the evidence that they should submit in their defense and, by definition, creates a one-sided and insufficient record at both the administrative and judicial level that does not provide a

genuine opportunity to present exculpatory evidence for the correction of errors.

Defendants point out that the information on which Plaintiffs rely to support their contention that the TSC has failed to modify adequately or to remove records when necessary is outdated and that the 2009 report indicated significant progress in maintenance of the TSDB. Although Defendants are correct that the TSC appears to have made improvements in ensuring the TSDB is current and accurate, Plaintiffs' contention that the TSDB carries with it a risk of error, nevertheless, carries significant weight. This point was recently reinforced in *Ibrahim* where the plaintiff was nominated to the No-Fly List in 2004 as a consequence of human error despite the fact that she did not pose a threat to national security. *Ibrahim v. Dep't of Homeland Sec.*, No. C 06-00545 WHA (#682)(N.D. Cal. Jan. 14, 2014) at 9. Although Ibrahim was taken off the No-Fly List shortly after the 2004 listing, the mistake itself was not discovered until 2013 and Ibrahim continued to experience substantial difficulties through the date of the order in which Judge William Alsup ultimately ordered the government to purge references to the erroneous 2004 nomination in all of its databases. *Id.* at 16-25, 38. The fact that the TSDB could still contain erroneous information more than nine years after commission of the error

belies Defendants' argument that the TSDB front-end safeguards substantially mitigate the risk of erroneous deprivation.

In any event, the DHS TRIP process suffers from an even more fundamental deficiency. As noted, the reasonable suspicion standard used to accept nominations to the TSDB is a low evidentiary threshold. This low standard is particularly significant in light of Defendants' refusal to reveal whether travelers who have been denied boarding and who submit DHS TRIP inquiries are on the No-Fly List and, if they are on the List, to provide the travelers with reasons for their inclusion on the List. "Without knowledge of a charge, even simple factual errors may go uncorrected despite potentially easy, ready, and persuasive explanations." *Al Haramain Islamic Found., Inc. v. United States Dep't of Treasury*, 686 F.3d 965, 982 (9th Cir. 2012).

The availability of judicial review does little to cure this risk of error. While judicial review provides an independent examination of the existing administrative record, that review is of the same one-sided and potentially insufficient administrative record that TSC relied on in its listing decision without any additional meaningful opportunity for the aggrieved traveler to submit evidence intelligently in order to correct anticipated

errors in the record.[7]   Moreover, judicial review only extends to whether the government reasonably determined the traveler meets the minimum substantive derogatory criteria; *i.e.,* the reasonable suspicion standard.   Thus, the fundamental flaw at the administrative-review stage (the combination of a one-sided record and a low evidentiary standard) carries over to the judicial-review stage.

Accordingly, on this record the Court concludes the DHS TRIP redress process, including the judicial review of DHS TRIP determinations, contains a high risk of erroneous deprivation of Plaintiffs' constitutionally-protected interests.

### 2.   Utility of Substitute Procedural Safeguards

In its analysis of the second *Mathews* factor, the Court also considers the probative value of additional procedural safeguards.   *Mathews*, 424 U.S. at 335.   Plaintiffs contend due process requires Defendants to provide post-deprivation notice of their placement on the No-Fly List; notice of the reasons they have been placed on the List; and a post-deprivation, in-person hearing to permit Plaintiffs to present exculpatory evidence. Notably, Plaintiffs argue these additional safeguards are only necessary after a traveler has been denied boarding.   Defendants,

---

[7] Because the risk of erroneous deprivation arises from the insufficiency of the administrative record rather than the reviewing court's analysis, the Ninth Circuit's holding in *Arjmand* is inapplicable.   745 F.3d at 1302-03.

39 - OPINION AND ORDER

in turn, assert the current procedures are sufficient in light of the compelling government interests in national security and protection of classified information.

Clearly, additional procedural safeguards would provide significant probative value. *See Mathews*, 424 U.S. at 335. In particular, notice of inclusion on the No-Fly List through the DHS TRIP process after a traveler has been denied boarding would permit the complainant to make an intelligent decision about whether to pursue an administrative or judicial appeal. In addition, notice of the reasons for inclusion on the No-Fly List as well as an opportunity to present exculpatory evidence would help ensure the accuracy and completeness of the record to be considered at both the administrative and judicial stages and, at the very least, would provide aggrieved travelers the opportunity to correct "simple factual errors" with "potentially easy, ready, and persuasive explanations." *See Al Haramain Islamic Found.*, 686 F.3d at 982. Thus, the Court concludes additional procedural safeguards would have significant probative value.

In summary, on this record the Court concludes the DHS TRIP process presently carries with it a high risk of erroneous deprivation in light of the low evidentiary standard required for placement on the No-Fly List together with the lack of a meaningful opportunity for individuals on the No-Fly List to provide exculpatory evidence in an effort to be taken off of the

40 - OPINION AND ORDER

List.  Moreover, the Court finds additional procedural safeguards
would have significant probative value in ensuring that
individuals are not erroneously deprived of their
constitutionally-protected liberty interests.  Accordingly, the
Court concludes the second *Matthews* factor weighs heavily in
favor of Plaintiffs.

### C.   The Government's Interest

When considering the third *Mathews* factor, the Court weighs
"the Government's interest, including the function involved and
the fiscal and administrative burdens that the additional or
substitute procedural requirement would entail."  *Mathews*, 424
U.S. at 335.  *See also Vasquez*, 734 F.3d at 1044.

"[T]he Government's interest in combating terrorism is an
urgent objective of the highest order."  *Holder v. Humanitarian
Law Project*, 561 U.S. 1, 28 (2010).  "It is 'obvious and
unarguable' that no governmental interest is more compelling than
the security of the Nation."  *Haig v. Agee*, 453 U.S. 280, 307
(1981)(quoting *Aptheker v. Sec'y of State*, 378 U.S. 500, 509
(1964)).  *See also Al Haramain*, 686 F.3d at 980 ("[T]he
government's interest in national security cannot be
understated.").

"[T]he Constitution certainly does not require that the
government take actions that would endanger national security."
*Al Haramain*, 686 F.3d at 980.  Moreover, the government has a

41 - OPINION AND ORDER

"'compelling interest' in withholding national security
information from unauthorized persons." *Dep't of the Navy v.
Egan*, 484 U.S. 518, 527 (1988)(quoting *Snepp v. United States*,
444 U.S. 507, 509 n.3 (1980)).  "Certainly the United States
enjoys a privilege in classified information affecting national
security so strong that even a criminal defendant to whose
defense such information is relevant cannot pierce that privilege
absent a specific showing of materiality." *Nat'l Council of
Resistance of Iran v. Dep't of State*, 251 F.3d 192, 207 (D.C.
Cir. 2001)(*NCORI*).  Obviously, the Court cannot and will not
order Defendants to disclose classified information to
Plaintiffs.

On this record the Court concludes the governmental
interests in combating terrorism and protecting classified
information are particularly compelling, and, viewed in
isolation, the third *Mathews* factor weighs heavily in Defendants'
favor.

### D.    Balancing the *Mathews* Factors

"'[D]ue process, unlike some legal rules, is not a technical
conception with a fixed content unrelated to time, place and
circumstances.'" *Gilbert v. Homar*, 520 U.S. 924, 930
(1997)(quoting *Cafeteria & Rest. Workers v. McElroy*, 367 U.S.
886, 895 (1961)).  *See also Ching v. Mayorkas*, 725 F.3d 1149,
1157 (9th Cir. 2013).  "'[D]ue process is flexible and calls for

such procedural protections as the particular situation demands.'" *Gilbert v. Homar*, 520 U.S. at 930 (quoting *Morrisey v. Brewer*, 408 U.S. 471, 481 (1972)). *See also Ching*, 725 F.3d at 1157.

"'The fundamental requisite of due process of law is the opportunity to be heard.'" *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (quoting *Grannis v. Ordean*, 234 U.S. 385, 394 (1914)). *See also In re Rains*, 428 F.3d 893, 903 (9th Cir. 2005). "This right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." *Mullane*, 339 U.S. at 314. *See also Circu v. Gonzalez*, 450 F.3d 990, 993 (9th Cir. 2006). "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present objections." *Id.* *See also Al Haramain*, 686 F.3d at 980 ("[T]he Constitution [requires] that the government take reasonable measures to ensure basic fairness to the private party and that the government follow procedures reasonably designed to protect against erroneous deprivation of the private party's interests.").

1.    **Applicable Caselaw**

Although balancing the *Mathews* factors is especially difficult in this case involving compelling interests on both sides, the Court, fortunately, does not have to paint on an empty canvass when balancing such interests. Indeed, several other courts have done so in circumstances that also required balancing a plaintiff's due-process right to contest the deprivation of important private interests with the government's interest in protecting national security and classified information. *See, e.g., Al Haramain*, 686 F.3d 965; *Jifry v. Fed. Aviation Admin.*, 370 F.3d 1174 (D.C. Cir. 2004); *NCORI*, 251 F.3d 192 (D.C. Cir. 2001); *Ibrahim*, No. C 06-00545 WHA (#682); *KindHearts for Charitable and Humanitarian Dev., Inc. v. Geithner*, 647 F. Supp. 2d 857 (N.D. Ohio 2009).

a.    ***Ibrahim v. Department of Homeland Security***

As noted, the plaintiff in *Ibrahim* was placed on the No-Fly List in November 2004 as a result of human error. *Ibrahim*, No. C 06-00545 WHA (#682), at 16. Nonetheless, Ibrahim's student visa was revoked in January 2005 because of "law enforcement interest in her as a *potential* terrorist." *Id.* at 17-18 (emphasis added). Even though Ibrahim was taken off of the No-Fly List shortly after her initial listing and the government had determined by February 10, 2006, that she had "no nexus to terrorism," she remained in the TSDB until September 18,

44 - OPINION AND ORDER

2006. *Id.* at 16-18.   Shortly after her removal from the TSDB,
Ibrahim was placed back in the TSDB before once again being
removed at the end of May 2007.   *Id.* at 18-19.   On October 20,
2009, however, Ibrahim was again nominated to the TSDB pursuant
to a secret exception to the reasonable-suspicion standard.   She
was not, however, placed on the No-Fly List.   *Id.* at 19.

     When Ibrahim applied for a visa in 2009, her
application was denied pursuant to 8 U.S.C. § 212(a)(3)(B), which
is a section of the Immigration and Nationality Act that relates
to terrorist activities.   The word "Terrorist" was handwritten on
the letter informing her of the denial.   *Id.* at 20-22.   Although
Ibrahim again applied for a visa in 2013, it was denied even
though the government conceded during litigation that Ibrahim did
not pose a threat to national security.   *Id.* at 18, 19-24.

     In 2013 Ibrahim's daughter, a United States
citizen, was not permitted to board a flight to the United States
because her name was in a section of the TSDB in which travelers'
admissibility to enter the United States is evaluated.   Within
six minutes, however, United States Customs and Border Patrol
discovered the error and corrected it the next day, and Ibrahim's
daughter was removed from the TSDB.   *Id.* at 24-25.

     The *Ibrahim* court applied the *Mathews* factors to
Ibrahim's procedural due-process challenge and found:
(1) Ibrahim's presence on the No-Fly List and subsequent events

infringed on her right to travel, right to be free from incarceration, and right to be free from the stigma associated with her public denial of boarding an airplane and subsequent incarceration; (2) there was not merely the *risk* of erroneous deprivation, but an *actual* erroneous deprivation; and (3) the government interest was low because the government conceded Ibrahim did not pose a threat to national security.  *Id.* at 27. The court ordered the defendants to purge from government databases all references to the erroneous 2004 listing and ordered the government to give Ibrahim the opportunity to apply for a discretionary waiver of visa ineligibility.  After reviewing classified information, however, the court refused to overturn Ibrahim's visa denial.  *Id.* at 27-28, 31-34.

### b.  *National Council of Resistance of Iran (NCORI) v. Department of State*

In *NCORI* two organizations sought review of the Secretary of State's actions designating them as "foreign terrorist organizations" under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), 8 U.S.C. § 1189.  251 F.3d at 195-96.  Such a designation under AEDPA results in the blocking of all funds that the organization has on deposit in United States banks, bans certain members and representatives of the organization from entry into the United States, and forbids all persons within the United States "from 'knowingly providing material support or resources' to the organization."  *Id.* at 196

46 - OPINION AND ORDER

(quoting 18 U.S.C. § 2339B(a)(1)).  During the administrative
review of the State Department's determination, the Secretary of
State "compiles an 'administrative record,'" but the Secretary
does not provide the target organizations with notice of the
materials used against them in that record, the opportunity to
comment on such materials, or the opportunity to develop the
administrative record further.  *Id.*  The administrative record
may contain classified materials.  *Id.*  Judicial review is
available, but it is based solely on the administrative record
and the classified portion of the record that the government
submits to the court *ex parte* and *in camera*.  *Id.* at 196-97.

When analyzing the procedural due-process claim,
the District of Columbia Circuit found the plaintiffs were
deprived of their property interests and a stigma-plus liberty
interest by their designation as foreign terrorist organizations.
*Id.* at 203-05.  After considering the risk of erroneous
deprivation and the government's interests, the court held the
Secretary must provide the organizations with "'notice of the
action sought,' along with the opportunity to effectively be
heard."  *Id.* at 208 (quoting *Mathews*, 424 U.S. at 334).
Accordingly, the court held the Secretary must (1) afford the
target organizations *pre-deprivation* notice that they are under
consideration for designation; (2) provide the organizations with
notice of the unclassified portions of the administrative record

47 - OPINION AND ORDER

on which the Secretary will rely in making the designation determination; and (3) provide the organizations with some "opportunity to present, at least in written form, such evidence as those entities may be able to produce to rebut the administrative record or otherwise negate the proposition that they are foreign terrorist organizations." *Id.* at 208-09. Notably, however, the court left open "the possibility of the Secretary, in an appropriate case, demonstrating the necessity of withholding all notice and all opportunity to present evidence until the designation is already made." *Id.* at 208.

   c.   ***KindHearts for Charitable Humanitarian Development v. Geithner***

   In *KindHearts* the plaintiff challenged the Office of Foreign Assets Control's provisional designation of KindHearts as a Specially Designated Global Terrorist (SDGT).  647 F. Supp. 2d at 864.  On February 19, 2006, the Office of Foreign Assets Control (OFAC) sent notice to KindHearts that OFAC had frozen all of Kindhearts's assets and property pending investigation into whether KindHearts was subject to designation as an SDGT.  *Id.* at 866-67.  The "blocking notice" reflected KindHearts was being investigated "for being controlled by, acting for or on behalf of, assisting in or providing financial or material support to, and/or otherwise being associated with Hamas." *Id.* at 867.

After ignoring a responsive letter from KindHearts and its request for a copy of the administrative record relied on in the investigation, OFAC provisionally designated KindHearts as an SDGT on May 25, 2007, more than a year after the initial asset freeze. *Id.* With that letter OFAC included 35 unclassified and nonprivileged documents; "acknowledged it also relied on other 'classified and privileged documents'" and provided a three-page summary of the classified evidence; and informed KindHearts that it could present any evidence or other information for OFAC's consideration in making the final determination. *Id.* at 868. After unsuccessfully requesting access to the full classified and unclassified record, KindHearts sent OFAC a 28-page preliminary submission on June 25, 2007, together with 1,369 pages of evidence to address OFAC's concerns to the best of Kindhearts' ability. *Id.* OFAC later misplaced Kindhearts' submission. *Id.* at 868 n.4.

KindHearts filed a lawsuit in which it argued, among other things, that "OFAC provided inadequate post-deprivation process" by failing "to specify any objective criteria for blocking KindHearts' assets" and by failing to provide either pre- or post-deprivation process. *Id.* at 899. While finding other issues unripe for review on the merits, the court addressed the sufficiency of the procedural protections associated with the initial freeze of Kindhearts' assets.

49 - OPINION AND ORDER

In a summary of the notice provided to KindHearts, the court noted "KindHearts remains largely uniformed about the basis for the government's actions." *Id.* at 904. The government's failure to provide notice was particularly important in that "[n]otice is to come from the government because it alone knows what *it* believes, and why what it believes justifies its action." *Id.* at 904 n.25 (emphasis in original). Accordingly, after weighing the *Mathews* factors, the court found OFAC failed to provide KindHearts with proper notice, and, therefore, "violated KindHearts' fundamental right to be told on what basis and for what reasons the government deprived it of all access to all its assets and shut down its operations." *Id.* at 906. In addition to the notice deficiencies, the court found OFAC "failed to provide a meaningful hearing, and to do so with sufficient promptness to moderate or avoid the consequences of delay." *Id.* at 907-08.

### d.    *Jifry v. Federal Aviation Administration*

In *Jifry* the Federal Aviation Administration (FAA) revoked the airman certificates of Jifry and Zarie on the ground that the two pilots "presented 'a security risk to civil aviation or national security.'" *Jifry*, 370 F.3d at 1176-77. Jifry and Zarie were both nonresident alien pilots who used their FAA certificates to pilot aircraft abroad, but they had not piloted

commercial aircraft in the United States for four and nine years respectively.  *Id.* at 1177.

The airman certificate-revocation process involved both the TSA and FAA.  *Id.*  When the TSA finds a pilot poses a security threat, TSA issues an Initial Notification of Threat Assessment (Initial Notice) to the individual and serves that determination on the FAA.  *Id.*  The pilot may request "releasable materials upon which the Initial Notice was based."  *Id.*  On receipt of the releaseable materials, the pilot has 15 days to submit a substantive response to the Initial Notice.  *Id.*  The TSA Deputy Administrator then reviews the record *de novo* and issues a Final Notification of Threat Assessment (Final Notice) if he finds the pilot poses a security threat, and the FAA revokes the pilot's certificate.  *Id.*  The pilot may appeal to the National Transportation Safety Board and then to the court of appeals.  *Id.* at 1177-78.

Jifry and Zarie received the Initial Notice and requested the releaseable materials.  The materials that TSA provided, however, did not include the factual basis for TSA's determination because it was based on classified information. *Id.* at 1178.  Jifry and Zarie stated in their written response that "the 'lack of evidence and information about the basis for the determination contained in the TSA's response' made it impossible for them to specifically rebut the TSA's allegations,

51 – OPINION AND ORDER

and [they denied] that they were security threats." *Id.* The TSA
Deputy Administrator issued a Final Notice, and the FAA
subsequently revoked the pilots' certificates. *Id.*

Jifry and Zarie argued the procedures for revoking
their certificates violated their rights to due process. After
assuming Jifry and Zarie were entitled to constitutional
protections as nonresident alien pilots with FAA certificates,
the court found the balance of the *Mathews* factors favored the
FAA. The court noted the pilots' interest in possessing FAA
airman certificates to fly foreign aircraft outside of the United
States "pales in significance to the government's security
interests in preventing pilots from using civil aircraft as
instruments of terror." *Id.* at 1183. The court also noted
"whatever the risk of erroneous deprivation, the pilots had the
opportunity to file a written reply to the TSA's initial
determination and [the] independent *de novo* review of the entire
administrative record by the Deputy Administrator of the TSA
. . . and *ex parte*, *in camera* judicial review of the record" and
that "substitute procedural safeguards may be impracticable" in
light of the government's interest in protecting classified
information. The court relied on *NCORI* for the proposition that
the government needed to "'afford to the entities under
consideration notice that the designation is impending,' . . .
and 'the opportunity to present, at least in written form, such

evidence as those entities may be able to produce to rebut the administrative record or otherwise negate the proposition that they are foreign terrorist organizations.'"  *Id.* at 459-60 (quoting *NCORI*, 251 F.3d at 208-09).  The court found the TSA and FAA's procedures satisfied this standard.  *Id.* at 460.

### e.  *Al Haramain Islamic Foundation v. United States Department of the Treasury*

The issues in *Al Haramain* are similar to those in this case.  In *Al Haramain* the Ninth Circuit addressed the sufficiency of the procedural safeguards in OFAC's investigation and designation of AHIF-Oregon as an SDGT.  On February 19, 2004, OFAC issued a press release stating it had blocked the assets of AHIF-Oregon pending an investigation concerning the potential designation of AHIF-Oregon as an SDGT.  *Al Haramain*, 686 F.3d at 973.  OFAC did not provide notice before blocking AHIF-Oregon's assets nor did the press-release reveal the reasons for the investigation.  OFAC and AHIF-Oregon exchanged "voluminous documents on a range of topics," the bulk of which concerned AHIF-Oregon's possible connections to and financial support of Chechen terrorism.  *Id.*  On September 9, 2004, OFAC issued a press-release declaring that it had designated AHIF-Oregon as an SDGT because of direct links between AHIF-Oregon and Osama bin Laden, violations of tax and money-laundering laws, attempts to conceal the movement of funds intended for Chechnya by falsely

representing that those funds were for the purpose of purchasing a prayer house in Missouri, and re-appropriation of funds donated for the purpose of humanitarian relief to support mujahideen in Chechnya. *Id.* at 973-74.

On September 16, 2004, OFAC sent a letter advising AHIF-Oregon that it had been designated as an SDGT and that it could request administrative reconsideration. *Id.* at 974. In early 2005 AHIF-Oregon submitted additional documents for the administrative record and requested reconsideration of the designation. AHIF-Oregon asserted it did not have a connection to terrorism and provided a detailed explanation of its Chechen donation. *Id.* Thereafter it repeatedly sought an explanation for its designation and a determination of its request for reconsideration, but OFAC did not respond. *Id.* AHIF-Oregon then filed a lawsuit in which it asserted the procedural protections provided by OFAC violated AHIF-Oregon's procedural due-process rights under the United States Constitution.

In November 2007 after the commencement of AHIF-Oregon's lawsuit and more than three years after the letter informing AHIF-Oregon of its designation, OFAC sent AHIF-Oregon a letter advising that OFAC provisionally intended "to 'redesignate'" AHIF-Oregon and offering AHIF-Oregon a final opportunity to submit documentation for OFAC's consideration. *Id.* AHIF-Oregon again submitted nearly 1,000 pages of documents.

*Id.*  On February 6, 2008, OFAC sent AHIF-Oregon a letter stating OFAC had determined AHIF-Oregon continued to meet the criteria for designation as an SDGT and specified three reasons for the designation:  (1) two designated persons owned or controlled AHIF-Oregon; (2) AHIF-Oregon acted for or on behalf of those designated persons; and (3) AHIF-Oregon operated as a branch office of the Al Haramain Islamic Foundation, an international charity that provided support for al-Qaeda and other SDGTs.  *Id.*

The court found the procedural protections afforded to AHIF-Oregon did not satisfy due process.  Applying the *Mathews* factors, the court found AHIF-Oregon's "property interest is significant" because the designation "completely shutters all [of AHIF-Oregon's] domestic operations" indefinitely.  *Id.* at 979-80.  On the other hand, the court found "the government's interest in national security cannot be understated."  *Id.* at 980.

"[W]ith respect to the use of classified information without disclosure," the court observed "'[o]ne would be hard pressed to design a procedure more likely to result in erroneous deprivations.'"  *Id.* (quoting *American-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1069 (9th Cir. 1995)).  As to the probative value of additional procedural safeguards, the court found "[t]o the extent that an unclassified summary could provide helpful information, such as the subject

matter of the agency's concerns, and to the extent that it is
feasible to permit a lawyer with security clearance to view the
classified information, the value of those methods seems
undeniable." *Id.* at 982-83.

The Al *Haramain* court noted the Ninth Circuit held
in *Gete v. Immigration and Naturalization Services*, 121 F.3d
1285, 1287-91 (9th Cir. 1997), that in the context of the
government's seizure of vehicles from aliens who allegedly
transported unauthorized aliens into the country, "[d]ue
[p]rocess required the INS to disclose the 'factual bases for
seizure[]' and 'the specific statutory provision allegedly
violated.'" *Al Haramain*, 686 F.3d at 987 (quoting *Gete*, 121 F.3d
at 1298). The court specifically rejected the defendants'
argument that *NCORI* and a subsequent District of Columbia Circuit
case, *Holy Land Foundation for Relief and Development v.
Ashcroft*, 333 F.3d 156, 163-64 (D.C. Cir. 2003), stood for the
proposition that the agency need not provide a statement of
reasons for its investigation. The Ninth Circuit observed the
District of Columbia Circuit did not address whether the agency
was required to provide notice of the reasons for the deprivation
in either *NCORI* or *Holy Land Foundation*. *Al Haramain*, 686 F.3d
at 987-88. To the extent that *NCORI* and *Holy Land Foundation*
could be interpreted as permitting the agency to avoid providing
a statement of reasons for the deprivation, the *Al Haramain* court

explicitly stated those cases were inconsistent with the Ninth
Circuit's precedent in *Gete*. *Id.* at 988. Accordingly, the court
held: "In the absence of national security concerns, due process
requires OFAC to present the entity with, at a minimum, a timely
statement of reasons for the investigation." *Id.* at 987. As to
national security concerns about providing a statement of reasons
for the deprivation or permitting counsel with security clearance
to view the classified information, the court "recognize[d] that
disclosure may not always be possible" and that the agency may in
some cases withhold such mitigating measures after considering
"at a minimum, the nature and extent of the classified
information, the nature and extent of the threat to national
security, and the possible avenues available to allow the
designated person to respond more effectively to the charges."
*Id.* at 983-84.

### 2.   Application to the DHS TRIP Process

As noted, the Court finds Plaintiffs here have
significant protected liberty interests at stake. Plaintiffs'
interests in traveling internationally by air are substantially
greater than the interest "in possessing FAA airman certificates
to fly foreign aircraft outside the United States" as in *Jifry*.
Although the private interests involved in *Al Haramain,
KindHearts*, and *NCORI* are somewhat different from Plaintiffs'
individual interests, the analysis in those three cases

(particularly in *Al Haramain*) is more closely applicable to this case.

As in *Al Haramain*, "the government's interest in national security cannot be understated" in this case. *Id.* at 980. Nevertheless, the Ninth Circuit in *Al Haramain* found additional probative procedural protections were possible without jeopardizing the government's interest in national security. The adequacy of current procedures and potential additional procedures, however, affect the weight given to the governmental interest. *See Al Haramain*, 686 F.3d at 983 ("In many cases, though, some information could be summarized or presented to a lawyer with a security clearance without implicating national security."). Thus, while the government's interest in national security in this case weighs heavily, the sufficiency of the DHS TRIP redress process ultimately turns on the procedural protections provided to Plaintiffs.

A comparison of the procedural protections provided in this case with those provided in *Al Haramain*, *Jifry*, *KindHearts*, and *NCORI* reveals the DHS TRIP process falls far short of satisfying the requirements of due process. In *Al Haramain*, *Jifry*, and *KindHearts* the defendants provided the plaintiffs with some materials relevant to the respective agencies' reasons for the deprivation at some point in the proceedings. In *KindHearts* the initial notice of the asset freeze advised the plaintiff that

58 - OPINION AND ORDER

the investigation concerned connections between KindHearts and
Hamas and a later, provisional designation notice included the
unclassified administrative record and a three-page summary of
the classified evidence.  647 F. Supp. 2d at 866-68.  In *Jifry*
TSA provided the pilots with the Initial Notice and, upon
request, the "releaseable materials" before issuing the Final
Notice.  370 F.3d at 1177.  Finally, in *Al Haramain* during the
months after AHIF-Oregon's assets were initially frozen, OFAC and
AHIF-Oregon "exchanged voluminous documents," the "bulk" of which
"concerned AHIF-Oregon's possible connections to Chechen
terrorism in Russia."  *Al Haramain*, 686 F.3d at 973.

Unlike the plaintiffs in *Al Haramain*, *KindHearts*, and
*Jifry*, however, Plaintiffs in this case were not given any notice
of the reasons for their placement on the No-Fly List nor any
evidence to support their inclusion on the No-Fly List.  Indeed,
the procedural protections provided to Plaintiffs through the DHS
TRIP process fall substantially short of even the notice that the
courts found insufficient in *KindHearts* and *Al Haramain*.  In this
respect, this case is similar to *NCORI* in which the plaintiffs
were not afforded "notice of the materials used against [them],
or a right to comment on such materials or [to develop the]
administrative record."  *NCORI*, 251 F.3d at 196.

Defendants' failure to provide any notice of the
reasons for Plaintiffs' placement on the No-Fly List is

59 - OPINION AND ORDER

especially important in light of the low evidentiary standard required to place an individual in the TSDB in the first place. When only an *ex parte* showing of reasonable suspicion supported by "articulable facts . . . taken together with rational inferences" is necessary to place an individual in the TSDB, it is certainly possible, and probably likely, that "simple factual errors" with "potentially easy, ready, and persuasive explanations" could go uncorrected. *See Al Haramain*, 686 F.3d at 982. Thus, without proper notice and an opportunity to be heard, an individual could be doomed to indefinite placement on the No-Fly List. Moreover, there is nothing in the DHS TRIP administrative or judicial-review procedures that remedies this fundamental deficiency. The procedures afforded to Plaintiffs through the DHS TRIP process are wholly ineffective and, therefore, fall short of the "elementary and fundamental requirement of due process" to be afforded "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present objections." *See Mullane*, 339 U.S. at 314.

Accordingly, on this record the Court concludes the absence of any meaningful procedures to afford Plaintiffs the opportunity to contest their placement on the No-Fly List violates Plaintiffs' rights to procedural due process.

### 3.   Due-Process Requirements

Although the Court holds Defendants must provide a new process that satisfies the constitutional requirements for due process, the Court concludes Defendants (and not the Court) must fashion new procedures that provide Plaintiffs with the requisite due process described herein without jeopardizing national security.

Because due process requires Defendants to provide Plaintiffs (who have all been denied boarding flights and who have submitted DHS TRIP inquiries without success) with notice regarding their status on the No-Fly List and the reasons for placement on that List, it follows that such notice must be reasonably calculated to permit each Plaintiff to submit evidence relevant to the reasons for their respective inclusions on the No-Fly List.  In addition, Defendants must include any responsive evidence that Plaintiffs submit in the record to be considered at both the administrative and judicial stages of review.  As noted, such procedures could include, but are not limited to, the procedures identified by the Ninth Circuit in *Al Haramain*; that is, Defendants may choose to provide Plaintiffs with unclassified summaries of the reasons for their respective placement on the No-Fly List or disclose the classified reasons to properly-cleared counsel.

Although this Court cannot foreclose the possibility that in some cases such disclosures may be limited or withheld altogether because any such disclosure would create an undue risk to national security, Defendants must make such a determination on a case-by-case basis including consideration of, at a minimum, the factors outlined in *Al Haramain*; *i.e.*, (1) the nature and extent of the classified information, (2) the nature and extent of the threat to national security, and (3) the possible avenues available to allow the Plaintiff to respond more effectively to the charges. *See Al Haramain*, 686 F.3d at 984. Such a determination must be reviewable by the relevant court.

## II. Claim Three:  Administrative Procedure Act

Plaintiffs also raise claims under 5 U.S.C. §§ 706(2)(A) and 706(2)(B) of the APA.

### A.  Section 706(2)(A)

Under Section 706(2)(A) the court will only set aside an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." An agency rule is arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

When prescreening passengers, Congress instructed the Executive to "establish a procedure to enable airline passengers, who are delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat, to appeal such determination *and correct information contained in the system.*" 49 U.S.C. § 44903(j)(2)(C)(iii)(I) (emphasis added). *See also* 49 U.S.C. § 44903(j)(2)(G)(i) (the Executive "shall establish a timely and fair process for individuals identified as a threat . . . to appeal to the [TSA] the determination and correct any erroneous information.").

As discussed herein at length, the DHS TRIP process does not provide a meaningful mechanism for travelers who have been denied boarding to correct erroneous information in the government's terrorism databases. A traveler who has not been given any indication of the information that may be in the record does not have any way to correct that information. As a result, the DHS TRIP process "entirely fail[s] to consider an important aspect" of Congress's instructions with respect to travelers denied boarding because they are on the No-Fly List. *See Motor Veh. Mfrs. Ass'n*, 463 U.S. at 43.

Accordingly, on this record the Court concludes the DHS TRIP process violates § 706(2)(A) of the APA.

### B.   Section 706(2)(B)

Under 5 U.S.C. § 706(2)(B) the court must set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity."  As noted, the Court has concluded the DHS TRIP process violates Plaintiffs' rights to procedural due process under the United States Constitution.  Accordingly, Plaintiffs' claim under § 706(2)(B) merely mirrors Plaintiffs' procedural due-process claim.

Because the Court has already concluded the DHS TRIP process violates Plaintiffs' procedural due-process rights, the Court also concludes the DHS TRIP process violates § 706(2)(B) of the APA.

### C.   Remedy

As noted, Plaintiffs' APA claims are closely related to Plaintiffs' procedural due-process claims, and the substantive deficiencies in the DHS TRIP redress process are the same under the APA as they are under procedural due process.  Accordingly, the substitute procedures that Defendants select to remedy the violations of Plaintiffs' due-process rights, if sufficient, will also remedy the violations of Plaintiffs' rights under the APA.

## CONCLUSION

For these reasons, the Court **DENIES** Defendants' Motion (#85) for Partial Summary Judgment and **GRANTS** Plaintiffs' Cross-Motion (#91) for Partial Summary Judgment as to Claims One and Three in Plaintiffs' Third Amended Complaint (#83).

The Court directs the parties to confer as to the next steps in this litigation and to file no later than July 14, 2014, a Joint Status Report with their respective proposals and schedules. The Court will schedule a Status Conference thereafter at which primary counsel for the parties should plan to attend in person.

IT IS SO ORDERED.

DATED this 24th day of June, 2014.

_____
ANNA J. BROWN
United States District Judge