BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

AMY POWELL
amy.powell@usdoj.gov
BRIGHAM J. BOWEN
brigham.bowen@usdoj.gov
ADAM KIRSCHNER
adam.kirschner@usdoj.gov
SAM SINGER
samuel.m.singer@usdoj.gov
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C.  20001
Tel:    (202) 514-6289
Fax:    (202) 616-8470

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT
DISTRICT OF OREGON**

| | |
|---|---|
| AYMAN LATIF, et al., <br><br>     *Plaintiffs*, <br><br> v. <br><br> ERIC H. HOLDER, JR.,  et al., <br><br>     *Defendants*. | Case 3:10-cv-00750-BR <br><br> --- <br><br> **DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** <br><br> **ORAL ARGUMENT REQUESTED** |

Pursuant to Rule 56, Defendants move for summary judgment on Plaintiffs' procedural due process and Administrative Procedure Act claims.  The revised DHS TRIP process provided to redress inquiries relating to the No Fly List fully satisfies the requirements of the Constitution by providing for appropriate disclosure of information, where possible, and an opportunity to be heard, without compromising the paramount interest in protecting the national security.  For the

same reasons, Defendants oppose Plaintiffs' motion for summary judgment on their procedural due process and APA claims.  Filed concurrently herewith is a consolidated memorandum in support of Defendants' cross-motion and in opposition to Plaintiffs' motion for summary judgment.

<u>LR 7-1 CERTIFICATION</u>

In accordance with LR 7-1, undersigned counsel has conferred with counsel for Plaintiffs concerning these filings.  Plaintiffs oppose Defendants' motion for summary judgment.

Dated: May 28, 2015                          Respectfully submitted,


BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

*s/ Brigham J. Bowen*

BRIGHAM J. BOWEN
brigham.bowen@usdoj.gov
AMY POWELL
amy.powell@usdoj.gov
ADAM KIRSCHNER
adam.kirschner@usdoj.gov
SAMUEL M. SINGER
samuel.m.singer@usdoj.gov
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C.  20001
Tel:     (202) 514-6289
Fax:     (202) 616-8470


*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing motion was delivered to all counsel of record via the Court's ECF notification system.

*s/ Brigham J. Bowen*
Brigham J. Bowen

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

AMY POWELL
amy.powell@usdoj.gov
BRIGHAM J. BOWEN
brigham.bowen@usdoj.gov
ADAM KIRSCHNER
adam.kirschner@usdoj.gov
SAMUEL M. SINGER
samuel.m.singer@usdoj.gov
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C.  20001
Tel:    (202) 514-6289
Fax:    (202) 616-8470

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| AYMAN LATIF, et al., | Case 3:10-cv-00750-BR |
| *Plaintiffs*, | |
| v. | **DEFENDANTS' CONSOLIDATED MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION** |
| ERIC H. HOLDER, JR.,  et al., | |
| *Defendants*. | |

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND .............................................................................................................. 4

    I.      The Terrorist Screening Center And The No Fly List ...................................4

    II.     Prior Proceedings: The Court's June 24, 2014 Order ...............................8

    III.    Revised DHS TRIP Procedures ...................................................................9

    IV.    Reevaluation Of Plaintiffs' DHS TRIP Inquiries ..................................11

ARGUMENT ...................................................................................................................12

    I.      The Revised DHS TRIP Process Honors The Parameters And Limitations
        That Emerge From Due Process Law, National Security Precedent, And
        The Court's Prior Order. ...........................................................................13

    II.     Plaintiffs' Interests Are Limited. ..............................................................23

    III.    Revised DHS TRIP Provides Individuals With Meaningful Opportunities
        To Be Heard Without Compromising The Government's Compelling
        National Security Interests. ........................................................................25

    IV.    Current Procedures Minimize the Risk of Error. ......................................27

    V.     The Formal, Adversarial Additional Procedures Demanded By Plaintiffs
        Are Not Required Under The Due Process Clause. ..................................30

    VI.    The No Fly List Criteria Are Clear And Survive Plaintiffs' Vagueness
        Challenge .................................................................................................46

    VII.   If Any Errors Arise From The Revised Process, They Are Harmless As
        Applied To These Plaintiffs. .....................................................................51

    VIII.  Defendants Are Entitled To Summary Judgment On Plaintiffs' APA
        Claims. ......................................................................................................52

CONCLUSION...............................................................................................................53

# TABLE OF AUTHORITIES

**CASES**                                                                **PAGE(S)**

*Addington v. Texas,*
   441 U.S. 418 (1979) ............................................................................................. 31

*Al-Haramain Islamic Found., Inc. v. Bush,*
   507 F.3d 1190 (9th Cir. 2007) ........................................................................... 18

*Al Haramain Islamic Found. v. Dep't of Treasury,*
   686 F.3d 965 (9th Cir. 2012) ....................................................................... <u>passim</u>

*Al Maqaleh v. Hagel,*
   738 F.3d 312, 327 (D.C. Cir. 2013) .................................................................. 37

*Alabed v. Crawford,*
   No. 1:13-cv-2006, 2015 WL 1889289 (E.D. Cal. Apr. 24, 2015) ..................... 39

*Alfred A. Knopf, Inc. v. Colby,*
   509 F.2d 1362 (4th Cir. 1975) ........................................................................... 51

*Am. Arab Anti-Discrimination Comm. v. Reno,*
   70 F.3d 1045 (9th Cir. 1995) ............................................................................. 31

*Aptheker v. Sec'y of State,*
   378 U.S. 500 (1964) ........................................................................................... 16

*Arjmand v. U.S. Dep't. of Homeland Sec.,*
   745 F.3d 1300 (9th Cir. 2014) ........................................................................... 29

*Armstrong v. Manzo,*
   380 U.S. 545 (1965) ........................................................................................... 12

*Boddie v. Connecticut,*
   401 U.S. 371 (1971) ........................................................................................... 13

*Brady v. Maryland,*
   373 U.S. 83 (1963) ............................................................................................. 37

*Bridges v. Wixon,*
   326 U.S. 135 (1945) ........................................................................................... 32

*Brock v. Roadway Express, Inc.,*
   481 U.S. 252 (1987) ........................................................................................... 39

*Buckingham v. USDA,,*
   603 F.3d 1073 (9th Cir. 2010) ........................................................................... 39

*Califano v. Aznavorian,*
   439 U.S. 170 (1978) ........................................................................................... 23

*Ching v. Mayorkas,*
    725 F.3d 1149 (9th Cir. 2013) ........................................................... 39

*CIA v. Sims,*
    471 U.S. 159 (1985)........................................................................... 43

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) .......................................................................... 52

*Cleveland Bd. of Educ. v. Loudermill,*
    470 U.S. 532 (1985) .......................................................................... 13

*Collins v. City of Harker Heights, Tex.,*
    503 U.S. 115 (1992) .......................................................................... 24

*Colorado v. New Mexico,*
    467 U.S. 310 (1984) .......................................................................... 41

*Demjanjuk v. Petrovsky,*
    10 F.3d 338 (6th Cir. 1993) ............................................................... 37

*Dennis v. United States,*
    384 U.S. 855 (1966) .......................................................................... 31

*Dent v. Holder,*
    627 F.3d 365 (9th Cir. 2010) ............................................................. 37

*Dep't of Navy v. Egan,*
    484 U.S. 518 (1988)................................................................... <u>passim</u>

*Din v. Kerry,*
    718 F.3d 856 (9th Cir. 2013), ........................................................... 37

*Dorfmont v. Brown,*
    913 F.2d 1399 (9th Cir. 1990) ..................................................... 43, 46

*Ellsberg v. Mitchell,*
    709 F.2d 51 (D.C. Cir. 1983)............................................................ 45

*El-Masri v United States,*
    479 F.3d 296 (4th Cir. 2007) ............................................................ 43

*Estate of Saunders v. C.I.R.,*
    745 F.3d 953 (9th Cir. 2014) ............................................................ 33

*F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.,*
    244 F.3d 1128 (9th Cir. 2001) .......................................................... 13

*Fitzgibbon v. CIA,*
    911 F.2d 755 (D.C. Cir. 1990).......................................................... 19

*Gen. Dynamics Corp. v. United States,*
    131 S. Ct. 1900 (2011)...................................................................... 46

*Gilbert v. Homar*,
    520 U.S. 924 (1997) ..................................................................................... 12

*Gilmore v. Gonzales*,
    435 F.3d 1125 (9th Cir. 2006) ................................................................... 22

*Global Relief Found., Inc. v. O'Neill*,
    315 F.3d 748 (7th Cir. 2002) ..................................................................... 38

*Gonzalez v. Freeman*,
    334 F.2d 570 (D.C. Cir. 1964) ................................................................... 13

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ............................................................................. 48, 49

*Haig v. Agee*,
    453 U.S. 280 (1981) .............................................................................. passim

*Hill v. Colorado*,
    530 U.S. 703 (2000) ..................................................................................... 49

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ............................................................................. 47, 48

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ................................................................................. passim

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
    333 F.3d 156 (D.C. Cir. 2003) ....................................................... 36, 39, 43

*Hortonville Joint Sch. Dist. v. Hortonville Educ. Ass'n*,
    426 U.S. 482 (1976) ..................................................................................... 20

*Humanitarian Law Project v. U.S. Treasury Dep't*,
    578 F.3d 1133 (9th Cir. 2009) ................................................................... 48

*Ibrahim v. DHS*,
    2014 WL 6609111 (N.D. Cal. 2014) ..................................................... passim

*James v. United States*,
    550 U.S. 192 (2007) ..................................................................................... 48

*Jifry v. FAA*,
    370 F.3d 1174 (D.C. Cir. 2004) .............................................................. passim

*Johnson v. United States*,
    628 F.2d 187 (1980) ..................................................................................... 24

*Kasza v. Browner*,
    133 F.3d 1159 (9th Cir. 1998) ................................................................... 22

*Kent v. Dulles*,
    357 U.S. 116 (1958)] ................................................................................... 23

*Khan v. Holder*,
　　584 F.3d 773 (9th Cir. 2009) ................................................................ 48

*Khouzam v. Att'y Gen'l of U.S.*,
　　549 F.3d 235 (3d Cir. 2008) ................................................................. 44

*Kiareldeen v. Reno*,
　　71 F. Supp. 2d 402 (D. N.J. 1999) ....................................................... 32

*KindHearts for Charitable and Humanitarian Dev., Inc. v. Geithner*,
　　647 F. Supp. 2d 857 (N.D. Ohio 2009) .............................................. 8, 34

*Kolender v. Lawson*,
　　461 U.S. 352 (1983) ........................................................................ 48, 49

*Latif v. Holder*,
　　686 F.3d 1122 (9th Cir. 2012) ......................................................... 29, 42

*Leonardson v. City of E. Lansing*,
　　896 F.2d 190 (6th Cir. 1990) ............................................................... 47

*Lynch v. Household Finance Corp.*,
　　405 U.S. 538 (1972) ............................................................................ 20

*Maqaleh v. Hagel*,
　　738 F.3d 312 (D.C. Cir. 2013) ............................................................. 37

*Mathews v. Eldridge*,
　　424 U.S. 319 (1976) ..................................................................... passim

*Memphis Light, Gas & Water Div. v. Craft*,
　　436 U.S. 1 (1978) ................................................................................ 33

*Meshal v. Higgenbotham*,
　　47 F. Supp. 3d 115 (D.D.C. 2014) ....................................................... 38

*Morrissey v. Brewer*,
　　408 U.S. 471 (1972) ............................................................................ 31

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*,
　　463 U.S. 29 (1983) .............................................................................. 52

*Murphy v. I.N.S.*,
　　54 F.3d 605 (9th Cir. 1995) ................................................................. 41

*Nat'l Council of Resistance of Iran v. Dep't of State*,
　　251 F.3d 192 (D.C. Cir. 2001) .............................................. 17, 18, 19, 36

*O'Bannon v. Town Court Nursing Ctr.*,
　　447 U.S. 773 (1980) ............................................................................ 22

*Padberg v. McGrath-McKechnie*,
　　203 F. Supp. 2d 261 (E.D.N.Y. 2002), *aff'd*, 60 F. App'x 861 (2d Cir. 2003) ........................ 37

*Parham v. J.R.*,
 442 U.S. 584 (1979) ......................................................................................... 23

*Pavlik v. United States*,
 951 F.2d 220 (9th Cir. 1991) ........................................................................... 37

*Pinnacle Armor, Inc. v. U.S.*,
 648 F.3d 708 (9th Cir. 2011) ......................................................... 13, 30, 38, 39

*Posters N' Things, Ltd. v. United States*,
 511 U.S. 513 (1994) ......................................................................................... 48

*Rafeedie v. INS*,
 795 F. Supp. 13 (D.D.C. 1992) ........................................................................ 32

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
 758 F.3d 296 (D.C. Cir. 2014) ......................................................................... 35

*Sierra Ass'n. for Env't. v. FERC*,
 744 F.2d 661 (9th Cir. 1984) ........................................................................... 39

*Singh v. Holder*,
 638 F.3d 1196 (9th Cir. 2001) ......................................................................... 41

*Sterling v. Tenet*,
 416 F.3d 338 (4th Cir. 2005) ...................................................................... 43, 44

*In re U.S. Dep't of Homeland Sec.*,
 459 F.3d 565 (5th Cir. 2006) ........................................................................... 22

*In re United States*,
 1 F.3d 1251, 1993 WL 262656 (Fed. Cir. Apr. 19, 1993) ............................... 43

*United States v. Abu Ali*,
 528 F.3d 210 (4th Cir. 2008) ........................................................................... 44

*United States v. Gallagher*,
 99 F.3d 329 (9th Cir. 1996) ........................................................................ 48, 49

*United States v. Harrington*,
 749 F.3d 825 (9th Cir. 2014) ........................................................................... 13

*United States v. Hartwell*,
 436 F.3d 174 (3d Cir. 2006) ............................................................................ 16

*United States v. Hawkins*,
 249 F.3d 867 (9th Cir. 2001) ........................................................................... 18

*United States v. Johnson*,
 130 F.3d 1352 (9th Cir. 1997) ......................................................................... 47

*United States v. Moussaoui*,
 591 F.3d 263 (4th Cir. 2010) ........................................................................... 44

*United States v. O'Hara*,
    301 F.3d 563 (7th Cir. 2002) ................................................................ 38

*United States v. Salerno*,
    481 U.S. 739 (1987) .............................................................................. 47

*United States v. The Sum of $70, 990, 605*,
    No. 12-cv-1905, Mem. Op., ECF No. 174 (D.D.C. Mar. 6, 2015) ......... 44

*United States v. Valenzuela-Bernal*,
    458 U.S. 858 (1982) .............................................................................. 37

*Veterans for Common Sense v. Shinseki*,
    678 F.3d 1013 (9th Cir. 2012) ............................................................. 13

*Walters v. Nat'l Ass'n of Radiation Survivors*,
    473 U.S. 305 (1985) .............................................................................. 23

*Washington v. Harper*,
    494 U.S. 210 (1990) .............................................................................. 23

*W. States Paving Co., Inc. v. Washington State Dep't. of Transp.*,
    407 F.3d 983 (9th Cir. 2004) ............................................................... 47

*Wilkinson v. Austin*,
    545 U.S. 209 (2005) .............................................................................. 23

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886) .............................................................................. 32

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) .............................................................................. 20

*Zinermon v. Burch*,
    494 U.S. 113 (1990) .............................................................................. 20

**STATUTES**

5 U.S.C. § 706 .................................................................................................. 52

10 U.S.C. § 2801 ................................................................................................ 5

18 U.S.C. § 2331 .................................................................................... 5, 10, 49

18 U.S.C. App. 3 ................................................................................. 42, 44, 45

18 U.S.C. § 6 ..................................................................................................... 45

18 U.S.C. § 7 ..................................................................................................... 45

49 U.S.C. § 114 ........................................................................................ passim

49 U.S.C. § 46110 .................................................................................. 10, 28, 29

49 U.S.C. § 44903 ..................................................................................... 4, 7, 42

49 U.S.C. § 44926 ........................................................................................... 7

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 54 .......................................................................................... 22

Fed. R. Civ. P. 56 .......................................................................................... 51

**FEDERAL RULES OF EVIDENCE**

Fed. R. Evid 101 ........................................................................................... 36

Fed. R. Evid 901 ........................................................................................... 51

**REGULATIONS**

49 C.F.R. § 1560.105 ...................................................................................... 4

49 C.F.R. § 1560.3 ......................................................................................... 4

66 Fed. Reg. 49079 (Sept. 23, 2001) .......................................................... 20

75 Fed. Reg. 707 (Jan. 5, 2010) ............................................................ 43, 46

**UNITED STATES CONSITUTION**

U.S. Const. art. II, § 2, cl. 1 ..................................................................... 6, 18

**LEGISLATIVE MATERIALS**

Executive Order 13,224 ....................................................................... 19, 20, 32

Exec. Order 13,526 ............................................................................... 43, 46

**MISCELLANEOUS**

9/11 Comm'n Report, Exec. Summary,
   http://www.9-11commission.gov/report/ 911Report_Exec.pdf ............................................. 17

Classified Information Procedures Act
   Pub. L. No. 96-456, 94 Stat. 2025 (1980) ............................................. 44

**DEFENDANTS' CONSOLIDATED MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## INTRODUCTION

Congress and the President have charged federal agencies with taking steps to secure the nation and its airways from the grave threat of terrorism.  Few interests could be more compelling.  The Government carries out this mandate by making predictive judgments, based on sensitive intelligence reporting and investigative information, as to whether certain individuals present too great a risk to be allowed to board commercial aircraft.  In making these determinations, the Government has taken concrete steps to balance the liberty interests of travelers with the serious national security concerns addressed by the No Fly List — and, through revised redress procedures, has specifically taken into account the Court's finding that U.S. persons denied boarding because of their status on the No Fly List should have a meaningful way to contest their listing.  As set forth herein, Plaintiffs' renewed procedural due process challenge to the Government's procedures lacks merit.

As with any procedural due process challenge, the Court is called upon to determine (i) what process is constitutionally required under the circumstances, (ii) whether the challenged government procedures satisfy the constitutional requirement, and (iii) assuming the challenged procedures are constitutional, whether the procedures were fairly applied to the particular plaintiff.  The first question was addressed by the Court in its June 24, 2014 order.  The second question is the primary subject of this consolidated brief, and the third question is addressed in the plaintiff-specific briefs submitted herewith.

With respect to the first question, the Court has determined in its prior summary judgment order that due process under these circumstances requires notice of an individual's

status on the No Fly List and, to the extent consistent with national security, notice of the reasons

for the individual's placement on the List. In particular, the Court recognized that

determinations about what information can be provided must be made on a case-by-case basis,

and that, in some cases, certain information underlying the No Fly List determination may not be

able to be disclosed without compromising national security.

      With these principles in mind, the resolution of the second question is straightforward.

The revised redress procedures incorporate all the key features of a constitutionally adequate

process described in the Court's order. For U.S. persons denied boarding on flights, the redress

process now provides notice of an individual's status on the No Fly List and the basis for the

listing, and the Government makes every effort to provide such individuals with information

addressing the reasons for their placement. Whether and to what extent such information can be

disclosed depends on the nature of the information at issue and the constraints on disclosure

required by the Government's interest in protecting that information. But while the outcome of

the redress process may vary from case to case, the underlying process and procedures remain

the same. In all cases, the placement decision undergoes several independent layers of review to

ensure that the requisite criteria are met and the underlying information is reliable. And during

the redress process, multiple federal agencies review the available information with an eye

towards disclosing as much information as possible without compromising national security or

law enforcement interests. This flexible, case-by-case review strikes an appropriate balance

between the Plaintiffs'[1] interest in receiving information relating to their inclusion on the No Fly

List and the Government's interest in securing the nation from terrorist threats and protecting

---

[1] Defendants use "Plaintiffs" throughout to refer to those plaintiffs who have active claims
because they remain on the No Fly List after the conclusion of the revised DHS TRIP process
they received in late 2014 and early 2015.

sensitive information from disclosure.  It also falls squarely within the parameters of the Court's

due process analysis.

Once the Court concludes that the process surrounding placement on the No Fly List is

fair, the only remaining question is whether Plaintiffs received the benefit of that process when

they sought redress with the Department of Homeland Security Traveler Redress Inquiry

Program (DHS TRIP).  As we explain further in the plaintiff-specific briefs submitted herewith,

the answer is yes, and the individual Plaintiffs' summary judgment motions should be denied on

that ground alone.  Contrary to Plaintiffs' suggestion, the Court need not decide whether

additional procedures would have reduced the risk of an erroneous listing in the circumstances of

each particular plaintiff.  The Government has established redress procedures that are reasonably

calculated to provide U.S. persons denied boarding because of their status on the No Fly List

with a meaningful opportunity to contest their inclusion.  That the process might not yield

information about No Fly List determinations to every applicant who requests it is not an

indication of its constitutional inadequacy, but rather a reflection of the important interests at

stake and the unavoidable constraints on the disclosure of national security information.

Plaintiffs disregard the parameters set by the Court and demand procedures akin to those

used in criminal trials, including access to witnesses and sensitive documents, as well as

confrontational live hearings.  Plaintiffs' demands ignore not only the Court's prior order but

also other governing law as well as the unique national security considerations that must guide

the redress process.  The procedures Plaintiffs seek would seriously undercut the very interests

the No Fly List is designed to protect, and are not required by the Due Process Clause in these

circumstances.  Under the revised procedures, DHS TRIP provided Plaintiffs with a meaningful

opportunity to be heard with respect to their inclusion on the No Fly List.  The Constitution

requires no more. The Court should grant Defendants' motion for summary judgment and deny Plaintiffs' motions.[2]

## BACKGROUND

### I.    The Terrorist Screening Center And The No Fly List

In the aftermath of the September 11 attacks, Congress and the Executive Branch have devoted extensive resources to further strengthen the ability of the United States to protect the people, property, and territory of the United States against acts of terrorism. *See* Homeland Security Presidential Directive 6 (HSPD-6), *Integration and Use of Screening Information* (September 16, 2003). One significant security measure is the use of a consolidated terrorist watchlist, the Terrorist Screening Database ("TSDB"), and its subset lists, the No Fly and Selectee Lists. *See* 49 C.F.R. § 1560.3; *see also Terrorist Screening Center FAQ*, available at http://www.fbi.gov/about-us/nsb/tsc/terrorist-screening-center-frequently-asked-questions (April 21, 2015). The TSDB, which is maintained by the Terrorist Screening Center ("TSC"), enables U.S. authorities to identify those individuals known or suspected of engaging in terrorist activity. The No Fly List, a subset of the TSDB, flows from a congressional mandate to identify individuals who may be a threat to civil aviation or national security and prevent such

---

[2] As Defendants explained in the parties' February 6, 2015 status report proposing the presentation of cross-motions for summary judgment on the basis of unclassified records, [Dkt. No. 167], Defendants do not concede that the claims in this case necessarily can be resolved solely on the basis of unclassified information and, in particular, do not waive any argument that national security information may be at issue in any attempt to adjudicate some or all of the claims. *Id.* at 11. Rather, Defendants contend that the revised No Fly List redress procedures and renewed status determinations Plaintiffs received can be sustained on the basis of publicly available information already exchanged. Should the Court conclude that the parties' exchanges are not sufficient, the parties and the Court may be faced with further questions concerning the impact of national security information on any further proceedings, should they be needed. By deferring such questions until the parties have endeavored to litigate on the basis of unclassified information, a meaningful assessment of Plaintiffs' claims can occur without the need for the Government and the Court to address the impact of national security information on this case.

individuals from boarding aircraft. *See* 49 U.S.C. §§ 114(h)(3), 44903(j)(2)(A). To effectuate

this mandate, the Transportation Security Administration ("TSA") uses the No Fly List to

identify and deny boarding to individuals who may pose a threat to aviation or national security

as they seek to fly on U.S. air carriers or any flight into, out of, or over the United States. *See* 49

C.F.R. § 1560.105.

In order to place an individual on the No Fly List, the Government must assess that the

individual meets one of four additional criteria above what is required for inclusion in the larger

TSDB. More specifically, any individual, regardless of citizenship, may be placed on the No Fly

List if the TSC determines that he or she represents: a threat of committing an act of international

terrorism (as defined in 18 U.S.C. § 2331(1)) or an act of domestic terrorism (as defined in 18

U.S.C. § 2331(5)) with respect to an aircraft (including a threat of air piracy, or threat to an

airline, passenger, or civil aviation security); or a threat of committing an act of domestic

terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to the homeland; or a threat of

committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) against any U.S.

Government facility abroad and associated or supporting personnel, including U.S. embassies,

consulates and missions, military installations (as defined by 10 U.S.C. § 2801(c)(4)), U.S. ships,

U.S. aircraft, or other auxiliary craft owned or leased by the U.S. Government; or a threat of

engaging in or conducting a violent act of terrorism and who is operationally capable of doing

so. *See* Gen. Stipulations [Dkt. No. 173] ¶ 5; Declaration of TSC Deputy Director for

Operations G. Clayton Grigg, May 28, 2015 (Grigg Decl.) ¶ 17.[3]

---

[3] The lesser standard for inclusion in the broader TSDB — which is not at issue in this lawsuit —
requires a reasonable suspicion that the individual is a known or suspected terrorist. Grigg Decl.
¶ 15.

By its very nature, identifying individuals who "may be a threat to civil aviation or national security" is a predictive judgment intended to prevent future acts of terrorism in an uncertain context. *See* Declaration of FBI Assistant Direct of Counterterrorism Michael Steinbach, May 28, 2015 (Steinbach Decl.) ¶ 7. Such assessments differ significantly in their nature and purpose from the filing of criminal charges and the development of evidence to obtain a conviction. *Id.* For No Fly determinations, the Executive Branch assesses the threat a person poses to commit an act of terrorism based on information available, for the purposes of protecting a commercial civilian aircraft and its passengers from harm and protecting the national security. *Id.*; 49 U.S.C. §§ 114(h)(3), 44903(j)(2)(A). Such assessments are made in the midst of a fluid environment of gathering intelligence, investigating potential terrorist threats, and seeking to stop attacks before they happen. Steinbach Decl. ¶¶ 7, 37. Of necessity, such information-gathering activities rely heavily on highly sensitive intelligence and investigative sources and methods for identifying terrorist threats and activities that must be protected from disclosure. *Id.* ¶ 23.

It follows from the nature of the No Fly List inquiry that much of the information bearing on a No Fly List determination is sensitive national security information — information the Executive Branch has constitutional authority to protect. *Id.*; *see also* U.S. Const. art. II, § 2, cl. 1; *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988) ("[The Executive's] authority to classify and control access to information bearing on national security … flows primarily from this constitutional investment of power in the President"). Such information may reside in counterterrorism investigative files, and will often identify various intelligence sources and methods, including confidential human sources, information obtained from partners, and

information about other sources and methods that must be protected from disclosure to prevent significant harm to national security. *See* Steinbach Decl. ¶¶ 23-33.

The Government has established numerous safeguards and policies to ensure that No Fly List determinations are responsive to emerging threats and based on information that is reliable and up to date. As established by the Grigg Declaration, the TSDB and the No Fly List are subject to "rigorous and ongoing quality control." Grigg Decl. ¶ 22. Prior to placement, nominations are reviewed both at the nominating agency and by subject matter experts at TSC in coordination with the nominating agency and the National Counterterrorism Center ("NCTC") to ensure that the information is reliable and satisfies the standard for inclusion. *Id*. ¶ 19. After placement, regular reviews and audits include but are not limited to: "(a) at least a biannual review for all U.S. Person records in the TSDB; (b) at least a biannual review for all U.S. Persons on the Selectee List or No Fly List by a [subject matter expert]; (c) a review of the available derogatory and biographic information for subjects in TSDB following a screening encounter to ensure appropriate watchlisting as well as an appropriate encounter response when applicable; and (d) regular audits of individual analyst work to ensure appropriate procedures and practices are being executed during the review of TSDB nominations." *Id.* ¶ 28.

In addition to these internal mechanisms designed to ensure the effective administration of the TSDB and the No Fly List, these lists are paired with a robust redress process for persons denied boarding to further ensure the accuracy of No Fly List determinations. Pursuant to statutory authority and Executive Branch action, individuals who believe they have been delayed or denied boarding because they were wrongly identified as a threat may file inquiries with the Department of Homeland Security's Traveler Redress Inquiry Program ("DHS TRIP"). *See* 49 U.S.C. §§ 44903, 44926; 49 C.F.R. §§ 1560.201 *et seq*. DHS TRIP is a single point of contact

for individuals who have inquiries or seek resolution regarding travel-related difficulties such as denied or delayed airline boarding, denied entry into the United States, or repeated referral for additional (secondary) screening.  *See* DHS TRIP Website, http://www.dhs.gov/dhs-trip.

## II.    Prior Proceedings: The Court's June 24, 2014 Order

Under prior DHS TRIP procedures in place when this lawsuit commenced, an individual on the No Fly List would not receive confirmation of his or her status on the list, nor notice of the criteria pursuant to which he or she was listed, nor additional information concerning the basis for his or her placement.  This Court determined that this prior redress process did not satisfy the requirements of due process.  Dkt. No. 136.  Although the Court found that the Government's interests in protecting aviation and national security and preventing the disclosure of sensitive information were "particularly compelling," *id.* at 42, the Court found that nondisclosure of any information concerning an individual's status on the No Fly List was insufficient, *id.* at 11, 13, 59.  The Court analyzed other cases in involving national security matters in which individuals were provided with some (but not all) information concerning the reasons for their purported liberty or property deprivations (including *Jifry v. FAA*, 370 F.3d 1174 (D.C. Cir. 2004), *Al Haramain Islamic Found. Inc. v. Dep't of Treasury*, 686 F.3d 965 (9th Cir. 2012) ("*AHIF II*"), and *KindHearts for Charitable and Humanitarian Dev., Inc. v. Geithner*, 647 F. Supp. 2d 857 (N.D. Ohio 2009)), and observed that, in contrast to those cases, DHS TRIP did not provide "any notice" of the reasons for placement on the List.  Dkt. No. 136 at 59.  The Court concluded that "the absence of any meaningful procedures to afford Plaintiffs the opportunity to contest their placement" violated due process.  *Id.* at 60.  The Court further held that the Government must devise new procedures "with the requisite due process described herein without jeopardizing national security."  *Id.* at 61.  The Court noted that such procedures

must include individualized assessments by the Government of what information can be provided in light of relevant national security and other concerns regarding disclosure. *Id.* at 62 (citing factors discussed in *AHIF II*, 686 F.3d at 984).

## III.    Revised DHS TRIP Procedures

After the issuance of the Court's June 2014 Order, Defendants advised the Court that the Government intended to make changes to the existing redress process regarding the No Fly List, "in coordination with other agencies involved in aviation security screening, informed by the myriad legal and policy concerns that affect the Government's administration of the No Fly List and the redress process, and with full consideration of the Court's opinion." Dkt. No. 144 at 4. Defendants advised further that "the Government will endeavor to increase transparency for certain individuals denied boarding who believe they are on the No Fly List and have submitted DHS TRIP inquiries, consistent with the protection of national security and national security information, as well as transportation security." *Id.*

The revised procedures were made available to Plaintiffs in November 2014 and were made generally available in March 2015. As noted, under the previous redress procedures, individuals who submitted inquiries to DHS TRIP received a letter responding to their inquiry that neither confirmed nor denied their No Fly status. Under the newly revised procedures, a U.S. person who (a) purchases an airline ticket for a flight to, from, or over the United States; (b) is denied boarding on that flight; (c) subsequently files a redress inquiry regarding the denial of boarding with DHS TRIP; (d) provides all information and documentation required by DHS TRIP; and (e) is determined to be appropriately included on the No Fly List following the TSC Redress Office's review of the redress inquiry, will receive a letter stating that he or she is on the No Fly List and providing the option to receive and submit additional information. If such a

person timely requests additional information, DHS TRIP will respond with a second letter that identifies the specific criteria or criterion under which the person has been included on the No Fly List. The second letter will also include an unclassified summary of information supporting the individual's No Fly List status, to the extent feasible and consistent with the national security and law enforcement interests at stake. The amount and type of information provided will vary on a case-by-case basis, depending on the facts and circumstances. In some circumstances, an unclassified summary may not be provided when the national security and law enforcement interests are taken into account. *See generally* Notice Regarding Revisions to DHS TRIP Procedures [Dkt. No. 197]; Declaration of Deborah O. Moore, Branch Manager of the Transportation Security Redress Branch in the Office of Civil Rights & Civil Liberties, Ombudsman and Traveler Engagement at TSA, May 28, 2015 (Moore Decl.) ¶¶ 12–13.

This second letter will also provide requesters an opportunity to be heard further concerning their status. If a U.S. person timely responds to the second letter requesting further review, DHS TRIP forwards the response to the TSC Redress Unit for careful consideration. *Id.* ¶ 14. Upon completion of TSC's comprehensive review, the TSC Principal Deputy Director provides DHS TRIP with a recommendation memorandum to the TSA Administrator as to whether the individual should be maintained on the No Fly List and the reasons for the recommendation. Grigg Decl. ¶ 43. The TSA Administrator then reviews the material and either remands the redress case back to TSC for additional information or clarification or issues a final order removing the U.S. person from the No Fly List or maintaining him on the List. *Id.* ¶ 44; Moore Decl. ¶ 15. If a final order is issued, DHS TRIP will provide the order to the individual. *Id.* ¶ 16. If the final order maintains the individual on the No Fly List, it will state the basis for the decision to the extent feasible without compromising the national security and law

enforcement interests at stake and will notify the person of the ability to seek judicial review

under 49 U.S.C. § 46110 or as otherwise permitted by law.  *Id.*

**IV.    Reevaluation Of Plaintiffs' DHS TRIP Inquiries**

As the Court also is aware, this revised redress process was made available to Plaintiffs.[4]

In initial letters to Plaintiffs, DHS TRIP informed each Plaintiff of his placement on the No Fly

List and of the applicable basis for placement.  *See* Joint Stmt. of Agreed Facts for all Pls. [Dkt.

No. 173] and for Plaintiffs Faisal Kashem, Mohamed Sheikh Abdirahman Kariye, Raymond

Knaeble, Amir Meshal, Stephen Persaud, and Steven Washburn [Dkt. Nos. 175–180].  Each

Plaintiff was notified that he was on the No Fly List because he was "identified as an individual

who 'may be a threat to civil aviation or national security.'  49 U.S.C. § 114(h)(3)(A)."  *See* Dkt.

Nos. 175–180 ¶ 3.  The DHS TRIP notification letters for Messrs. Kashem, Meshal, and Persaud

further informed each of them that "it has been determined that you are an individual who

represents a threat of engaging in or conducting a violent act of terrorism and who is

operationally capable of doing so."  *See* Dkt. Nos. 176 ¶ 4, 178 ¶ 4, 180 ¶ 4.  Messrs. Knaeble

and Washburn were each notified in the DHS TRIP notification letters that "it has been

determined that you pose a threat of committing an act of domestic terrorism (as defined in 18

U.S.C. § 2331(5)) with respect to the homeland."  *See* Dkt. Nos. 177 ¶ 4, 179 ¶ 4.  The DHS

TRIP notification letter informed Mr. Kariye that "it has been determined that you represent a

threat of committing an act of international terrorism against any U.S. Government facility

abroad and associated or supporting personnel, including U.S. embassies, consulates and

---

[4] Due to litigation deadlines, DHS TRIP combined the first and second letters into one letter.
Moore Decl. ¶ 18.

missions, military installations, U.S. ships, U.S. aircraft, or other auxiliary craft owned or leased by the U.S. Government." *See* Dkt. No. 175 ¶ 4.

In addition, each Plaintiff was provided with an individualized, unclassified statement of reasons supporting his inclusion on the No Fly List, where feasible and consistent with national security and law enforcement interests. *See* Dkt. Nos. 175–180 ¶¶ 5. Each letter further notified each Plaintiff that the Government was "unable to provide additional disclosures" due to the nature of that information, including because of national security concerns. *See* Notification Ltrs.[5]

After the six Plaintiffs were notified that they were on the No Fly List, each Plaintiff submitted a response to the notification letter he had received. The Government then assessed each of their responses and the Acting TSA Administrator made a final determination that each of them should remain on the No Fly List. *See* Dkt. No. 173 ¶ 29; *see also* Exs. C to Joint Stmt. of Agreed Facts for Indiv. Pls. [Dkt. Nos. 175–180].

## ARGUMENT

Congress, the President, and this Court have all reaffirmed that the Government has a compelling interest in preventing terrorist attacks, including attacks on commercial aircraft. The No Fly List relies on sensitive intelligence and law enforcement information to identify threats and prevent such deadly attacks. These compelling interests necessarily constrain the breadth and depth of information that can be provided through the DHS TRIP redress process.

---

[5] Because the substance of these statements have been designated by Plaintiffs as "confidential," Defendants do not describe their contents in this public memorandum and instead refer the Court to the documents themselves for an assessment of their nature, scope and breadth. *See* Exs. A to Joint Stmt. of Agreed Facts for Indiv. Pls. [Dkt. Nos. 175–180] (hereinafter "Notification Ltrs."). Defendants have also provided further detail about each individual in the summary judgment memoranda for each individual plaintiff, which have been filed under seal, in part.

Notwithstanding these constraints, and contrary to Plaintiffs' contention, the revised DHS TRIP process provides meaningful notice and an opportunity for individuals on the No Fly List to be heard concerning their status.  This process is consistent with the due process case law governing disclosures of information where national security interests are implicated.  As set forth further below, the revised redress procedures are squarely responsive to the Court's June 2014 order, and the additional notice and process demanded by Plaintiffs is neither appropriate nor possible in the national security setting at issue here.

**I.      The Revised DHS TRIP Process Honors The Parameters And Limitations That Emerge From Due Process Law, National Security Precedent, And The Court's Prior Order.**

"[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (internal quotations and citation omitted).  Instead, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id.* (internal quotation and citation omitted).  The fundamental requirement of due process is "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  Three factors generally are relevant to this analysis: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interests through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest," including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Gilbert*, 520 U.S. at 931–32 (quoting *Mathews*, 424 U.S. at 335).  How to satisfy due process's meaningful-opportunity requirement is informed by context, and, accordingly, due process procedures may vary "'depending upon the importance

of the interests involved.'"  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985)

(quoting *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971)).

Due process does not require, in all cases, "the full panoply" of trial-type protections

generally afforded criminal defendants.  *F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*,

244 F.3d 1128, 1143 (9th Cir. 2001); *see also Gonzalez v. Freeman*, 334 F.2d 570, 580 n.21

(D.C. Cir. 1964).  In particular, due process does not "require that [an] agency grant a formal

hearing."  *Pinnacle Armor, Inc. v. U.S.*, 648 F.3d 708, 717 (9th Cir. 2011).  Due process, rather,

"'is flexible,'" *United States v. Harrington*, 749 F.3d 825, 828 (9th Cir. 2014) (quoting *Mathews*,

424 U.S. at 334), requiring only "'notice and opportunity for hearing <u>appropriate to the nature of</u>

<u>the case</u>,'" *Pinnacle Armor*, 648 F.3d at 717 (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470

U.S. 532, 542 (1985) (emphasis in *Pinnacle Armor*)).

Moreover, the due process analysis looks to the "generality of cases," beyond the

particular application of the process to the individual at bar.  *Mathews*, 424 U.S. at 344

("[P]rocedural due process rules are shaped by the risk of error inherent in the truthfinding

process as applied to the generality of cases, not the rare exceptions."); *Veterans for Common*

*Sense v. Shinseki*, 678 F.3d 1013, 1034 (9th Cir. 2012) (en banc) (same).  Thus, the central

question is whether the challenged process, which seeks to provide additional information to

individuals to the extent consistent with national security and law enforcement interests,

adequately reduces the risk of erroneous listing in the generality of cases.[6]

In considering Plaintiffs' challenge, the Court's inquiry should be confined to the

---

[6] To be sure, the nature and amount of information provided to a particular plaintiff may bear on
how the process operates, to the extent it provides a point of reference that informs how likely
individuals are to receive information reasonably calculated to allow for a meaningful
opportunity to contest their listing.  But the inquiry remains focused on the overall process,
rather than the risk of erroneous inclusion in a particular case.

parameters set forth in the case law governing the meaning and scope of due process in the national security context, including this Court's prior opinion. <u>First</u>, it is beyond reasonable dispute that the Government must assess sensitive national security and law enforcement information in order to effectively guard against threats to aviation or national security posed by potential terrorists. Dkt. No. 136 at 41–42; *Haig v. Agee*, 453 U.S. 280, 306–307 (1981). <u>Second</u>, No Fly List determinations are predictive assessments about potential threats based on national security and law enforcement information developed from multiple sources in the midst of ongoing counterterrorism activities by the Government. *See* 49 U.S.C. § 114(h)(3); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) ("[N]ational security and foreign policy concerns arise in connection with efforts to confront evolving threats in an area where information can be difficult to obtain and the impact of certain conduct difficult to assess."). <u>Third</u>, information relevant to making such predictive judgments necessarily consists of national security information that the Executive Branch has the authority (and, indeed, an obligation) to protect. <u>Fourth</u>, many courts, including this one, have recognized the compelling interest in protecting national security information from disclosure. Dkt. No. 136 at 42 (collecting cases). <u>Fifth</u>, in light of the compelling interests at stake, considerations of due process should not require the Government to compromise national security by risking or requiring the disclosure of such information. Indeed, circumstances may require that national security information be "withheld altogether." Dkt. No. 136; *see also Ibrahim v. DHS*, -- F. Supp. 2d --, 2014 WL 6609111, at *18 note.

Defendants' revised DHS TRIP procedures adhere to these principles. DHS TRIP provides for a meaningful opportunity for U.S. persons denied boarding due to their status on the No Fly List to learn of their status on the List; to learn (in every case) the applicable basis for

their listing; to learn (to the extent possible without compromising national security or law enforcement interests) additional information elucidating the reasons for their inclusion; and to respond through the submission of any information they deem relevant to their determination. *See* Moore Decl. ¶¶ 12–14.  The determination is then placed before the TSA Administrator for a final determination, taking into account both the information on which the Government has relied to support inclusion on the list and the requester's response.  *Id.* ¶ 15.  These changes to the redress process are responsive to the flaws the Court identified in its previous order and are consistent with the law governing due process in the national security context.

Plaintiffs, however, continue to insist that more is required.  Primarily through analogies to cases in inapposite contexts, Plaintiffs demand a wide range of procedures and disclosures of information, none of which are called for by the requirements of due process in this setting, and all of which would significantly threaten the very national security interests the No Fly List is designed to protect.  The kind of procedures Plaintiffs demand, including (among other things) adversarial hearings and access to witnesses and all information pertinent to a No Fly List determination (including classified national security and privileged law enforcement information), are not applicable to No Fly List determinations and, indeed, disregard well-founded protections for the kind of national security information needed maintain the No Fly List.  Plaintiffs' demands also pay little heed to the parameters set out in the Court's June 2014 opinion.  For these reasons, Plaintiffs' summary judgment motion should be rejected and Defendants' motion should be granted.  The significant changes the Government has undertaken to the redress process satisfy the context-specific demands of due process, and Plaintiffs' demands for yet more process are misplaced.

**A.     No Fly List Determinations Involve Compelling National Security Interests.**

The compelling governmental interests that underlie the No Fly List are clear.  As this

Court recognized:

> "[T]he Government's interest in combating terrorism is an urgent objective of the highest
> order."  *Holder* v. *Humanitarian Law Project,* 561 U.S. 1, 28 (2010).  "It is 'obvious and
> unarguable' that no governmental interest is more compelling than the security of the
> Nation."  *Haig* v. *Agee,* 453 U.S. 280, 307 (1981) (quoting *Aptheker v. Sec'y of State,* 378
> U.S. 500, 509 (1964)); *see also Al Haramain,* 686 F.3d at 980 ("[T]he government's
> interest in national security cannot be understated.").  "[T]he Constitution certainly does
> not require that the government take actions that would endanger national security."  *Al
> Haramain,* 686 F.3d at 980.

Dkt. No. 136 at 41.  There is no dispute, therefore, that the Government's interest in identifying

potential terrorists and prohibiting them from boarding aircraft is compelling.  *Id.* at 41–42; *see

also United States v. Hartwell*, 436 F.3d 174, 179 (3d Cir. 2006).  There is likewise no dispute

that Congress appropriately identified persons who "may be a threat to civil aviation or national

security" as those who should be so prohibited.  49 U.S.C. § 114(h)(3)(A).

The congressionally required task of maintaining the No Fly List requires the Executive

Branch to make judgments about potential threats to aviation and national security, based on

information available to the Government.  These assessments are, by nature and necessity,

predictive judgments about individuals who may pose threats to civil aviation and national

security — assessments made in the midst of gathering intelligence and investigating potential

terrorist threats to national security.  *See Humanitarian Law Project*, 561 U.S. at 34.  Judgments

concerning such potential threats to aviation and national security call upon the unique

prerogatives of the Executive in assessing such threats.

**B.      No Fly List Determinations Rely On National Security Information That Cannot Be Disclosed.**

No Fly determinations are often based on highly sensitive national security and law enforcement information that cannot be disclosed without "grave consequences for the national security."  Steinbach Decl. ¶ 23.  Information underlying No Fly determinations could, for example, "tend to reveal whether an individual has been the subject of an FBI counterterrorism investigation" or "whether particular sources and methods were used by the FBI in a counterterrorism investigation or intelligence activity related to the individual."  *Id*.  Because disclosing this type of information would, among other harms, provide adversaries with "valuable insight into the specific ways in which the Government goes about detecting and preventing terrorist attacks," *id.*, ensuring its protection remains a "particularly compelling" national security interest, as this Court has recognized, Dkt. No. 136 at 42; *cf. AHIF II*, 686 F.3d at 980 (observing that "the Constitution certainly does not require that the government take actions that would endanger national security."); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 207 (D.C. Cir. 2001) ("*NCRI*") ("[T]hat strong interest of the government [in protecting against the disclosure of classified information] clearly affects the nature … of the due process which must be afforded petitioners.").

The Steinbach Declaration details the types of sensitive national security and law enforcement information that often forms the basis for No Fly determinations.  *See id*. ¶¶ 23--33. It also describes the serious harms that could flow from the disclosure of such information, including the disruption of ongoing counterterrorism investigations and intelligence operations, *id*. ¶ 24, the exposure of classified sources and methods, *id*. ¶¶ 24–30, and harms to relationships with domestic and foreign partners, *id*. ¶ 31.  In particular, such disclosures could reveal the specific investigative or intelligence-gathering methods used for a certain target, such as court-

ordered searches or surveillance, confidential human sources, undercover operations, or various forms of national security process. *Id.* ¶ 27. This, in turn, would "provide a roadmap to adversaries" as to how the FBI goes about detecting and preventing terrorist attacks, allowing them to take countermeasures to avoid detection and undermine the FBI's counterterrorism mission. *Id.*

Moreover, a rule requiring disclosure of this kind of information in the course of the No Fly List redress process would "have a dangerous chilling effect on the use of such information in the nomination process" and thereby undermine the effectiveness of the No Fly List. *Id.* ¶ 34. Indeed, the No Fly List would "become self-defeating if, in order to protect against terrorist threats to aviation and national security, the Government were required to disclose classified national security information about a particular known or suspected terrorist on the List." *Id.* In Assistant Director Steinbach's judgment, "there would be a strong reluctance to share such information in the nomination process" and, in some cases, and incentive to "forego a nomination entirely." There is no basis to conclude that placing nominators on the horns of such a dilemma is required by the Constitution.[7]

_____

[7] The obligation to determine what national security information to protect, how to protect it, and to whom and how much to disclose, falls to the Executive. U.S. Const. art. II, § 2, cl. 1; *Egan*, 484 U.S. at 527. As the D.C. Circuit explained in *NCRI*, disclosure of classified information "is within the privilege and prerogative of the executive, and we do not intend to compel a breach in the security which that branch is charged to protect." 251 F.3d at 208–209; *see also* Dkt. No. 136 at 42 ("Obviously, the Court cannot and will not order Defendants to disclose classified information to Plaintiffs."). In balancing the private interest in obtaining information against the Government's interest in protecting it, Courts are obligated to defer to the Executive's determinations in this regard. *Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1196 (9th Cir. 2007) (observing in a state-secrets-assertion case that "we acknowledge the need to defer to the Executive on matters of foreign policy and national security and surely cannot legitimately find ourselves second guessing the Executive in this arena"); *see also United States v. Hawkins*, 249 F.3d 867, 873 n.2 (9th Cir. 2001) (government interest in "ensuring national security" is "important in [itself]… but courts have long recognized that the Judicial Branch

**C.    Compelling Interests In Protecting National Security Information Limit The Scope Of Information That Can Be Disclosed Through DHS TRIP.**

In light of the compelling interests at stake, due process considerations should not risk, much less require, the disclosure of sensitive national security information.  Dkt. No. 136 at 41–42; *NCRI*, 251 F.3d at 208–209.  Whatever other information can be provided through an administrative process, its scope will necessarily be limited, and, in some cases (as the Court recognized), may be "withheld altogether."  Dkt. No. 136; *see also AHIF II*, 686 F.3d at 980; *Ibrahim*, 2014 WL 6609111, at *18 note.

In this respect, both *Al Haramain* and *Jifry* are particularly instructive.  In both cases the courts weighed the private interest in obtaining national security information underlying an administrative action against the Government's interest in protecting it, and in both cases the courts struck the balance in favor of the Government.  *Al Haramain*, which the Court relied upon extensively in imposing the parameters here, arose in the context of targeted international sanctions against a designated terrorist organization.  In that context, courts have upheld redress processes even though the administrative procedures are informal and the petitioners are not provided with classified information.  *See*, *e.g.*, *AHIF II*, 686 F.3d at 980–82 (collecting cases).[8]

_____

should defer to decisions of the Executive Branch that relate to national security."); *Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) ("The assessment of harm to intelligence sources, methods and operations is entrusted to the Director of Central Intelligence, not to the courts.") (internal citation omitted).

[8]Notably, *Al Haramain* involved a deprivation arguably more significant than that at issue here.  Unlike a publicly announced terrorism designation, accompanied by freezing of assets and regulation of activities in the United States, placement on the No Fly List is not public and deprives a person of use of a single mode of transportation for an indeterminate amount of time.  In contrast, designation as a specially designated global terrorist ("SDGT") under Executive Order 13224 freezes all property in the United States and prohibits all transactions with U.S. persons (without a license from the Treasury Department).  *See* E.O. 13224, as amended, 66 Fed. Reg. 49079 (Sept. 23, 2001); *AHIF II*, 686 F.3d at 979–80 ("No person or organization may conduct any business whatsoever with the entity, other than a very narrow category of actions

When considering the deprivation occasioned by designation as an SDGT, the Ninth Circuit required only that the Government consider whether it is possible to provide unclassified summaries or to clear counsel. *See* 686 F.3d at 984. Further, the Ninth Circuit signaled the scope of what it contemplated that the Executive would consider disclosing by way of an unclassified summary: not an exhaustive statement (nor a "complete statement," as Plaintiffs demand), but rather an unclassified summary providing potentially "helpful information, such as the subject matter of the agency's concerns." *Id.* at 983.

    *Jifry* is likewise instructive. In that case, the plaintiffs had their airmen's certificates — effectively their licenses to practice their chosen livelihood — revoked. The factual basis for TSA's determination was based on classified information that was not disclosed; plaintiffs were told only that they presented a security risk to civil aviation or national security, without any additional substantive information. *See Jifry*, 370 F.3d at 1177. Although this Court has opined

---

such as legal defense."). As such, SDGTs cannot purchase an airline ticket in the United States, pay a mortgage, sell a car, receive a salary or use a credit card. *Id.* Loss of a single mode of transportation (and, for purposes of the claims here, only for international travel), although potentially very inconvenient, is not nearly as significant a deprivation as designation under E.O. 13224.

Plaintiffs dispute this Court's conclusion that this authority is analogous and contend that the sanctions cases somehow involve a <u>less</u> severe deprivation because sanctions affect "property" rather than "liberty" interests. Plaintiffs' further contention that only property interests are at stake in sanction cases is likewise meritless. The prohibition on business transactions with U.S. persons can also affect a liberty interest, and in any event the Supreme Court has squarely rejected the notion of a categorical difference between liberty and property interests. *See Zinermon v. Burch*, 494 U.S. 113, 132 (1990) (rejecting argument that deprivation of liberty rather than property required predeprivation process); *Lynch v. Household Finance Corp.*, 405 U.S. 538, 552 (1972) ("[T]he dichotomy between personal liberties and property rights is a false one."). Moreover, Plaintiffs' citations are not helpful to their argument that all "liberty" deprivations are more serious than "property" deprivations. *See* Pls' Mem. [Dkt. No. 207] at 9. The dicta in *Hortonville Joint Sch. Dist. v. Hortonville Educ. Ass'n*, 426 U.S. 482, 495 (1976) significantly predates the on-point decisions cited above, and the dicta in *Zadvydas v. Davis*, 533 U.S. 678, 692 (2001) compares the procedures required for property deprivation to the procedures required for indefinite physical detention of an individual.

that the present case involves a "substantially greater" deprivation than that at issue in *Jifry*, *see*

Dkt. No. 136 at 57, the Government respectfully disagrees with that assessment.  Indeed, *Jifry*

involved the substantial curtailment of the ability to pursue the plaintiffs' chosen livelihood.[9]

The D.C. Circuit, assuming the plaintiffs had a protected interest in their certificates, upheld the

process despite the use of a classified administrative record and despite the distinctly limited

disclosures.

In any event, both *Jifry* and *Al-Haramain* demonstrate the courts' recognition that where

unclassified disclosures are made in the national security context, due process may be satisfied

even through the invocation of "a security risk" or unclassified summaries identifying "the

subject matter of the agency's concerns."  *Jifry*, 370 F.3d at 1177; *AHIF II*, 686 F.3d at 983.

Accordingly, the law recognizes the limitations on any attempt to disclose information in an

unclassified fashion, where the subject matter to be referenced involves sensitive national

security information.  It follows that unclassified summaries, provided where possible and to the

extent possible without compromising national security and law enforcement interests, well

satisfy the demands of due process and the parameters outlined by the Court in its June 2014

opinion.[10]

---

[9] This Court noted that the *Jifry* plaintiffs' livelihood was being pursued overseas, but that fact
seems related to the strength of their connections to the United States, not the strength of their
interest in their livelihood.  Indeed, the D.C. Circuit assumed that they had sufficient connection
to the United States to be entitled to due process and held the process sufficient all the same.
*Jifry*, 370 F.3d at 1173.

[10] The Government also considered — and did not provide to Plaintiffs — law-enforcement
privileged information. *See* Steinbach Decl. ¶¶ 32–33 (explaining that No Fly determinations
often hinge on law enforcement sensitive information).  In many instances, this material is
intertwined with classified information and cannot be segregated without risking unauthorized
disclosure of the classified information.  *In re U.S. Dep't of Homeland Sec.*, 459 F.3d 565, 569
(5th Cir. 2006) ("[T]he reasons for recognizing the law enforcement privilege are even more
compelling" when "the compelled production of government documents could impact highly

II.   **Plaintiffs' Interests Are Limited.**

Another factor that the Court must consider and balance under *Mathews* concerns both the nature of the liberty interest at stake and the degree of the deprivation alleged. Although the Court previously found that placement on the No Fly List amounts to "a significant deprivation of their liberty interests in international travel," Dkt. No. 136 at 30,[11] the first inquiry must precisely identify the nature and weight of the liberty interest at stake before addressing the degree of deprivation. When a less weighty liberty interest is at stake, the process due is more limited.

Here, the interest identified by Plaintiffs — the ability to travel by airplane — is only a limited aspect of an individual's liberty interest in international travel. The Supreme Court has held that "the <u>freedom</u> to travel outside the United States must be distinguished from the <u>right</u> to travel within the United States." *Haig*, 453 U.S. at 306; *see also Califano v. Aznavorian*, 439 U.S. 170, 176–77 (1978) (governmental action "which is said to infringe the freedom to travel abroad is not to be judged by the same standard applied to laws that penalize the right of

_____

sensitive matters relating to national security."). The Steinbach Declaration establishes that disclosure of such information would harm law enforcement interests by, for example, revealing information relating to sensitive law enforcement techniques, or information that would undermine the confidentiality of sources or endanger law enforcement personnel. *Id.* ¶ 32. In any event, because Plaintiffs otherwise have access to adequate notice of the basis for their listing, law enforcement information was appropriately withheld.

[11] Defendants respectfully note their continued objection to that finding. *See* Fed. R. Civ. P. 54(b). In particular, the Court found that inclusion on the No Fly List constitutes a significant deprivation of the liberty interest in international travel because it would prevent Plaintiffs from partaking in a variety of personal and professional activities. Dkt. No. 136 at 30. Butthe Supreme Court has explained that "the due process provision of the Fifth Amendment does not apply to the indirect adverse effects of governmental action." *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 789 (1980). Otherwise, the nature of the liberty interest at stake — and, consequently, the process that is due — would vary based upon the individual circumstances of each plaintiff. *Cf. Mathews*, 424 U.S. at 344.

23 – MEM. IN SUPP. OF DEFS.' CONSOLIDATED CROSS-MOT. FOR S.J. AND OPP'N
*Latif v. Holder*, Civil Case No. CV 10-00750-BR

interstate travel").[12]  For this reason, "the 'right' of international travel has been considered to be no more than an aspect of the 'liberty' protected by the Due Process Clause of the Fifth Amendment," *id.* at 176, and "the freedom to travel abroad … is subordinate to national security and foreign policy considerations … [and] is subject to reasonable governmental regulation," *Haig*, 453 U.S. at 306-07.[13]  Thus, even if Plaintiffs have a cognizable liberty interest in traveling internationally by airplane, a less weighty interest is due less process.  *See Wilkinson v. Austin*, 545 U.S. 209, 225 (2005) (applying *Mathews* by "first consider[ing] the significance of the inmate's [liberty] interest," which is "curtailed by definition, so the procedural protections to which [the inmate is] entitled are more limited than in cases where the right at stake is the right to be free from confinement at all"); *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 320 (1985) ("[T]he processes required … with respect to the termination of a protected interest will vary depending upon the importance attached to the interest and the particular circumstances under which the deprivation may occur.").  Here, Plaintiffs' liberty interest is necessarily weaker than other liberty interests courts have recognized, such as the right to be free from confinement, and weaker than liberty interests in interstate travel, because it gives way to government regulation that is "reasonable."  *See Haig*, 453 U.S. at 306; *cf. Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 130 (1992) ("The reasons why the [government's] alleged failure … did not

---

[12] The Supreme Court's decision in *Haig* clarified the Court's jurisprudence regarding the liberty interest at stake in international travel, and it distinguished prior decisions on the issue that involved restrictions on international travel based on political beliefs and affiliations, not conduct.  *See Haig*, 453 U.S. at 304 ("The *Kent* [*v. Dulles*, 357 U.S. 116 (1958),] Court had no occasion to consider whether the Executive had the power to revoke the passport of an individual whose <u>conduct</u> is damaging the national security and foreign policy of the United States.").

[13] *Compare id. with*, *e.g.*, *Washington v. Harper*, 494 U.S. 210, 221 (1990) (identifying "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs"); *Parham v. J.R.*, 442 U.S. 584, 600 (1979) (noting the "substantial liberty interest in not being confined unnecessarily").

constitute a constitutionally arbitrary deprivation of [] life apply *a fortiori* to the less significant

liberty interest[.]") (internal citation omitted).

### III.    Revised DHS TRIP Provides Individuals With Meaningful Opportunities To Be Heard Without Compromising The Government's Compelling National Security Interests.

The revised DHS TRIP procedures applied to Plaintiffs are tailored specifically to the

task of providing a meaningful opportunity to respond, appropriately calibrated to this national

security context.  In addition to the individual's status on the No Fly List and the applicable

criteria or criterion under which the individual was placed on the No Fly List, the individual will

receive, where possible and consistent with the national security and law enforcement interests at

stake, an unclassified summary of information supporting the individual's placement on the No

Fly List — something each Plaintiff received here.  Moore Decl. ¶¶ 13, 18–19.  As noted, the

revised process requires that the nominating agency or agencies attempt to provide as much

information as possible without disclosing protected information, and multiple agencies,

including the nominating agency and TSC, participate in the process of developing that

information and making the disclosure assessment.  Grigg Decl. ¶¶ 41--42; Steinbach Decl. ¶¶

20–21.  As summaries — a possibility permitted by the Court's opinion and squarely

commensurate with the kinds of disclosures contemplated in other cases — the notice letters do

not include every fact or detail considered by the Government in determining whether the

individual poses a threat to civil aviation or national security.  Defendants have considered the

notice provided to each Plaintiff on a case-by-case basis, taking into account the individual threat

posed by particular pieces of information and determining whether it is possible to create an

unclassified version of each fact or unclassified versions thereof.[14]  *See id.* ¶¶ 46–47.

Accordingly, the level of detail provided to each Plaintiff varies, in some cases significantly.

But the fact that some individuals may be provided with more information by way of an additional unclassified statement does not undermine the propriety of the revised process.  As this and other courts have recognized, the need to protect of national security may render it impossible to provide any information in some cases, beyond the applicable criteria that was provided here.  *Id.* at 62; *Ibrahim v. DHS*, -- F. Supp. 2d --, 2014 WL 6609111, at *18 note (same); *see Jifry*, 370 F.3d at 1183–84 (in determining whether plaintiffs posed threats to civil aviation, "substitute procedural safeguards may be impracticable [in those cases] and, in any event, are unnecessary" because of "the governmental interests at stake and the sensitive security information" involved; as a result, due process did not require that plaintiffs be given the "specific evidence" upon which the determinations are based); *see also AHIF II*, 686 F.3d at 982–83 (discussing potential disclosure of the "subject matter of the agency's concerns").

The Fifth Amendment process requires that "a person receive his 'due' process, not every procedural device that he may claim or desire."  *Johnson v. United States*, 628 F.2d 187, 194 (D.C. Cir. 1980).  The disclosures requested by Plaintiffs would be inappropriate, for the reasons discussed above.  Instead, an eligible individual on the No Fly List receives, at a minimum, their status on the No Fly List and the applicable criterion, *i.e.*, the "subject of the agency's concerns," *see AHIF II*, 686 F.3d at 982–83, along with an unclassified summary, to the extent possible. Due process should not require that an action to protect national security from a terrorist threat become inherently self-defeating by requiring the disclosure of national security information

---

[14] This includes an assessment of whether particular facts, which standing alone may be innocuous, might nonetheless compromise important information if released together. *Cf. Kasza v. Whitman*, 325 F.3d 1178, 1180-81 (9th Cir. 2003).

about such threats.  Such a choice would compromise the very security the No Fly List is designed to protect.

In sum, and with due consideration to the Court's orders and the competing interests in disclosure and secrecy, the Government has revised DHS TRIP to permit U.S. persons who are on the No Fly List such as Plaintiffs an opportunity to (1) know they are on the No Fly List; (2) be advised of the basis for their inclusion (including as much as can be provided without compromising the national security, including, at a minimum, the applicable criteria); (3) be heard by way of a written response before a final redress determination is made; and (4) seek judicial review of TSA's final determination.  This balanced approach satisfies the requirements of due process by providing a meaningful opportunity to be heard without compromising the Government's compelling interests in protecting the national security.

**IV.    Current Procedures Minimize the Risk of Error.**

Crucial to the *Mathews* inquiry is "the probable value, if any, of additional or substitute procedural safeguards."  *Mathews*, 424 U.S. at 335.  As the evidence shows, the current procedures surrounding the No Fly List — including the numerous safeguards built into the nomination and review process, the revised DHS TRIP redress process, and the opportunity for judicial review as permitted by law — provide a reasonable assurance that U.S. persons will not be placed on the No Fly List in error.

Current procedures, including the revised DHS TRIP process, minimize the risk of error.  First, multiple layers of independent review ensure that the risk of erroneous placement on the No Fly List is quite low.  As established by the Grigg Declaration, the TSDB and the No Fly List are subject to "rigorous and ongoing quality control."  Grigg Decl. ¶ 22.  Prior to placement, nominations are reviewed both at the nominating agency and by subject matter experts at TSC in

coordination with the nominating agency and NCTC to ensure that the information is reliable and satisfies the standard for inclusion.  *Id.* ¶¶ 12–21.  After placement, regular reviews and audits include but are not limited to: "(a) at least a biannual review for all U.S. Person records in the TSDB; (b) at least a biannual review for all US Persons on the Selectee List or No Fly List by a [subject matter expert]; (c) a review of the available derogatory and biographic information for subjects in TSDB following a screening encounter to ensure appropriate watchlisting as well as an appropriate encounter response when applicable; and (d) regular audits of individual analyst work to ensure appropriate procedures and practices are being executed during the review of TSDB nominations."  *Id.* ¶ 28.  And, as a result of these constant reviews and intelligence updates, the procedural safeguards surrounding the No Fly List are quite dynamic.  *Id.* ¶ 29.[15]

In addition to this robust quality control, redress procedures, including the new redress measures prescribed by the Court and developed in coordination with multiple agencies, provide further assurance that any erroneous placements are corrected.  Anytime someone denied boarding as a result of the No Fly List seeks redress through DHS TRIP, a separate Redress Unit within TSC conducts a substantive review of the substantive derogatory information in coordination with the nominating agency, using the identifying information provided by the petitioner.  *See* Grigg Decl. ¶ 33.  As described above, U.S. persons who were denied boarding due to placement on the No Fly List and who seek redress and additional information through DHS TRIP now receive additional measures, including confirmation of their status, the criteria or criterion underlying their particular listing, and, whenever possible, an unclassified summary of the reasons.  *See* Grigg Decl. ¶¶ 36–44.  The criterion under which someone was listed is the

_____

[15] It is noteworthy that most of the original plaintiffs in this action, who at one time or another called themselves "exiled" from the United States, have since found themselves able to fly without application of the new procedures.

overarching legal and factual basis for the listing, and it permits the listee to respond and provide relevant information. In each instance relevant here, the Government has gone beyond a statement of the applicable criteria and provided at least some of the additional factual information underlying the application of the criterion at issue. Each plaintiff here received an unclassified summary of the factual basis for his listing. This statement of the basis is more than adequate to permit each plaintiff to understand the general concerns and to provide some information in response. In short, the Government has made a "case-by-case" determination of what information supporting a listing can be released and has provided all information underlying each listing that it can without damaging national security or law enforcement investigations. *See* Grigg Decl. ¶¶ 46–47. The Government has further considered all information submitted by the Plaintiffs in reaching a final decision. *See id.*

Finally, the opportunity for judicial review (under 49 U.S.C. § 46110 or as otherwise provided by law) after individuals like Plaintiffs have exhausted the administrative process, provides additional protection against erroneous deprivation. *See* Dkt. No. 136 at 62.[16]

In light of the multiple, independent layers of review that are already in place, the value of additional procedures at the administrative stage would be slight, and would not outweigh the considerable national security concerns and legal constraints discussed above. It bears repeating

---

[16] Defendants note that under revised DHS TRIP, the TSA Administrator conducts an independent, final determination of a person's inclusion on the No Fly List. This and other changes call into question the continuing vitality of the Ninth Circuit's decision in this case that there would be no jurisdiction in the court of appeals to hear a challenge to the outcome of a DHS TRIP determination. *Latif v. Holder*, 686 F.3d 1122, 1128–29 (9th Cir. 2012); *see also Arjmand v. U.S. Dept. of Homeland Sec.*, 745 F.3d 1300, 1302–03 (9th Cir. 2014). That decision rested in significant part on the view that TSA had no decisionmaking role in No Fly List determinations. The Government has long disagreed with that conclusion, but in any event, the Government maintains that under revised DHS TRIP procedures, challenges to the conclusion of that process (and to the process itself) could be heard in the courts of appeals pursuant to Section 46110.

that the Government's predictive judgments are entitled to substantial deference in this national

security context, involving substantive predictions based on limited intelligence.  *See, e.g.*, *AHIF*

*II*, 686 F.3d at 979 (acknowledging "extremely deferential" review in the national security and

intelligence area).  Here, the Government is not simply finding facts regarding past conduct; it is

assessing the likelihood of future threats to national security based on limited intelligence from a

variety of sensitive sources and methods.  As the Supreme Court recognized in the foreign

terrorism context, "national security and foreign policy concerns arise in connection with efforts

to confront evolving threats in an area where information can be difficult to obtain and the

impact of certain conduct difficult to assess."  *Humanitarian Law Project*, 561 U.S. at 34–35.

The Court concluded that although such concerns "do not warrant abdication of the judicial

role," when "it comes to collecting evidence and drawing factual inferences in this area, the lack

of competence on the part of the courts is marked, and respect for the Government's conclusions

is appropriate."  *Id*. at 34 (internal quotation marks and citation omitted).  Because the

implementation of the No Fly List involves similar threat assessment, the additional process

Plaintiffs demand would not provide probative value or serve to increase fairness.  *Cf. Pinnacle*

*Armor*, 749 F.3d at 717 ("Such evidence lends itself to the kind of paper review a district court

might engage in on a motion for summary judgment and does not require a full [administrative]

trial.").  Additional procedures, such as additional opportunity for plaintiffs to assess information

themselves, would not substantially improve the exercise of the Government's expertise in

intelligence analysis and threat assessment.

## V.    The Additional Formal, Adversarial Procedures Demanded By Plaintiffs Are Not Required Under The Due Process Clause.

Plaintiffs argue for additional, novel procedures required neither by this Court's order nor

by any relevant case law.  In so doing, Plaintiffs rely on inapposite analogies and demand

inappropriate procedures that would seriously compromise the Government's interests in counterterrorism investigative and intelligence-gathering activities, and in preventing harm to national security.  Plaintiffs' demands for extraordinary procedures, including those afforded to criminal defendants, are inconsistent with the Court's order, the law, and common sense.  While the denial of a means of transportation is not insignificant, it does not constitute the kind of deprivation, such as detention, confinement, or taking property, that has been held to require greater procedural protections — particularly given the national security interests at stake in detecting and preventing terrorism.

### A.  Plaintiffs' Analogies To The Process Due In Plainly Distinct Settings Are Misplaced.

Rather than decisions arising in the national security context, Plaintiffs would have the Court rely on case law from a host of unrelated contexts which they claim are relevant to the due process issues in this case.  Pls.' Mem. at 9–14.  But none of these circumstances are present here nor demonstrate the need for additional process for No Fly List determinations.

*Detention and Criminal Cases*:  Plaintiffs cite cases involving actual physical detention, including civil commitment, immigration, Guantanamo and criminal cases.  *See* Pls.' Mem. at 10–14; *see*, *e.g.*, *Addington v. Texas*, 441 U.S. 418 (1979) (civil commitment); *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972) (parole revocation); *Dennis v. United States*, 384 U.S. 855 (1966) (criminal case).  It should be plain that actual detention is a substantially more severe deprivation than the inability to fly aboard a commercial aircraft.  An interest in air travel is not comparable to indefinite military detention at Guantanamo, imprisonment for criminal offenses or the death penalty.  A person on the No Fly List may live in his home, may pursue employment, take holidays, and is otherwise entirely at liberty, apart from his access to airplanes for the purpose of travel.  A confined person is, by definition, not at liberty.  Accordingly, while

it is true that both Congress and the courts have enforced more demanding procedural protections for such cases, those protections are not reasonably applicable to No Fly List determinations intended to prevent immediate acts of terrorism and are not required by any relevant law.

*Deportation Procedures*:  Likewise, Plaintiffs' reliance on procedures available in immigration and deportation cases related to terrorism is misplaced.  For example, while the Ninth Circuit disfavored the use of classified evidence in that context on both constitutional and statutory grounds, *see Am. Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1067–70 (9th Cir. 1995) ("*ADC*"), the Ninth Circuit has also expressed doubts as to the application of *ADC* in the variety of contexts in which federal courts make use of classified information, *see AHIF II,* 686 F.3d at 982, n.8 (collecting cases).  Indeed, *AHIF II* appears to limit *ADC* to its particular situation in which the Court did not believe that the withheld information implicated national security.  *Id*. at n.9 (expressing "hesitation about the continuing vitality of *ADC*").  Also, the *AHIF II* Court found the declaration of emergency (precedent to designations under Executive Order 13224 in that case) sufficiently pressing to overcome any presumption in favor of disclosure.  *Id*. at 982.  The No Fly List is similarly designed to prevent ongoing terrorist threats to civil aviation and national security.  *See* Steinbach Decl. ¶ 7; 49 U.S.C. § 114(h).[17]
And even more significantly, Plaintiffs' interest in travel by a particular mode is certainly less

---

[17] The other immigration cases Plaintiffs cite are even less analogous to the case at bar.  *See*, *e.g.*, *Rafeedie v. INS*, 795 F. Supp. 13, 19 (D.D.C. 1992) (finding due process violation where permanent resident alien who had lived in the U.S. for nearly 20 years was summarily excluded from the U.S. without provision of any unclassified statement of reasons until after decision was made); *Kiareldeen v. Reno*, 71 F. Supp. 2d 402 (D.N.J. 1999) (holding that government could not withhold all evidence used to justify indefinite bodily detention of alien in deportation proceedings).  Plaintiffs' reading of *Bridges v. Wixon*, 326 U.S. 135 (1945),  is even more strained; Plaintiffs claim in a footnote that the Supreme Court "suggest[s]" that due process does not allow use of "secret" evidence against permanent residents facing deportation, but in fact the court just found impermissible use of hearsay in a case not involving classified information. *Compare id.* at 152–57 *with* Pls.' Mem. at 18.

weighty than that of individuals seeking to remain in the United States and enjoy its protections and privileges.

*Property Cases*:  Plaintiffs also cite property and civil forfeiture cases in which the Government provides broader procedural protections before taking private property.  The difference in the balance of interests is marked.  In civil forfeiture or subsidy cases, the Government is typically not acting to prevent terrorism threats to civilian aircraft or national security; nor is there any national security information typically at stake.  Accordingly, the government's interests in those cases are generally less significant than the compelling interests at issue here.  *Cf. Haig*, 453 U.S. at 307 ("[N]o governmental interest is more compelling than the security of the Nation.").  Moreover, these "property" cases can involve the permanent deprivation of private property or the denial of services essential to safety.  *See*, *e.g.*, *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 18 (1978) (considering termination of utility subsidies, and recognizing that "[u]tility service is a necessity of modern life; indeed, the discontinuance of water or heating for even short periods of time may threaten health and safety"); *see also* n.8, *supra* (false dichotomy between property and liberty interests). Accordingly, the balance of interests in such matters favors the individual being permanently deprived of property and warrants greater due process protections than in this context.

### B.  Plaintiffs Are Not Entitled To Additional Notice.

Plaintiffs also argue that the notice provided during the DHS TRIP process is constitutionally deficient because it does not include "all" reasons for inclusion, because it does not include "any evidence" and because it does not include "material and exculpatory evidence." *See* Pls.' Mem. at 14–21.  As described above, the notice provided to Plaintiffs fully comports with the Court's order and applicable law, and Plaintiffs' attempt to ferret out additional information about sensitive sources and methods should fail.

Plaintiffs cite a variety of cases for the misleading proposition that they are entitled to "full notice" of the reasons for their inclusion on the No Fly List. *See* Pls.' Mem. at 14-16. This argument ignores both the notice that they have received and this Court's order, which permits a "summary" and acknowledges that in some cases no information at all may be provided. *See* Dkt. No. 136 at 61–62. Each Plaintiff has been notified of the criterion under which he was included on the No Fly List (*i.e.*, the "reason" for his listing or the "subject matter of the agency's concerns," *see AHIF II*, 686 F.3d at 983) and at least a general summary of the underlying factual basis, including any unclassified, nonprivileged facts that have been segregated for disclosure, Grigg Decl. ¶ 46. Because No Fly List determinations are typically based on sensitive and classified information, this summary necessarily may not reflect the complete factual basis for inclusion. *See* Dkt. No. 173 ¶¶ 17–18; Grigg Decl. ¶ 46; Moore ¶¶ 18-19. Nonetheless, the Government has considered the mitigating measures available to provide notice and disclosed what information it could in order to make the notice as meaningful as possible under the circumstances. Grigg Decl. ¶ 46; Moore Decl. ¶¶ 18-19. That is all that is required by the Due Process Clause. Moreover, and in any event, Plaintiffs have been provided sufficient information to respond. Although the amount of information provided to each Plaintiff necessarily varies depending on the type of information available to the Government, each is aware of at least the applicable criterion and the nature of the Government's concerns.[18]

---

[18] Plaintiffs complain that Mr. Knaeble in particular was provided inadequate notice. In light of the protective order the Government will address these complaints in the individual brief filed under seal with respect to Mr. Knaeble, but can repeat here that Mr. Knaeble was told what criterion he satisfied and the general nature of the Government's concerns. To the extent Mr. Knaeble has explanations for these concerns, he has been enabled to provide, and, in fact, has provided them. That his explanations did not assuage the agency's concerns regarding his activities does not demonstrate that he received inadequate notice.

Similarly, Plaintiffs complain that they did not receive "any evidence" supporting their inclusion on the No Fly List. *See* Pls.' Mem. at 16–19. It is, however, undisputed that the notice letters include an unclassified summary of the information relied upon. The information considered — and where possible, summarized — by the Government typically implicates classified or privileged information. To the extent possible, in the interest of maximizing disclosure, Defendants have segregated unclassified, non-privileged statements from sensitive documents and provided summaries that place the information in the overall context of the agency's reasoning. *Id*. The due process clause does not impose additional requirements for the production of original documents or other forms of evidence, especially where such forms of evidence implicate classified national security or otherwise sensitive law enforcement information concerning counterterrorism matters.[19] The question before the Court is not whether it is theoretically possible to conceive of additional disclosures but whether the notice that the Government determined it could provide — without threatening national security or law enforcement investigations — satisfies due process.[20] The notice provided in these cases is an adequate description of the basis for the decision under the circumstances.

---

[19] *Ralls* clearly does not support Plaintiffs' position that they are entitled to any and all evidence. In *Ralls*, the plaintiff corporation was ordered to divest itself of four companies it owned without any statement of reasons beyond "national security." Upon finding the deprivation of a property interest, the Court found that the Government should provide unclassified information relied upon in making its determination. *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296 (D.C. Cir. 2014). Nothing purports to suggest that the provision of unclassified information must take a particular form, and *Ralls* expressly reaffirms the proposition that "due process does not require disclosure of <u>classified</u> information supporting official action." *Id*. at 319 (emphasis in original).

[20] The DHS TRIP process is not a vehicle for discovery and document requests. The Freedom of Information Act already provides a means for requesting agency records, and Plaintiffs are free to utilize it (and appear not to have done so). Accordingly, any "error" in not providing any underlying documents with redactions is not pertinent to the due process issue where unclassified information concerning the No Fly List determination has been summarized.

Plaintiffs raise even more specific objections to the adequacy of notice, none of which has merit.  For example, they complain that they do not know the identity of witnesses or government agents who provided information (with respect to Mr. Kariye) and do not have copies of the recorded witness statements.  *See* Pls.' Mem. at 19.  But neither Mr. Kariye nor anyone else is entitled to the identity of witnesses or to cross-examine them.  The protection of any sensitive sources and methods that underlie No Fly List determinations is often at the heart of both national security and law enforcement information at issue, precisely because disclosure of such information could seriously jeopardize ongoing counterterrorism intelligence or law enforcement investigative activities.  Given the significant government and public interests at stake, the Government has provided ample information about the reasons relied upon with respect to Plaintiffs.  Nor does any due process concern arise from any reliance on hearsay.  *See Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003) (upholding use of hearsay from FBI and intelligence sources, as well as the findings of foreign governments);[21] *NCRI*, 251 F.3d at 196.[22]

---

[21] TSC is not subject in the course of performing its operational functions and duties to the Federal Rules of Evidence, which apply in United States Courts, *see* Fed. R. Evid. 101.  Any notion that it should be so limited is profoundly misguided. Application of a rule against "hearsay" in No Fly List determinations would plainly eviscerate the flexibility needed to make sensitive national security determinations based on, *inter alia,* sensitive intelligence sources, foreign government information, and information obtained in the midst of ongoing investigations.

[22] Plaintiffs' citation of *Ibrahim* is singularly misplaced here.  Pls.' Mem. at 19; *cf. Ibrahim v. DHS*, 2014 WL 6609111 (N.D. Cal. 2014).  Ms. Ibrahim was denied boarding as a result of a clerical error that was corrected within a day, and she was allowed to fly the next day.  Although the Court found that "while "[i]t is perhaps true that the error has already been corrected, at least in part, … there is reason to doubt that the error and all of its echoes have been traced and cleansed from all interlocking databases," *id.* at *17, it did not find that the error that caused her denial of boarding also "resulted in the denial of her visa," as Plaintiffs contend.  Rather, the Court noted that "Whether true or not, [Ms. Ibrahim] reasonably suspects that those [visa] troubles are traceable to the original wrong that placed her on the no-fly list" and ordered the

Finally, Plaintiffs argue that the Government is required to provide all potentially

"exculpatory" information just as it would to a criminal defendant.  *See* Pls.' Mem. at 19–21.

Again, even the existence of arguably "exculpatory" information would not give Plaintiffs a due

process right to access classified or law enforcement sensitive sources.  More importantly,

placement on the No Fly List is simply not analogous to criminal proceedings.  The *Brady*

doctrine applies only in the criminal context.  *See Brady v. Maryland*, 373 U.S. 83, 86 (1963).

Indeed, in an immigration case (a context itself not analogous to administrative redress of No Fly

List determinations), the Ninth Circuit made it "emphatically clear" that "the Government's

obligation to provide information in this context is not even remotely close to the Government's

obligation under *Brady*."  *Din v. Kerry*, 718 F.3d 856, 865 (9th Cir. 2013), cert. granted 135 S.

Ct. 44 (2014) (emphasis added).[23]  Even if some very limited form of *Brady* obligation were

found to exist, weighty governmental interests diminish the duty to provide exculpatory evidence

even in the criminal law context.  *See*, *e.g.*, *United States v. Valenzuela-Bernal*, 458 U.S. 858

---

Defendants to "cleanse" the databases of any references.  *Id.* at 16.  Even if the Plaintiffs had
been correct in their reading of the *Ibrahim* opinion, none of their proposed procedures would
improve incorrectly filled-out forms and none of their proposed procedures would purge such
errors from the system.

[23] None of the cases Plaintiffs cite stands for the proposition that *Brady* applies in the civil
context at all, much less that there is a specific obligation in this unique context.  *Pavlik v.
United States*, 951 F.2d 220, 223 (9th Cir. 1991) (assuming, without deciding, the applicability
of *Brady* principles in dicta); *Dent v. Holder*, 627 F.3d 365 (9th Cir. 2010) (finding alien had
statutory right of access to his file); *Demjanjuk v. Petrovsky*, 10 F.3d 338, 353 (6th Cir. 1993)
(applying certain *Brady* principles only because denaturalization required criminal proof, and
noting that had the government "sought to denaturalize Demjanjuk only on the basis of his
misrepresentations at the time he sought admission to the United States" that "it would have been
only a civil action" and *Brady* would not have been at issue); *Padberg v. McGrath-McKechnie*,
203 F. Supp. 2d 261, 277 (E.D.N.Y. 2002) (finding a right to present exculpatory evidence),
*aff'd*, 60 F. App'x 861 (2d Cir. 2003).  A significantly modified form of this principle has been
applied in the Guantanamo cases, where the detainees face indefinite physical detention.  Even
there, it is not clear that it is constitutionally required.  *See*, *e.g.*, *Al Maqaleh v. Hagel*, 738 F.3d
312, 327 (D.C. Cir. 2013).

---

(1982) (dismissing due process claims where Government had deported relevant witnesses in part because defendants had not shown that the witnesses could have affected the judgment); *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002) (holding that *in camera* examination and redaction of purported *Brady* material by trial court was proper).[24]

      Here, the Government has provided Plaintiffs an opportunity to present any evidence they deem relevant, including mitigating or exculpatory information regarding their prior statements or conduct, and indeed they have done so.[25]  The due process clause imposes no additional requirement.

### C.  Plaintiffs Are Not Entitled To A Live Or Adversarial Hearing.

      Plaintiffs demand a particular form of evidentiary hearing to rebut the Government's judgment as to the threat they pose to national security, including a live hearing with the right to cross-examine witnesses and the imposition of a high burden of proof on the Government.  But such procedures are not required by the case law, would add little value to the process or reduce the risk of error, and reasonably can be expected to risk significant harm to national security.

      None of the case law relied on by the Court in its prior decision contemplated the kind of proceeding Plaintiffs seek, nor does the Court's decision itself.  On the contrary, procedures not

---

[24] Plaintiffs offer no basis on which to believe that the Government would disregard exculpatory information in making a No Fly List determination.  The Government seeks to ensure that individuals placed on the No Fly List meet the applicable criteria, and would examine exculpatory evidence and weigh it against evidence that supports placement on the list in the ordinary course.  *See generally* Grigg Decl. ¶¶ 19–21.

[25] Plaintiffs' citation of *Meshal v. Higgenbotham*, 47 F. Supp. 3d 115 (D.D.C. 2014), is misleading.  The Court did not conclude that "Mr. Meshal's treatment at the hands of the FBI [was] appalling and embarrassing," as Plaintiffs claim; the Court assumed the "appalling" allegations were true for the purposes of the motion to dismiss, which was granted.  *See Meshal*, 47 F. Supp. 3d at 130.  Although the district court judge expressed his reservations about the state of the case law in this area, he made no findings of fact or even intimations with respect to the truth of Mr. Meshal's allegations.  And Plaintiffs have offered no admissible evidence in this record concerning them.

involving a formal hearing have been upheld in the context of SDGT designations, s*ee, e.g.*, *AHIF II*, 686 F.3d at 1001; *Holy Land Found.*, 333 F.3d at 164; *Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748 (7th Cir. 2002), and have been found sufficient in other administrative contexts. *See, e.g.*, *Pinnacle Armor*, 648 F.3d at 716–18 (revocation of safety certification for body armor provided "an adequate opportunity to be heard, even if no formal administrative hearings took place"); *Buckingham v. USDA*, 603 F.3d 1073, 1083 (9th Cir. 2010) (cancelled grazing permit); *Sierra Ass'n for Env't v. FERC*, 744 F.2d 661, 663 (9th Cir. 1984) (noting that a "paper hearing" provides due process).

Plaintiffs again rely heavily on deportation cases for the proposition that the right to cross-examine witnesses is an indispensable element of due process. But a wide variety of contexts establish that it is not. *See, e.g.*, *AHIF II*, 686 F.3d at 988–90 (finding only harmless notice errors with respect to SDGT proceedings); *Holy Land Found.*, 333 F.3d at 164 (upholding informal SDGT proceedings); *see also Brock v. Roadway Express, Inc.*, 481 U.S. 252, 266 (1987); *Buckingham*, 603 F.3d at 1083. Plaintiffs should not be granted the right to cross-examine individuals, let alone any sources of intelligence or investigative information provided to the Government, in this national security context. Even in the non-analogous immigration context, the preference for a live hearing to confront witnesses may be dispensed with in appropriate cases. *See Alabed v. Crawford*, No. 1:13-cv-2006, 2015 WL 1889289 at *20 (E.D. Cal. April 24, 2015) ("Plaintiffs' interpretation … —that where important questions of fact turn on credibility, a hearing is required—is simply too broad as applied to the circumstances and facts presented in this case."); *see also Ching v. Mayorkas*, 725 F.3d 1149, 1157 (9th Cir. 2013) ("Because of its inherent differences from the judicial process, administrative proceedings in

particular must be carefully assessed to determine what process is due given the specific circumstances involved. And we must do so on a case by case basis.").

Here, the specific circumstances strongly weigh against a live adversarial hearing to contest No Fly determinations. Of necessity, TSC and the nominating agencies may rely on reporting from a wide variety of sources, including foreign governments, confidential informants, and other sources and methods. To require disclosure and cross-examination of those sources in order to administratively adjudicate a No Fly List determination would obviously risk the destruction of vital counterterrorism sources and methods used to detect and prevent terrorist attacks that may be directed at commercial aircraft or other locations. As noted above, due process does not require that an action to protect national security from a terrorist threat become inherently self-defeating through forced disclosure of national security information. A hearing that places the kind of intelligence sources and methods at issue in No Fly determinations would compromise them, the information they may have provided, and vital counterterrorism interests. Such a rule would again effectively require that the Government decide between not listing otherwise eligible individuals or compromising its sources and methods — a manifestly unwarranted choice as to which no extant authority supports.

Plaintiffs' individual complaints in this regard only underscore the point: Mr. Meshal remonstrates that he should have the opportunity to test the credibility of the FBI agents who interviewed him. But such inquiries would inevitably seek to scrutinize reasons for the No Fly determination and support for them — the vast majority of which would implicate classified national security and law enforcement information. Similarly, Mr. Kariye demands access to witnesses and agency decisionmakers for cross-examination, including a cooperating witness, any relevant government agents and the DHS TRIP Director. In other words, he seeks details of

intelligence information, sources and methods, and the deliberations and analysis informing his

inclusion on the List — precisely what cannot be provided if the security of the No Fly List and

any related investigative activities is to be maintained, as it manifestly should be.

Finally, Plaintiffs opine that the "burden of proof" on the nominating agencies is

inadequate and unclear. As the Government has previously explained and this Court has

previously acknowledged, the standard for inclusion on the No Fly List is "reasonable

suspicion." Dkt. No. 136 at 8; *see also* Grigg Decl ¶ 15. The Government must have a

reasonable suspicion that one of the criteria for inclusion is met. This standard is consistent not

only with the standard provided by Congress but also with the type of predictive judgments that

No Fly List determinations must necessarily entail. Plaintiffs' assertion that due process

requirements impose a higher burden of "clear and convincing evidence" is based on cases

applying that standard for imprisonment and physical detention of individuals for prolonged

periods of time. *See*, *e.g.*, *Singh v. Holder*, 638 F.3d 1196, 1204 (9th Cir. 2011) (where Mr.

Singh "face[d] years of detention before resolution of [his] removability'); *see also Colorado v.*

*New Mexico*, 467 U.S. 310, 316 (1984) (defining clear and convincing evidence as establishing

"an abiding conviction that the … factual contentions are highly probable.") (internal quotations

and citations omitted); *Murphy v. I.N.S.*, 54 F.3d 605, 610 (9th Cir. 1995) (the burden of proving

a matter by clear and convincing evidence is "a heavier burden than the preponderance of the

evidence standard"). This argument is misplaced. In the first instance, it is squarely at odds with

the standards contemplated by Congress, which determined that the standard for inclusion on the

List should be based on predictive judgments about who "may" be a threat to civil aviation or

national security. *See* 49 U.S.C. §§ 114(h)(3); Grigg Decl. ¶ 17. A rule requiring the

Government to satisfy an "abiding conviction" to a "highly probable" degree of certainty that

certain individuals present a risk of committing terrorist acts, including to commercial aircraft, would eviscerate the Government's ability to protect the national security in the fluid environment of counterterrorism investigations.

Moreover, Plaintiffs' analogy to *Singh* and similar cases is clearly misplaced.  Plaintiffs here do not face imprisonment or indefinite confinement as a result of a No Fly List determination; they are merely unable to travel abroad on commercial aircraft.

### D.    Plaintiffs Are Not Entitled To CIPA-like Proceedings.

Finally, Plaintiffs assert that the Government and the Court could use the same procedures set forth in the Classified Information Procedures Act, 18 U.S.C. App. 3, which is applied in criminal cases in which classified information is at issue.  *See* Pls.' Mem. at 32-34.[26] By its terms, CIPA is inapplicable to civil cases, and any attempt to apply "CIPA-like" procedures in this setting would risk unauthorized disclosure of information reasonably likely to cause harm to national security.  It is certainly not required to satisfy procedural due process.

Any discussion of Plaintiffs' effort to gain access to classified information must begin with the well-established principle that a civil litigant has no legal entitlement to be granted access to classified information.  The Executive Branch has the responsibility and the plenary discretion to classify and control access to national security information.  *See Egan*, 484 U.S. at 529  ("For reasons too obvious to call for enlarged discussion, the protection of classified information must be committed to the broad discretion of the agency responsible, and this must

---

[26] The Ninth Circuit cited CIPA in its opinion, but did not hold it applicable or even require this Court to consider it.  *See Latif*, 686 F.3d at 1130 ("We also leave to the sound judgment of the district court how to handle discovery of what may be sensitive intelligence information.  *See* Classified Information Procedures Act, 18 U.S.C. app. 3. §§ 1-16").  This citation is not a direction to the district court as to how to proceed or even dicta suggesting that it might be appropriate.

include broad discretion to determine who may have access to it.") (internal citation and

punctuation omitted); *see also* Exec. Order 13,526, 75 Fed. Reg. 707 (Jan. 5, 2010).  This

authority derives from the President's Article II powers to conduct foreign affairs and provide for

the national defense.  *See Egan*, 484 U.S. at 527.  Under well-established separation of powers

principles, decisions about who may access or use classified information and under what

circumstances are not subject to judicial review.  *See id.* at 529-30; *CIA v. Sims*, 471 U.S. 159,

180 (1985) ("[I]t is the responsibility of [the Executive], not that of the judiciary, to weigh the

variety of complex and subtle factors in determining whether [to disclose sensitive

information]."); *see also Dorfmont v. Brown*, 913 F.2d 1399, 1401 (9th Cir. 1990) ("The decision

to grant or revoke a security clearance is committed to the discretion of the President by law.").

As a corollary to this principle, a federal district court may not compel the Executive to

grant an opposing party, or any other person, access to classified information.  *See*, *e.g.*, *In re

United States*, 1 F.3d 1251 (Table), 1993 WL 262656, at *9 (Fed. Cir. Apr. 19, 1993) (finding

that, under separation of powers principles, "the access decisions of the Executive [Branch] may

not be countermanded by either coordinate Branch"); *Holy Land Found. for Relief & Dev. v.

Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2004) (emphasizing "the primacy of the Executive in

controlling and exercising responsibility over access to classified information").  Thus,

regardless of whether a court believes that additional procedural protections are needed to afford

due process, the Executive Branch retains constitutionally-vested discretion to determine access.

*See*, *e.g.*, *Egan*, 484 U.S. at 527; *El-Masri*, 479 F.3d at 311 (rejecting argument that the court

provide counsel access to state secrets pursuant to a nondisclosure agreement (after arranging for

necessary security clearances), and then conduct an in camera trial); *Sterling v. Tenet*, 416 F.3d

338, 344–49 (4th Cir. 2005) (rejecting a plaintiff's request to devise "special procedures" to allow suit involving state secrets proceed).[27]

Moreover, CIPA-like procedures have no application to civil, administrative cases such as this one. Pub. L. No. 96-456, 94 Stat. 2025 (1980) (codified at 18 U.S.C. App. 3) ("An act to provide certain pretrial, trial, and appellate procedures for criminal cases involving classified information."); *see also id.* § 3 ("Upon motion of the United States, the court shall issue an order to protect against the disclosure of any classified information disclosed by the United States to any defendant in any <u>criminal case</u> in a district court of the United States." (emphasis added)).[28] A central purpose of CIPA is to determine if classified information is relevant to a criminal prosecution. If so, the Government may, if necessary, choose to withdraw evidence, summarize evidence, dismiss charges, or dismiss an indictment in order to protect national security information. In the present setting, the Government has already sought to summarize the unclassified information available, but of course cannot unilaterally end this lawsuit. And again,

---

[27] Plaintiffs cite only one case for the (incorrect) proposition that a protective order can be used to protect classified information in the immigration context. But *Khouzam v. Att'y Gen'l of U.S.*, 549 F.3d 235, 259 n. 16 (3d Cir. 2008) says no such thing. The footnote, which is dicta, makes no reference to classified information but hints that there may be some information relevant to national security that could be protected via protective order. It is wholly unclear what information might be at issue, whether the information was classified, or whether it was ever disclosed. Certainly, the Third Circuit did not order its disclosure under a protective order.

[28] In fact, Congress originally enacted CIPA to protect <u>the Executive</u> from the threat of disclosure of classified national security information. *See United States v. Moussaoui*, 591 F.3d 263, 281 (4th Cir. 2010) ("'Originally enacted by Congress in an effort to combat the growing problem of graymail, a practice whereby a criminal defendant threatens to reveal classified information during the course of his trial in the hope of forcing the government to drop the charge against him,' CIPA provides procedures for protecting classified information without running afoul of a defendant's right to a fair trial." (quoting *United States v. Abu Ali*, 528 F.3d 210, 245 (4th Cir. 2008)); *see also ACLU v. DOJ*, 681 F.3d 61, 72 & n.9 (2d Cir. 2012) (holding that CIPA applies exclusively to criminal proceedings); *United States v. The Sum of $70, 990, 605*, No. 12-cv-1905, Mem. Op., ECF No. 174, at 13 (D.D.C. Mar. 6, 2015) ("CIPA is a procedural tool for the district court to rule on the admissibility of classified information and to govern the disclosure of classified information in a <u>criminal case</u>.") (emphasis in original).

as noted, the proper balancing of interests should not require the Government to provide access

to classified information in order to defend claims challenging a No Fly List determination. In

particular, a requirement that classified information be disclosed even under a purportedly secure

CIPA-like process to private counsel for suspected terrorists would itself "present significant

risks to FBI investigative or intelligence activities" and "create a severe disincentive to use such

information to nominate individuals on the No Fly List," Steinbach Decl. ¶ 37, while at the same

time providing considerable incentive for terrorist organizations and other adversaries to

manipulate the DHS TRIP process to seek access to classified information, *id*. ¶ 35.

Accordingly, Plaintiffs' blithe assertion (unsupported by evidence) that CIPA-like procedures

would not harm government interests is therefore wrong and not entitled to any weight. By

contrast, the Government's assessment, which is entitled to deference, is that such procedures

would unduly threaten the national security and are therefore unwarranted in this instance. *Id*.

¶ 23; *cf. Ellsberg v. Mitchell*, 709 F.2d 51, 61 (D.C. Cir. 1983) ("[O]ur nation's security is too

important to be entrusted to the good faith and circumspection of a litigant's lawyer (whose

sense of obligation to his client is likely to strain his fidelity to his pledge of secrecy) or to the

coercive power of a protective order.").[29]

---

[29] Required disclosure of information to "cleared counsel" also would be contrary to the
established doctrine that granting such access is "a sensitive and inherently discretionary
judgment call … committed by law to the appropriate agency of the Executive Branch." *See*,
*e.g.*, *Egan*, 484 U.S. at 527. The grant of access to classified information requires the Executive
Branch to make two determinations: first, a favorable determination that an individual is
trustworthy for access to classified information and, second, a separate determination "within the
executive branch" that an individual has a demonstrated "need-to-know" classified information –
that is, the individual "requires access to specific classified information in order to perform or
assist in a lawful and authorized governmental function." Exec. Order No. 13,526, 75 Fed. Reg.
707 (Dec. 29, 2009) at §§ 4.1(a)(3), 6.1(dd). Both determinations are crucial to the protection of
sensitive information. In other words, a prior determination of trustworthiness does not by itself
provide adequate protection. *See Gen. Dynamics Corp. v. United States*, 131 S. Ct. 1900, 1904

Despite the inapplicability of any governing law that could require disclosure of classified information, the Government has nonetheless carefully examined the information  at issue in order to segregate unclassified information and has taken the extraordinary step of summarizing the underlying information for the purpose of this administrative, national security matter, aimed at preventing threats to national security.  That is all that can be required.

**VI.    The No Fly List Criteria Are Clear And Survive Plaintiffs' Vagueness Challenge.**

Plaintiffs also claim that the No Fly List criteria are impermissibly vague.  Pls.' Mem. at 22 *et seq.*  In considering such a claim, the Court must consider whether the No Fly List criteria are vague as applied to the particular party challenging them, not merely "in its hypothetical applications."  *United States v Johnson*, 130 F.3d 1352, 1354 (9th Cir. 1997); *Humanitarian Law Project*, 561 U.S. at 18–19; *see also Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982) ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.").  Plaintiffs cannot demonstrate that impermissibly vague criteria were the reason they were placed on the No Fly List.  To the contrary, as we explain in the individual briefs, the conduct of each individual lies at the core of why that individual is included on the No Fly List.  The fact that the No Fly criteria are not unconstitutionally vague as applied to the individual Plaintiffs is reason enough to dismiss this claim.  *See Haig*, 453 U.S. at 309 n.61 (1981) ("[S]ince [the plaintiff's] conduct falls

---

(2011) (noting that disclosure of sensitive information to a limited number of cleared lawyers nevertheless led to several unauthorized disclosures).  Moreover, the Executive's determination about which persons may access classified information, and under what circumstances, is "'sensitive and inherently discretionary.'"  *Dorfmont*, 913 F.2d at 1401 (quoting *Egan*, 484 U.S. at 527).  As the Supreme Court has recognized, "[p]redictive judgment[s]" about the possible "compromise [of] sensitive information" involve the determination of "what constitutes an acceptable margin of error in assessing the potential risk" and thus "must be made by those with the necessary experience in protecting classified information."  *Egan*, 484 U.S. at 528–29.

within the core of the regulation, [the plaintiff] lacks standing to contend that the regulation is vague and overbroad[.]").

Even if Plaintiffs could bring a facial vagueness challenge in this context,[30] the challenge should be rejected, for several reasons.  First, the traditional formulation of the void-for-vagueness doctrine applied to statutes and regulations "reflects the principle that a statute which either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Roberts v. United States Jaycees*, 468 U.S. 609, 629 (1984) (citations omitted).  But the No Fly List is not a statute, and No Fly List assessments neither forbid nor require particular conduct.  Rather than regulating conduct per se, the No Fly List requires predictive assessments about conduct that may or may not occur in the future. As the Supreme Court has noted in rejecting a vagueness challenge to predictive assessments made in the criminal context, "[i]t is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made.  Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system." *Jurek v. Texas*, 428 U.S. 262, 274–75 (1976) (plurality op.).  And regimes requiring factfinders to make such predictive assessments have survived vagueness challenges a wide range of liberty-curtailing contexts, including  civil commitment, *United States v. Carta*, 592 F.3d 34 (1st Cir. 2010) (upholding civil commitment components of the Walsh

---

[30] In pressing their facial attack, Plaintiffs appear to be seeking a declaration not that the No Fly criteria are unconstitutionally vague as applied to them, but rather that they are always unconstitutionally vague, no matter in what context they are applied.  *See Western States Paving Co., Inc.* v. *Washington State Dept. of Transp.*, 407 F.3d 983, 991 (9th Cir. 2004) ("the challenge must establish that no set of circumstances exist under which the Act would be valid.") (emphasis added) (quoting *United States* v. *Salerno*, 481 U.S. 739, 745 (1987)).  Plaintiffs, however, make no attempt to satisfy the "no-set-of-circumstances" tests.

Act),and conditions of supervised release, *United States v. Soltero*, 510 F.3d 858, 865–66 (9th

Cir. 2007) (rejecting challenge to conditions of supervised release prohibiting plaintiff from,

*inter alia*, "associate[ing]" with "criminal street gangs").

      Second, the No Fly List criteria are sufficiently clear to survive scrutiny.

Unconstitutional vagueness may take two forms.  First, "[a] vague ordinance denies fair notice of

the standard of conduct to which a citizen is held accountable;" second, "an ordinance is void for

vagueness if it is an unrestricted delegation of power, which in practice leaves the definition of

its terms to law enforcement officers, and thereby invites arbitrary, discriminatory and

overzealous enforcement."  *Leonardson v. City of E. Lansing*, 896 F.2d 190, 196 (6th Cir. 1990).

To satisfy this requirement, the Government need not define an offense with "mathematical

certainty," *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972), but must provide only

"relatively clear guidelines as to prohibited conduct," *Posters N'Things, Ltd. v. United States*,

511 U.S. 513, 525 (1994).

      With respect to the first test, an ordinary person is likely to understand what conduct

triggers placement on the No Fly List.  "The test for vagueness is whether the provision fails to

give a person of ordinary intelligence fair notice that it would apply to the conduct

contemplated."  *Johnson*, 130 F.3d at 1354 (quoting *United States v. Gallagher*, 99 F.3d 329,

334 (9th Cir. 1996) (internal quotation marks omitted).  The conduct contemplated by the No Fly

List is a violent act of terrorism, and the criteria provide an objective level of justification for

inclusion on the List.  The criteria are certainly no less restrictive than the numerous criminal

prohibitions on conduct related to terrorism that have withstood challenges on vagueness

grounds.  *See*, *e.g.*, *Humanitarian Law Project*, 561 U.S. at  21–23 (material support statute not

void for vagueness); *James v. United States*, 550 U.S. 192, 210 n.6 (2007) (statutory prohibition

against "terrorist act" in Armed Career Criminal Act not impermissibly vague); *Humanitarian Law Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1144–45 (9th Cir. 2009) (authority to designate entities as terrorist organizations under Executive Orders issued pursuant to the International Emergency Economic Powers Act not impermissibly vague); *Khan v. Holder*, 584 F.3d 773, 785–86 (9th Cir. 2009) ("terrorist activity" as used in the Immigration and Nationality Act not impermissibly vague).  If <u>criminal</u> provisions could withstand vagueness challenges, there can be no question that the No Fly criteria at issue here should as well.  *Village of Hoffman Est.*, 455 U.S. at 498–99.

With respect to the second test, the criteria "provide explicit standards for those who apply them," *Grayned*, 408 U.S. at 108, and thereby protect against "arbitrary enforcement" of the law through "minimal guidelines to govern" its use, *see Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983) (internal citation and quotations omitted).  The No Fly List criteria require more than a loose connection to terrorist activity; rather, there must be concrete information about the nature of the terrorist threat (*e.g.*, domestic or international) and the likely targets (*e.g.*, the homeland, aircraft, military installations), or, where there is no information about targets, information about the individual's operational capability to carry out an attack.  Common to each criterion is a focus on <u>violent</u> acts of terrorism.  The first three criteria incorporate the statutory definitions of domestic and international terrorism, which presuppose "violent acts," 18 U.S.C. § 2331(1)(A) (international terrorism), or "activities that involve acts dangerous to human life," (18 U.S.C. § 2331(5)(A) (domestic terrorism); and the fourth criterion requires presenting "a threat of engaging in or conducting a violent act of terrorism" by its own terms.  In this way, the criteria strike an appropriate balance — general enough to encompass a range of terrorist activity, yet sufficiently specific to exclude individuals who are associated with

terrorism but have not been assessed to pose an operationally capable violent threat or a violent threat to a particular target.

Plaintiffs' arguments to the contrary are misconceived in several respects. To begin, Plaintiffs' contention that the No Fly criteria "lack any nexus" to aviation security is not only inaccurate but also wholly irrelevant to the question of vagueness. *See* Pls. Mem. at 35. The touchstone of the vagueness inquiry is whether the criteria "provide[] people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," *Hill v. Colorado*, 530 U.S. 703, 732 (2000), not whether the criteria share a common theme or bear a sufficient nexus to a broader governmental objective. The No Fly criteria could be completely unmoored from their statutory purpose and still provide "explicit standards for those who apply them," *Grayned*, 408 U.S. at 108, and "fair notice" to an ordinary person that the criteria would apply to his or her conduct, *see Gallagher*, 99 F.3d at 334. Whether the criteria adequately serve the statutory purpose of maintaining the No Fly List is a matter of substantive due process, which is not now before the Court.

Nonetheless, the No Fly criteria do bear a meaningful nexus to their statutory purpose — which, contrary to Plaintiffs' suggestion, is broader than aviation security. Congress has directed the Government to identify travelers who may pose "a threat to civil aviation or national security" and prevent them from boarding aircraft. 49 U.S.C. § 114(h)(3)(A) (emphasis added). As explained in the Grigg declaration, in accordance with this congressional mandate, the No Fly List criteria allow nominators to identify individuals who pose a threat to key national security interests — the homeland, for example, or U.S. facilities or personnel overseas — even if they do not pose a threat to civil aviation. Grigg Decl. ¶ 17. Circumscribing the No Fly criteria to focus exclusively on civil aviation would jeopardize

national security by preventing the Government from addressing many of the very threats and vulnerabilities Congress required the Government to address.

Nor is there any merit to Plaintiffs' contention that the No Fly criteria penalize individuals for conduct protected by the First Amendment. The No Fly criteria focus on conduct, not speech. Not only would a nomination based solely on First Amendment-protected activity run afoul of longstanding watchlisting policy, Grigg Decl. ¶ 15, but it would be exceedingly unlikely to satisfy the substantive derogatory criteria, which, as explained, require articulable intelligence about the nature of the terrorist threat and the likely targets, or, in the absence of information about targets, intelligence about the individual's operational capability to carry out an attack.[31] These features greatly reduce the likelihood that the criteria will be used to penalize First Amendment-protected activity.

## VII.  If Any Errors Arise From The Revised Process, They Are Harmless As Applied To These Plaintiffs.

To the extent that the Court finds any error at all in the process provided to Plaintiffs, the Plaintiffs must then show substantial prejudice as a result of the specific error found. *See AHIF II*, 686 F.3d at 988–90 (conducting a harmless-error analysis and finding that the failure to consider additional summaries or to clear counsel was harmless in that case). As demonstrated

---

[31] Plaintiffs' First Amendment argument is based in part on a purportedly leaked version of the Government's Watchlisting Guidance. *See* Pls.' MSJ Opp. at 24 (citing Handeyside Decl. Ex. A). The Government has neither confirmed nor denied the authenticity of the purportedly leaked document. *See Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975) (holding that purportedly leaked national security information "was not in the public domain unless there had been official disclosure of it"). Because the document relied upon by Plaintiffs has not been produced by the Government in discovery in this case, it cannot be authenticated, *see* Fed. R. Evid. 901(a), is inadmissible, and therefore may not be considered as part of the record on summary judgment, *see* Fed. R. Civ. P. 56(c)(1)(B), (c)(2). Indeed, the Government has asserted the state secrets privilege over the watchlisting guidance and related materials in other litigation involving the No Fly List. The document cited by Plaintiffs cannot be relied upon in this summary judgment proceeding.

by the *AHIF II* opinion, this is a fact-intensive inquiry that can be addressed only on the basis of the specific information at issue. To the extent possible to address these issues now on the public record, Defendants have briefly addressed them in the individual briefs. Defendants present additional arguments under seal in those briefs.[32]

### VIII.    Defendants Are Entitled To Summary Judgment On Plaintiffs' APA Claims.

Judgment should also be entered for Defendants on Plaintiffs' APA Claims. Pursuant to the APA's limited waiver of sovereign immunity, a reviewing court must uphold an agency decision unless it is (1) arbitrary and capricious; (2) an abuse of discretion; or (3) otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). The scope of judicial review under this standard is a narrow and deferential one, and a court cannot substitute its judgment for that of the agency. *See Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As discussed above, the agency's judgment is entitled to substantial deference in this context.

Plaintiffs primarily restate their procedural due process claims and add that the revised redress procedures are "arbitrary and capricious" for unspecified reasons. The Court previously treated these claims as co-extensive with the procedural due process claims, *see* Dkt. No. 136 at 62–64, and Plaintiffs have made no new arguments here. Defendants have followed Congress' statutory directive and authority that all passengers be screened, and that all persons (including

---

[32] As Defendants note above, *see* n.2, *supra*, Defendants have reserved the possibility that if the Court is unable to grant summary judgment for Defendants on the basis of the unclassified record developed here, additional consideration will be required concerning the impact of national security information on the proceedings. Such information has particular implications for the harmless error analysis; however, Defendants maintain that the Court can discern the harmlessness of any error here based solely on the unclassified record already developed. Only if the Court is unable to grant the Government's motion will the impact of national security information on this aspect of Plaintiffs' claims need to be addressed.

U.S. citizens) who pose a threat to civil aviation or national security, be denied boarding on any

flight, and have developed a redress process that provides due process.

## CONCLUSION

For all of the reasons discussed above, the Court should deny Plaintiffs' Motion for

Summary Judgment and grant Defendants' Motion for Summary on Plaintiffs' procedural due

process claims.


Dated: May 28, 2015                              Respectfully submitted,


                                                 BENJAMIN C. MIZER
                                                 Principal Deputy Assistant Attorney General
                                                 Civil Division

                                                 ANTHONY J. COPPOLINO
                                                 Deputy Branch Director
                                                 Federal Programs Branch

                                                   *s/ Brigham J. Bowen*

                                                 BRIGHAM J. BOWEN
                                                 brigham.bowen@usdoj.gov
                                                 AMY POWELL
                                                 amy.powell@usdoj.gov
                                                 ADAM KIRSCHNER
                                                 adam.kirschner@usdoj.gov
                                                 SAMUEL M. SINGER
                                                 samuel.m.singer@usdoj.gov
                                                 U.S. Department of Justice
                                                 Civil Division, Federal Programs Branch
                                                 20 Massachusetts Avenue, N.W.
                                                 Washington, D.C.  20001
                                                 Tel:    (202) 514-6289
                                                 Fax:    (202) 616-8470


                                                 *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing filing was delivered to all counsel of record via the Court's ECF notification system.

*s/ Brigham J. Bowen*
Brigham J. Bowen

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains fewer than 60 pages, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

*s/ Brigham J. Bowen*
Brigham J. Bowen
