UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

| | |
|---|---|
| AYMAN LATIF, *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> ERIC H. HOLDER, JR., *et al.*, <br><br> Defendants. | Case No. 3:10-cv-00750-BR |

## DECLARATION OF MICHAEL STEINBACH

I, Michael Steinbach, hereby declare the following:

1. (U) I am the Assistant Director of the Counterterrorism Division, Federal Bureau of Investigation ("FBI"), United States Department of Justice. As Assistant Director, I am the chief supervisory official of the counterterrorism investigative activities of the FBI, including any role the Counterterrorism Division plays in the nomination of individuals to the No Fly List. I also have official supervision and control over the files and records of the Counterterrorism Division of the FBI. These files and records include national security information that is classified or in some instances sensitive but unclassified. I am also responsible for the protection of national security information within the Counterterrorism Division, including the sources, methods, and techniques used by the FBI in the collection of national security information. Thus, I have been authorized by the Director of the FBI to execute declarations and affidavits in order to protect such information. The matters stated in this declaration are based on my personal knowledge, my background, training, and experience relating to counterterrorism, my

consideration of information provided to me in my official capacity, and my evaluation of that information.[1] My conclusions have been reached in accordance therewith.

2. (U) Through the exercise of my official duties, I have become familiar with this civil action in which the Plaintiffs challenge their placement on the Government's No Fly List and allege, among other things, the denial of procedural due process, based on an alleged failure to provide them with a meaningful opportunity to challenge their placement on the No Fly List. I understand that the United States Government has revised the Department of Homeland Security's ("DHS") Traveler Redress Inquiry Process ("TRIP") procedures and has applied those revised procedures to the Plaintiffs. I further understand that Plaintiffs have recently filed a Motion for Summary Judgment, asserting that those revised procedures do not satisfy procedural due process. I submit this declaration in support of the Defendants' Memorandum in Support of its Cross-Motion for Summary Judgment on the issue of procedural due process, and also in support of the Defendants' Opposition to the Plaintiffs' Motion for Summary Judgment on the same issue.

3. (U) The purpose of this declaration is to set forth the views, experience and perspective of the FBI as one of the agencies who can nominate to the TSDB and the No Fly List. The information provided herein is illustrative as a general matter, and in providing this information, I do not confirm or deny whether the FBI was or was not the nominating agency for any of the plaintiffs in this lawsuit. To confirm or deny such a fact would risk significant harm to the Government's intelligence and counterterrorism activities, including by revealing information about which agency or agencies may possess (or not possess) information

---

[1] (U) The information in this declaration is unclassified. Accordingly, the paragraphs in this declaration are marked with a "U".

concerning the individual plaintiffs. In addition, because many of the topics discussed herein implicate national security and law enforcement investigative information, this declaration does not disclose all pertinent details about matters discussed herein, but only information that can be disclosed publicly.

4. (U) The Government, as part of its revised DHS TRIP procedures, has provided Plaintiffs with notice of their status on the No Fly List and, to the extent feasible and consistent with the national security and law enforcement interests at stake, with an unclassified explanation of the reasons for their inclusion on the No Fly List. I discuss below some of the types of information the FBI, as a nominating agency, relies upon in making nominations to the No Fly List, the mechanisms in place to ensure such nominations are accurate and efficacious, the redress process as viewed from the perspective of a nominating agency, the processes established to assess the scope of information that can be disclosed to an individual through DHS TRIP in unclassified summaries, and other pertinent information. As explained more fully below, any requirement that the Government on the whole, and the FBI as a nominating agency, provide additional information beyond that contemplated by the Government's revised procedures (and made available here to plaintiffs) would risk significant harm to ongoing counterterrorism investigative or intelligence activities, to the sources and methods used in those activities, and to the overall national security interests of the United States. In particular, the use of surveillance, confidential human sources, national security process, and other sensitive sources may be compromised if additional information regarding the reasons for a person's No Fly status must be disclosed.

## (U) THE FBI'S AUTHORITIES AND RESPONSIBILITIES

5.  (U) The FBI's mission is to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners. In order to defend the country from a range of national security and major crime threats, the FBI uses an intelligence-driven and threat-focused approach, combining its investigative and intelligence operations to be more predictive and preventative, more aware of emerging threats, and better able to stop them before they turn into crimes or acts of terrorism.

6.  (U) The FBI's top priority is protecting the United States from terrorist attacks. Working closely with its partners, the FBI uses its investigative and intelligence capabilities to neutralize terrorist cells and operatives in the United States, to help dismantle extremist networks worldwide, and to cut off financing and other forms of support provided by terrorist sympathizers. In carrying out the FBI's paramount mission of securing the nation from terrorism, criminal prosecution is only one of several means that the FBI uses to protect national security.

7.  (U) The FBI and other federal agencies also use the Terrorist Screening Center's ("TSC") Terrorist Screening Database ("TSDB") and its subsets, the No Fly and Selectee Lists, as preventative measures to protect against terrorist threats. These preventative measures differ in fundamental respects from the FBI's role in the criminal process, because the overriding goal in using the TSDB is to protect the United States from harm, not to collect evidence of a crime already committed for purposes of prosecution. Inclusion in the TSDB is based on an assessment of the threat of terrorist activity posed by a particular individual to a commercial

aircraft or national security. TSDB determinations are made in a fluid, intelligence-driven environment based on the most current information.

8. (U) As with any other aspect of the FBI's investigative or intelligence-gathering operations, nominations to the TSDB must conform to FBI policies and procedures. This includes the requirement, set forth in both the Attorney General's Guidelines for Domestic FBI Operations and the FBI's Domestic Investigations and Operations Guide, that FBI agents consider and, if reasonable based on the circumstances of the investigation, use the least intrusive means or method to obtain intelligence or evidence and to protect national security. In addition, a fundamental principle of the Attorney General's Guidelines, and of the FBI's investigations and operations, is that investigative activity may not be based solely on the exercise of rights guaranteed by the First Amendment to the United States Constitution. Investigative activity for the sole purpose of monitoring the exercise of First Amendment rights is prohibited.

### (U) THE TSDB NOMINATION PROCESS

9. (U) The TSDB is updated continuously through the addition or removal of information to ensure that the database reflects the most recent information for use in terrorism screening. As one of numerous members of the watchlisting community, the FBI nominates known or suspected terrorists for inclusion in the TSDB. Nominations to the TSDB must satisfy minimum identifying criteria to allow screening agencies to be able to discern a match, and include sufficient substantive derogatory criteria to establish reasonable suspicion that the individual is a known or suspected terrorist. To meet this standard, a nominator such as the FBI must rely upon objective "articulable" intelligence or other information which, based on the totality of the circumstances and taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is known or suspected to be or has been knowingly

engaged in conduct constituting, in preparation of, in aid of, or related to terrorism and/or terrorist activities.[2] Mere guesses or "hunches," or the reporting of suspicious activity alone, are not sufficient to establish reasonable suspicion. As with the Attorney General Guidelines previously discussed, TSDB nominations must not be based solely on race, ethnicity, national origin, religious affiliation, or activities protected by the First Amendment, such as free speech, the exercise of religion, freedom of the press, freedom of peaceful assembly, and petitioning the government for redress of grievances.

10.  (U) Nominations of international terrorists are submitted by federal departments and agencies (including the FBI) for inclusion in the Terrorist Identities Datamart Environment ("TIDE"), and are processed through the National Counterterrorism Center ("NCTC"). Since the FBI is responsible for the nominations of purely domestic terrorists, TSDB nominations by the FBI are submitted directly to the TSC, via the Terrorist Records Examination Unit ("TREX"). TREX coordinates the transmission of domestic terrorist nominations to the TSDB and international terrorist nominations to NCTC for inclusion in TIDE.

11.  (U) Additionally, as a nominating agency, the FBI can recommend that an individual be included on one of the subset lists within the TSDB, such as the No Fly List, if additional heightened derogatory criteria required for inclusion are met. The TSC reviews all No Fly List nominations and determines if an individual meets these heightened derogatory criteria

---

[2] (U) I understand that there are limited exceptions to the reasonable suspicion requirement, which exist solely to support immigration and border screening processes by the Department of State and the Department of Homeland Security.

for inclusion.[3]

12. (U) Each nominating agency is responsible for ensuring that its watchlist nominations satisfy the applicable criteria for inclusion, and that it has established internal procedures to confirm that the nominations process is properly performed. In addition to those safeguards, nominating agencies are required by interagency-approved policies and procedures ("the Watchlisting Guidance") to conduct periodic reviews of nominations of U.S. citizens and lawful permanent residents (collectively "U.S. Persons") to the TSDB and to have internal procedures that facilitate the prevention, identification, and correction of any errors in information that are shared as part of the watchlisting process. These procedures include the review of retractions or corrections of information that may have been used to support a nomination.

13. (U) When a retraction or new information becomes available, the nominating agency, such as the FBI, is required to promptly send a TSDB modification or deletion request, as appropriate. In cases where modification or deletion of a record relating to international terrorism is required, notice of any errors or outdated information must be provided to NCTC, unless there is an articulated reason why such notification could not be made immediately. NCTC processes and transmits such corrections to TSC for appropriate action. TREX performs all review and quality control functions for the FBI to help maintain the currency, accuracy and thoroughness of the TSDB nominations that are submitted.

---

[3] (U) The identity of persons in the TSDB is treated as unclassified "For Official Use Only" so that the database can be shared with screening and law enforcement officers throughout the Federal Government who may lack the necessary clearance for access to classified information. The TSDB nonetheless contains sensitive national security and law enforcement information concerning the identity of known or suspected terrorists. The TIDE database contains classified investigative or intelligence information about particular individuals, including those on the TSDB.

## (U) FBI'S INVOLVEMENT IN THE REVISED DHS TRIP PROCESS

14. (U) As part of the watchlist enterprise, all nominators will cooperate with the redress procedures as provided in the *Memorandum of Understanding on Terrorist Watchlist Redress Procedures* (Exhibit A), which was executed in September 2007 by the Secretaries of State, Treasury, Defense, and Homeland Security, the Attorney General, and the Directors of the FBI, NCTC, Central Intelligence Agency, Office of the Director of National Intelligence, and TSC.

15. (U) I understand from the MOU and the FBI's general role in the process that the DHS Traveler Redress Inquiry Program ("TRIP") provides the public with a single point of contact for individuals who have inquiries or seek resolution regarding difficulties they experienced during travel screening at transportation hubs (such as airports and train stations) or during their inspection at a U.S. port of entry. DHS TRIP provides a means of seeking redress for travelers who have, for example, been delayed or denied airline boarding, delayed or denied entry into or exit from the United States at a port of entry, or have been repeatedly referred for additional (secondary) screening at an airport. As part of the redress process, DHS TRIP invites the traveler to submit any information that may be relevant to the travel difficulties experienced. Since there are many reasons why a traveler may seek redress, DHS TRIP works with DHS component agencies, such as CBP, TSA and U.S. Immigration and Customs Enforcement, in addition to other government agencies such as the Department of State, the FBI, and the TSC (which is administered by the FBI), as appropriate, to make an accurate determination about the traveler's redress matter.

16. (U) In particular, the TSC supports DHS TRIP by helping to resolve inquiries that appear to be related to data in the TSDB. In cases where the traveler is an exact match to an

identity in the TSDB, the TSC's Redress Office will contact NCTC and the nominating agency, such as the FBI, to assist in the resolution of the inquiry and to provide the information submitted by the traveler, along with any other relevant information. The Redress Office will then work with the FBI to determine whether the traveler should continue to remain in the TSDB by asking for updated intelligence, information, or analysis, and a recommendation about maintaining the individual in the TSDB or on the No Fly or Selectee List, if applicable.

17. (U) After reviewing the available derogatory information and considering any recommendation from the nominating agency, the TSC's Redress Office will determine whether the traveler's record should remain in the TSDB, or be modified or removed, unless the legal authority to make such a determination resides, in whole or in part, with another government agency. In such cases, the Redress Office will prepare a recommendation for the decision-making agency and will implement any determination once made. When changes to a record's status are warranted, the Redress Office will seek to ensure such corrections are made, and verify that such modifications or removals were carried over to the various screening systems that receive TSDB data (*e.g.*, TSA's Secure Flight program, which implements the Selectee and No Fly Lists). After the TSC's Redress Office completes its review of the matter, it notifies DHS TRIP of the outcome of its review. Under the U.S. Government's prior redress procedures, DHS TRIP determination letters sent to a U.S. Person who remained on the No Fly List following review by the TSC Redress Office did not disclose whether or not he or she was included on the No Fly List.

18. (U) In order to improve the DHS TRIP redress process for individuals seeking resolution of claims involving denials of aircraft boarding, the Government has revised the redress procedures for U.S. Persons. Under the new redress procedures, a U.S. Person who

(a) purchases an airline ticket for a flight to, from, or over the United States; (b) is denied boarding on that flight; (c) subsequently files a redress inquiry regarding the denial of boarding with DHS TRIP; (d) provides all information and documentation required by DHS TRIP; and (e) is determined to be appropriately included on the No Fly List following the TSC Redress Office's review of the redress inquiry, will receive a letter stating that he or she is on the No Fly List and providing the option to receive and submit additional information.

19. (U) If such a person timely requests additional information, DHS TRIP will respond with a second letter that identifies the specific criteria or criterion under which the person is included on the No Fly List. The second letter will also include an unclassified summary of information supporting the individual's No Fly List status. The amount and type of information provided, however, will vary on a case-by-case basis depending on the facts and circumstances of any national security and law enforcement interests. In some circumstances, an unclassified summary may not be provided when the national security and law enforcement interests at stake are taken into account.

20. (U) As a nominating agency, the FBI is keenly aware of the critical role it plays at this stage of the redress process. In particular, the nominating agency endeavors to create, based on the totality of the information available, an unclassified statement of reasons that includes as much information as possible and is reasonably calculated to permit the individual to craft a meaningful response. Because the information used to determine whether an individual should be included on the No Fly List may be based on classified national security information or otherwise privileged law enforcement information, determining the nature and amount of unclassified information that can be provided to the listed individual requires a careful review of the circumstances of the case and the nominating agency's interest in protecting the information.

At the FBI, this review process will generally involve multiple levels of review, including by operational personnel with substantive expertise concerning the listed individual, operational initiatives and intelligence activities implicated by the information pertinent to the No Fly listing, as well as by legal counsel and others. This multi-layered review seeks to both maximize disclosures and minimize the risk that such disclosures pose to national security and law enforcement interests.

21. (U) Pursuant to the revised redress procedures, and regardless of the amount and nature of information provided to the applicant, the nominating agency must in all cases provide to the TSC Redress Office the reasons that can be relied upon to support inclusion on the No Fly List and the reasons why it is in the interest of national security or law enforcement that no further information be disclosed in the second letter to the applicant. TSC will provide DHS TRIP with the specific criterion or criteria under which the U.S. Person is included on the No Fly List, and, if applicable, an unclassified summary of information supporting that placement provided by the nominating agency and approved for disclosure to the person. DHS TRIP will include this information in the second response letter to the person. The letter will invite the applicant to furnish any additional information he wishes the Government to consider in connection with any further administrative appeal.

22. (U) If the applicant timely responds to the second letter, DHS TRIP will forward the response to the TSC Redress Office for additional review. The Redress Office will follow the procedures described above and again request the nominating agency's review of the applicant's submission and all other available information. Once this additional review is complete, TSC will provide DHS TRIP with a recommendation memorandum to the TSA Administrator as to whether the individual should be removed from or maintained on the No Fly

List and the reasons for that recommendation. This memorandum to TSA will reflect the derogatory information supporting TSC's recommendation, which may include classified or law enforcement sensitive information.

### (U) HARM TO NATIONAL SECURITY FROM DISLCOSURE OF NATIONAL SECURITY AND LAW ENFORCEMENT PRIVILEGED INFORMATION REGARDING AN INDIVIDUAL'S INCLUSION ON THE NO FLY LIST

23.  (U) As noted, inclusion on the No Fly List is often based on highly sensitive national security and law enforcement information that is properly protected from disclosure under law, including: (i) information that could tend to reveal whether an individual has been the subject of an FBI counterterrorism investigation, including the basis, status, or results of the investigation, and the content of any relevant investigative files; and (ii) information that could tend to reveal whether particular sources and methods were used by the FBI in a counterterrorism investigation or intelligence activity related to the individual on the No Fly List or his associates. As explained below, disclosure of this information would provide adversaries with valuable insight into the specific ways in which the Government goes about detecting and preventing terrorist attacks, with potentially grave consequences for the national security.

**(U) Subject Identification And Ongoing Investigations**

24.  (U) Requiring nominating agencies to disclose the reasons, beyond the type of information contemplated by the Government's revised TRIP procedures, for including individuals on the No Fly List could jeopardize the integrity and secrecy of ongoing counterterrorism investigative or intelligence activities. In many cases, such disclosures would contain information that could tend to confirm or deny whether a particular individual is the subject of an FBI investigation or intelligence operation. For example, the existence of an FBI record about an individual, whether contained in the TIDE database or any other FBI

12
UNCLASSIFIED

counterterrorism investigative files, could alert the individual to the Government's investigative or intelligence interest in him and cause him to take counter-measures to evade detection. The risk of harm to national security would be amplified were such disclosure to include the *contents* of an FBI counterterrorism investigative or operational file, thereby revealing to the individual what the FBI knows about his plans. This might include information that could tend to reveal the reason for initiating the investigation or intelligence activity, the status of the investigation or operation, or other sensitive information that the investigation had brought to light.

25. (U) Disclosures of this nature would be particularly damaging where FBI subjects or former subjects have associates whom the FBI may still be investigating for potential ties to terrorist activity. Information regarding one subject may reflect law enforcement interest in other subjects, with the result that releasing such information could reasonably be expected to alert the other subjects that they are of interest to law enforcement. This, in turn, could cause the other subjects to flee, destroy evidence, or take steps to alter their conduct or communications so as to avoid detection of future activities. In these circumstances, law enforcement and intelligence officers would be significantly hindered in gathering further information on the activities of the other subjects or in determining their whereabouts. In addition, an individual's knowledge that he is under investigation might enable him to anticipate law enforcement actions by, for example, conducting counter-surveillance, which could place federal agents at higher risk of harm.

**(U) Sources and Methods**

26. (U) The disclosure of national security information in the course of the No Fly redress process could also reveal sensitive, classified, or previously undisclosed FBI sources and

methods used in counterterrorism investigations and intelligence activities, as well as the type of information derived from such techniques.[4]

27.    (U) In particular, such disclosures could reveal the specific investigative methods used with respect to a certain individual target, such as court-ordered searches or surveillance, confidential human sources, undercover operations, or various forms of national security process. This, in turn, could further reveal the reasons for initiating an investigation, the steps taken in an investigation, the reasons certain methods or sources were used, the status of the use of such methods or sources, and any results derived from those techniques. Detecting and preventing terrorist attacks is the paramount objective of the FBI, and the disclosure of sensitive and classified techniques and methods would provide a roadmap to adversaries as to how the FBI goes about this vital task, allowing them to engage in countermeasures to escape detection and frustrate the FBI's ongoing counterterrorism mission.

28.    (U) Although the FBI's general use of certain methods, such as physical surveillance, are known to the public, the release of information derived from such a method in a particular matter could, in some circumstances, risk the success of investigations. For example, where surveillance is being conducted of a group of associates, providing one of the targets with information sufficient to identify where and when the surveillance took place, and even which agency was responsible for the surveillance, could lead a single target to warn his associates. That, in turn, would eliminate the effectiveness of the continued use of the surveillance with regard to the other associates.

---

[4] (U) Nothing in the following discussion is meant to suggest that any of these types of sources or methods were used with regard to the determination to include any plaintiff on the No Fly List.

29. (U) In addition to traditional surveillance, the Government has a compelling interest in protecting the secrecy of national security process, such as National Security Letters ("NSLs"), and Foreign Intelligence Surveillance Act ("FISA") surveillance. When used, NSLs can be important in the early phases of national security investigations, by providing subscriber telephone numbers and other non-content information, which can assist investigators in developing leads to determine, among other things, investigative subjects' true identities, actions, intent, associates, and financial transactions. Just as critically, the FBI uses NSLs to remove individuals from suspicion. To the extent that the reasons for inclusion on the No Fly List are based, even in part, on information obtained through NSLs or FISA court orders or court warrants, disclosure of that fact, or of the information derived from those methods, would pose serious risks, including jeopardizing further surveillance activity and putting the success of the entire investigation or intelligence operation at risk. Moreover, revealing the use of an NSL or FISA order or warrant with regard to a particular subject could tip off that subject's associates that the Government may be aware of communication between the subject and his associates.

30. (U) The disclosure of information concerning the basis for an individual's placement on the No Fly List could also reveal the identity of confidential human sources ("CHSs"), where such sources are used as part of an investigation. At the very least, such a disclosure could reveal information that a subject or his associates could use to determine that a CHS is being used and to discover the identity of that CHS. The risks posed by the discovery of a CHS's identity are twofold. First, when a target identifies a CHS, the CHS's usefulness to the ongoing investigation is greatly diminished, if not eliminated altogether. More importantly, however, the CHS's safety, and possibly the safety of his family, is put at risk. Where the disclosure of information regarding one subject leads to additional subjects learning that they too

are of interest to the FBI, such disclosure could enable subjects to ascertain the identities of additional confidential informants or other sources of intelligence, putting those sources at risk as well.

31. (U) In addition, where foreign law enforcement information has been used in an investigation, revealing such information could compromise the confidentiality agreements with foreign government(s) and thereby reasonably could be expected to strain relations between the United States and the foreign government(s) and disrupt the free flow of vital information to United States intelligence and law enforcement agencies. Information about the FBI's relationships with certain foreign government entities is subject to constraints on disclosure. Some foreign government information is classified, while other foreign government information is subject to the law-enforcement privilege. The FBI's ability to carry out its responsibilities to conduct counterterrorism investigations often depends on the cooperation of certain foreign government officials, foreign intelligence services, or foreign security services. Maintaining the confidentiality of foreign government information is critical to the maintenance of ongoing productive cooperation with friendly foreign nations in the field of counterterrorism. The free exchange of information among United States intelligence and law enforcement services and their foreign counterparts is predicated upon the understanding that, not only must the information exchanged be kept in confidence, but that the relationships themselves likewise be kept confidential. Indeed, in many instances, information received from a foreign government remains the property of that government and is provided under the express caveat that it may not be released outside the FBI without that government's express permission.

**(U) Law Enforcement Privilege**

32. (U) In addition to reliance on national security information, inclusion on the No Fly List is sometimes based on sensitive law enforcement information, including information that pertains to law enforcement techniques and procedures, information that would undermine the confidentiality of sources, information that would endanger witness and law enforcement personnel, information that would undermine the privacy of individuals involved in the investigation, or information that would seriously impair the ability of a law enforcement agency to conduct future investigations.

33. (U) Revealing additional information, beyond the types already contemplated in the revised TRIP procedures, would risk the revelation of law enforcement privileged information including, among other things, information about individuals contained in FBI files, the identities of FBI agents and TSC personnel, and policies and procedures relating to the watchlisting process. In particular, the Watchlisting Guidance, approved by the National Security Council Deputies Committee, details the current policies and procedures governing the process for identifying and placing individuals on terrorism screening watchlists. The guidance is disseminated solely within the watchlisting community. Official disclosure or confirmation of the contents of the guidance and related materials would provide certainty to terrorist adversaries as to how the watchlisting process works and assist those adversaries in their effort to circumvent that process.[5]

---

[5] (U) Indeed, in related No Fly litigation, the United States has asserted the states secrets privilege in response to discovery demands seeking disclosure of watchlisting guidance materials. Defendants' Memorandum in Support of Their Motion to Dismiss Plaintiff's Complaint as a Result of the Assertion of the State Secrets Privilege, Dkt. No. 105, *Mohamed v. Holder*, No. 1:11-cv-0050 (E.D. Va. 2014).

## (U) ADDITIONAL HARMS TO NATIONAL SECURITY FROM PLAINTIFFS' PROPOSED PROCEDURES

34. (U) In addition to the concerns described above, a requirement that national security and law enforcement privileged information be disclosed in the course of the No Fly redress process would have a potentially dangerous chilling effect on the use of such information in the nomination process, which in turn could undermine the effectiveness of the No Fly List. If nominating agencies had reason to believe that national security information used to support their No Fly nominations would be disclosed, there would be a strong reluctance to share such information in the nomination process and, potentially in some cases, to forego a nomination entirely. The No Fly listing process would become self-defeating if, in order to protect against terrorist threats to aviation and national security, the Government were required to disclose classified national security information or law enforcement information about a particular known or suspected terrorist included on the List. In my judgment, nominating agencies such as the FBI should not be forced to choose between, on the one hand, disclosing information that could reasonably be expected to compromise an investigation, expose a source, or reveal sensitive surveillance techniques, and, on the other, withholding information that could be used to identify and prevent a terrorist attack.

35. (U) The national security considerations described above apply with equal force to the broad procedures I am advised that Plaintiffs have asked the Court to impose on the redress process for U.S. persons challenging their placement on the No Fly List. For example, if the Government were required to provide full notice of its reasons for placing an individual on the No Fly List and to turn over all evidence (both incriminating and exculpatory) supporting the No Fly determination, the No Fly redress process would place highly sensitive national security

information directly in the hands of terrorist organizations and other adversaries, who would have every incentive to manipulate the DHS TRIP redress procedures in order to discover whether they or their members are subject to investigation or intelligence operations, what sources and methods the Government employs to obtain information, or what type of intelligence information is sufficient to trigger an investigation in the first place.

36. (U) Moreover, an adversarial hearing that calls for the cross-examination of Government witnesses would expose the identity of any confidential sources at issue in particular No Fly determinations, which would not only end their cooperation but endanger their lives and jeopardize the success of the investigation. Similarly, foreign governments likely would no longer assist in providing information relevant to No Fly nominations. An adversarial hearing would also require the devotion of significant intelligence and investigative resources, with the burden of preparation placed on some of the very officials charged with detecting and preventing terrorist attacks and undertaking counterterrorism investigations. This would provide further disincentive for agents to participate in the nomination process.

37. (U) Likewise, the release of national security information even to cleared counsel would present significant risks to FBI investigative or intelligence activities and would create a severe disincentive to use such information to nominate individuals to the No Fly List. It must be stressed that No Fly determinations are made in the midst of ongoing investigative or intelligence activities, not during a post-investigation criminal proceeding, and that these activities are directed at the most significant of interests – detecting and preventing terrorist attacks. In these circumstances, the need to protect investigative or intelligence information and the sources and methods used to obtain it is at its zenith. Any disclosure in the administrative process, whether intentional or inadvertent, risks compromising an ongoing counterterrorism

activity and the corresponding risk to national security – no matter what kind of protective procedures might be adopted. Any such efforts at a secure process would only give rise to the added risk of public disclosure. In my informed judgment, disclosure of information to counsel for suspected terrorists on the No Fly List raises significant risks of harm to national security. By contrast, the development of unclassified summaries to eligible requesters whose status would be revealed, paired with the disclosure of applicable No Fly List criteria – itself disclosures that present some risk of harm to national security – establishes a balanced process that provides notice to an individual and an opportunity to respond to the concerns identified.

### (U) CONCLUSION

38. (U) Based on my consideration of this matter, I have concluded that the disclosure of underlying classified national security and law enforcement privileged information that typically supports a No Fly listing risks significant harm to the FBI's counterterrorism investigative and intelligence activities and thus to the national security of the United States.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 28 day of May, 2015.

_____
Michael Steinbach
Assistant Director
Counterterrorism Division
Federal Bureau of Investigation
Washington, D.C.