**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

<table>
<tr><td>

FAISAL NABIN KASHEM; RAYMOND
EARL KNAEBLE IV; AMIR MESHAL;
STEPHEN DURGA PERSAUD,
            *Plaintiffs-Appellants*,

                  v.

WILLIAM P. BARR, Attorney General;
CHRISTOPHER A. WRAY; CHARLES H.
KABLE IV, Director,
            *Defendants-Appellees.*

</td><td>

No. 17-35634

D.C. No.
3:10-cv-00750-
BR

OPINION

</td></tr>
</table>

Appeal from the United States District Court
for the District of Oregon
Anna J. Brown, District Judge, Presiding

Argued and Submitted October 9, 2018
Portland, Oregon

Filed October 21, 2019

Before:  Raymond C. Fisher and Consuelo M. Callahan,
Circuit Judges, and Cathy Ann Bencivengo,
District Judge.[*]

Opinion by Judge Fisher

---

[*] The Honorable Cathy Ann Bencivengo, United States District
Judge for the Southern District of California, sitting by designation.

# SUMMARY[**]

## No Fly List

The panel affirmed the district court's summary judgment in favor of the United States government in an action alleging that plaintiffs' inclusion on the No Fly List, prohibiting them from boarding commercial aircraft flying to, from or within the United States or through United States airspace, violates their procedural and substantive due process rights.

The panel held that the district court properly rejected plaintiffs' as-applied vagueness challenges. The panel determined that the No Fly List criteria are not impermissibly vague merely because they require a prediction of future criminal conduct, or because they do not delineate what factors are relevant to that determination. The panel held that the criteria are "reasonably clear," in their application to the specific conduct alleged in this case, which includes, for one or more plaintiffs, associating with and financing terrorists, training with militant groups overseas and advocating terrorist violence. Furthermore, the criteria are not so standardless that they invite arbitrary enforcement, at least as applied to plaintiffs. Because the panel concluded the No Fly List criteria were not vague as applied, it declined to reach plaintiffs' facial vagueness challenges.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel agreed with the district court's disposition of plaintiffs' procedural due process claims.    Applying *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), the panel weighed plaintiffs' private interests, the government's interests, the risk of erroneous deprivation through the procedures provided, and the value of the additional safeguards proposed by the plaintiffs, and concluded that the procedures provided to plaintiffs were constitutionally sufficient, or that any error was nonprejudicial.  The panel determined that given the national security concerns at issue, and with the exceptions noted, the government had taken reasonable measures to ensure basic fairness to the plaintiffs and followed procedures reasonably designed to protect against erroneous deprivation of plaintiffs' liberty.  Because there was no prejudicial denial of basic fairness, the panel did not decide whether, in a different case, less severe travel restrictions might be required as an alternative to a complete ban on air travel.  Nor did the panel address whether the procedures employed here would be adequate in a different case.

The panel held that the district court properly dismissed plaintiffs' substantive due process claims for lack of jurisdiction under 49 U.S.C. § 46110(a), which places review of Transportation Security Administration orders in the courts of appeals rather than the district court.  The panel noted that although this Court previously held that substantive challenges to No Fly List determinations could be pursued in district court, the 2015 revisions to the traveler redress procedures altered that analysis.   Under the new procedures, the Transportation Security Administrator bears sole responsibility for issuing a final order maintaining or removing a traveler from the No Fly List and sole authority to remove a traveler from the list.  In light of this change, the

statute grants the courts of appeals exclusive jurisdiction over substantive challenges to No Fly List determinations.

---

**COUNSEL**

Hina Shamsi (argued) and Hugh Handeyside, American Civil Liberties Union Foundation, New York, New York; Ahilan T. Arulanantham, American Civil Liberties Union Foundation of Southern California, Los Angeles, California; Steven M. Wilker, Tonkon Torp LLP, Portland, Oregon; Richard M. Steingard, Law Offices of Richard M. Steingard, Los Angeles, California; Joel Leonard, Elliott Ostrander & Preston PC, Portland, Oregon; for Plaintiffs-Appellants.

Joshua Waldman (argued) and Sharon Swingle, Appellate Staff; Billy J. Williams, United States Attorney; Joseph H. Hunt, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellees.

---

**OPINION**

FISHER, Circuit Judge:

The plaintiffs are on the No Fly List, which prohibits them from boarding commercial aircraft flying to, from or within the United States or through United States airspace. They challenge, under the Due Process Clause of the Fifth Amendment to the United States Constitution, both their inclusion on the No Fly List and the sufficiency of the procedures available for contesting their inclusion on the list. Specifically, the plaintiffs argue (1) the criteria for inclusion on the No Fly List are unconstitutionally vague; (2) the

procedures for challenging inclusion on the list fail to satisfy
procedural due process; and (3) their inclusion on the list
violates their substantive due process rights.  The district
court granted summary judgment to the government on the
vagueness and procedural due process claims and dismissed
the substantive due process claims for lack of jurisdiction
under 49 U.S.C. § 46110.  We affirm.

The district court properly rejected the plaintiffs' as-
applied vagueness challenges.  A law is unconstitutionally
vague when it "fails to give ordinary people fair notice of the
conduct it punishes."  *Johnson v. United States*, 135 S. Ct.
2551, 2556 (2015).  Here, the No Fly List criteria are not
impermissibly vague merely because they require a
prediction of future criminal conduct, *see id.* at 2561; *Schall
v. Martin*, 467 U.S. 253, 278–79 (1984); *Jurek v. Texas*,
428 U.S. 262, 272–76 (1976) (plurality opinion), or because
they do not delineate what factors are relevant to that
determination, *see Schall*, 467 U.S. at 279.  The criteria are
"reasonably clear," *Village of Hoffman Estates v. Flipside,
Hoffman Estates, Inc.*, 455 U.S. 489, 505 (1982), in their
application to the specific conduct alleged in this case, which
includes, for one or more plaintiffs, associating with and
financing terrorists, training with militant groups overseas
and advocating terrorist violence.[1]  Furthermore, the criteria
are not "so standardless that [they] invite[] arbitrary
enforcement," *Johnson*, 135 S. Ct. at 2556, at least as applied
to these plaintiffs.  Because we conclude the No Fly List

---

[1] We emphasize that these are allegations.  The plaintiffs have not
been charged or convicted of a crime; the government's allegations have
not been proven in a court of law; and the plaintiffs vigorously dispute
the government's conclusion that they pose a threat of committing
terrorism.    Additionally, although this opinion summarizes the
government's allegations against the plaintiffs, it does not summarize the
plaintiffs' responses and explanations.

criteria are not vague as applied, we decline to reach the plaintiffs' facial vagueness challenges. *See Hoffman Estates*, 455 U.S. at 495.

We also agree with the district court's disposition of the plaintiffs' procedural due process claims. Applying *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), we balance three considerations: (1) the plaintiffs' liberty interests; (2) the risk of an erroneous liberty deprivation through the current traveler redress procedures, and the probable value of additional or substitute procedural safeguards; and (3) the government's interest in national security, including the administrative burdens that additional procedural requirements would entail. Even when national security interests are at stake, moreover, the government must "take reasonable measures to ensure basic fairness to the private party and . . . follow procedures reasonably designed to protect against erroneous deprivation of the private party's interests." *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury* (*Al Haramain II*), 686 F.3d 965, 980 (9th Cir. 2012). Weighing the *Mathews* factors, we conclude the procedures provided to the plaintiffs were constitutionally sufficient in the case before us, or that any error was nonprejudicial.

Finally, the district court properly dismissed the plaintiffs' substantive due process claims for lack of jurisdiction under 49 U.S.C. § 46110(a), which places review of Transportation Security Administration (TSA) orders in the courts of appeals rather than the district court. Although we previously held that substantive challenges to No Fly List determinations could be pursued in district court, the 2015 revisions to the traveler redress procedures alter our analysis. Under the new procedures, the TSA Administrator bears sole responsibility for issuing a final order maintaining

or removing a traveler from the No Fly List and sole authority to remove a traveler from the list. In light of this change, the statute grants the courts of appeals exclusive jurisdiction over substantive challenges to No Fly List determinations.

## I.  BACKGROUND

### A.  Factual Background

#### 1.  *The No Fly List*

The No Fly List is a register of individuals who are barred from boarding commercial aircraft flying to, from, within or over the United States. It contains a subset of the individuals appearing on the government's more extensive terrorist watchlist, formally known as the Terrorist Screening Database (TSDB).

The TSDB is maintained by the Terrorist Screening Center (TSC), which is administered by the Federal Bureau of Investigation (FBI). An individual is placed on the TSDB when there is "reasonable suspicion" that he or she is a known or suspected terrorist – i.e., when there is "articulable intelligence or information which, taken together with rational inferences from those facts, reasonably warrant[s] the determination that an individual is known or suspected to be, or has been engaged in conduct constituting, in preparation for, in aid of or related to, terrorism and terrorist activities."

The No Fly List is a subset of the TSDB. Federal departments and agencies submit nominations for inclusion on the No Fly List, and TSC decides which individuals to include. TSC then provides the list to the Transportation

Security Administration (TSA), which implements the list at airports.

An individual is placed on the No Fly List when the TSC has "reasonable suspicion" to believe that he or she represents one of the following:

    a.  A threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) or an act of domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to an aircraft (including a threat of air piracy, or threat to an airline, passenger, or civil aviation security); or

    b.  A threat of committing an act of domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to the homeland; or

    c.  A threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) against any U.S. Government facility abroad and associated or supporting personnel, including U.S. embassies, consulates and missions, military installations (as defined by 10 U.S.C. § 2801(c)(4)), U.S ships, U.S. aircraft, or other auxiliary craft owned or leased by the U.S. Government; or

    d.  A threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so.

Each nominating agency is responsible for ensuring that its No Fly List nominations satisfy one of these four criteria. Additionally, nominating agencies are required by internal policies known as the Watchlisting Guidance to conduct

periodic reviews of nominations of U.S. citizens and lawful permanent residents to the TSDB and to have internal procedures that reduce and correct errors in the nomination process.

### 2. *The No Fly List Redress Procedures*

Before 2015, an individual who was denied boarding at an airport could challenge his or her apparent inclusion on the No Fly List by submitting a complaint to the Department of Homeland Security Traveler Redress Inquiry Program (DHS TRIP). DHS TRIP would forward the complaint to TSC, which would determine whether the complainant was on the No Fly List and, if so, whether the complainant's continued inclusion on the list was justified. After TSC made this determination, DHS TRIP would advise the complainant by letter that the review was complete. These letters neither confirmed nor denied the complainant's status on the No Fly List. Nor did they disclose the basis or bases for the complainant's possible inclusion on the list or provide assurances about the complainant's ability to undertake future travel.

In 2015, as a result of this litigation, the government revised these redress procedures. Under the revised procedures challenged here, an individual who has been denied boarding at an airport may apply for redress through DHS TRIP. If the complainant is on the No Fly List, DHS TRIP advises the complainant by letter that he or she is on the list and provides instructions for requesting further information. If the complainant requests further information, DHS TRIP provides a second, more detailed letter identifying the specific criterion under which the complainant has been included on the list. The second letter may also provide an unclassified summary of information supporting the complainant's inclusion on the list, although

whether such a summary is provided – and the amount and type of information included – depends on the national security and law enforcement interests at stake. The second letter also notifies the complainant of the option to seek further review of his or her inclusion on the No Fly List and invites the complainant to submit any information he or she believes is relevant to that determination.

If the complainant requests further review, DHS TRIP forwards that request to TSC, along with any supporting information submitted by the complainant. After reviewing the materials, TSC provides DHS TRIP with a recommendation as to whether the complainant should be removed from the No Fly List. This recommendation, along with the complainant's complete DHS TRIP file, is provided to the TSA Administrator, who is the final decisionmaker. After reviewing these materials, the TSA Administrator may either remand the case to TSC with a request for additional information or issue a final order, a copy of which is provided to the complainant. If the final order maintains the complainant on the list, it will state the basis for that decision to the extent permitted by national security and law enforcement interests. The final order also informs the complainant of the right to seek judicial review.

**B.  Procedural History**

In 2010, 10 individuals filed this action after they were prevented from boarding commercial flights to or within the United States. The district court dismissed the entire action for lack of subject matter jurisdiction, holding that the plaintiffs' claims challenged TSA orders and thus fell within the exclusive jurisdiction of the federal appellate courts under 49 U.S.C. § 46110(a). *See Latif v. Holder* (*Latif I*),

No. 3:10-cv-00750-BR, 2011 WL 1667471, at *6 (D. Or. May 3, 2011).[2]  In relevant part, § 46110(a) states:

> [A] person disclosing a substantial interest in an order issued by . . . the Administrator of the Transportation Security Administration with respect to security duties and powers designated to be carried out by the Administrator of the Transportation Security Administration . . . may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business.

49 U.S.C. § 46110(a).

We vacated and remanded, reasoning that under the pre-2015 redress procedures, it was TSC – not TSA – that compiled the No Fly List, decided whether to remove an individual from the list and bore sole authority to grant relief. *See Latif v. Holder* (*Latif II*), 686 F.3d 1122, 1127–29 (9th Cir. 2012).  Because § 46110(a) does not apply to TSC, we held the statute did not strip the district court of jurisdiction over the plaintiffs' claims.  *See id*. at 1129–30.

On remand, the district court held the pre-2015 procedures for seeking removal from the No Fly List

---

[2] Originally, the lead parties in this case were plaintiff Ayman Latif and defendant Attorney General Eric Holder.  At present, the lead parties are plaintiff Faisal Nabin Kashem and defendant Attorney General William Barr.  Accordingly, citations to the *Latif* line of cases are references to previous decisions in this litigation.

violated both procedural due process and the Administrative
Procedure Act.  *See Latif v. Holder* (*Latif III*), 28 F. Supp.
3d 1134, 1161–63 (D. Or. 2014).  In response to that ruling,
the government adopted the revised redress procedures at
issue here, and it informed several plaintiffs that they were
not on the No Fly List.  The court dismissed those plaintiffs'
claims, as well as the claims of a deceased plaintiff.

As to the remaining four plaintiffs, all of whom are
United States citizens, the government reevaluated their
statuses under the revised DHS TRIP procedures.[3]  At the
conclusion of this review, each received a notification letter
informing him of his continued inclusion on the No Fly List,
identifying the criterion on which the government relied,
providing a statement – sometimes incomplete – of the
reasons for his inclusion on the list, and providing an
unclassified summary of the evidence upon which the
government relied in making its determination.[4]   The
unclassified summaries are paraphrased below.  We again
emphasize that these summaries are based on the
government's *allegations* as to the plaintiffs' conduct.
Whether the allegations are true has not been decided in this
litigation, and, given their sensitive nature, nothing we say
in this opinion should suggest otherwise.

One plaintiff was included on the No Fly List based in
part on statements he allegedly made about his support of

---

[3] The district court also addressed the claims of a fifth plaintiff.  In
June 2019, however, we granted the fifth plaintiff's motion to be
dismissed from this appeal under Federal Rule of Appellate Procedure
42(b).  Accordingly, we do not address this plaintiff's claims.

[4] The government did not redact any of the DHS TRIP letters it sent
the plaintiffs.  At the plaintiffs' request, however, the district court sealed
those materials and redacted certain portions from the public record.

violent terrorism and his willingness to fight in Iraq against the United States. According to the government, this plaintiff was interviewed in July 2010 by FBI agents, with counsel present. During that interview, the plaintiff allegedly acknowledged purchasing and distributing lectures by Anwar Al-Aulaqi, emailing Al-Aulaqi on one occasion and authoring posts on Al-Aulaqi's website advocating the bombing of Jewish settlements. Al-Aulaqi, an American Muslim cleric and specially designated global terrorist, was killed in a U.S. drone strike in 2011.

A second plaintiff was included on the No Fly List based on statements he allegedly made to FBI agents after his arrest by the Kenyan military in 2007. According to the government, this plaintiff admitted engaging in militant activities in Somalia. The government alleged the plaintiff admitted receiving weapons training at a camp in Somalia; fighting in Somalia with a group of armed militants that probably included members of al-Qaeda; and being hosted in Somalia by individuals associated with the Council of Islamic Courts, the military wing of which – al-Shabaab – is a designated foreign terrorist organization (FTO).

A third plaintiff was included on the No Fly List based in part on his alleged travel to Somalia to train for and engage in jihad. According to the government, this plaintiff was interviewed by the FBI on 12 occasions. The plaintiff allegedly acknowledged traveling to Somalia and joining and receiving weapons training from the Islamic Courts Union, which is associated with al-Shabaab.

In contrast to the relatively detailed letters provided to the other plaintiffs, a fourth plaintiff's notification letter provided only the following unclassified statement of reasons for his inclusion on the No Fly List: "The Government has concerns about the nature and purpose of

[plaintiff's] travel to Yemen in 2010." The government expanded on the reasons for this plaintiff's inclusion on the No Fly List in classified information filed ex parte and in camera in district court.

The letters stated the government could not provide additional disclosures because of national security concerns, privileges or other legal limitations, and they notified the plaintiffs of their opportunity both to respond to the government's allegations and to submit relevant evidence or information on their behalf.

Each plaintiff responded to his notification letter, contesting the reasons for his inclusion on the No Fly List and requesting further information and procedures. None of the plaintiffs submitted evidence in support of his response, however.

DHS TRIP forwarded the plaintiffs' responses to TSC for review. After completing its reviews, TSC provided DHS TRIP with recommendations for the TSA Administrator as to whether each plaintiff should remain on the No Fly List. DHS TRIP forwarded these recommendations to the Acting TSA Administrator, who issued final orders maintaining each plaintiff on the list.

The plaintiffs then returned to the district court, challenging the vagueness of the No Fly List criteria, the adequacy of the revised DHS TRIP procedures and their inclusion on the list. The court held the criteria were not unconstitutionally vague. *See Latif v. Lynch* (*Latif IV*), No. 3:10-cv-00750-BR, 2016 WL 1239925, at *11–12 (D. Or. Mar. 28, 2016). As to the procedural and substantive due process claims, the court initially concluded the record was not adequate to resolve those claims because the government had not identified the information it had withheld from the

plaintiffs' notification letters or the reasons for withholding that information. *See id*. at *2, 14–20.  The court directed the government to supplement the record with a summary of the material information it had withheld from the notification letters, together with a justification for that withholding. *See id*. at *20.  The government did so, submitting classified materials in an ex parte filing.  After reviewing those materials in camera, the district court granted summary judgment to the government on the plaintiffs' procedural due process claims. *See* Order at 5–6, *Latif v. Lynch* (*Latif V*), No. 3:10-cv-00750-BR (D. Or. Oct. 6, 2016).  The court thereafter dismissed the plaintiffs' substantive due process claims for lack of subject matter jurisdiction, holding the claims challenged TSA orders and thus fell within the exclusive jurisdiction of the courts of appeals under § 46110. *See Latif v. Sessions* (*Latif VI*), No. 3:10-cv-00750-BR, 2017 WL 1434648, at *9 (D. Or. Apr. 21, 2017).

The plaintiffs appeal the grant of summary judgment on their vagueness and procedural due process claims and the dismissal of their substantive due process claims for lack of subject matter jurisdiction.

## II. STANDARD OF REVIEW

We have appellate jurisdiction under 28 U.S.C. § 1291. "We review de novo a district court's grant or denial of summary judgment," *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 777 (9th Cir. 2014) (en banc), and a district court's dismissal for lack of subject matter jurisdiction, *see Young v. United States*, 769 F.3d 1047, 1052 (9th Cir. 2014).

### III.  ANALYSIS

#### A.  Vagueness

We first examine whether the criteria for inclusion on the No Fly List are unconstitutionally vague under the Due Process Clause of the Fifth Amendment.[5]  "The void-for-vagueness doctrine . . . guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes."  *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (quoting *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972)); *see United States v. Williams*, 553 U.S. 285, 304 (2008); *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  Additionally, "the doctrine guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges."  *Dimaya*, 138 S. Ct. at 1212; *see Williams*, 553 U.S. at 304; *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983); *Grayned*, 408 U.S. at 108–09.  Here, the plaintiffs invoke each of these theories – fair notice and arbitrary enforcement – and they raise both as-applied and facial challenges.

---

[5] As the district court observed, it is unclear whether the plaintiffs raised a distinct claim that the No Fly List criteria are void for vagueness, or whether they instead contended the vagueness of the criteria amounted to inadequate notice for the purpose of procedural due process.  *See Latif IV*, 2016 WL 1239925, at *11.  The third amended complaint states procedural due process, substantive due process and Administrative Procedure Act claims, but makes no mention of vagueness.  Because the district court reached the vagueness issue in granting summary judgment to the government, and because both parties treat vagueness as an independent challenge under the Due Process Clause, we approach it as a distinct claim.

*1. The Strictness of Our Review*

Before reaching those questions, we consider the parties' contentions regarding the strictness of our review. The degree of vagueness the Due Process Clause will tolerate "depends in part on the nature of the enactment." *Hoffman Estates*, 455 U.S. at 498. Relevant factors include whether the challenged provision involves only economic regulation, imposes civil rather than criminal penalties, contains a scienter requirement and threatens constitutionally protected rights. *See id.* at 498–99; *Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995). A provision that nominally imposes only civil penalties but nonetheless carries a "prohibitory and stigmatizing effect" may warrant a "relatively strict test." *Hoffman Estates*, 455 U.S. at 499.

The plaintiffs ask us to apply an exacting vagueness standard because the No Fly List criteria penalize First Amendment-protected speech and association and impose a punishment – an indefinite bar on air travel – of comparable severity to deportation. *See Dimaya*, 138 S. Ct. at 1213 (applying "the most exacting vagueness standard" in removal cases "'in view of the grave nature of deportation'" (quoting *Jordan v. De George*, 341 U.S. 223, 231 (1951)); *Hoffman Estates*, 455 U.S. at 499 ("If . . . the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.").

The government counters that because the No Fly List criteria impose civil rather than criminal penalties and "the consequences of imprecision are qualitatively less severe," we should "express[] greater tolerance." *Hoffman Estates*, 455 U.S. at 498–99; *see also Gilmore v. Gonzales*, 435 F.3d 1125, 1135 (9th Cir. 2006) (distinguishing the vagueness standard applied to penal statutes from a challenge to the government's airline passenger identification policy on the

ground that the latter "simply prevent[ed] [passengers] from boarding commercial flights" and did not "impose any criminal sanctions, or threats of prosecution, on those who do not comply"). The government points out, moreover, that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010) (quoting *Williams*, 553 U.S. at 304); *see, e.g.*, *Grayned*, 408 U.S. at 108–14 (rejecting a vagueness challenge to a criminal law that implicated First Amendment activities); *Scales v. United States*, 367 U.S. 203, 223 (1961) (same). Under the No Fly List policy, "nominations must not be based solely on the individual's race, ethnicity, national origin, religious affiliation, or activities protected by the First Amendment as free speech, the exercise of religion, freedom of the press, freedom of peaceful assembly, and petitioning the government for redress of grievances."

Ultimately, we need not decide whether this case calls for the most exacting vagueness standard. Even assuming for purposes of our analysis that a strict standard applies, the plaintiffs' vagueness challenges to the No Fly List criteria fail.

### 2.  *The As-Applied Vagueness Challenges*

As noted, the plaintiffs' as-applied vagueness challenges assert both that the No Fly List criteria fail to give ordinary people fair notice of the conduct it punishes and that the criteria are so standardless that they invite arbitrary enforcement. We address these contentions in turn.

### a.  *Fair Notice*

Whether a provision is vague for lack of fair notice is an objective inquiry. *See Williams*, 553 U.S. at 304–05;

*Grayned*, 408 U.S. at 108. We ask whether the law gives "a person of ordinary intelligence fair notice of what is prohibited," *Williams*, 553 U.S. at 304, not whether a particular plaintiff actually received a warning that alerted him or her to the danger of being held accountable for the behavior in question. *See Maynard v. Cartwright*, 486 U.S. 356, 361 (1988); *cf. Grayned*, 408 U.S. at 108. The question, therefore, is whether a reasonable person would have known that the plaintiffs' alleged conduct fell within the No Fly List criteria. *See Humanitarian Law Project*, 561 U.S. at 18; *Maynard*, 486 U.S. at 361; *United States v. Kim*, 449 F.3d 933, 941–42 (9th Cir. 2006).

The plaintiffs argue the No Fly List criteria are unconstitutionally vague because they provide no notice of what specific conduct they proscribe, leaving an ordinary person to guess what behavior might lead the government to determine that someone represents a threat of committing an act of terrorism; permit a threat finding based on conduct that is not unlawful, let alone clearly so; fail to specify the degree of risk inherent in the concept of a "threat"; and are based on predictive judgments about future criminal behavior that are inherently unreliable and error-prone. The plaintiffs contend the government has identified no behavioral indicators that can accurately predict whether someone will engage in terrorist activity.

We are not persuaded that the criteria are vague merely because they are based on a threat assessment involving a prediction of future criminal conduct. In *Schall v. Martin*, 467 U.S. 253, 278–79 (1984), the Supreme Court rejected the argument that a provision was "fatally vague" because it authorized pretrial detention of juveniles deemed a "serious risk" of committing a crime before their next court appearance. Similarly, in *Jurek v. Texas*, 428 U.S. 262, 272–

76 (1976) (plurality opinion), the Court rejected the
argument that a capital sentencing scheme was "so vague as
to be meaningless" because it required the jury to find
whether the defendant posed a "continuing threat to society."
As the Court explained in *Schall*:

> [F]rom a legal point of view there is nothing
> inherently unattainable about a prediction of
> future criminal conduct.  Such a judgment
> forms an important element in many
> decisions, and we have specifically rejected
> the contention . . . 'that it is impossible to
> predict future behavior and that the question
> is so vague as to be meaningless.'

467 U.S. at 278–79 (footnote omitted) (quoting *Jurek*,
428 U.S. at 274).[6]

    We are not persuaded, moreover, that the criteria are
vague simply because they fail to delineate a set of factors

---

[6] The plaintiffs seek to distinguish *Schall* and *Jurek* on three
grounds.  First, they contend the risk assessments at issue in *Schall* and
*Jurek* required a prior judicial determination of at least probable cause to
believe the individual had already engaged in clearly proscribed conduct.
*See Schall*, 467 U.S. at 258–60 (judicial probable cause finding within
days after detention began); *Jurek* 428 U.S. at 267 (defendant had been
convicted of a capital offense).  Second, they argue *Schall* and *Jurek*
involved procedural protections – including the right to counsel,
disclosure of evidence and adversarial hearings – designed to reduce the
possibility of error inherent in a risk assessment.  Third, the plaintiffs
contend predictions of future dangerousness in pretrial and sentencing
contexts rest on "decades of judicial practice," whereas here, the
government has not identified any indicators that can reliably assess the
likelihood that a given person will commit a terrorist offense.  These
concerns speak more to the plaintiffs' procedural and substantive due
process challenges than to vagueness.

relevant to a threat assessment.  As the Court explained in
*Schall*, "a prediction of future criminal conduct is 'an
experienced prediction based on a host of variables' which
cannot be readily codified."   467 U.S. at 279 (quoting
*Greenholtz v. Neb. Penal Inmates*, 442 U.S. 1, 16 (1979)).

Furthermore, a conduct-based threat assessment is not
vague merely because it takes lawful conduct into account.
The pretrial detention decision in *Schall* was "based on as
much information as can reasonably be obtained," including
a range of factors that did not amount to unlawful, let alone
clearly unlawful, conduct.  *Id.* (listing, by way of example,
relevant factors such as lack of parental control and the
child's "school situation").  Likewise, *Jurek* observed that
the jury must be able to consider "all possible relevant
information" in deciding whether a person convicted of
capital murder was likely to commit "criminal acts of
violence" that would constitute a "continuing threat to
society" – terms that the statute left undefined.  *Jurek*,
428 U.S. at 272, 276.

Nor are the criteria vague merely because they fail to
specify the "degree of risk inherent in the concept of a
'threat.'"  The plaintiffs are correct that the Supreme Court
emphasized this factor in striking down the statutory
provisions at issue in *Johnson* and *Dimaya*.  The Court
struck down those provisions in part because they "left
unclear what threshold level of risk" was required.  *See
Dimaya*, 138 S. Ct. at 1214 (citing *Johnson*, 135 S. Ct. at
2558).[7]  In both cases, however, the Court "emphasized that

_____

[7] *Johnson* struck down the residual clause of the Armed Career
Criminal Act, which defined the term "violent felony" to include any
felony that "involves conduct that presents a *serious potential risk* of
physical injury to another." 18 U.S.C. § 924(e)(2)(B) (emphasis added).

this feature alone would not have violated the void-for-vagueness doctrine:  Many perfectly constitutional statutes use imprecise terms like 'serious potential risk' . . . or 'substantial risk' . . . ." *Id.*  The indeterminate risk standard rendered the provisions vague only because it was combined with a second factor – the categorical approach – that required the court to imagine the kind of conduct involved in the "ordinary case" of a crime and then decide whether that abstract scenario presented the requisite risk of physical injury or physical force.  *See United States v. Davis*, 139 S. Ct. 2319, 2326 (2019) ("*Johnson* and *Dimaya* . . . . teach that the imposition of criminal punishment can't be made to depend on a judge's estimation of the degree of risk posed by a crime's imagined 'ordinary case.'"); *Dimaya*, 138 S. Ct. at 1213–14; *Johnson*, 135 S. Ct. at 2557–58.  Here, by contrast, the categorical approach does not apply, no "ordinary case" inquiry is required and the threat assessment required under the No Fly List criteria applies to real-world conduct.    *Johnson*   and   *Dimaya*,   therefore,   are distinguishable.  *See Davis*, 139 S. Ct. at 2327 ("[A] case-specific approach would avoid the vagueness problems that doomed the statutes in *Johnson* and *Dimaya*.  In those cases, we recognized that there would be no vagueness problem with asking a jury to decide whether a defendant's 'real-world conduct' created a substantial risk of physical violence."); *Johnson*, 135 S. Ct. at 2561 ("As a general matter, we do not doubt the constitutionality of laws that call

---

*Dimaya* invalidated the residual clause of the Immigration and Nationality Act, which defined the term "crime of violence" to include "any other offense that is a felony and that, by its nature, involves a *substantial risk* that physical force against the person or property of another may be used in the course of committing the offense."  *Id.* § 16(b) (emphasis added).

for the application of a qualitative standard such as
'substantial risk' to real-world conduct . . . .").

Perhaps most significantly, the plaintiffs emphasize that
the criteria are silent as to the kinds of specific conduct that
may lead to inclusion on the No Fly List.  The criteria do not,
for example, delineate the types of associations, foreign
travel or online activities in which an individual can safely
engage or, alternatively, that would raise suspicion.  This is
a valid concern.  Although "a prediction of future criminal
conduct is 'an experienced prediction based on a host of
variables' which cannot be readily codified," *Schall*,
467 U.S. at 279 (quoting *Greenholtz*, 442 U.S. at 16), and
"due process does not require 'impossible standards' of
clarity," *Kolender*, 461 U.S. at 361 (quoting *United States v.
Petrillo*, 332 U.S. 1, 7 (1947)), further precision may be
required where possible and practical, *see id.*

Ultimately, this case does not require us to address
whether further precision was required in the abstract.  Even
if the criteria might be vague as applied to others – a question
we do not reach – this is an as-applied challenge, and we are
persuaded that each of *these plaintiffs* had fair notice that *his
conduct* would raise suspicion under the criteria.  It was
reasonably clear to one of the plaintiffs, for example, that a
person would fall within the criteria if he traveled to Somalia
"to fight jihad and to train for jihad," received weapons
training at a camp associated with a foreign terrorist
organization (FTO) and fought with a group that likely
included members of al-Qaeda.  A second plaintiff had fair
notice that the criteria applied to a person who traveled to
Somalia to join a group associated with a foreign terrorist
organization, received weapons training from that group and
served as a medic near the front line of combat.  It was
reasonably clear to someone in a third plaintiff's position

that the criteria applied to a person who appears to have
endorsed a specially designated global terrorist's message by
distributing that terrorist's lectures and communicating with
the terrorist, wrote posts on the terrorist's website
advocating bombing members of another religious group
and made statements about his willingness to fight in Iraq
against the United States.[8]   Finally, although a fourth
plaintiff's notification letter stated only that he was included
on the No Fly List based on "concerns about the nature and
purpose of [his] travel to Yemen in 2010," the classified
information filed by the government satisfies us that
someone in this plaintiff's position had fair notice that his
conduct fell under the second of the No Fly List criteria.
Thus, notwithstanding their lack of specificity, the criteria
provided fair notice to these plaintiffs.

The plaintiffs also point out that the government did not
disclose the four criteria "until well after Plaintiffs filed this
lawsuit."   "Thus," in their view, "even if Plaintiffs and the
Court could discern what conduct the criteria proscribe
now[,] . . . Plaintiffs did not have *any* notice, let alone 'fair
notice,' that their . . . conduct could have led to placement
on the No Fly List when it occurred."   The operative
question, however, is whether the plaintiffs had fair notice
of the No Fly List *policy* at the time of their conduct, not
whether they had notice of the written criteria summarizing
that policy.  *See Gilmore*, 435 F.3d at 1135–36 ("Although
Gilmore was not given the text of the identification policy
. . . , he was nonetheless accorded adequate notice given that
he was informed of the policy and how to comply.").  Here,

---

[8] Three of the plaintiffs were included on the No Fly List based on
the fourth No Fly List criterion – i.e., TSC determined they represented
"[a] threat of engaging in or conducting a violent act of terrorism and
[were] operationally capable of doing so."

the written criteria say only that inclusion on the No Fly List turns on whether an individual poses a threat of committing (a) aviation-related terrorism, (b) domestic terrorism against the U.S. homeland, (c) international terrorism against U.S. interests abroad or (d) an act of terrorism that the individual is operationally capable of carrying out. The plaintiffs have not shown they lacked fair notice of this policy before the written criteria were disclosed.

### b. Arbitrary Enforcement

The plaintiffs alternatively argue the No Fly List criteria are unconstitutionally vague because they vest the government with unbridled enforcement discretion. *See Dimaya*, 138 S. Ct. at 1212 ("The void-for-vagueness doctrine . . . guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges."); *Williams*, 553 U.S. at 304; *Kolender*, 461 U.S. at 358. "[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Grayned*, 408 U.S. at 108.

Upon review of the government's public and classified filings, we are satisfied that the No Fly List criteria are governed by constitutionally sufficient standards, at least as applied to these plaintiffs. Rules governing the No Fly List require a nominating agency to provide a summary of the underlying substantive information demonstrating that a nominee meets the criteria for inclusion on the list. This information is then assessed according to the interagency Watchlisting Guidance to determine whether there is reasonable suspicion that the individual represents a threat of committing a terrorist act. The nominator must rely on articulable intelligence to meet the reasonable suspicion standard; mere guesses or "hunches" are insufficient.

It is not the case that the No Fly List criteria lack "any ascertainable standard for inclusion and exclusion," *Smith v. Goguen*, 415 U.S. 566, 578 (1974), nor do they contain "no guidelines, such that the authorities can arbitrarily prosecute one class of [persons] instead of another," *Kim*, 449 F.3d at 943. Rather, application of the criteria turns on whether – based on articulable, concrete intelligence, assessed according to the Watchlisting Guidance – there is a reasonable suspicion the nominee represents a threat of committing an act of terrorism. The reasonable suspicion standard, moreover, "ensures the existence of 'neutral limitations on the conduct of individual [law enforcement] officers.'" *Kolender*, 461 U.S. at 360–61 (quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979)). Accordingly, we are not persuaded, on the facts of this case, that the criteria raise substantial concerns of arbitrary application.

### 3. The Facial Vagueness Challenges

"[V]agueness challenges to statutes that do not involve First Amendment violations must be examined as applied to the defendant." *Kim*, 449 F.3d at 942; *see Maynard*, 486 U.S. at 361. "A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Hoffman Estates*, 455 U.S. at 495. Thus, as a general matter, a defendant who cannot sustain an as-applied vagueness challenge to a statute cannot be the one to make a facial vagueness challenge to the statute.[9]

---

[9] These requirements are relaxed in the First Amendment context. Under the First Amendment overbreadth doctrine, "[l]itigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or

We recognize that this rule is not absolute. In *Johnson*, for example, the Supreme Court "looked past [the] as-applied challenge directly to the petitioner's facial challenge." *Henry v. Spearman*, 899 F.3d 703, 709 (9th Cir. 2018). Thus, the general rule that a litigant whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness challenge is subject to exceptions.

We do not, however, agree with the plaintiffs' argument that the general rule has been altogether abolished. Rather than arguing an exception applies here, the plaintiffs raise a blanket challenge to the general rule. Exceptions aside, they argue more broadly that it is no longer the case that a litigant whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness challenge. They note that, in *Johnson* and *Dimaya*, the Supreme Court squarely rejected the proposition that a statute is void for vagueness only if it is vague in all its applications. *See Johnson*, 135 S. Ct. at 2561; *Guerrero v. Whitaker*, 908 F.3d 541, 544 (9th Cir. 2018). They maintain that the rule that a litigant whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness challenge is nothing more than a corollary to the now discarded rule that a facial challenge requires a statute to be vague in all its applications. Thus, in

---

assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973); *see also Humanitarian Law Project*, 561 U.S. at 20; *Williams*, 553 U.S. at 304. Here, the plaintiffs have not asserted a First Amendment overbreadth claim. Moreover, "[e]ven assuming that a heightened [vagueness] standard applies because the [No Fly List criteria] potentially implicate[] speech," the rule that a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others "makes no exception for conduct in the form of speech." *Humanitarian Law Project*, 561 U.S. at 20–21.

their view, *Johnson* and *Dimaya* "plainly establish that Plaintiffs may raise – and this Court may decide – their facial vagueness challenge regardless of any question as to whether their own alleged conduct might fall within the scope of the No Fly List criteria."

We disagree. The principle that a litigant whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness challenge rests on an independent foundation, apart from the vague-in-all-applications rule:

> Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court. A closely related principle is that constitutional rights are personal and may not be asserted vicariously. These principles rest on more than the fussiness of judges. They reflect the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws. Constitutional judgments, as Mr. Chief Justice Marshall recognized, are justified only out of the necessity of adjudicating rights in particular cases between the litigants brought before the Court . . . .

*Broadrick*, 413 U.S. 610–11 (citations omitted).

*Johnson* and *Dimaya* did not explicitly question the rule that a litigant whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness challenge. Nor did they question the independent foundation for that rule described in *Broadrick*. Accordingly, we conclude that *Johnson* and *Dimaya* did not alter the general rule that a defendant whose conduct is clearly prohibited cannot be the one to make a facial vagueness challenge to a statute. *Cf. United States v. Cook*, 914 F.3d 545, 554 (7th Cir. 2019), *cert. granted and judgment vacated on other grounds*, 2019 WL 4921160 (U.S. Oct. 7, 2019).

This conclusion is not at odds with our recent decision in *Henry*. There, we observed that the rule that "a statute must be vague as applied to the person challenging it . . . may not reflect the current state of the law." 899 F.3d at 709. We did not reach a conclusion on that question, however. The only question we decided was whether the petitioner had "made a *prima facie* showing that he has standing to challenge California's second-degree felony-murder rule as unconstitutionally vague" – i.e., "'a sufficient showing of *possible* merit to warrant a fuller exploration by the district court.'" *Id.* at 706, 708 (quoting *Cooper v. Woodford*, 358 F.3d 1117, 1119 (9th Cir. 2004)). We did not ultimately decide whether *Johnson* or *Dimaya* abrogated the rule that a litigant whose conduct is clearly prohibited by a statute cannot bring a facial vagueness challenge.

In approaching this question, moreover, we are mindful of the Supreme Court's repeated admonitions that it is that Court's "prerogative alone to overrule one of its precedents." *Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) (per curiam) (quoting *United States v. Hatter*, 532 U.S. 557, 567 (2001)); *see Hohn v. United States*, 524 U.S. 236, 252–53 (1998) ("Our decisions remain binding precedent until we see fit to

reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality."); *Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("[I]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (quoting *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989))).

In sum, we are not persuaded by plaintiffs' contention that we may cast aside the longstanding rule that a litigant whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness challenge. The relevant question, therefore, is simply whether this case, like *Johnson* and *Dimaya*, warrants an exception to this rule. We conclude that *Johnson* and *Dimaya* are distinguishable, and thus that no departure from the rule is warranted.

First, both *Johnson* and *Dimaya* suggested the residual clauses were plagued by such indeterminacy that they might be vague even as applied to the challengers. *See Johnson*, 135 S. Ct. at 2559–60 (observing that application of the residual clause to the defendant's conviction for unlawful possession of a short-barreled shotgun was not "so easy after all"); *Dimaya*, 138 S. Ct. at 1214 n.3 (making the same observation as to the petitioner's conviction for completed burglary). Second, although the Court did not say so explicitly, the residual clauses did not lend themselves easily to a traditional as-applied analysis. Both cases involved the categorical approach, which "requires the judge to imagine how the idealized ordinary case of the crime subsequently plays out," *Johnson*, 135 S. Ct. at 2557–58, instead of considering the conduct underlying the convictions. This limited the extent to which the Court could examine the

vagueness challenges "in light of the facts of the case at
hand," *Maynard*, 486 U.S. at 361, as is required in an as-
applied challenge. *See Cook*, 914 F.3d at 553 ("It is not clear
how much *Johnson* – and the Court's follow-on decision last
term in *Sessions v. Dimaya* . . . – actually expand the
universe of litigants who may mount a facial challenge to a
statute they believe is vague [because] so much of the
Court's analysis in *Johnson* deals with a statute that is in key
respects *sui generis*."). Thus, to the extent *Johnson* and
*Dimaya* bypassed as-applied challenges and proceeded
directly to facial vagueness, that approach appears to have
turned on the "exceptional circumstances" of the provisions
at issue. *See Copeland v. Vance*, 893 F.3d 101, 111 n.2 (2d
Cir. 2018).[10]

This case does not present exceptional circumstances.
The plaintiffs raise a straightforward vagueness challenge to
the No Fly List criteria, which are applied using a risk
determination based on real-world conduct. Because there
is no reason to depart from the traditional rule that a person
to whom a provision clearly applies cannot raise a facial
vagueness challenge, *see Hoffman Estates*, 455 U.S. at 495,
and because we conclude the criteria are not vague as applied
to the plaintiffs, we decline to reach the plaintiffs' facial
vagueness claims.

## B.  Procedural Due Process

The plaintiffs argue that, despite the 2015 revisions, the
DHS TRIP redress procedures continue to violate procedural

---

[10] Similar exceptional circumstances appear to have been present in
*Henry*. *See Henry*, 899 F.3d at 707–08 (discussing the petitioner's
contention that the second-degree felony murder rule at issue presented
"the same two features of indeterminacy" as the residual clauses at issue
in *Johnson* and *Dimaya*).

due process. We apply the *Mathews v. Eldridge*, 424 U.S. 319 (1976), balancing test. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 528–29 (2004) (plurality opinion) (applying *Mathews* balancing to a procedural due process claim by an American citizen whom the government had classified and detained as an enemy combatant); *Al Haramain II*, 686 F.3d at 979 (applying *Mathews* to a procedural due process claim by an organization challenging its designation as a specially designated global terrorist).

*Mathews* set forth a three-part inquiry to determine whether administrative procedures provided to protect a liberty or property interest are constitutionally sufficient:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335. "In 'balancing' the *Mathews* factors, we are mindful that 'the requirements of due process are flexible and call for such procedural protections as the particular situation demands.'" *Vasquez v. Rackauckas*, 734 F.3d 1025, 1044 (9th Cir. 2013) (quoting *Wilkinson v. Austin*, 545 U.S. 209, 224–25 (2005)). We begin by addressing the first and third factors and then turn to the second.

*1. The Private Interest at Stake*

The plaintiffs undoubtedly have a strong liberty interest in domestic and international travel. *See Kent v. Dulles*, 357 U.S. 116, 125–26 (1958) ("The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment. . . . Freedom of movement across frontiers in either direction, and inside frontiers as well . . . is basic in our scheme of values."); *Gilmore*, 435 F.3d at 1136–37 (noting "the fundamental right to interstate travel"). The plaintiffs may not "possess a fundamental right to travel *by airplane*," *Gilmore*, 435 F.3d at 1137 (emphasis added), but in many instances air travel constitutes the only practical means of traveling across great distances, especially internationally. As the district court noted, "the realistic implications of being on the No Fly List are potentially far-reaching." *Latif III*, 28 F. Supp. 3d at 1149.

> Plaintiffs have suffered significantly[,] including long-term separation from spouses and children; the inability to access desired medical and prenatal care; the inability to pursue an education of their choosing; the inability to participate in important religious rites; loss of employment opportunities; loss of government entitlements; the inability to visit family; and the inability to attend important personal and family events such as graduations, weddings, and funerals. The Court concludes international travel is not a mere convenience or luxury in this modern world. Indeed, for many international travel is a necessary aspect of liberties sacred to members of a free society.

*Id*. at 1149–50.  The plaintiffs' liberty interest in air travel, therefore, is substantial.

We note, however, that "the freedom to travel abroad . . . is subordinate to national security and foreign policy considerations; as such, it is subject to reasonable government regulation."  *Haig v. Agee*, 453 U.S. 280, 306 (1981).  Furthermore, "[a]lthough the freedom to travel internationally is a liberty interest recognized by the Fifth Amendment," we have said that it is "not accorded the same stature as the freedom to travel among the states."  *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1438–39 (9th Cir. 1996).

### 2.  *The Government's Interest*

On the other side of the scale, the government asserts interests of the highest order in combatting terrorism and withholding national security information from unauthorized persons.  "[N]ational security is a compelling government interest," *In re Nat'l Sec. Letter*, 863 F.3d 1110, 1123 (9th Cir. 2017), and combatting terrorism is "an urgent objective of the highest order," *Humanitarian Law Project*, 561 U.S. at 28.  Likewise, "keeping sensitive information confidential in order to protect national security is a compelling government interest."  *In re Nat'l Sec. Letter*, 863 F.3d at 1123; *see also Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 207 (D.C. Cir. 2001).  The government has presented persuasive evidence describing the potential harms posed by disclosure of privileged information regarding an individual's inclusion on the No Fly List.

### 3. The Risk of Erroneous Deprivation and the Probable Value of Any Additional Procedural Safeguards

Under the second *Mathews* factor, we examine whether the DHS TRIP procedures provided to the plaintiffs risked erroneous deprivation of their liberty interests, as well as the value of any additional or substitute procedural safeguards. *See Mathews*, 424 U.S. at 335. "As the *Mathews* balancing test makes clear, we must carefully assess the precise 'procedures used' by the government, 'the value of additional safeguards,' and 'the burdens of additional procedural requirements.'" *Al Haramain II*, 686 F.3d at 980 (quoting *Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584, 589 (9th Cir. 1998)). "[T]he Constitution certainly does not require that the government take actions that would endanger national security; nor does it require the government to undertake every possible effort to mitigate the risk of erroneous deprivation and the potential harm to the private party. But the Constitution does require that the government take reasonable measures to ensure basic fairness to the private party and that the government follow procedures reasonably designed to protect against erroneous deprivation of the private party's interests." *Id.*

Under the revised DHS TRIP procedures, individuals have a right to: (1) an administrative challenge to their inclusion on the No Fly List; (2) a letter identifying the criterion or criteria used to place them on the list; (3) an unclassified summary of the information supporting their inclusion on the list that identifies at least some of the reasons for their placement on the list, subject to national security concerns; (4) submit exculpatory information to the government for reconsideration of their placement on the list; (5) review by the TSA Administrator; and (6) judicial

review of the TSA's decision based on the administrative record before the TSA Administrator.

The plaintiffs contend these procedures are constitutionally inadequate because they pose a high risk of error and sweep onto the No Fly List many individuals who do not present a genuine terrorism threat.[11]  They argue due process requires additional procedures, including: (1) a threat finding by "clear and convincing evidence" rather than "reasonable suspicion"; (2) the right to be informed of *all* reasons for their placement on the list; (3) access to the evidence relied upon by the government to include them on the list, not just a summary of that evidence; (4) access to any exculpatory evidence in the government's possession; (5) a live hearing affording them the opportunity to cross-examine the witnesses against them; and (6) the use of procedures like those authorized in criminal cases under the Classified Information Procedures Act (CIPA), such as allowing a lawyer with security clearance to review the classified information used to justify their inclusion on the No Fly List.  We address these additional procedures in turn below.

In summary, we hold that the "reasonable suspicion" standard satisfies due process.  We hold that individuals challenging their No Fly List designation are presumptively entitled to a full statement of the reasons for their inclusion on the list and to disclosure of the original evidence –

---

[11] The plaintiffs submitted declarations by Dr. James Austin, a correctional sociologist with expertise in risk assessment in the criminal justice context, and Dr. Marc Sageman, an intelligence community consultant and forensic psychiatrist.  Both said they were unaware of any methodological system that can reliably predict terrorist activity, and both opined that the DHS TRIP procedures are not accurate enough to guard against a high risk of error.

inculpatory and exculpatory – upon which the government relied in making the designation.  This entitlement, however, is qualified by national security concerns.   Under the framework we established in *Al Haramain II*, the government may withhold classified information that truly implicates national security so long as it undertakes reasonable measures to mitigate the potential unfairness to the affected traveler.  The government may, for example, provide an unclassified summary of the classified information or permit a lawyer for the affected traveler to view the information after receiving a security clearance and pursuant to a protective order.   The government may altogether withhold classified information only when such measures are not practical.   Next, although we do not foreclose the need for a hearing in another case, we hold *these* plaintiffs were not entitled to a live hearing affording them the opportunity to cross-examine witnesses.  Finally, we once again hold that CIPA-like procedures, such as disclosure of classified information to cleared counsel, may be employed where appropriate, although their use was not required here.  Applying these principles, we conclude the procedures provided to the plaintiffs were constitutionally sufficient, or that any error was harmless.  Accordingly, we hold the district court properly granted summary judgment to the government on the plaintiffs' procedural due process claims.

### a.  Clear and Convincing Evidence Standard

Government policy requires a nomination to the No Fly List to be supported by reasonable suspicion that the individual represents a threat of committing an act of terrorism.   The plaintiffs argue due process requires a standard higher than reasonable suspicion.  They note that, under a reasonable suspicion standard, an individual can be

included on the No Fly List so long as the government believes he or she *might* present a threat, even if it determines he or she probably is not a threat.  The plaintiffs propose a clear and convincing evidence standard, which applies in a range of civil proceedings involving substantial deprivations of liberty.  *See, e.g.*, *Foucha v. Louisiana*, 504 U.S. 71, 80–81 (1992) (civil commitment); *Santosky v. Kramer*, 455 U.S. 745, 769 (1982) (termination of parental rights); *Woodby v. INS*, 385 U.S. 276, 286 (1966) (deportation); *Chaunt v. United States*, 364 U.S. 350, 353 (1960) (denaturalization); *Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011) (detention pending a removal determination).

"The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.'"  *Addington v. Texas*, 441 U.S. 418, 423 (1979) (quoting *In re Winship*, 397 U.S. 358, 370 (1970) (Harlan, J., concurring)).  "[I]n any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants." *Santosky*, 455 U.S. at 755.

Although courts have required clear and convincing evidence in other civil contexts, those cases have involved greater deprivations of liberty than the prohibition against air travel at issue here.  The plaintiffs have not pointed to precedent in which a clear and convincing standard was deemed necessary to justify a liberty deprivation comparable to a prohibition against air travel.

On the other hand, the government has not identified cases in which a reasonable suspicion standard has been deemed sufficient to justify a deprivation of liberty as serious as that at issue here. A reasonable suspicion standard justifies a brief investigative stop or frisk by police officers, an administrative investigation by a government employer into an employee and a non-routine search or seizure at the border. *See Terry v. Ohio*, 392 U.S. 1, 20–21 (1968) (investigative stop); *O'Connor v. Ortega*, 480 U.S. 709, 724, 726 (1987) (plurality opinion) (administrative investigation); *United States v. Montoya de Hernandez*, 473 U.S. 531, 541 (1985) (non-routine search or seizure at the border). Those liberty deprivations are all temporary, whereas the deprivation at issue here is indefinite. Nor has the government identified any circumstances in which a liberty deprivation has been justified by a reasonable suspicion that a person poses a non-imminent *threat* of harmful conduct. *Cf. United States v. Sandoval*, 390 F.3d 1077, 1080 (9th Cir. 2004) (holding that an investigative stop is justified "if there is a reasonable suspicion that the suspect is engaged in, or is *about to engage in*, criminal activity" (emphasis added)).

We nonetheless conclude that the reasonable suspicion standard satisfies procedural due process here. Congress has mandated that TSA "identify individuals on passenger lists who *may be a threat* to civil aviation or national security" and prevent such individuals from boarding aircraft. 49 U.S.C. § 114(h)(3)(A) (emphasis added). By doing so, Congress has made a reasonable "judgment about how the risk of error should be distributed between litigants" in this context, *Santosky*, 455 U.S. at 755, and the reasonable suspicion standard reasonably implements that judgment. Although the plaintiffs' liberty interest is substantial, it must be balanced against the government's "urgent" interest in

combatting terrorism, *Humanitarian Law Project*, 561 U.S. at 28, and the public's "manifest interest in aviation safety," *Aeronautical Repair Station Ass'n v. FAA*, 494 F.3d 161, 178 n.10 (D.C. Cir. 2007).    The reasonable suspicion standard therefore satisfies due process.

### b. A Full Statement of Reasons

The plaintiffs argue procedural due process requires individuals to be provided a statement of *all* reasons for their inclusion on the No Fly List.  Here, the notification letter each plaintiff received from DHS TRIP supplied an unclassified summary of reasons for his inclusion on the list, but at least some of those letters failed to provide all such reasons.  The plaintiffs contend these summaries deprived them of "adequate notice and a meaningful opportunity to respond" to the DHS TRIP determinations.  *Al Haramain II*, 686 F.3d at 984.

"Due process requires notice 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"  *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)); *see also Al Haramain II*, 686 F.3d at 986 (holding due process required the government to provide, "at a minimum, a terse and complete statement of reasons for the investigation," and finding "no reason why [the government] could not have given [such] notice in this particular case"); *see also Gete v. INS*, 121 F.3d 1285, 1297 (9th Cir. 1997) (holding that notice of an administrative forfeiture of a vehicle under 8 U.S.C. § 1324(b) must include "the exact reasons" for the adverse action).  "[T]he opportunity to guess at the factual and legal bases for a government action does

not substitute for actual notice of the government's intentions." *Al Haramain II*, 686 F.3d at 986–87.

Where national security concerns arise, however, an exact statement of reasons "may not always be possible." *Id.* at 983. Under the framework we established in *Al Haramain II*, the government may use classified information without disclosure in "extraordinary circumstances" – i.e., "if that information *truly* implicates national security." *Id*. at 982 & n.9. When this occurs, however, we have accepted the proposition that the government must, if possible, "undertake some reasonable measure to mitigate the potential unfairness to" the affected private party. *Id.* at 982. The government may, "for example, provide an unclassified summary of the classified information or permit [the affected party's] lawyer to view the documents after receiving a security clearance and pursuant to a protective order." *Id.* Even these mitigation measures, however, may not always be possible. "[A]n unclassified summary may not be possible because, in some cases, the subject matter itself may be classified and cannot be revealed without implicating national security." *Id.* at 983. "Depending on the circumstances, [the government] might have a legitimate interest in shielding the materials even from someone with the appropriate security clearance." *Id.*; *see Gen. Dynamics Corp. v. United States*, 563 U.S. 478, 482 (2011) (noting that disclosure of sensitive information to a limited number of lawyers led to "unauthorized disclosure of military secrets"). Courts should adopt "a case-by-case approach" to determining what disclosure of classified information is required, considering, "at a minimum, the nature and extent of the classified information, the nature and extent of the threat to national security, and the possible avenues available to allow the designated person to respond more effectively to the charges." *Al Haramain II*, 686 F.3d at 984.

Applying the *Al Haramain* framework, we hold the government may withhold a reason for a DHS TRIP complainant's inclusion on the No Fly List only if two conditions are satisfied:

> (1) the withheld reason is classified and truly implicates national security; and
>
> (2) reasonable mitigation measures are not possible without unduly implicating national security. Mitigation measures may include, for example, disclosing the classified evidence to cleared counsel subject to a protective order or providing the complainant an unclassified summary of the information.

*See id.* at 982–84. Unless these conditions are satisfied, due process requires a full statement of reasons. *See id.*; *see also Gete*, 121 F.3d at 1297–98.

We emphasize that the government's decision to limit disclosures due to national security concerns must not be taken lightly. *Cf. Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1080 (9th Cir. 2010) (en banc) (applying the state secrets doctrine); *Al Haramain Islamic Found., Inc. v. Bush* (*Al Haramain I*), 507 F.3d 1190, 1203 (9th Cir. 2007) ("Simply saying 'military secret,' 'national security' or 'terrorist threat' . . . is insufficient to support the [state secrets] privilege."). When the government withholds information by citing national security, a reviewing court should require the government to inform the court what information it has withheld, why the information was withheld and why less drastic alternatives were not employed, as the district court did here. *See, e.g., Latif IV*, 2016 WL 1239925, at *14, 19–20. In responding to such an

order, the government, through a competent witness with personal knowledge, must describe the withheld information in sufficient detail – and, if necessary, file the withheld information with the court – to allow the court to decide whether the two conditions we have identified are satisfied. A court's review of the government's assertions, in turn, should be thorough and critical. *See Jeppesen*, 614 F.3d at 1082, 1086; *Al Haramain I*, 507 F.3d at 1203 ("The process of *in camera* review . . . . places on the court a special burden to assure itself that an appropriate balance is struck between protecting national security matters and preserving an open court system.").

Here, based on our review of the government's classified filings, we conclude as follows. As to the first condition under the *Al Haramain* framework, we are satisfied that the reasons that were not disclosed to the plaintiffs were classified and truly implicate national security. The government has presented detailed evidence describing the potential harms posed by disclosure of the classified information at issue here.

As to the second condition, we are persuaded that an unclassified summary of the undisclosed reasons was not possible here. Although the plaintiffs contend the additional reasons for their inclusion on the No Fly List should have been disclosed to cleared counsel, the district court found that "the record does not reflect whether any Plaintiff is represented by counsel with an appropriate security clearance," and the plaintiffs have not challenged that finding on appeal. *See Latif IV*, 2016 WL 1239925, at *18.

Furthermore, even assuming cleared counsel were available to the plaintiffs and that it was error not to disclose the additional reasons to such counsel, the plaintiffs have not shown that they were prejudiced. *See Al Haramain II*,

686 F.3d at 989.  This is not a case in which the government withheld the sole or predominant reason for including the plaintiffs on the No Fly List.  The government had numerous reasons for designating these plaintiffs, and those reasons generally were disclosed.  Given the disclosed reasons, we are not persuaded that the disclosure of *additional* reasons would have enabled the plaintiffs to undermine their designation on the list.

### c.  Disclosure of the Underlying Evidence

The plaintiffs seek disclosure of the evidence the government relied upon in placing them on the No Fly List – e.g., recordings of the plaintiffs' conversations with third parties, the plaintiffs' own statements to investigators and transcripts of the plaintiffs' conversations with confidential informants.  The government did not disclose any original evidence to the plaintiffs, whether classified or unclassified.  Rather, it supplied them with unclassified summaries of that evidence.  To the extent these summaries were based on classified evidence, the plaintiffs argue the district court should have required the government to identify and disclose that evidence to cleared counsel.  To the extent the government relied on unclassified evidence, the plaintiffs contend due process required its disclosure.  The plaintiffs assert, moreover, that the summaries did not encompass all of the evidence.

### i.  Unclassified evidence

The Supreme Court has long recognized the "immutable" principle that "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue."

*Greene v. McElroy*, 360 U.S. 474, 496 (1959).  Thus, as a general rule, "due process requires, at the least, that an affected party be informed of the official action, be given access to the unclassified evidence on which the official actor relied and be afforded an opportunity to rebut that evidence." *Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, 758 F.3d 296, 319 (D.C. Cir. 2014).  "[A] substantial interest in national security supports withholding only the *classified* information but does not excuse the failure to provide notice of, and access to, the unclassified information." *Id.* at 320.[12] Accordingly, where a DHS TRIP complainant responds to his or her initial notification letter and requests further information, we hold the government must, as a general matter, disclose all unclassified material evidence relating to the complainant in its possession, not just summaries of that evidence.

Here, the district court concluded that providing summaries of the unclassified evidence was adequate because disclosure of the evidence itself would have "raise[d] significant and likely insoluble practical difficulties because, unlike the context of ordinary civil litigation, separating unclassified information from protected national security information is exceedingly

---

[12] The D.C. Circuit has approved the disclosure of unclassified evidence with respect to, for example, designation as a "significant foreign narcotics trafficker, *see Zevallos v. Obama*, 793 F.3d 106, 117 (D.C. Cir. 2015), the FAA's revocation of airmen certificates on security grounds, *see Jifry v. FAA*, 370 F.3d 1174, 1178, 1184 (D.C. Cir. 2004), designation as a foreign terrorist organization, *see People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238, 1241–42 (D.C. Cir. 2003); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 209 (D.C. Cir. 2001), and designation as a specially designated global terrorist, *see Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2003).

complicated in the national security context." *Latif IV*, 2016 WL 1239925, at *14. "For example, a report may contain material, unclassified information regarding an individual placed on the No-Fly List interspersed with classified information that may or may not be material to the No-Fly List determination." *Id*. at *14 n.6.

The district court's analysis reflects the valid concern that "there will be occasions when, as a practical matter, [classified] and [unclassified] information cannot be separated." *Jeppesen*, 614 F.3d at 1082. "In some cases, therefore, 'it is appropriate that the courts restrict the parties' access not only to evidence which itself risks the disclosure of [classified information], but also those pieces of evidence or areas of questioning which press so closely upon highly sensitive material that they create a high risk of inadvertent or indirect disclosures.'" *Id*. (quoting *Bareford v. Gen. Dynamics Corp.*, 973 F.2d 1138, 1143–44 (5th Cir. 1992)).

There is, however, no general presumption that classified information cannot be segregated from unclassified information. To the extent the district court applied such a presumption, any error was harmless. *See Al Haramain II*, 686 F.3d at 988–89. Having reviewed the government's in camera filings, we are not persuaded that, had the plaintiffs been provided the unclassified evidence itself, rather than summaries, they plausibly would have undermined their designations on the No Fly List. *See id*. at 989–90.

### ii. Classified evidence

As noted, the *Al Haramain* framework dictates that the government must disclose evidence supporting a DHS TRIP complainant's inclusion on the No Fly List unless two conditions are satisfied:

(1) the evidence is classified and truly implicates national security; and

(2) reasonable mitigation measures are not possible without unduly implicating national security. As noted, mitigation measures may include disclosing the classified evidence to cleared counsel subject to a protective order or providing the complainant an unclassified summary of the classified evidence.

*See Al Haramain II*, 686 F.3d 982–84.[13]

Here, the first condition is satisfied. Turning to the second condition, the government provided the plaintiffs – other than one of the plaintiffs, whose notification letter said only that the government had concerns about the nature and purpose of his travel to Yemen – with unclassified summaries of the classified evidence. *Cf. id.* at 982–83. The plaintiffs challenge these summaries on three grounds.

First, they complain that the summaries were incomplete because they failed to summarize all of the evidence. One of the plaintiffs, whose notification letter said only that the government had concerns about his travel to Yemen, received no summary of the evidence against him at all, while the other plaintiffs argue the summaries they received were incomplete. As the government concedes, the notification letters "did not disclose all of the reasons or

---

[13] As noted, where the government fails to disclose evidence on national security grounds, a reviewing court should require the government to explain what evidence it has withheld, why the evidence was withheld and why less drastic alternatives were not employed. *Cf. Jeppesen*, 614 F.3d at 1082, 1086; *Al Haramain I*, 507 F.3d at 1203.

information that the government relied upon in determining that the six Plaintiffs should remain on the No Fly List." With respect to the plaintiff whose notification letter disclosed only that the government had concerns about the nature and purpose of his travel to Yemen, we have reviewed the materials filed in camera, and we conclude that additional disclosure – even in the form of an unclassified summary – was not possible without unduly implicating national security. *See id*. at 983. In this plaintiff's case, and to the extent the other plaintiffs' notification letters did not fully encompass the classified evidence, such nondisclosure was justified by the need to prevent inadvertent disclosure of the names of cooperating witnesses and other highly sensitive information contained in the original evidence. *See id*.

Second, the plaintiffs argue that the unclassified summaries provided too little detail to serve their purpose of mitigating the unfairness that arises when the government relies on undisclosed classified evidence. *See id.* at 982–84. The notification letter for one of the plaintiffs referred to certain statements he allegedly made while detained by the FBI. The plaintiffs argue the letter withheld critical context, thereby limiting his ability to show "bias and coercion" in the case against him. As to two other plaintiffs, their notification letters referred to statements they allegedly made to FBI agents and unidentified third parties. Finally, a fourth plaintiff's notification letter included a one-sentence disclosure but did not refer to any evidence against him. The plaintiffs argue this prohibited this plaintiff from tailoring his response to the government's concerns. *See Ralls*, 758 F.3d at 320.

We conclude the summaries afforded the plaintiffs a meaningful opportunity to tailor their responses to the

subject matter of the government's concerns. *See Al Haramain II*, 686 F.3d at 982–83. In one case, for example, the facts the plaintiff contends were omitted from his letter were within his personal knowledge. As to two other plaintiffs, the summaries they were provided identified the subject matter of the government's concerns such that they were able to respond meaningfully to the allegations. *See id*. As to the final plaintiff who was informed only that the government had concerns about his travel to Yemen, we reiterate that additional disclosure – even in the form of an unclassified summary – was not possible without unduly implicating national security.

Third, the plaintiffs argue due process required not only these unclassified summaries but also the disclosure of classified evidence itself to cleared counsel. As noted, however, the district court found that "the record does not reflect whether any Plaintiff is represented by counsel with an appropriate security clearance." *Latif IV*, 2016 WL 1239925, at *18. As we explained in *Al Haramain II*, moreover, there is no general rule requiring both an unclassified summary *and* disclosure to cleared counsel. Although "the Constitution does require that the government take reasonable measures to ensure basic fairness to the private party," it "does not require . . . the government to undertake every possible effort to mitigate the risk of erroneous deprivation and the potential harm to the private party." *Al Haramain II*, 686 F.3d at 980.

In sum, the government did not violate due process when it provided unclassified summaries of the underlying evidence and withheld from those summaries information that could not be disclosed without jeopardizing national security.

### d.   Disclosure of Exculpatory Evidence

The plaintiffs argue the due process concerns underlying *Brady v. Maryland*, 373 U.S. 83 (1963), require the government to disclose material exculpatory evidence as part of the DHS TRIP redress process.   *Brady* requires the prosecution in a criminal case to disclose "[material] evidence favorable to an accused." *Id*. at 87.   "The purpose of *Brady* is to ensure that criminal trials are fair, and that a miscarriage of justice does not occur." *Amado v. Gonzalez*, 758 F.3d 1119, 1133 (9th Cir. 2014) (citations and internal quotation marks omitted).   In the plaintiffs' view, *Brady*'s disclosure obligations should apply to the DHS TRIP review process because access to material exculpatory evidence would reduce the likelihood of error in No Fly List determinations.

The extent to which *Brad*y-like obligations extend to civil cases is an open question.   As the government acknowledges, *Brady* has been applied in the civil context when a substantial private interest is at stake, *see Al Maqaleh v. Hagel*, 738 F.3d 312, 327 (D.C. Cir. 2013) (alleged enemy combatants detained by the United States military), *vacated in part sub nom. al-Najar v. Carter*, 135 S. Ct. 1581 (2015); *United States v. Edwards*, 777 F. Supp. 2d 985, 991–92 (E.D.N.C. 2011) (civil commitment proceedings for sexually dangerous persons); *Dhiab v. Bush*, No. 05-1457(GK), 2008 WL 4905489, at *1–2 (D.D.C. Nov. 17, 2008) (habeas proceedings on behalf of alleged enemy combatants detained at Guantanamo); *cf. Bismullah v. Gates*, 501 F.3d 178, 188 (D.C. Cir. 2007) (holding that, with respect to "enemy combatant" designations, counsel for Guantanamo Bay detainees had a right to access all government information regarding their clients, subject to national security concerns), *vacated and remanded sub nom.*

*Gates v. Bismullah*, 554 U.S. 913 (2008), *petitions dismissed*, *Bismullah v. Gates*, 551 F.3d 1068 (D.C. Cir. 2009), or a civil matter is jointly investigated with a criminal prosecution, *see United States v. Gupta*, 848 F. Supp. 2d 491, 495–97 (S.D.N.Y. 2012) (SEC enforcement action investigated jointly with a criminal case).

"But courts have only in rare instances found *Brady* applicable in civil proceedings," *Fox ex rel. Fox v. Elk Run Coal Co.*, 739 F.3d 131, 138 (4th Cir. 2014), "such as when a person's liberty is at stake," *Brodie v. Dep't of Health & Human Servs.*, 951 F. Supp. 2d 108, 118 (D.D.C. 2013), *aff'd*, 2014 WL 211222 (D.C. Cir. Jan. 10, 2014).

Here, the district court concluded the government's "obligation to disclose exculpatory information is the same as [its] obligation to provide other material information; *i.e.*, as long as disclosure of the information would not create an undue risk to national security, [the government] must provide sufficient material information, whether exculpatory or inculpatory, to each Plaintiff in order to permit such Plaintiff to respond meaningfully to the reasons he has been placed on the No-Fly List." *Latif IV*, 2016 WL 1239925, at *16. To determine whether the government had complied with this requirement, the court required the government to submit for in camera review "(1) a summary of any material information (including material exculpatory or inculpatory information) that [it] withheld from the notice letters sent to each Plaintiff and (2) an explanation of the justification for withholding that information," *id.* at *20, and, after reviewing the government's submissions, it concluded that the government had "provided sufficient justifications for withholding additional information."

The plaintiffs challenge the district court's handling of the exculpatory evidence issue on the ground that the district

court permitted the government to withhold information based on a "undue risk to national security." We are not convinced, however, that the undue risk standard the district court applied, *see id*. at *13–16, differs from the *Al Haramain* framework we have adopted here. The district court, moreover, did not "permit[] the government to withhold information based on a unilateral and categorical assertion of 'undue risk to national security,'" as the plaintiffs contend. It required the government to explain and justify the information withheld, and it then independently verified the government's representations. We find no error in the district court's handling of this subject.

We agree, moreover, with the district court's considered judgment that the government was required to provide "sufficient material information, whether exculpatory or inculpatory, to each Plaintiff in order to permit such Plaintiff to respond meaningfully to the reasons he has been placed on the No-Fly List," *id*. at *16, subject to the *Al Haramain* framework governing the disclosure of classified evidence. Where the information is classified, the government may use unclassified summaries or disclose the information to cleared counsel. Where even those measures would compromise national security, the information may altogether be withheld.

### e. The Right to a Hearing

The plaintiffs argue due process requires a post-deprivation hearing as part of the DHS TRIP process and the opportunity to cross-examine government witnesses.[14] They contend due process mandates a hearing as a matter of course

---

[14] The plaintiffs do not challenge the government's failure to provide pre-deprivation notice of their inclusion on the No Fly List.

in the DHS TRIP context, given the centrality of credibility determinations and disputed facts to No Fly List determinations and because hearings are required where lesser liberty deprivations are at issue. *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) (termination of welfare benefits); *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 19–20 (1978) (cancellation of subsidized utility services); *Califano v. Yamasaki*, 442 U.S. 682, 696 (1979) (recovery of excess social security payments).

The plaintiffs argue, moreover, that the failure to afford them individual hearings was particularly harmful because their No Fly List determinations turned in large part on their own credibility, the credibility of witnesses, contested facts and hearsay evidence. They object to being denied removal from the No Fly List based on adverse credibility findings made on a written record. They contend that, had hearings taken place, each plaintiff would have presented testimony that he presents no threat to aviation security and refuted any adverse evidence the government disclosed.

The plaintiffs' request for a hearing focuses in part on the need to cross-examine adverse witnesses. In their response letters to DHS TRIP, the plaintiffs contested many of the allegations against them, creating fact disputes that, in their view, should have been tested at a live hearing. For example, one plaintiff's notification letter alleged he made several inculpatory statements to FBI agents while detained in Kenya and Ethiopia. This plaintiff apparently did not deny making these statements, but instead argued they were the result of coercion and unlawful interrogation. In his response to DHS TRIP, the plaintiff denied key allegations in the notification letter, including that he traveled to Somalia to "fight jihad" or "train for jihad," that he was trained to participate in "militant activities," and that he

joined a group of "foreign fighters" that he knew to include al-Qaeda members.  The plaintiffs argue that, because they were denied hearings, they had no opportunity to test the credibility of the witnesses against them or the accuracy of their accounts.  In the plaintiffs' view, the denial of a hearing and the opportunity to cross-examine adverse witnesses denied them due process.

The government points out that due process does not require a live hearing in every instance.  In the government's view, the unpredictable environment of a live, adversarial hearing makes it particularly inappropriate in the DHS TRIP context, given the risk of exposing protected national security information.

"In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg*, 397 U.S. at 269.  Due process does not always require a live hearing, however.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) ("The opportunity to present reasons, *either in person or in writing*, why proposed action should not be taken is a fundamental due process requirement." (emphasis added)).  Where the evidence at issue in a case is documentary and a live hearing would implicate national security interests, for example, a "written hearing" may satisfy due process.  *See, e.g.*, *Jifry*, 370 F.3d at 1183–84 (revocation of airmen certificates on security grounds); *Holy Land Found.*, 333 F.3d at 161–64 (specially designated global terrorist designation); *Nat'l Council of Resistance of Iran*, 251 F.3d at 209 (foreign terrorist organization designation).

There may be No Fly List cases in which due process would require some type of live hearing or some opportunity to cross-examine witnesses.  That determination will require

weighing the potential value of a hearing to the DHS TRIP complainant – considering the extent to which the No Fly List determination turned on credibility assessments and disputed facts – against the considerable burden on the government, considering the nature and extent of the threat to national security.  *See Al Haramain II*, 686 F.3d at 982–84.  A case-by-case approach is proper.  *See id*. at 984.

Having reviewed the government's classified materials, we conclude this is not a case in which due process required live hearings.  We recognize that the No Fly List determinations in this case turned in part on credibility assessments, contested facts and, in some cases, hearsay evidence.  On this record, however, we hold that the value of providing these plaintiffs a live hearing was outweighed by legitimate national security concerns.  Affording adversarial hearings with the opportunity to confront adverse witnesses would have risked inadvertently exposing protected information, such as the government's use of foreign sources, intelligence-gathering techniques and other confidential material.

In reaching our conclusion, we take into consideration the information that was disclosed to the plaintiffs in the notification letters.  We note, for example, that the unclassified summary provided to one of the plaintiffs was sufficiently specific that he was able to deny the key allegations in his response letter.  Likewise, the unclassified summaries provided to two other plaintiffs were sufficiently detailed as to afford them a meaningful opportunity to respond to the government's concerns in their written responses.  As to the final plaintiff, whose notification letter said only that the government had concerns about his travel to Yemen, we are persuaded after reviewing the classified materials that national security concerns would have made a

live hearing unduly burdensome.  We conclude, in sum, that the opportunity to provide written responses was sufficient to satisfy due process in this case and live hearings were not required.

### f.   CIPA Procedures

The plaintiffs argue the risks associated with an adversarial hearing would be mitigated by use of the procedures specified for handling classified information in criminal cases under the Classified Information Procedures Act (CIPA), 18 U.S.C. app. 3, §§ 1–16, which is designed "to harmonize a defendant's right to a fair trial with the government's right to protect classified information." *United States v. Sedaghaty*, 728 F.3d 855, 903 (9th Cir. 2013).  The plaintiffs seek the disclosure of classified material to counsel with appropriate security clearances, subject to protective orders.

The government correctly points out that, by statute, CIPA applies only in criminal cases.  *See, e.g.*, 18 U.S.C. app. 3, §§ 3, 5; *Sedaghaty*, 728 F.3d at 903.  Nevertheless, we have looked to CIPA for guidance on handling classified materials in civil cases.  *See Latif II*, 686 F.3d at 1130; *Al Haramain II*, 686 F.3d at 983.  Where CIPA-like procedures are appropriate, courts should not hesitate to employ them.[15]

We conclude, however, that due process did not require the use of CIPA-like procedures here.  First, as noted, "the record does not reflect whether any Plaintiff is represented by counsel with an appropriate security clearance." *Latif IV*,

---

[15] The utility of making classified disclosures to counsel with security clearances may be limited where counsel are prohibited from sharing that information with their clients, but "limited utility is very different from no utility."  *Al Haramain II*, 686 F.3d at 983 n.10.

2016 WL 1239925, at *18.  Second, as discussed, where the government undertook other "reasonable measures to ensure basic fairness," disclosures to cleared counsel were not required.  *See Al Haramain II*, 686 F.3d at 980.

* * *

In sum, weighing the plaintiffs' private interests, the government's interests, the risk of erroneous deprivation through the procedures provided, and the value of the additional safeguards proposed by the plaintiffs, we conclude the procedures provided to the plaintiffs were constitutionally sufficient in the case before us, or that any error was nonprejudicial.  *See Mathews*, 424 U.S. at 335. Given the national security concerns at issue, and with the exceptions noted, the government has taken reasonable measures to ensure basic fairness to the plaintiffs and followed procedures reasonably designed to protect against erroneous deprivation of the plaintiffs' liberty.  *See Al Haramain II*, 686 F.3d at 980.  Because there was no prejudicial denial of basic fairness, we do not decide whether, in a different case, less severe travel restrictions might be required as an alternative to a complete ban on air travel.  Nor do we address whether the procedures employed here would be adequate in a different case.

## C.  Jurisdiction

The district court dismissed the plaintiffs' substantive due process challenges to their inclusion on the No Fly List under 49 U.S.C. § 46110.  *See Latif VI*, 2017 WL 1434648, at *9.  Under § 46110(a), a person challenging "an order issued by" the TSA must seek judicial review in the court of appeals rather than the district court.

Before the 2015 revisions to the DHS TRIP procedures, we held that § 46110 does not bar district court review of a No Fly List order.  *See Arjmand v. U.S. Dep't of Homeland Sec.*, 745 F.3d 1300, 1301–03 (9th Cir. 2014); *Latif II*, 686 F.3d at 1127–29; *Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1255–56 (9th Cir. 2008).    Two considerations drove those holdings.  First, it was TSC, not TSA, that made the ultimate decision under the pre-2015 rules:

> TSA simply passes grievances along to TSC and informs travelers when TSC has made a final determination.    TSC – not TSA – actually reviews the classified intelligence information about travelers and decides whether to remove them from the List.  And it is TSC – not TSA – that established the policies governing that stage of the redress process.

*Latif II*, 686 F.3d at 1128.  Second, any judicial remedy would have required the involvement of "both TSA and TSC," given that TSC was "the sole entity with both the classified intelligence information Plaintiffs want and the authority to remove them from the List."  *Id*. at 1129.  We would have needed jurisdiction over TSC to effect relief, and § 46110 did not grant us that jurisdiction.  *See id*.

Under the current procedures, however, the TSA Administrator is solely responsible for issuing a final order maintaining a traveler on the No Fly List.  TSC submits a *recommendation*, along with supporting materials, to the TSA Administrator.  If the TSA Administrator requires additional information or clarification, he or she may remand the case to TSC.  But the TSA Administrator ultimately

issues the final order either removing the complainant from the No Fly List or maintaining him or her on the list.  The TSA Administrator also has full authority to order the complainant removed from the list.  It is no longer the case, therefore, that any remedy must involve TSC.  *Cf. id.*  Thus, we hold that § 46110 grants the courts of appeals, rather than the district courts, exclusive jurisdiction over the plaintiffs' substantive due process claims.[16]

We recognize that vesting original jurisdiction in the courts of appeals may present practical difficulties in some cases.  Judicial review of No Fly List orders may entail factfinding and case management responsibilities that district courts are best equipped to perform.  *See Ibrahim*, 538 F.3d at 1256 (noting a district court's "ability to take evidence").  But we are bound by the plain language of the statute.  Furthermore, as a practical matter, the landscape has changed since we decided *Ibrahim*.  The current DHS TRIP procedures generate an administrative record for a court to review, *cf. id.*, and that record includes the DHS TRIP notification letter's unclassified summary of the reasons for the complainant's inclusion on the No Fly List, the final TSA order setting forth the unclassified reasons for the decision to maintain the complainant on the list, the government's in camera filings, and any material the complainant chose to submit in the administrative proceedings.  There are, moreover, options available to an appellate court that finds the administrative record inadequate, including remanding

---

[16] The parties appear to agree that original jurisdiction over the plaintiffs' *procedural* due process claims lies in the district court. Those claims challenge the sufficiency of the revised DHS TRIP procedures administered by the TSC, not the substantive decision in the final TSA order.

the case to the agency for supplementation of the record or additional factfinding. *See* 49 U.S.C. § 46110(c).

In sum, the plaintiffs are free to assert their substantive challenges to their inclusion on the No Fly List by filing a petition for review in an appropriate court of appeals under § 46110. Although such claims must ordinarily be filed within 60 days after issuance of the order being challenged, a "court may allow the petition to be filed after the 60th day if there are reasonable grounds" for doing so. *Id.* § 46110(a). Here, the government acknowledges that the plaintiffs have reasonable grounds for delay. Thus, the plaintiffs are free to assert their substantive due process claims in an appropriate court of appeals without fear of having their claims rejected as untimely.

## IV. CONCLUSION

The district court properly granted the government's motion for summary judgment on the plaintiffs' vagueness and procedural due process claims and properly dismissed their substantive due process claims for lack of subject matter jurisdiction. The judgment of the district court is therefore affirmed.

**AFFIRMED.**